# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BUTTE COUNTY, CALIFORNIA, 25 County
Center Drive, Oroville, CA 95965,

      Plaintiff,

      v.

PHILIP N. HOGEN, in his official capacity as
CHAIRMAN OF THE NATIONAL INDIAN
GAMING COMMISSION, 1441 L Street,
N.W., Suite 9100, Washington, D.C. 20005,
and NORMAN H. DESROSIERS, in his
official capacity as COMMISSIONER OF
THE NATIONAL INDIAN GAMING
COMMISSION, 1441 L Street, Suite 9100,
Washington, D.C. 20005,

      Defendants.

                       

MECHOOPDA INDIAN TRIBE OF CHICO
RANCHERIA, CALIFORNIA, a federally
recognized Indian Tribe, c/o Dennis E.
Ramirez, Chairman, Tribal Offices, 125
Mission Ranch Boulevard, Chico, CA 95926,

      Intervenor.

Case No.: 1:08-cv-00519-HHK
Judge: Henry H. Kennedy, Jr.
Deck Type: Administrative Agency
              Review
Date Filed: 03/26/08

**NOTICE OF MOTION AND
MOTION OF MECHOOPDA
INDIAN TRIBE OF CHICO
RANCHERIA, CALIFORNIA TO
INTERVENE UNDER FEDERAL
RULE OF CIVIL PROCEDURE 24**

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES, THEIR COUNSEL OF RECORD, AND TO THE COURT:

PLEASE TAKE NOTICE that, pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, the Mechoopda Indian Tribe of Chico Rancheria, California, a federally-recognized Indian tribe (hereinafter "Tribe"), will respectfully move to permissively intervene in this action to defend against allegations that seek to derail an economic development project the Tribe plans to pursue.   The complaint was filed by the County of Butte against officials of the federal agency that approved the Tribe's amended gaming ordinance.[1]  Attached to this Notice of Motion and Motion are the Tribe's Statement of Points and Authorities, a Declaration by the Tribe's Chairperson, a Declaration by Nicholas C. Yost, a Proposed Order, and a Proposed Answer on behalf of the Tribe, as required by Fed. R. Civ. P. 24(c).  For the reasons set forth in the Tribe's Statement of Points and Authorities, and below, the Tribe respectfully requests that the Court grant its Motion to Intervene in this matter, as follows:

---

[1] In accordance with the Local Rules of the U.S. District Court for the District of Columbia 7(m), the undersigned discussed this Motion with counsel for the United States, Amy Tryon, via telephone, who stated that she does not oppose permissive intervention.  (Declaration of Nicholas C. Yost, ¶ 2).  The undersigned also contacted Plaintiff Butte County's legal counsel, Dennis J. Whittlesey, via telephone to request that the County would stipulate to the Tribe's request to intervene.  Mr. Whittlesey responded that the Plaintiff was unwilling to consent to the Motion to Intervene.  (Yost Decl., ¶ 3.)

1.      The Tribe is a federally-recognized Indian tribe, whose historic reservation is located in what is currently the City of Chico, and whose reservation was lost through unlawful termination by the United States.  Because the Tribe has no reservation or federally-protected lands, the Tribe has sought to establish a land base to reaffirm its self-sufficiency and to foster tribal economic development.  In pursuit of this goal, the Tribe acquired a 630-acre parcel in Butte County.  Soon thereafter, the Tribe submitted an application to the Secretary of the Interior to take this land into trust for the Tribe.  In 2003, the National Indian Gaming Commission ("NIGC") determined that this land would qualify as "restored land," as defined by Section 20(b)(1)(B)(iii) of the Indian Gaming Regulatory Act, if the land were taken into trust by the United States for the benefit of the Tribe.  On May 8, 2008, the Secretary of the Interior issued a Notice of Intent to accept the identified parcel into trust for the Tribe.  73 Fed. Reg. 26142 (May 8, 2008).

2.      On February 8, 2007, Defendant NIGC approved an ordinance enacted by the Tribe for the development of a gaming facility on this restored land.  This action challenges that approval.

3.      The Tribe seeks to permissively intervene in this action pursuant to Fed. R. Civ. P. 24(b) to defend the NIGC's determination to approve the Tribe's gaming ordinance.

4.      Under Rule 24(b)(1) of the Federal Rules of Civil Procedure, an applicant may be permitted, upon timely motion, to intervene when the applicant "has a claim or defense that shares with the main action a common question of law or fact."  When considering whether intervention is proper under Rule 24(b)(1), "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  The federal Defendants' answer is not due until May 27, 2008.

5.      The Tribe has a concrete and immediate stake in the outcome of this litigation, which involves a challenge to the NIGC's decision to approve a gaming ordinance at the request and benefit of the Tribe.  The Tribe has a compelling interest in defending the NIGC's action and in opposing any further delay in the realization of its plans for the development of its property, which is the key to achieving economic self-sufficiency and strengthening its government so as to provide for the health and welfare of its members.  The parcel in Butte County will become the Tribe's reservation, and, upon acquisition in trust, it will be the only land over which the Tribe will exercise geographic jurisdiction as a federally-recognized Indian tribe.

6.      The Tribe is the party both most familiar with the underlying facts of the case and most keenly interested in its speedy resolution.  Intervention will not delay adjudication of this matter or prejudice the parties in any way.  Accordingly, the requirements for permissive intervention under Rule 24(b)(1) are satisfied.

7.      By filing the Proposed Answer, as it is required to do under Fed. R. Civ. P. 24(c), the Tribe in no way intends to relinquish the opportunity to file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) in this case.

Dated: May 13, 2008

Respectfully submitted,

Mechoopda Indian Tribe of Chico Rancheria, California, Intervenor-Defendant,

By _____/s/ Nicholas C. Yost_____

Michael J. Anderson, DC Bar 417887
Anderson Tuell LLP
300 Independence Avenue, SE
Suite 200
Washington, D.C. 20003
Telephone: (202) 543-5000
Facsimile:  (202) 543-7716

Nicholas C. Yost, USDC-DC Bar No. 968289[2]
Paula M. Yost, CA Bar 156843
Katherine K. Moore, CA Bar 235958
Sonnenschein Nath & Rosenthal LLP
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

Christina Kazhe, CA Bar 192158
Kazhe Law Group P.C.
8359 Elk Grove Florin Road
Suite 103287
Sacramento, CA 95829
Telephone: (916) 226-2590
Facsimile:  (916) 880-5691

---

[2] Mr. Yost is admitted to practice before this Court (USDC-DC Bar No. 968289).  Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar No. 35297).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BUTTE COUNTY, CALIFORNIA, 25 County Center Drive, Oroville, CA 95965, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:  1:08-cv-00519-HHK |
| PHILIP N. HOGEN, in his official capacity as CHAIRMAN OF THE NATIONAL INDIAN GAMING COMMISSION, 1441 L Street, N.W., Suite 9100, Washington, D.C. 20005, and NORMAN H. DESROSIERS, in his official capacity as COMMISSIONER OF THE NATIONAL INDIAN GAMING COMMISSION, 1441 L Street, Suite 9100, Washington, D.C. 20005, | ) ) ) ) ) ) ) ) ) ) ) | Judge:  Henry H. Kennedy, Jr. Deck Type:  Administrative Agency Review Date Filed:  03/26/08 |
| Defendants. | ) ) ) | **STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA, CALIFORNIA TO INTERVENE UNDER FEDERAL RULE OF CIVIL PROCEDURE 24** |
| MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA, CALIFORNIA, a federally recognized Indian Tribe, c/o Dennis E. Ramirez, Chairman, Tribal Offices, 125 Mission Ranch Boulevard, Chico, CA 95926, | ) ) ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Intervenor. | ) ) ) ) ) ) ) ) ) ) ) | |

The Mechoopda Indian Tribe of Chico Rancheria, California (the "Tribe" or "Mechoopda") files this Statement of Points and Authorities in Support of its Motion to Intervene in the above-captioned case pursuant to Fed. R. Civ. P. 7(b) and 24(b), and pursuant to LCvR 7(a). The Tribe seeks to intervene in this action by permission pursuant to Fed. R. Civ. P. 24(b).[1]

## I.    INTRODUCTION

The Mechoopda Indian Tribe of Chico Rancheria, California is a federally recognized Indian tribe that has no reservation or federally protected lands, and whose aboriginal territory lies in what is now Butte County, California. Although the Tribe has maintained its identity from time immemorial, between 1967 and 1992 it was unlawfully denied both federal recognition and reservation lands on which to pursue self-determination and economic self-sufficiency. In 1992, the Tribe, the United States, and the City of Chico, California entered a stipulated judgment acknowledging that the Tribe had been unlawfully terminated and restoring the Tribe's federally recognized status. The parties to the stipulated judgment further provided for the acquisition of land outside the Tribe's former rancheria boundaries, because the Tribe's former trust lands are now located in the heart of the City of Chico.

Since 2001, the Tribe has sought to have a 630-acre site within its aboriginal territory taken into trust for its benefit by the United States for the purposes of establishing a seat of tribal government and pursuing economic development through Indian gaming. The land at issue sits in Butte County, which filed this lawsuit to challenge the Tribe's economic development plans. Specifically, the County seeks to further delay the Tribe's plans by seeking to reverse the

---

[1] The undersigned has contacted Amy Tryon, counsel for the United States, which defends this suit on behalf of the National Indian Gaming Commission officials, who states that the United States does not oppose permissive intervention, but does not consent to intervention as of right. *See* Declaration of Nicholas C. Yost, ¶ 2 (hereinafter "Yost Decl.").

approval by the National Indian Gaming Commission ("NIGC") of an amendment to a Tribal gaming ordinance. The Complaint's claims belie Plaintiff's real goal, which is to attack a determination by the NIGC that the proposed site, if taken into trust for the benefit of the Tribe, would qualify as "restored lands" under the Indian Gaming Regulatory Act (25 U.S.C. § 2701, et seq.) (hereinafter "IGRA"). *See* NIGC, Mechoopda Restored Lands Opinion, Mar. 14, 2003 (hereinafter "Restored Lands Op."), attached as Exhibit A to the Request for Judicial Notice In Support of Tribe's Motion to Intervene ("RFJN").

Having enacted the amended tribal ordinance whose approval Butte County challenges, the Tribe indisputably possesses an obvious, significant interest in this case. If Plaintiff is granted the injunctive and declaratory relief it seeks through the Complaint, then the Tribe's rights and livelihood will be substantially and perhaps irreparably harmed. Developing the property at issue would generate the revenue the Tribe needs to provide for the health and welfare of its members, for example, by supplying the funding it needs for education, housing, health care and other programs needed to improve tribal living conditions. For this reason, the Tribe promptly seeks permissive intervention in this litigation to protect its interests by defending the legality of the NIGC's approval of the Tribe's gaming ordinance amendments, by promoting the swift resolution of this lawsuit, by providing this Court with the interpretation of its history of restoration from its own unique perspective, and by vigorously opposing any further delay in the legal steps necessary for the Tribe to proceed with its long-delayed plans for self-sufficiency and self-determination. Permissive intervention is appropriate to enable the Tribe to protect those of its rights that are directly at stake here. The United States, which defends this suit on behalf of NIGC officials, does not oppose the Tribe's permissive intervention in this action. *See* Yost Decl., ¶ 2. Accordingly, the Tribe respectfully asks the Court to grant its motion to intervene as a defendant in this action.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The Mechoopda Indian Tribe of Chico Rancheria, California is a federally-recognized Indian tribe.  73 Fed. Reg. 18553 (Apr. 4, 2008) (RFJN, Ex. B).  Most of the Tribe's 474 members reside in and around the City of Chico, California.  Approximately 52 percent of the Tribe's labor force is unemployed, and approximately one-third of employed tribal members live below the poverty line.  Declaration of Mechoopda Tribal Chairman Dennis E. Ramirez, ¶ 5 (hereinafter "Ramirez Decl.").

The Mechoopda Tribe has lived in and around what is now known as Butte County from time immemorial.  In the years immediately before and after California statehood in 1852, the lands of California's Indians began to be taken up by non-Indian settlers.  Restored Lands Op., p. 10.  To protect the Mechoopda and to preserve at least some of their lands, in 1851, the United States executed a treaty promising about 227 square miles of land to the Tribe.  *Id.*  This treaty was never ratified, however.  *Id.*  As a result, at least some of the Mechoopda Tribe's homelands were incorporated into a land grant to an early California settler named John Bidwell.  *See* Restored Lands Opinion, p. 6.  The loss of tribal lands meant the loss of traditional economic means of subsistence.  Restored Lands Op., pp. 9-10.  Though tribal members continued to reside on what were for them still tribal lands, they became wage-laborers on the Bidwell ranch.  *Id.*  The Mechoopda Tribe continued to reside in and around the Bidwell ranch into the twentieth century, and, in 1939, the United States took approximately 26 acres of land on the Bidwell ranch into trust for the benefit of the Tribe, trust land which became known as the Chico Rancheria.  *See* Restored Lands Op., p. 6.

In 1958, Congress enacted legislation to terminate the federal status of forty-one named California Indian tribes and their lands, including the Chico Rancheria.  *See* 72 Stat. 619, *as*

*amended*, 78 Stat. 390 (hereafter the "Rancheria Act") (RFJN, Ex. C). In 1967, the United States

terminated the trust status of the Tribe and its lands, purportedly pursuant to the Rancheria Act.

32 Fed. Reg. 7981 (Jun. 2, 1967) (RFJN, Ex. D). The lands of the Tribe's rancheria were

distributed to Tribal members and soon lost to land sales and to tax liens. *See* Restored Lands

Op., p. 8. In 1986, the Mechoopda Tribe joined other tribes to bring suit challenging the legality

of their purported termination under the Rancheria Act. *See* Restored Lands Op., p. 7. In 1992,

the case settled by stipulated judgment between the Tribe, the United States, and the City of

Chico, in which the Tribe's former rancheria was located. *See* Restored Lands Op., p. 7. *See*

*also* Stipulation for Entry of Judgment, *Scotts Valley Band of Pomo Indians, et al. v. United*

*States* (Case No. C-86-3660-VRW) (N.D. Cal. Filed 1986) (RFJN, Ex. E) (hereinafter the

"Stipulated Judgment"). As part of the settlement, the United States agreed the Tribe had not

been lawfully terminated, and reinstated the Tribe's federally recognized status. *Id*. *See also* 57

Fed. Reg. 19133 (May 4, 1992) (RFJN, Ex. F). However the Stipulated Judgment did not restore

the trust status of the Tribe's former rancheria lands, because those lands had in the meantime

become part of the center of the City of Chico. *See* Restored Lands Op., p. 8. Instead, the

parties to the Stipulated Judgment anticipated the United States would acquire trust and/or

reservation lands outside the boundaries of the Tribe's former rancheria. Restored Lands Op., p.

11.

Since its restoration, the Tribe has steadfastly sought land to have placed into trust for its

benefit for the purpose of establishing a seat of tribal government and pursuing tribal self-

determination and economic self-sufficiency. Ramirez Decl., ¶ 6. To that end, it acquired an

interest in an approximately 630-acre site in Butte County, California (the "Site") in 2001, about

10 miles from the Tribe's former Rancheria. Restored Lands Op., p. 9. The Site lies within the

Tribe's aboriginal territory and also falls within the area to have been set aside for the Tribe by the unratified 1851 treaty.  Restored Lands Op., p. 10.

In 2001, the Tribe submitted a fee-to-trust application to the Department of Interior seeking to have the Site taken into trust for its benefit.  Restored Lands Op., p. 1.  The Tribe proposed to operate a gaming facility on the Site (the "Proposed Project"), and consequently submitted a management contract to the NIGC for approval pursuant to IGRA.  At approximately the same time the Tribe adopted a tribal ordinance for the regulation of Class II and Class III gaming on Indian lands within the Tribe's jurisdiction.  *See* Mechoopda Tribal Ordinance No. 01-53 (Oct. 10, 2001) (hereafter the "Gaming Ordinance") (RFJN, Ex. G).  Then as now, the Tribe had no Indian lands within its jurisdiction. The Gaming Ordinance was submitted to the NIGC for approval pursuant to IGRA, and was approved. *See* http://www.nigc.gov/Portals/0/NIGC%20Uploads/readingroom/gamingordinances/mechoopdain diantribe/mechoopdaord120301.pdf.

In considering the Tribe's land-into-trust application, the Department of Interior, Office of the Solicitor, requested that the NIGC assume primary responsibility for an opinion as to whether the Site, if taken into trust for the Tribe's benefit, would meet one of the statutory exceptions to IGRA's ban on gaming on Indian lands acquired after October 17, 1988.  Restored Lands Op., p. 1.  On March 26, 2002, the Tribe submitted documentation to support its contention that the Site met the "restored lands" exception of IGRA.  *Id*.  *See also* 25 U.S.C. § 2719(b).  After reviewing the materials submitted by the Tribe, which included both legal and ethnohistorical analyses, the NIGC, with the concurrence of the Department of Interior, Office of the Solicitor, determined that the Site would constitute "restored lands" for purposes of IGRA if taken into trust for the benefit of the Tribe.  *See* Restored Lands Op., p. 12.  The NIGC and the Department of Interior, Office of the Solicitor have issued joint restored lands opinions on the

basis of a joint Memorandum of Agreement.  *See* Memorandum of Agreement between the National Indian Gaming Commission and the Department of Interior, May 2006 (RFJN, Ex. H).

The Tribe's request to take the Site into trust for its benefit and its request for approval of a gaming management contract required the BIA and the NIGC, respectively, to undertake an assessment of the environmental impact of each proposed action pursuant to the National Environmental Protection Act (42 U.S.C. §§ 4321-4345) (hereafter "NEPA").  Between 2002 and 2006, the BIA and the NIGC consulted with the Tribe to prepare an environmental assessment ("EA") of the proposed trust acquisition of the Site and the Proposed Project.  The Tribe submitted a final EA to the BIA in August 2006.  On December 13, 2006, the BIA Pacific Regional Office recommended to the Central Office that the Assistant Secretary – Indian Affairs issue a finding of no significant impact ("FONSI") for the proposed trust acquisition of the Site. *See* Letter, BIA Regional Director, Pacific Regional Office, to Assistant Secretary-Indian Affairs, Dec. 13, 2006 (RFJN, Ex. I).

While awaiting a final determination with respect to the EA, the Tribe adopted a resolution amending its Gaming Ordinance to add provisions permitting enforcement by the NIGC of any mitigation requirements contained in a FONSI approved by the Department of Interior.  *See* Mechoopda Tribal Ordinance No. 06-62 (Dec. 20, 2006) (hereafter the "Amendments") (RFJN, Ex. J).  The Tribe submitted the Amendments to the NIGC for approval pursuant to IGRA, and after comments and review the NIGC approved the Amendments.  *See http://www.nigc.gov/Portals/0/NIGC%20Uploads/readingroom/ gamingordinances/mechoopdaindiantribe/amend020807.pdf.*

The NIGC issued a FONSI for the Proposed Project on October 25, 2007, and on January 4, 2008, the BIA did the same for the proposed trust acquisition of the Site.  *See* NIGC, "Finding

of No Significant Impact and Notice, Proposed Mechoopda Casino Project, Butte County, California," Oct. 25, 2007 (RFJN, Ex. K); BIA, "Finding of No Significant Impact for the Proposed Mechoopda Indian Tribe Chico Casino Fee-to-Trust Acquisition," Jan. 4, 2008 (RFJN, Ex. L).  On March 26, 2008, Plaintiff filed this suit challenging the NIGC's approval of the Amendments.  On May 8, 2008, the BIA published a notice of intent to take the Site into trust for the benefit of the Tribe.  *See* 73 Fed. Reg. 26142 (May 8, 2008) (RFJN, Ex. M).

The Tribe now moves the Court for an order allowing it to intervene by permission under Fed. R. Civ. P. 24(b).  As set forth below, the Tribe's participation in this suit is essential to the Tribe's ability to protect the vital interests of itself and its members.  While the Tribe expects that the United States will vigorously defend against Plaintiff's claims, the Tribe possesses immediate and compelling needs that are different in nature and priority than the interests of the United States.  The Tribe also possesses a significant interest in avoiding further delay in its long-overdue restoration of a tribal land-base, without which the Tribe cannot achieve full self-determination, self-sufficiency or economic development, all expressed Congressional goals, and ends anticipated by the Stipulated Judgment restoring Mechoopda to federal recognition.  Moreover, to the extent that Plaintiff's complaint seeks to use the NIGC's approval of the Amendments as a feint for its true goal of attacking the history and recognized status of the Tribe, Mechoopda alone is uniquely qualified to address issues concerning its history and existence as a tribal community.  For these reasons, the Tribe respectfully asks this Court to allow it to intervene by permission.  The Tribe also requests oral argument on this matter.

**III.    THE COURT SHOULD ALLOW THE TRIBE TO INTERVENE TO PROTECT ITS INTERESTS, AS THE TEST FOR PERMISSIVE INTERVENTION IS MET.**

Federal Rule of Civil Procedure 24(b)(1) provides that, "on timely motion, the court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact."  Rule 24(b)(3) states that, in "exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  In this Circuit, "permissive intervention is an inherently discretionary enterprise, [and] the court enjoys considerable discretion under Rule 24(b)."  *Envtl. Def. v. Leavitt*, 329 F.Supp.2d 55, 66 (D.D.C. 2004) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998)).  This Circuit has adopted a flexible reading of Rule 26(b).  *See Nat'l Children's Ctr.*, 146 F.3d at 1045.  Indeed, Indian tribes have been permitted to intervene in this Circuit and elsewhere in similar cases.  *See*, *e.g.*, *Michigan Gambling Opposition v. Kempthorne*, No. 07-5092, slip op. at 6 (D.C. Cir. Apr. 29, 2008); *City of Roseville v. Norton*, 348 F.3d 1020, 1023 (D.C. Cir. 2003); *see also El Dorado County v. Norton*,  No. 02-1818, slip. op. at 2 (E.D. Cal. Jan. 10, 2005).

### A.    The Tribe's Motion to Intervene is Timely.

In this Circuit, "[e]valuation of the timeliness of a motion to intervene lies within the sound discretion of the District Court."  *Acree v. Republic of Iraq*, 370 F.3d 41, 49 (D.C. Cir. 2004), citing *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003).  This Circuit reviews timeliness in light of "all the circumstances of the case…including the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the possibility of prejudice to existing parties."  *Id*. (Internal citations omitted.)

The County filed this action on March 26, 2008.  Therefore, the United States' responsive pleading is due on May 27, 2008.  Fed. R. Civ. P. 12(a)(2).  The Tribe enacted the Ordinance the County challenges, approval of which is the subject of this litigation, and the Court's grant of the

County's requested relief will directly and adversely impact the Tribe.  It is, after all, the Tribe's future that is the subject of this litigation.  The Tribe's intervention will not unduly delay the proceedings or prejudice the parties, as the Tribe seeks to intervene at the outset of this litigation and raises no additional claims.  Therefore, this motion to intervene is timely.

**B.      The Tribe's Defense and the Main Action Share Common Questions of Law and Fact.**

To intervene, the Tribe's claims or defenses must share questions of law or fact in common with the main action.  *See*, *e.g*., *Huron Environmental Activist League v. United States Environmental Protection Agency*, 917 F. Supp. 34, 43 (D.D.C. 1996) (allowing intervention where "[t]he movants' defenses to the plaintiffs' claims have both questions of law and fact in common with the main action, i.e., whether the defendant's meetings with the movants violated the FACA.")  The Tribe's defense of this action arises directly from the plaintiff County's claims in this case.  As the beneficiary of the NIGC's challenged decision to approve the Ordinance, the Tribe possesses a substantial interest in defending that decision and in receiving a full and expeditious ruling in this matter.  Proper defense of the County's allegations requires not only a familiarity with the facts, but also an intimacy with the process that only the Tribe can meaningfully and fully represent.  *Cf. Mass. Sch. Law at Andover, Inc. v. U.S*., 118 F.3d 776, 782 (D.C. Cir. 1997) (stating that increased information may reduce the risk of error).

The Tribe does not seek to add any additional claims.  Rather, the Tribe seeks to simply defend against the Complaint's allegations.

C.    **The Tribe's Intervention Will Not Unduly Delay or Prejudice the Adjudication of the Existing Parties' Rights.**

The Tribe's intervention will not unduly delay the proceedings or prejudice the parties, because it seeks to intervene at the outset of the litigation.  The case is not yet even at issue, as the United States' response is not due until late May.  The Tribe seeks to raise no additional claims, but, rather, merely seeks to assist the Court in disposing of the County's claims.  As the entity that enacted the Ordinance at issue here, the Tribe is intimately involved and familiar with the relevant facts.  Further, the federal government's approval of the Ordinance directly affects the viability of the Tribe's proposed economic development project.  Due to the economic benefits that will flow to the Tribe from the Project, it embodies the Tribe's hopes for a better future for its members.  The Tribe, therefore, has a keen interest in the full and expeditious ruling in this matter, and its unique position offers the advantage of "increased information (which might reduce the risk of error)."  *Mass. Sch. Law at Andover, Inc. v. U.S.*, 118 F.3d 776, 782 (D.C. Cir. 1997).  Thus, the Tribe's intervention will not unduly delay or prejudice the rights of the original parties, but will facilitate the meaningful disposition of this action.

D.    **The U.S. Supreme Court Favors Intervention By Indian Tribes Seeking To Protect Their Welfare.**

The United States Supreme Court has explicitly held that permissive intervention should be encouraged where, as here, an Indian tribe seeks to participate in litigation critical to its welfare.  In *Arizona v. California*, 460 U.S. 605 (1983), a number of Indian tribes sought to intervene in an action between various states and the federal government to determine water rights to the Colorado River.  The tribes did not seek to bring new claims or issues against the states, "but only ask[ed] leave to participate in an adjudication of their vital water rights that was commenced by the United States."  *Id.* at 614.  Thus, the Court's "judicial power over the controversy [was] not enlarged by granting leave to amend."  *Id.*  The states opposed the tribes'

- 11 -

intervention on the theory that the United States' presence in the action ensured adequate representation of tribe interests. *Id*. In granting the tribes' motions to intervene, the Court explained that "it is *obvious* that the Indian Tribes, *at a minimum, satisfy the standards for permissive intervention*," because "[t]he Tribes' interests … have been and will continue to be determined in this litigation." *Id*. at 614-15. (Emphasis added.) The Supreme Court emphasized that "the United States' action as [the Tribes'] representative will bind the Tribes to any judgment." *Id*. The Court also emphasized that "the Indians are entitled 'to take their place as independent qualified members of the modern body politic.'" *Id*. at 615. Thus, "the Indians' participation in litigation critical to their welfare *should not be discouraged*." *Id*. (Emphasis added.)

So too here. This case will determine the Tribe's ability to pursue gaming on the historically significant site it has identified as restored land. As in *Arizona v. California*, the Tribe's interests will be adjudicated, and the Tribe will be bound to any judgment. The Tribe is a party to the Ordinance that required NIGC approval and stands to gain if the Project is allowed to proceed. If the County prevails in this action, the Tribe's proposed economic development will be in jeopardy. In sum, the Tribe possesses a direct and substantial stake in the matter to be decided here, and should be allowed to intervene to protect that stake.

The Tribe has interests other than economic interests that will be adversely affected by a decision granting the County's requested relief. The Tribe has interests in self-sufficiency, self-government as a sovereign, and in educating tribal members, all of which economic development enables. *See* EA, p. 1-4 ("Approval of a management contract will…provid[e] a new revenue source the Tribe could utilize to…fund a variety of social, governmental, administrative, education and health and welfare services.") If the County's requested relief is granted, the

- 12 -

Tribe would be prevented from developing a project that would enable it to become self-sufficient and to strengthen its government.  As such, if the County obtains the relief requested in this action, the Tribe's rights and interests will be directly and adversely impacted.

**2.     CONCLUSION**

The Tribe qualifies for permissive intervention under Federal Rule of Civil Procedure 24(b)(1).  As the Supreme Court has emphasized, the Tribe's participation in litigation critical to its welfare should not be discouraged.  The Tribe, therefore, respectfully asks the Court to grant its motion to intervene.

Dated:  May 13, 2008

Respectfully submitted,

Mechoopda Indian Tribe of Chico Rancheria, California, Intervenor-Defendant,

By ____/s/ Nicholas C. Yost_____

Michael J. Anderson, DC Bar 417887
Anderson Tuell LLP
300 Independence Avenue, SE
Suite 200
Washington, D.C. 20003
Telephone: (202) 543-5000
Facsimile:  (202) 543-7716

Nicholas C. Yost, USDC-DC Bar No. 968289[2]
Paula M. Yost, CA Bar 156843
Katherine K. Moore, CA Bar 235958
Sonnenschein Nath & Rosenthal LLP
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

Christina Kazhe, CA Bar 192158
Kazhe Law Group P.C.
8359 Elk Grove Florin Road
Suite 103287
Sacramento, CA 95829
Telephone:  (916) 226-2590
Facsimile:   (916) 880-5691

---

[2] Mr. Yost is admitted to practice before this Court (USDC-DC Bar No. 968289).  Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar No. 35297).

# CERTIFICATE OF SERVICE

I certify that on May 13, 2008, I filed the above document via the Clerk of the

Court's Generic Email Box, which will send notice of electronic filing to the following:

Dennis Jeffrey Whittlesey
DICKINSON WRIGHT, P.L.L.C.
1901 L Street, NW
Suite 800
Washington, DC  20036
Tele:  (202) 659-6928
Fax:  (202) 659-1559
dwhittlesey@dicksinsonwright.com

Amy S. Tyron
U.S. DEPARTMENT OF JUSTICE
P.O. Box 44378
Washington, DC  20026-4378
Tele:  (202) 353-8596
amy.tryon@usdoj.gov


_____/s/ Kimberly J. Soto_____
Kimberly J. Soto

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BUTTE COUNTY, CALIFORNIA, 25 County            )
Center Drive, Oroville, CA 95965,              )
                                               )
      Plaintiff,                         )
                                               )
      v.                                 )
                                               )
PHILIP N. HOGEN, in his official capacity as   )   Case No.: 1:08-cv-00519-HHK
CHAIRMAN OF THE NATIONAL INDIAN               )   Judge: Henry H. Kennedy, Jr.
GAMING COMMISSION, 1441 L Street,             )   Deck Type:  Administrative Agency
N.W., Suite 9100, Washington, D.C. 20005,      )                Review
and NORMAN H. DESROSIERS, in his               )   Date Filed: 03/26/08
official capacity as COMMISSIONER OF          )
THE NATIONAL INDIAN GAMING                    )
COMMISSION, 1441 L Street, Suite 9100,        )
Washington, D.C. 20005,                        )
                                               )
      Defendants.                        )   **DECLARATION OF DENNIS E.**
                                               )   **RAMIREZ IN SUPPORT OF**
_____        )   **MOTION OF THE MECHOOPDA**
                                               )   **INDIAN TRIBE OF CHICO**
MECHOOPDA INDIAN TRIBE OF CHICO               )   **RANCHERIA, CALIFORNIA TO**
RANCHERIA, CALIFORNIA, a federally-            )   **INTERVENE**
recognized Indian Tribe, c/o Dennis E.         )
Ramirez, Chairman, Tribal Offices, 125         )
Mission Ranch Boulevard, Chico, CA 95926,      )
                                               )
      Intervenor.                        )
                                               )
                                               )
                                               )
                                               )
                                               )
                                               )
                                               )
                                               )
                                               )

In accordance with 28 U.S.C. § 1746, I, Dennis E. Ramirez, do declare and say:

1.    I am the Chair of the Mechoopda Indian Tribe of Chico Rancheria, California ("Tribe"), a federally recognized Indian tribe, and have held the position of Chair since I was first elected in 2006. I make this declaration in support of the Tribe's Motion to Intervene in the lawsuit brought by Butte County challenging the approval by the National Indian Gaming Commission ("NIGC") of an amendment to a gaming ordinance the Tribe enacted for the development of a gaming facility on lands the Tribe has asked the federal government to restore under the Indian Gaming Regulatory Act ("Amended Ordinance").

2.    Our Tribe's historic Rancheria was located within the present-day boundaries of the City of Chico. The Rancheria Act of 1958, an Act of Congress which authorized the termination of federal trust responsibilities to a number of California Indian tribes, including the Mechoopda Tribe, purported to terminate the sovereign status of the Chico Rancheria.

3.    The Mechoopda Tribe was finally able to regain federal recognition in 1992, when the Tribe consented to a stipulated judgment with the United States and the City of Chico. The Stipulation expressly provides for the restoration of the Tribe's land base through the acquisition of real property to be held in trust by the United States for the benefit of the Tribe. Unfortunately, by 1992, the former Chico Rancheria was unavailable, as it had been developed by the California State University at Chico and with a mixture of commercial and residential uses. Given the difficulties the Tribe would face in attempting to regain this land, the stipulated judgment provides that the Tribe will re-establish its land base on property outside the former Rancheria.

4.    We now have 474 Tribal members, of whom 280 are adults and 194 are minors. The majority of our members still live within the City of Chico and surrounding areas.

- 2 -

5.      Our Tribe is largely living in poverty. Over fifty percent of our Tribe's adult membership is unemployed. Significantly, one-third of our members who are employed live below the poverty level, and an estimated forty percent of tribal members reside in substandard housing. Moreover, approximately forty-four percent of the Tribe's elders are subsisting on government disability payments.

6.      After our Tribe's sovereign status was restored, we worked hard to identify suitable lands within our traditional homeland area, which includes Butte County, for the United States to take into trust for the Tribe as a new land base. We were able to identify and purchase approximately 630 acres in Butte County that is uniquely appropriate for commercial development and suitable for construction of a Class III gaming facility. The parcel is approximately 10 miles from the Tribe's former Rancheria.

7.      In 2001, we submitted to the United States Department of the Interior an application to take the parcel into trust. We supported the application by submitting an environmental assessment in compliance with the National Environmental Policy Act ("NEPA") and prepared under the supervision of the NIGC.

8.      The Tribe fully participated in the NEPA process, and also participated in the NIGC process which led to the Indian Lands determination that the parcel would qualify as "restored lands" under the Indian Gaming and Regulatory Act, 25 U.S.C. § 2719, if the parcel were taken into trust by the United States for the benefit of the Tribe.

9.      On February 8, 2007, the NIGC approved the Amended Ordinance pursuant to Section 13(b) of the Indian Gaming Regulatory Act.

10.    Not only does the Tribe have an interest in the Amended Ordinance, but our members have a concrete and immediate stake in the outcome of this litigation.  Members of the Tribe will be trained and employed during the construction phase of the planned gaming facility, and members who wish to work in the casino or related businesses on the land will also have opportunities for training and employment.

11.    Once operational, our casino will create an immediate revenue flow to support tribal government operations, education programs, housing programs, and health care, in addition to a source of employment and training.

12.    The members of our Tribe look forward to the development of a Tribal land base as a source of employment and as a way for us to become self-sufficient, as other tribes who have viable economic operations have become.  On the other hand, if we are further delayed in the realization of our objectives, the Tribe and its members will remain in the desperate conditions in which we now live.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this declaration on May 13, 2008.

Dennis E. Ramirez, Chairperson
Mechoopda Indian Tribe of Chico Rancheria, California

- 4 -

## CERTIFICATE OF SERVICE

I certify that on May 13, 2008, I filed the above document via the Clerk of the

Court's Generic Email Box, which will send notice of electronic filing to the following:

Dennis Jeffrey Whittlesey
DICKINSON WRIGHT, P.L.L.C.
1901 L Street, NW
Suite 800
Washington, DC  20036
Tele:  (202) 659-6928
Fax:   (202) 659-1559
dwhittlesey@dicksinsonwright.com

Amy S. Tyron
U.S. DEPARTMENT OF JUSTICE
P.O. Box 44378
Washington, DC  20026-4378
Tele:  (202) 353-8596
amy.tryon@usdoj.gov


            /s/ Kimberly J. Soto
            Kimberly J. Soto

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BUTTE COUNTY, CALIFORNIA, 25 County
Center Drive, Oroville, CA 95965,

      Plaintiff,

      v.

PHILIP N. HOGEN, in his official capacity as
CHAIRMAN OF THE NATIONAL INDIAN
GAMING COMMISSION, 1441 L Street,
N.W., Suite 9100, Washington, D.C. 20005,
and NORMAN H. DESROSIERS, in his
official capacity as COMMISSIONER OF
THE NATIONAL INDIAN GAMING
COMMISSION, 1441 L Street, Suite 9100,
Washington, D.C. 20005,

      Defendants.

MECHOOPDA INDIAN TRIBE OF CHICO
RANCHERIA, CALIFORNIA, a federally
recognized Indian Tribe, c/o Dennis E.
Ramirez, Chairman, Tribal Offices, 125
Mission Ranch Boulevard, Chico, CA 95926,

      Intervenor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:08-cv-00519-HHK
Judge: Henry H. Kennedy, Jr.
Deck Type: Administrative Agency
          Review
Date Filed: 03/26/08

**DECLARATION OF NICHOLAS C.
YOST IN SUPPORT OF
MECHOOPDA INDIAN TRIBE OF
CHICO RANCHERIA,
CALIFORNIA TO INTERVENE
UNDER FEDERAL RULE OF CIVIL
PROCEDURE 24**

I, Nicholas C. Yost, declare and state as follows:

1.      I am a partner in the law firm of Sonnenschein Nath & Rosenthal LLP, counsel of record for the Mechoopda Indian Tribe of Chico Rancheria, California (the "Tribe") in connection with this lawsuit.  I make this declaration in support of the Tribe's Motion to Intervene in this action, which the County of Butte filed against officials of the National Indian Gaming Commission.  I have personal knowledge of the matters set forth herein, and, if called as a witness, could and would testify competently thereto.

2.      In exchanges with Amy Tryon, U.S. Justice Department, most recently by telephone on April 30, 2008, Ms. Tryon stated to me that the United States would not oppose a motion by the Tribe to permissively intervene.

3.      In exchanges with Dennis J. Whittlesey, counsel for Butte County, most recently by electronic mail on May 5, 2008, Mr. Whittlesey communicated to me that the County of Butte would not consent to the Tribe's request to permissively intervene.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Executed this 13th day of May, 2008, at San Francisco, California.

_____
                Nicholas C. Yost

**CERTIFICATE OF SERVICE**

I certify that on May 13, 2008, I filed the above document via the Clerk of the

Court's Generic Email Box, which will send notice of electronic filing to the following:

Dennis Jeffrey Whittlesey
DICKINSON WRIGHT, P.L.L.C.
1901 L Street, NW
Suite 800
Washington, DC  20036
Tele:  (202) 659-6928
Fax:   (202) 659-1559
dwhittlesey@dicksinsonwright.com

Amy S. Tyron
U.S. DEPARTMENT OF JUSTICE
P.O. Box 44378
Washington, DC  20026-4378
Tele:  (202) 353-8596
amy.tryon@usdoj.gov

_____/s/ Kimberly J. Soto_____
Kimberly J. Soto

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BUTTE COUNTY, CALIFORNIA, 25 County    )
Center Drive, Oroville, CA 95965,    )
     )
      Plaintiff,    )
     )
      v.    )
     )
PHILIP N. HOGEN, in his official capacity as    )
CHAIRMAN OF THE NATIONAL INDIAN    )
GAMING COMMISSION, 1441 L Street,    )
N.W., Suite 9100, Washington, D.C. 20005,    )   Case No.:  1:08-cv-00519-HHK
and NORMAN H. DESROSIERS, in his    )   Judge:  Henry H. Kennedy, Jr.
official capacity as COMMISSIONER OF    )   Deck Type:  Administrative Agency
THE NATIONAL INDIAN GAMING    )               Review
COMMISSION, 1441 L Street, Suite 9100,    )   Date Filed:  03/26/08
Washington, D.C. 20005,    )
     )
      Defendants.    )   **REQUEST FOR JUDICIAL**
_____    )   **NOTICE IN SUPPORT OF MOTION**
     )   **TO INTERVENE**
MECHOOPDA INDIAN TRIBE OF CHICO    )
RANCHERIA, CALIFORNIA, a federally    )
recognized Indian Tribe, c/o Dennis E.    )
Ramirez, Chairman, Tribal Offices, 125    )
Mission Ranch Boulevard, Chico, CA 95926,    )
     )
      Intervenor.    )
     )
     )
     )
     )
     )
     )
     )
     )
     )
_____

The Federal Rules of Evidence permit this Court to take notice of facts "not subject to reasonable dispute" in that they are either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201.

Pursuant to Rule 201 of the Federal Rules of Evidence, Intervenor Mechoopda Indian Tribe of Chico Rancheria, California ("Tribe") requests judicial notice of the following documents in support of its Motion to Intervene:

A.      A true and correct copy of the National Indian Gaming Commission Mechoopda Restored Lands Opinion, dated March 14, 2003, referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit A.

B.      A true and correct copy of 73 Federal Register 18553 (April 4, 2008), referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit B.

C.      A true and correct copy of the Rancheria Act, 72 Stat. 619, *as amended*, 78 Stat. 390, referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit C.

D.      A true and correct copy of 32 Federal Register 7981 (June 2, 1967), referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit D.

E.      A true and correct copy of the Stipulation for Entry of Judgment, *Scotts Valley Band of Pomo Indians, et al. v. United States* (Case No. C-86-3660-VRW) (N.D. Cal. Filed 1986), referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit E.

F.      A true and correct copy of 57 Federal Register 19133 (May 4, 1992), referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit F.

G.      A true and correct copy of Mechoopda Tribal Ordinance No. 01-53 (October 10, 2001), referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit G.

H.      A true and correct copy of the Memorandum of Agreement between the National Indian Gaming Commission and the Department of Interior, dated May, 2006, referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit H.

I.      A true and correct copy of the Letter from Bureau of Indian Affairs Regional Director, Pacific Regional Office, to Assistant Secretary-Indian Affairs, dated December 13, 2006, referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit I.

J.      A true and correct copy of Mechoopda Tribal Ordinance No. 06-62 (December 20, 2006), referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit J.

K.      A true and correct copy of the National Indian Gaming Commission "Finding of No Significant Impact and Notice, Proposed Mechoopda Casino Project, Butte County, California," dated October 25, 2007, referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit K.

L.      A true and correct copy of the Bureau of Indian Affairs "Finding of No Significant Impact for the Proposed Mechoopda Indian Tribe Chico Casino Fee-to-Trust Acquisition," dated January 4, 2008, referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit L.

M.      A true and correct copy of 73 Federal Register 26142 (May 8, 2008), referenced in the Statement of Points and Authorities in Support of the Tribe's Motion to Intervene and attached hereto as Exhibit M.

The Tribe respectfully request that the Court take judicial notice of the contents of the documents listed above, all of which are official documents, public documents, or documents otherwise capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Dated: May 13, 2008

Respectfully submitted,

Mechoopda Indian Tribe of Chico Rancheria, California, Intervenor-Defendant,

By _____/s/Nicholas C. Yost_____

|                                        |                                               |
| -------------------------------------- | --------------------------------------------- |
| Michael J. Anderson, DC Bar 417887     | Nicholas C. Yost, USDC-DC Bar 968289[1]       |
| Anderson Tuell LLP                     | Paula M. Yost, CA Bar 156843                  |
| 300 Independence Avenue, SE            | Katherine K. Moore, CA Bar 235958             |
| Suite 200                              | Sonnenschein Nath & Rosenthal LLP             |
| Washington, D.C. 20003                 | 525 Market Street                             |
| Telephone: (202) 543-5000              | 26th Floor                                    |
| Facsimile: (202) 543-7716              | San Francisco, CA 94105-2708                  |
|                                        | Telephone: (415) 882-5000                     |
|                                        | Facsimile: (415) 882-0300                     |

Christina Kazhe, CA Bar 192158
Kazhe Law Group P.C.
8359 Elk Grove Florin Road
Suite 103287
Sacramento, CA 95829
Telephone: (916) 226-2590
Facsimile:  (916) 880-5691

---

[1] Mr. Yost is admitted to practice before this Court (USDC-DC Bar No. 968289).  Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar No. 35297).

## CERTIFICATE OF SERVICE

I certify that on May 13, 2008, I filed the above document via the Clerk of the

Court's Generic Email Box, which will send notice of electronic filing to the following:

Dennis Jeffrey Whittlesey
DICKINSON WRIGHT, P.L.L.C.
1901 L Street, NW
Suite 800
Washington, DC  20036
Tele:  (202) 659-6928
Fax:   (202) 659-1559
dwhittlesey@dicksinsonwright.com

Amy S. Tyron
U.S. DEPARTMENT OF JUSTICE
P.O. Box 44378
Washington, DC  20026-4378
Tele:  (202) 353-8596
amy.tryon@usdoj.gov

      /s/ Kimberly J. Soto
      Kimberly J. Soto

# EXHIBIT A



MEMORANDUM

To:     Chairman
From:  Acting General Counsel

Subject: Whether gaming may take place on lands taken into trust after October 17, 1988, by the Mechoopda Indian Tribe of the Chico Rancheria

Date: March 14, 2003

The Mechoopda Indian Tribe of the Chico Rancheria (Tribe or Mechoopda) has a management contract pending before the National Indian Gaming Commission (NIGC). The Tribe also has a fee-to-trust application pending before the Department of Interior, Bureau of Indian Affairs (BIA) for land acquired by the Tribe after October 17, 1988. The Tribe proposes to conduct gaming on this land. The Indian Gaming Regulatory Act (IGRA) precludes gaming on trust land acquired after October 17, 1988, unless the land meets one of several statutory exemptions. 25 U.S.C. § 2719 (Section 2719). The Department of the Interior, Office of the Solicitor requested that the NIGC assume primary responsibility for an opinion as to whether the land in question, if taken into trust, would meet one of the statutory exemptions. The Tribe submitted documentation to support its claim that the land meets the "restored lands" exception. The Tribe's submission satisfies us that the land in question, should it be taken into trust, would fall within the "restored lands" exception to Section 2719's prohibition against gaming on trust land acquired after October 17, 1988.

<u>Background</u>

At issue is an approximately 645-acre parcel of land[1] (Chico parcel) located outside the Chico city limits in Butte County, California. The Tribe acquired the parcel in December 2001. The Tribe has a fee-to-trust application for this parcel pending before the BIA. The Chico parcel is approximately 10 miles from the Tribe's original Rancheria, which was located in what is now the center of the city of Chico, California.

---

1 The legal description of the land is as follows: All that certain real property situated in the County of Butte, State of California, described as follows: that part of the east half of the northeast quarter which lies northeasterly of Highway 99 and the Oroville Chico Road, in section 1, township 20 north, range 2 east, M.D.B. & M; and all that portion lying north and east of the northerly line of the Chico Oroville Road in section 6, township 20 north, range 3 east, M.D.B. & M; and the north half of the northwest quarter; and the southwest quarter of the northwest quarter and the northwest quarter of the southwest quarter in section 5, township north, range 3 east, M.D.B. & M.

Mechoopda Indian Lands Opinion
Page 2

The Tribe submitted the following in support of its claim that the parcel in question was restored: Request for Indian Lands Determination, Dated March 26, 2002; Historical Use and Occupancy Report, Brian Biddy, Ethnographer/Historian, Dated May 9, 2002; Archeological Inventory of 640 Acres Located Near the Intersection of Highways 99 and 149, in Butte County, California, Jelmer W. Eerkens, Dated June 2002; Second Historical Use and Occupancy Report, Brian Biddy, Ethnographer/Historian, Dated July 26, 2002; Letter from Christina Kahze, Esq., Monteau and Peebles, to Maria Getoff, Esq., NIGC, Re: Supplemental Information Regarding Request for Mechoopda Indian Lands Determination, Dated November 8, 2002; and Letter from Christina Kahze, Esq., Monteau and Peebles, to Maria Getoff, Esq., NIGC, Re: Mechoopda Indian Tribe of the Chico Rancheria's Request for an Indian land Determination, Dated November 20, 2002.

## Applicable Provisions of IGRA

An Indian tribe may engage in gaming under IGRA only on "Indian lands" that are "within such tribe's jurisdiction." 25 U.S.C. § 2710(b).

IGRA defines "Indian lands" as:

(A) all lands within the limits of any Indian reservation; and
(B) *any lands* title to which is either *held in trust* by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and *over which an Indian tribe exercises governmental power* [emphasis added].

25 U.S.C. § 2703(4).

NIGC regulations further clarify the Indian lands definition:

Indian lands means:
(a) Land within the limits of an Indian reservation; or
(b) Land over which an Indian tribe exercises governmental power and that is either --
(1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
(2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12. Lands that do not qualify as Indian lands under IGRA generally are subject to state gambling laws. *See National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act*, 57 Fed. Reg. 12382, 12388 (1992).

The question whether a tribe "has jurisdiction" and "exercises governmental power" over land on which the tribe proposes to conduct gaming can arise under a variety of circumstances. *See, e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-703 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), superseded by statute as stated in *Narragansett Indian Tribe v. National*

Mechoopda Indian Lands Opinion
Page 3

*Indian Gaming Commission,* 158 F.3d 1335 (D.C.Cir.1998); *Miami Tribe of Oklahoma v. United States,* 5 F. Supp.2d 1213, 1217-18 (D.Kan. 1998) *(Miami II)* (a tribe must have jurisdiction to exercise governmental power); *State ex rel. Graves v. United States,* 86 F. Supp.2d 1094, 1099 (D.Kan. 2000), *aff'd and remanded, Kansas v. United States,* 249 F.3d 1213 (10th Cir. 2001); *Miami Tribe of Oklahoma v. United States,* 927 F. Supp. 1419, 1423 (D.Kan. 1996) *(Miami I).*

In this case, to determine whether the parcel at issue is Indian land, the NIGC must determine: (1) that the tribe has jurisdiction, and (2) if the proposed lands are trust or restricted lands outside the limits of an Indian reservation, that the tribe exercises governmental power over the proposed gaming lands. We consider the Tribe's proposed gaming site within this analytical framework.

### Fee-To-Trust Land Application

The Tribe proposes to conduct class III gaming on the parcel. The Tribe has a fee-to-trust application pending before the BIA. This opinion assumes that the BIA will take the land into trust for the benefit of the Tribe. This opinion cannot be relied upon if the land is not taken into trust.

### Jurisdiction

Because the land at issue is off-reservation, the Tribe has the additional burden of establishing that it exercises "governmental power" over the parcel it intends to use for gaming purposes. *See* 25 C.F.R. § 502.12(b). "Tribal jurisdiction" is a threshold requirement to the exercise of governmental power. *See, e.g., Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 701-703 (1st Cir. 1994), *cert. denied,* 513 U.S. 919 (1994), superseded by statute as stated in *Narragansett Indian Tribe v. National Indian Gaming Commission,* 158 F.3d 1335 (D.C.Cir.1998) (In addition to having jurisdiction a tribe must exercise governmental power in order to trigger [IGRA]); *Miami Tribe of Oklahoma v. United States,* 5 F. Supp:2d 1213, 1217-18 (D.Kan.1998) *(Miami II)* (A tribe must have jurisdiction in order to be able to exercise governmental power); *Miami Tribe of Oklahoma v. United States,* 927 F. Supp. 1419, 1423 (D.Kan.1996) *(Miami I)* (the NIGC implicitly decided that in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4), a tribe must first have jurisdiction over the land.); *State ex. rel. Graves v. United States,* 86 F. Supp 2d 1094 (D.Kan. 2000), *aff'd and remanded, Kansas v. United States,* 249 F.3d 1213 (10th Cir. 2001). This interpretation is consistent with IGRA's language limiting the applicability of its key provisions to "[a]ny Indian tribe having jurisdiction over Indian lands," or to "Indian lands within such tribe's jurisdiction." 25 U.S.C. §§ 2710(d)(3)(A), 2710(b)(1)); *see also Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 701-703 (1st Cir. 1994), *cert. denied* 513 U.S. 919 (1994). As a threshold matter, we must analyze whether the Tribe possesses jurisdiction over the parcel.

As a general matter, tribes are presumed to possess tribal jurisdiction within "Indian country." *See South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329 (1998). The Supreme Court has stated that Indian tribes are "invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 140 (1982).

Mechoopda Indian Lands Opinion
Page 4

Historically, the term "Indian country" has been used to identify land that is subject to the "primary jurisdiction . . . [of] the Federal Government and the Indian tribe inhabiting it." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998). The U.S. Code defines "Indian country" as:

> (a) all land within the limits of any Indian reservation...,
>
> (b) all dependent Indian communities..., and
>
> (c) all Indian allotments, the Indian titles to which have not been extinguished....

18 U.S.C. § 1151. The *Venetie* court observed that Section 1151 reflects the two criteria the Supreme Court "previously . . . had held necessary for a finding of 'Indian country' ... first, [the lands] must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." *Venetie*, 522 U.S. at 527. Prior to the enactment of section 1151 in 1948, the Court had already found that reservation lands and allotments satisfied those requirements. *See, e.g., United States v. Pelican*, 232 U.S. 442, 449 (1914) (Indian country includes individual Indian allotments held in trust by the United States because they "remain Indian lands set apart for Indians under governmental care"); *Donnelly v. United States*, 228 U.S. 243, 269 (1913) (Indian country includes lands within formal reservations). The *Venetie* court also observed that Congress used the term "dependent Indian communities" in Section 1151(b) to codify the Court's understanding, as expressed in *United States v. McGowan*, 302 U.S. 535 (1938), and *United States v. Sandoval*, 231 U.S. 28 (1913), that other lands, although not formally designated as a reservation, may also possess the attributes of "federal set-aside" and "federal superintendence" characteristic of Indian country. *Venetie*, 522 U.S. at 530; *see, e.g., McGowan*, 302 U.S. at 538-539 (Reno Indian Colony land held in trust by the United States is Indian country); *Sandoval*, 231 U.S. at 45-49 (Pueblo Indian lands).

Several Supreme Court decisions hold that tribal trust lands are Indian country although they are not part of a formal reservation. In *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, the Supreme Court concluded that lands held in trust by the United States for the Tribe were "validly set apart for the use of the Indians as such, under the superintendence of the Government," and therefore were Indian country, with the consequence that the State did not have the authority to tax sales of goods to tribal members that occurred on those lands. 498 U.S. 505, 511 (1991). The *Potawatomi* Court specifically rejected the contention that tribal trust land was not Indian country because it was not a reservation, noting that no "precedent of this Court has ever drawn the distinction between tribal trust land and reservations that Oklahoma urges." *Id*; *see also Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 452-453 and n.2 (1995) (treating tribal trust lands as Indian country); *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123-125 (1993) (same); *United States v. John*, 437 U.S. 634, 649 (1978) (observing that "[t]here is no apparent reason why these lands, which had been purchased [by the United States] in previous years for the aid of those Indians, did not become a 'reservation,' at least for purposes of federal criminal jurisdiction"); *United States v. McGowan*, 302 U.S. 535, 539 (1938).

Mechoopda Indian Lands Opinion
Page 5

Here, consistent with these decisions, once the land is taken into trust for the benefit of the Tribe, the land will be "Indian country," within the meaning of section 1151. The land has been "validly set-aside for the tribe under the superintendence of the federal government." *United States v. McGowan*, 302 U.S. at 539, quoted in *Venetie*, 522 U.S. at 529.

It is unnecessary to decide whether the Tribe's land is more properly categorized as an informal reservation under section 1151(a) or as a dependent Indian community under section 1151(b) because, regardless of category, the property in this case, held by the United States in trust for the Tribe, would be Indian country. The Tribe's land comes within at least one of the three statutory categories, because the trust lands possess the two characteristics of Indian country reflected in section 1151. *See Venetie*, 522 U.S. at 527. Therefore, when the land is acquired into trust, it is Indian country, and we can conclude that the Tribe has jurisdiction over it.

Exercise of Governmental Authority

The Tribe must also have a present day exercise of governmental authority over the land. See 25 U.S.C. § 2703(4)(B); see also, *Narragansett Indian Tribe*, 19 F.3d at 703; *Cheyenne River Sioux Tribe v. State of South Dakota*, 830 F. Supp. 523 (D.S.D. 1993), *aff'd* 3 f.3d 273 (8th Cir. 1993). Present day exercise of governmental authority cannot be established before the land is acquired into trust. The Tribe has submitted information indicating that, once the land is in trust, it will exercise governmental authority over the parcel through various environmental, zoning, trespass, law enforcement and other ordinances and programs. We can reasonably rely on the Tribe's representations and assume for the purposes of this opinion that the Tribe will exercise those authorities when the land is acquired into trust.

Lands Acquired in Trust by the Secretary After October 17, 1988

Even though a parcel may meet the definition of "Indian lands" under 25 U.S.C. § 2703(4), we must still determine whether the general gaming prohibition under IGRA would bar the Tribe from gaming on the trust land. Under Section 2719(a) of IGRA, gaming is prohibited on lands acquired by the Secretary of the Interior into trust for the benefit of an Indian tribe after October 17, 1988, unless the land falls within certain exceptions in 25 U.S.C. § 2719(b). Accordingly, we must review the exceptions to determine whether a tribe can conduct gaming on after-acquired trust lands.

The Tribe contends that the proposed site meets the requirements of the exception set forth at 25 U.S.C. § 2719(b)(1)(B)(iii)—"restoration of lands for an Indian tribe that is restored to Federal recognition"—and thus is outside the proscriptions on after-acquired land. To determine whether the Tribe meets the restoration exception we must determine, first, whether the Tribe is a "restored" tribe and, second, whether the land was taken into trust as part of a "restoration" of lands to the Tribe.

*"Restored" Tribe*

Mechoopda Indian Lands Opinion
Page 6

The key terms, "restored" and "restoration" are not defined in the text of IGRA. Nor are they defined in the various federal regulations issued by the NIGC and the Department of the Interior to implement IGRA.

The U.S. District Court for the Western District of Michigan recently addressed the definition of "restored" and "restoration" in *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 198 F. Supp. 2d 920 (W.D. Mich. 2002). At issue was whether the Grand Traverse Band was a restored tribe and whether the parcel on which gaming was conducted was restored lands. The *Grand Traverse* court held that both "restore" and "restoration" should be given their ordinary meaning ("In no sense has a proprietary use of 'restore' or 'restoration' been shown to have occurred." *Id.* at 931). Applying the ordinary meaning of the words, the court concluded that the Band's history showed that the Band was in fact restored:

> In sum, the undisputed history of the Band's treaties with the United States and its prior relationship to the Secretary and the BIA demonstrates that the Band was recognized and treatied with by the United States.... Only in 1872 was that relationship administratively terminated by the BIA. This history—of recognition by Congress through treaties (and historical administration by the Secretary), subsequent withdrawal of recognition, and yet later re-acknowledgment by the Secretary—fits squarely within the dictionary definitions of "restore" and is reasonably construed as a process of restoration of tribal recognition. The plain language of subsection (b)(1)(B)(iii) therefore suggests that this Band is restored.

*Grand Traverse Band* at 933.

An examination of the pattern of Mechoopda's history shows that it is similar to the pattern in the case of Grand Traverse Band. The Mechoopda Indian village was originally established in what is now Butte County, California and the present-day city of Chico by General and Mrs. John Bidwell for their Indian employees. In 1849, General Bidwell purchased from William Dickey a Mexican land grant of more than 22,000 acres, known as the Rancho del Arroyo Chico. The Mechoopda Tribe occupied this land base. In 1851, the United States entered into a treaty with the Mechoopda, in which the Tribe was promised land approximately 20 miles long and 6 miles wide in exchange for relinquishing all claim to their former territory. This treaty, which was never ratified, was found in 1905 by Senate clerks. (Request for Indian Lands Determination, March 26, 2002, page 6)

Between 1909 and 1918, Mrs. Bidwell gave 26 acres, where the Mechoopda Indians were living, to the Board of Home Missions in trust for the Mechoopda Indians. In 1939, this land was conveyed to the United States in trust for the Mechoopda Indians under the authority of the appropriation for Homeless California Indians of 1925, reappropriated in 1939, 50 Stat.564, 573. *Id.*

On August 15, 1958, Congress enacted the California Rancheria Act, authorizing the termination of the trust status of the lands and the Indian status of 41 California rancherias, including the Mechoopda. The Tribe was terminated by proclamation published on June 2, 1967. Pub. L. No. 85-671, 72 Stat. 619, amended by Act of August 11, 1964, Pub. L. No. 88-419, 78 Stat. 390.

Mechoopda Indian Lands Opinion
Page 7

In 1986, the Mechoopda Tribe, along with three other Indian Rancherias and several individuals, filed suit in federal court challenging the federal government's termination. *Scotts Valley v. United States*, No. C-86-3660-VRW (N.D. Cal. Filed 1986). On January 6, 1992, the Mechoopda Tribe and the United States entered into a Stipulation for Entry of Judgment to settle the Tribe's claims. In the Stipulation, the United States agreed that the Tribe was not lawfully terminated and further agreed that the Tribe and its members were eligible for all the rights and benefits extended to other federally-recognized Indian tribes. (Stipulation for Entry of Judgment, Monteau Submission, March 26, 2002, at Exhibit A). On May 4, 1992, the Assistant Secretary for Indian Affairs published a notice in the Federal Register that the Tribe and its members were reinstated to their status that existed prior to termination. 57 Fed. Reg. 19, 133 (May 4, 1992). The Mechoopda Tribe is now on the list of federally-recognized Indian tribes. 65 Fed. Reg. 13,298, 13, 300 (2000).

The qualified voters of Mechoopda adopted their constitution on February 1, 1998 at a Secretarial election. The BIA Sacramento Area Director approved the constitution on February 13, 1998, pursuant to delegated authority under the Act of June 18, 1934.

In short, like the Grand Traverse Band, the Tribe has been recognized by the federal government, terminated, and again recognized. Accordingly, we find that the Tribe qualifies as "an Indian tribe that is restored to Federal recognition" under 25 U.S.C. § 2719(b)(1)(B)(iii).

*Restoration of Lands*

Having concluded that the Tribe is a restored tribe under IGRA, the question remains whether the land at issue was "taken into trust as a part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).

Federal courts, the Department of the Interior, and NIGC have recently grappled with the concept of restoration of land. In so doing, they established several guideposts for a restoration-of-land analysis. First, "restored" and "restoration" must be given their plain, primary meanings. *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan ("Grand Traverse Band II")*, Supra,. *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt ("Coos")*, 116 F. Supp.2d 155, 161 (D.D.C. 2000). In addition, to be "restored," lands need not have been restored pursuant to Congressional action or as part of a tribe's restoration to federal recognition. *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan ("Grand Traverse Band I")*, 46 F. Supp.2d 689, 699 (W.D. Mich. 1999); *Coos* at 164. The language of section 2719(b)(1)(B)(iii)—"restoration of lands for an Indian tribe that is restored to Federal recognition"—"implies a process rather than a specific transaction, and most assuredly does not limit restoration to a single event." *Grand Traverse Band II* at 936; *Grand Traverse Band I* at 701.

Nonetheless, there are limits to what constitutes restored lands. As NIGC stated in the Grand Traverse Opinion, "[W]e believe the phrase 'restoration of lands' is a difficult hurdle and may not necessarily be extended, for example, to any lands that the tribe conceivably once occupied

Mechoopda Indian Lands Opinion
Page 8

throughout its history." NIGC Grand Traverse Opinion at p. 15; *see also* Office of the Solicitor's Memorandum Re: *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt* (Office of the Solicitor's Coos Opinion) ("It also seems clear that restored land does not mean any aboriginal land that the restored tribe ever occupied," p. 8).

The courts in *Coos* and *Grand Traverse Band I* and *II* noted that some limitations might be required on the term "restoration" to avoid a result that "any and all property acquired by restored tribes would be eligible for gaming." *Coos* at 164; *Grand Traverse Band I* at 700; *see also Grand Traverse Band II* at *934-935 ("Given the plain meaning of the language, the term 'restoration' may be read in numerous ways to place belatedly restored tribes in a comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion"). All three courts proposed that land acquired after restoration be limited by "the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the tribal restoration. *Id.* In this case, these factors lead us to conclude that the Tribe's land acquisition is a "restoration."

    1. Factual Circumstances of the Acquisition

The Tribe acquired the approximately 645-acre parcel in December 2001. Also in December 2001, the Tribe submitted a fee-to-trust land application to the BIA. The Tribe's acquisition arose in the following context:

The original 26-acre Rancheria was conveyed to the United States in trust for the Mechoopda Tribe in 1939. When the Tribe was terminated in 1967, there were somewhere between 50 and 70 Mechoopda tribal members living on the Rancheria. However, this entire land base was lost through unscrupulous land sales. Upon restoration in 1992, the Tribe was landless. The Tribe's former Rancheria was now located in the center of the city of Chico. Approximately one-half of the old Chico Rancheria is now owned by the State of California and is part of the campus of California State University, Chico. The other one-half contains 50 separate parcels and lots and are now devoted to mixed residential and commercial uses. By its terms, the Stipulation and Order restoring the Mechoopda Tribe prevents it from reestablishing its former Rancheria boundaries. Mechoopda, therefore, had no choice but to look for land outside the City of Chico.

Following restoration, the Tribe began to slowly reorganize, with a tribal office initially located in the home of the Tribe's first Chairperson. In 1994, the tribal office was moved to Chico, California. The Tribe focused on establishing a base roll, constitution, and ordinances and policies. Mechoopda administered its first HUD program at the end of 1996 and purchased land to address the immediate housing needs of tribal members. Unfortunately, this land was an almond orchard located in a flood plain and unsuitable for a housing project. HUD allowed the Tribe to keep the orchard as an economic development project, and it continues in operation today. (Request for Indian Lands Determination, March 26, 2002, page 2.)

In 1996, the Mechoopda prepared a restoration plan in collaboration with the BIA wherein it identified a parcel of land that it desired to acquire and transfer to the United States as trustee for the Tribe. One of the planned uses for the proposed property was to be a tribally-operated gaming facility. In August 1998, the Solicitor's Office of the Department of the Interior

Mechoopda Indian Lands Opinion
Page 9

informed Mechoopda that it disagreed with the Tribe's contention that the proposed land constituted restored lands under the IGRA. The Department based its disagreement on its interpretation that the restored lands exception only applied to tribes restored by Congress. [2] Id. at 3. Thereafter, in 1999 and 2000, two federal courts held in other cases that this interpretation of the IGRA's restored lands exception was too restrictive. *Grand Traverse, Supra; Coos, Supra.*

In December 2001, the Tribe purchased the approximately 645-acre parcel at issue. It is located about 10 miles from the Tribe's former Rancheria.

"Restoration" denotes a taking back or being put in a former position. *Coos* at 162. It might mean "reacquired." *Id.* ("The 'restoration of lands' could be construed to mean just that; the tribe would be placed back in its former position by reacquiring lands.") In any event, "restoration" does not mean "acquired." We therefore must look further for indicia that the land acquisition in some way restores to the Tribe what it previously had.

    2. Location

The parcel at issue on which the Tribe proposes to game is located outside the boundaries of the Rancheria as it existed immediately prior to termination under the California Rancheria Act. Specifically, the proposed gaming site is approximately ten (10) miles from the boundaries of the former Rancheria. (Request for Indian Lands Determination, March 26, 2002, page 3). (Because the Stipulation and Order restoring the Tribe prevented the Tribe from reestablishing its former Rancheria boundaries, the Tribe had no choice but to purchase land outside those boundaries.)

While restored lands may include off-reservation parcels, there must be indicia that the land has in some respect been recognized as having a significant relation to the Tribe. *Grand Traverse Band I* at 702. In *Grand Traverse Band II*, the court held that the lands at issue were restored because they lay within counties that had previously been ceded by the tribe to the United States. *Grand Traverse Band II* at 936. This ruling was consistent with its opinion in *Grand Traverse I*, in which the court stated that the land's location "within a prior reservation...is significant evidence that the land may be considered in some sense restored." *Id.* In its Grand Traverse Opinion, NIGC further found that restoration was shown by the Band's "substantial evidence tending to establish that the...site has been important to the tribe throughout its history and remained so immediately on resumption of federal recognition." Grand Traverse Opinion at 15. The tribe's history included the ceding of that very ground to the United States by the ancestors of the present tribe in a 1836 treaty. *Id.* at 9-10, 16. As a result, NIGC concluded that the Band had a "historical nexus" to the land. *Id.* at 17.

Brian Biddy, the Tribe's ethnographer and an expert on California Indian Communities, states that it is difficult to establish, with certainty, the exact boundaries of the Tribe's traditional territory. This is due to the lack of documentary materials detailing the traditional ethno-

---

2 The Tribe had an option to purchase this land. The Tribe let the option expire when it received the adverse opinion from the Department of Interior.

Mechoopda Indian Lands Opinion
Page 10

geography of the region. He further states that, "[t]he rapidity in which traditional native life changed, and the subsequent abandonment of villages, resulted in a significant loss of geographic information by the time anthropologists and ethnographers began to interview elderly native people of the region during the first two decades of the twentieth century." (Mechoopda Indian Tribe's Territory, Second Historical Use and Occupancy Report, July 26, 2002, page 1, Exhibit 5).

Despite the lack of information as to specific boundaries of territory, Biddy indicates that C. Hart Merriam's Field Notes are the most informative concerning the names and locations of former villages in the Chico area. Merriam was an ethnologist and botanist who interviewed residents of the Chico Rancheria on at least three occasions: June 8, 1903; November 20 and 21, 1919; and May 1923. Based on these interviews, Merriam was able to approximate the boundaries that contained the Mechoopda villages, of which there were 23.[3] Biddy plotted those boundaries on a map submitted by the Tribe as Exhibit 3 to the Second Historical Use and Occupancy Report. The map shows that the land the Tribe purchased falls squarely within those boundaries.

In addition, the land at issue is part of an area occupied by the Northwestern Valley Maidu, of whom the Mechoopda are the sole surviving group. "With the demise of other Sacramento Valley villages, residents of those Northwestern Valley Maidu villages, including Udahwek, Eskini and so forth, congregated at the Mechoopda village; by 1900, Mechoopda was the only remaining village of the Northwestern Valley Maidu. (Declaration of Craig D. Bates, para. 9, Exhibit H to Monteau Submission, March 26, 2002.)

Furthermore, the land is within a land base promised to the Mechoopda in the unratified treaty of 1851. (Treaty of August 1, 1851 Between United States and the Chiefs, Captains and Headmen of the Mi-chop-sa, Es-Kuin, etc., Tribes of Indians, Exhibit J to Request for Indian Lands Determination, March 26, 2002.) The treaty promised approximately 227 square miles of land, reaching roughly from Chico to Nimshew to Oroville. (Map of Land Boundary Granted by the U.S. Treaty of 1851, Exhibit J to Monteau Submission, March 26, 2002.) Biddy's map shows that the parcels at issue are within the unratified treaty area. (Second Historical Use and Occupancy Report, Exhibit 3).

According to Merriam, there were 23 villages which made up the Mechoopda Tribe. Merriam, C. Hart, Mitchopda (Mechoopda) Territory and Villages, Unpublished Manuscript, Bancroft Library, University of California Berkeley, undated. Several of these villages are located in close proximity to the parcels at issue, and include Eskeni-5 ½ miles; Hololopai-9 miles; Taimkoyo-7 miles; Mechoopda-8 miles; and Boga-16 ½ miles. Eskeni, Hololopai and Mechoopda were signers of the 1851 unratified treaty. (Request for Indian Lands Determination, March 26, 2002, pages 5-10.)

The proposed site has cultural and historical significance to the Tribe. Three buttes with cultural significance to the Mechoopda are located one mile north of the proposed site. These buttes figure prominently in the myth of Onkoitopeh, a cultural hero of the Mechoopda. (Historical

---

3 The boundaries are as follows: "[t]erritory from just south of Nord, southerly to a little beyond Durham, and from Sacramento River easterly to the foothills." Merriam, C. Hart, Mitchopda Territory and Villages, Unpublished manuscript, Bancroft Library, University of California Berkeley, undated.

Mechoopda Indian Lands Opinion
Page 11

Use and Occupancy Report, May 9, 2002, page 3.)  In addition, an historic trail, linking the villages of Ushtupedah and Weleuduh to other Maidu villages crosses the parcels. In historic times, the trail would have linked the Mechoopda at Chico with other villages in the Oroville region.  In addition, the lands encompassed by the parcels include areas likely used in the late 19th century and before by the Mechoopda for hunting and gathering. (Bates Declaration at para. 10, Exhibit H to Request for Indian Lands Determination, March 26, 2002).

Based on the above, the Tribe has proven a historical and cultural nexus to the land sufficient to show that the parcel was not merely an acquisition but a restoration of previously used lands.


### 3. Temporal Relationship of Acquisition to the Tribal Restoration

The Tribe was restored through the *Scotts Valley* Stipulated Judgment in 1992. The Tribe acquired the parcel at issue in December 2001, nine years after the Tribe was restored. This nine-year gap is the same as that in the case of the Grand Traverse Band's off-reservation acquisition, which was taken into trust nine years after Grand Traverse Band's acknowledgement through the federal administrative acknowledgement procedures. Also similar to Grand Traverse Band, the acquisition is the first and only land acquisition (aside from the almond orchard) after the Tribe's restoration.

At the heart of this inquiry is the question of whether the timing of the acquisition supports a conclusion that the land is restored. In its Office of the Solicitor's Coos Opinion, the Department of the Interior found that a 14-year lapse between a tribe's restoration and the acquisition of land into trust did not foreclose a finding that the land was restored.  Associate Solicitor Phil Hogen observed:

> Congress allowed 14 years to elapse before restoring the Peterson Tract to the Tribe.  Thus, in this particular instance, without some relevant attenuation, the mere passage of time should not be determinative.  Also, it is not improper of the Department to take account of the practical effect of the passage of the restored lands exception.  For instance, it will often be the case that newly restored tribes will, out of practical necessity, take some time to acquire land [footnote omitted].  The Department recognizes, as Congress surely did, that newly restored tribes do not have readily available funds for land acquisition, that land is not always available, and the process of land acquisition is time consuming….Thus, the Tribes quickly acquired the land as soon as it was available and within a reasonable amount of time after being restored.

Office of the Solicitor's Coos Opinion, pp. 13-14.

Furthermore, as part of the Stipulation in *Scotts Valley*, the Tribe agreed not to seek to reestablish the former boundaries of the Chico Rancheria.  The Stipulation provides for the acquisition of land outside the former Rancheria boundaries as part of the Tribe's restoration. (*Scotts Valley v. United States*, No. C-86-3660-VRW (N.D. Cal. Filed 1986)).

Mechoopda Indian Lands Opinion
Page 12

Although the Chico parcel was purchased nine years after the Tribe's restoration, the belated purchase is not fatal to a finding of restoration for the land. The Tribe's initial reorganization and search for appropriate land bases took several years and experienced significant obstacles. However, building a gaming facility was part of its economic development and land use plans from the beginning. Once the Tribe was in a position to acquire a sufficient amount of usable land to accomplish these goals, the Tribe moved quickly to complete its economic development plans. Based on these facts, we can find that the Chico parcel falls within the Tribe's process of restoration.

We conclude that the facts surrounding the timing of the acquisition support a determination of "restored land." A nine-year gap between the Tribe's restoration and the land's acquisition is a sufficient "temporal relationship" to establish lands as "restored." More importantly, the acquisition of the parcel was the first (with the exception of the unusable almond orchard) for this restored tribe.

In light of federal cases interpreting the restored lands exception, and the factual circumstances, location, and timing of the acquisition, we conclude that the Tribe's land may be considered "restored" for purposes of the pending fee-to-trust acquisition for gaming. The Tribe has shown that the land has been acquired to address the issue of landlessness and that there is a historical and cultural nexus between the Tribe and the land.

## Conclusion

IGRA permits tribes to conduct gaming on Indian lands only if they have jurisdiction over those lands, and only if they assert jurisdiction by exercising governmental power which will enable the tribe, through appropriate ordinances, to satisfy the statute's substantial and detailed requirements for the regulation of gaming. After careful review and consideration, we conclude that the Tribe's land, should it be taken into trust, qualifies as Indian lands as defined by IGRA and NIGC regulations. A close examination of the documentation submitted shows that the Tribe had a historical and cultural connection to the land and that the land is therefore restored. The proposed gaming site therefore falls within the restored land exception to Section 2719. The Tribe may therefore lawfully conduct gaming on its proposed site pursuant to IGRA when it is acquired by the United States in trust for the Tribe, provided the Tribe complies with all other applicable requirements of IGRA.

The Department of the Interior, Office of the Solicitor concurs with our conclusion.

If you have any questions, Maria Getoff, Staff Attorney, is assigned to this matter.

Signed: _____

Penny J. Coleman, Acting General Counsel

# EXHIBIT B

habitat for the endangered red-cockaded woodpecker and associated wildlife species of concern. Prescribed burning and timber thinning are used to ensure that quality pine habitat is maintained for red-cockaded woodpeckers, neotropical migratory songbirds, and other native wildlife. Hardwood stands provide excellent habitat for neotropical migratory songbirds, turkeys, squirrels, and other woodland wildlife. Open fields, maintained by burning and mowing, provide feeding and nesting areas for many species of birds and mammals. Numerous clear-flowing creeks and beaver ponds provide wetlands for waterfowl and other wildlife.

**Public Availability of Comments**

Before including your address, phone number, e-mail address, or other personal identifying information in your comment, you should be aware that your entire comment, including your personal identifying information, may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

**Authority:** This notice is published under the authority of the National Wildlife Refuge System Improvement Act of 1997, Public Law 105–57.

Dated: February 8, 2008.

Cynthia K. Dohner,

*Acting Regional Director.*

[FR Doc. E8–7000 Filed 4–3–08; 8:45 am]

**BILLING CODE 4310-55-P**

## DEPARTMENT OF THE INTERIOR

**Bureau of Indian Affairs**

**Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice publishes the current list of 562 tribal entities recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian tribes. The list is updated from the notice published on March 22, 2007 (72 FR 13648).

**FOR FURTHER INFORMATION CONTACT:** Daisy West, Bureau of Indian Affairs, Division of Tribal Government Services, Mail Stop 4513–MIB, 1849 C Street, NW., Washington, DC 20240. Telephone number: (202) 513–7641.

**SUPPLEMENTARY INFORMATION:** This notice is published pursuant to Section 104 of the Act of November 2, 1994 (Pub. L. 103–454; 108 Stat. 4791, 4792), and in exercise of authority delegated to the Assistant Secretary—Indian Affairs under 25 U.S.C. 2 and 9 and 209 DM 8.

Published below is a list of federally acknowledged tribes in the contiguous 48 states and in Alaska.

One tribe became recognized since the last publication. The Mashpee Wampanoag Tribe was acknowledged under 25 CFR part 83. The final determination for Federal acknowledgment became effective on May 23, 2007. The list also contains several tribal name changes and corrections. To aid in identifying tribal name changes, the tribe's former name is included with the new tribal name. To aid in identifying corrections, the tribe's previously listed name is included with the tribal name. We will continue to list the tribe's former or previously listed name for several years before dropping the former or previously listed name from the list.

The listed entities are acknowledged to have the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such tribes. We have continued the practice of listing the Alaska Native entities separately solely for the purpose of facilitating identification of them and reference to them given the large number of complex Native names.

Dated: March 25, 2008.

Carl J. Artman,

*Assistant Secretary—Indian Affairs.*

**Indian Tribal Entities Within the Contiguous 48 States Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

Absentee-Shawnee Tribe of Indians of Oklahoma
Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California
Ak Chin Indian Community of the Maricopa (Ak Chin) Indian Reservation, Arizona
Alabama-Coushatta Tribes of Texas
Alabama-Quassarte Tribal Town, Oklahoma
Alturas Indian Rancheria, California
Apache Tribe of Oklahoma
Arapahoe Tribe of the Wind River Reservation, Wyoming
Aroostook Band of Micmac Indians of Maine
Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana

Augustine Band of Cahuilla Indians, California (formerly the Augustine Band of Cahuilla Mission Indians of the Augustine Reservation)
Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin
Bay Mills Indian Community, Michigan
Bear River Band of the Rohnerville Rancheria, California
Berry Creek Rancheria of Maidu Indians of California
Big Lagoon Rancheria, California
Big Pine Band of Owens Valley Paiute Shoshone Indians of the Big Pine Reservation, California
Big Sandy Rancheria of Mono Indians of California
Big Valley Band of Pomo Indians of the Big Valley Rancheria, California
Blackfeet Tribe of the Blackfeet Indian Reservation of Montana
Blue Lake Rancheria, California
Bridgeport Paiute Indian Colony of California
Buena Vista Rancheria of Me-Wuk Indians of California
Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon
Cabazon Band of Mission Indians, California
Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California
Caddo Nation of Oklahoma
Cahuilla Band of Mission Indians of the Cahuilla Reservation, California
Cahto Indian Tribe of the Laytonville Rancheria, California
California Valley Miwok Tribe, California (formerly the Sheep Ranch Rancheria of Me-Wuk Indians of California)
Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California
Capitan Grande Band of Diegueno Mission Indians of California:
  Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California
  Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California
Catawba Indian Nation (aka Catawba Tribe of South Carolina)
Cayuga Nation of New York
Cedarville Rancheria, California
Chemehuevi Indian Tribe of the Chemehuevi Reservation, California
Cher-Ae Heights Indian Community of the Trinidad Rancheria, California
Cherokee Nation, Oklahoma
Cheyenne and Arapaho Tribes, Oklahoma (formerly the Cheyenne-Arapaho Tribes of Oklahoma)
Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota

Chickasaw Nation, Oklahoma

Chicken Ranch Rancheria of Me-Wuk Indians of California

Chippewa-Cree Indians of the Rocky Boy's Reservation, Montana

Chitimacha Tribe of Louisiana

Choctaw Nation of Oklahoma

Citizen Potawatomi Nation, Oklahoma

Cloverdale Rancheria of Pomo Indians of California

Cocopah Tribe of Arizona

Coeur D'Alene Tribe of the Coeur D'Alene Reservation, Idaho

Cold Springs Rancheria of Mono Indians of California

Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California

Comanche Nation, Oklahoma

Confederated Salish & Kootenai Tribes of the Flathead Reservation, Montana

Confederated Tribes of the Chehalis Reservation, Washington

Confederated Tribes of the Colville Reservation, Washington

Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians of Oregon

Confederated Tribes of the Goshute Reservation, Nevada and Utah

Confederated Tribes of the Grand Ronde Community of Oregon

Confederated Tribes of the Siletz Reservation, Oregon

Confederated Tribes of the Umatilla Reservation, Oregon

Confederated Tribes of the Warm Springs Reservation of Oregon

Confederated Tribes and Bands of the Yakama Nation, Washington

Coquille Tribe of Oregon

Cortina Indian Rancheria of Wintun Indians of California

Coushatta Tribe of Louisiana

Cow Creek Band of Umpqua Indians of Oregon

Cowlitz Indian Tribe, Washington

Coyote Valley Band of Pomo Indians of California

Crow Tribe of Montana

Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota

Death Valley Timbi-Sha Shoshone Band of California

Delaware Nation, Oklahoma

Dry Creek Rancheria of Pomo Indians of California

Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada

Eastern Band of Cherokee Indians of North Carolina

Eastern Shawnee Tribe of Oklahoma

Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California

Elk Valley Rancheria, California

Ely Shoshone Tribe of Nevada

Enterprise Rancheria of Maidu Indians of California

Ewiiaapaayp Band of Kumeyaay Indians, California

Federated Indians of Graton Rancheria, California

Flandreau Santee Sioux Tribe of South Dakota

Forest County Potawatomi Community, Wisconsin

Fort Belknap Indian Community of the Fort Belknap Reservation of Montana

Fort Bidwell Indian Community of the Fort Bidwell Reservation of California

Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California

Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon

Fort McDowell Yavapai Nation, Arizona

Fort Mojave Indian Tribe of Arizona, California & Nevada

Fort Sill Apache Tribe of Oklahoma

Gila River Indian Community of the Gila River Indian Reservation, Arizona

Grand Traverse Band of Ottawa and Chippewa Indians, Michigan

Greenville Rancheria of Maidu Indians of California

Grindstone Indian Rancheria of Wintun-Wailaki Indians of California

Guidiville Rancheria of California

Habematolel Pomo of Upper Lake, California (formerly the Upper Lake Band of Pomo Indians of Upper Lake Rancheria of California)

Hannahville Indian Community, Michigan

Havasupai Tribe of the Havasupai Reservation, Arizona

Ho-Chunk Nation of Wisconsin

Hoh Indian Tribe of the Hoh Indian Reservation, Washington

Hoopa Valley Tribe, California

Hopi Tribe of Arizona

Hopland Band of Pomo Indians of the Hopland Rancheria, California

Houlton Band of Maliseet Indians of Maine

Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona

Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California

Ione Band of Miwok Indians of California

Iowa Tribe of Kansas and Nebraska

Iowa Tribe of Oklahoma

Jackson Rancheria of Me-Wuk Indians of California

Jamestown S'Klallam Tribe of Washington

Jamul Indian Village of California

Jena Band of Choctaw Indians, Louisiana

Jicarilla Apache Nation, New Mexico

Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona

Kalispel Indian Community of the Kalispel Reservation, Washington

Karuk Tribe of California

Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California

Kaw Nation, Oklahoma

Keweenaw Bay Indian Community, Michigan

Kialegee Tribal Town, Oklahoma

Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas

Kickapoo Tribe of Oklahoma

Kickapoo Traditional Tribe of Texas

Kiowa Indian Tribe of Oklahoma

Klamath Tribes, Oregon (formerly the Klamath Indian Tribe of Oregon)

Kootenai Tribe of Idaho

La Jolla Band of Luiseno Mission Indians of the La Jolla Reservation, California

La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California

Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin

Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin

Lac Vieux Desert Band of Lake Superior Chippewa Indians, Michigan

Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada

Little River Band of Ottawa Indians, Michigan

Little Traverse Bay Bands of Odawa Indians, Michigan

Lower Lake Rancheria, California

Los Coyotes Band of Cahuilla & Cupeno Indians of the Los Coyotes Reservation, California

Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada

Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota

Lower Elwha Tribal Community of the Lower Elwha Reservation, Washington

Lower Sioux Indian Community in the State of Minnesota

Lummi Tribe of the Lummi Reservation, Washington

Lytton Rancheria of California

Makah Indian Tribe of the Makah Indian Reservation, Washington

Manchester Band of Pomo Indians of the Manchester-Point Arena Rancheria, California

Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California

Mashantucket Pequot Tribe of Connecticut

Mashpee Wampanoag Tribe, Massachusetts

Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan

Mechoopda Indian Tribe of Chico Rancheria, California

Menominee Indian Tribe of Wisconsin

Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California

Mescalero Apache Tribe of the Mescalero Reservation, New Mexico

Miami Tribe of Oklahoma

Miccosukee Tribe of Indians of Florida

Middletown Rancheria of Pomo Indians of California

Minnesota Chippewa Tribe, Minnesota (Six component reservations: Bois Forte Band (Nett Lake); Fond du Lac Band; Grand Portage Band; Leech Lake Band; Mille Lacs Band; White Earth Band)

Mississippi Band of Choctaw Indians, Mississippi

Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada

Modoc Tribe of Oklahoma

Mohegan Indian Tribe of Connecticut

Mooretown Rancheria of Maidu Indians of California

Morongo Band of Cahuilla Mission Indians of the Morongo Reservation, California

Muckleshoot Indian Tribe of the Muckleshoot Reservation, Washington

Muscogee (Creek) Nation, Oklahoma

Narragansett Indian Tribe of Rhode Island

Navajo Nation, Arizona, New Mexico & Utah

Nez Perce Tribe, Idaho (previously listed as Nez Perce Tribe of Idaho)

Nisqually Indian Tribe of the Nisqually Reservation, Washington

Nooksack Indian Tribe of Washington

Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana

Northfork Rancheria of Mono Indians of California

Northwestern Band of Shoshoni Nation of Utah (Washakie)

Nottawaseppi Huron Band of the Potawatomi, Michigan (formerly the Huron Potawatomi, Inc.)

Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota

Ohkay Owingeh, New Mexico (formerly the Pueblo of San Juan)

Omaha Tribe of Nebraska

Oneida Nation of New York

Oneida Tribe of Indians of Wisconsin

Onondaga Nation of New York

Osage Nation, Oklahoma (formerly the Osage Tribe)

Ottawa Tribe of Oklahoma

Otoe-Missouria Tribe of Indians, Oklahoma

Paiute Indian Tribe of Utah (Cedar City Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes)

Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California

Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada

Paiute-Shoshone Indians of the Lone Pine Community of the Lone Pine Reservation, California

Pala Band of Luiseno Mission Indians of the Pala Reservation, California

Pascua Yaqui Tribe of Arizona

Paskenta Band of Nomlaki Indians of California

Passamaquoddy Tribe of Maine

Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California

Pawnee Nation of Oklahoma

Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California

Penobscot Tribe of Maine

Peoria Tribe of Indians of Oklahoma

Picayune Rancheria of Chukchansi Indians of California

Pinoleville Pomo Nation, California (formerly the Pinoleville Rancheria of Pomo Indians of California)

Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias)

Poarch Band of Creek Indians of Alabama

Pokagon Band of Potawatomi Indians, Michigan and Indiana

Ponca Tribe of Indians of Oklahoma

Ponca Tribe of Nebraska

Port Gamble Indian Community of the Port Gamble Reservation, Washington

Potter Valley Tribe, California (formerly the Potter Valley Rancheria of Pomo Indians of California)

Prairie Band of Potawatomi Nation, Kansas

Prairie Island Indian Community in the State of Minnesota

Pueblo of Acoma, New Mexico

Pueblo of Cochiti, New Mexico

Pueblo of Jemez, New Mexico

Pueblo of Isleta, New Mexico

Pueblo of Laguna, New Mexico

Pueblo of Nambe, New Mexico

Pueblo of Picuris, New Mexico

Pueblo of Pojoaque, New Mexico

Pueblo of San Felipe, New Mexico

Pueblo of San Ildefonso, New Mexico

Pueblo of Sandia, New Mexico

Pueblo of Santa Ana, New Mexico

Pueblo of Santa Clara, New Mexico

Pueblo of Santo Domingo, New Mexico

Pueblo of Taos, New Mexico

Pueblo of Tesuque, New Mexico

Pueblo of Zia, New Mexico

Puyallup Tribe of the Puyallup Reservation, Washington

Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada

Quapaw Tribe of Indians, Oklahoma

Quartz Valley Indian Community of the Quartz Valley Reservation of California

Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona

Quileute Tribe of the Quileute Reservation, Washington

Quinault Tribe of the Quinault Reservation, Washington

Ramona Band or Village of Cahuilla Mission Indians of California

Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin

Red Lake Band of Chippewa Indians, Minnesota

Redding Rancheria, California

Redwood Valley Rancheria of Pomo Indians of California

Reno-Sparks Indian Colony, Nevada

Resighini Rancheria, California

Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California

Robinson Rancheria of Pomo Indians of California

Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota

Round Valley Indian Tribes of the Round Valley Reservation, California

Rumsey Indian Rancheria of Wintun Indians of California

Sac & Fox Tribe of the Mississippi in Iowa

Sac & Fox Nation of Missouri in Kansas and Nebraska

Sac & Fox Nation, Oklahoma

Saginaw Chippewa Indian Tribe of Michigan

St. Croix Chippewa Indians of Wisconsin

Saint Regis Mohawk Tribe, New York (formerly the St. Regis Band of Mohawk Indians of New York)

Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona

Samish Indian Tribe, Washington

San Carlos Apache Tribe of the San Carlos Reservation, Arizona

San Juan Southern Paiute Tribe of Arizona

San Manual Band of Serrano Mission Indians of the San Manual Reservation, California

San Pasqual Band of Diegueno Mission Indians of California

Santa Rosa Indian Community of the Santa Rosa Rancheria, California

Santa Rosa Band of Cahuilla Indians, California (formerly the Santa Rosa Band of Cahuilla Mission Indians of the Santa Rosa Reservation)

Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California

Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation, California

Santee Sioux Nation, Nebraska
Sauk-Suiattle Indian Tribe of Washington
Sault Ste. Marie Tribe of Chippewa Indians of Michigan
Scotts Valley Band of Pomo Indians of California
Seminole Nation of Oklahoma
Seminole Tribe of Florida (Dania, Big Cypress, Brighton, Hollywood & Tampa Reservations)
Seneca Nation of New York
Seneca-Cayuga Tribe of Oklahoma
Shakopee Mdewakanton Sioux Community of Minnesota
Shawnee Tribe, Oklahoma
Sherwood Valley Rancheria of Pomo Indians of California
Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California
Shoalwater Bay Tribe of the Shoalwater Bay Indian Reservation, Washington
Shoshone Tribe of the Wind River Reservation, Wyoming
Shoshone-Bannock Tribes of the Fort Hall Reservation of Idaho
Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada
Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota
Skokomish Indian Tribe of the Skokomish Reservation, Washington
Skull Valley Band of Goshute Indians of Utah
Smith River Rancheria, California
Snoqualmie Tribe, Washington
Soboba Band of Luiseno Indians, California
Sokaogon Chippewa Community, Wisconsin
Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado
Spirit Lake Tribe, North Dakota
Spokane Tribe of the Spokane Reservation, Washington
Squaxin Island Tribe of the Squaxin Island Reservation, Washington
Standing Rock Sioux Tribe of North & South Dakota
Stockbridge Munsee Community, Wisconsin
Stillaguamish Tribe of Washington
Summit Lake Paiute Tribe of Nevada
Suquamish Indian Tribe of the Port Madison Reservation, Washington
Susanville Indian Rancheria, California
Swinomish Indians of the Swinomish Reservation, Washington
Sycuan Band of the Kumeyaay Nation (formerly the Sycuan Band of Diegueno Mission Indians of California)
Table Mountain Rancheria of California
Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band)
Thlopthlocco Tribal Town, Oklahoma
Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota
Tohono O'odham Nation of Arizona
Tonawanda Band of Seneca Indians of New York
Tonkawa Tribe of Indians of Oklahoma
Tonto Apache Tribe of Arizona
Torres Martinez Desert Cahuilla Indians, California (formerly the Torres-Martinez Band of Cahuilla Mission Indians of California)
Tule River Indian Tribe of the Tule River Reservation, California
Tulalip Tribes of the Tulalip Reservation, Washington
Tunica-Biloxi Indian Tribe of Louisiana
Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California
Turtle Mountain Band of Chippewa Indians of North Dakota
Tuscarora Nation of New York
Twenty-Nine Palms Band of Mission Indians of California
United Auburn Indian Community of the Auburn Rancheria of California
United Keetoowah Band of Cherokee Indians in Oklahoma
Upper Sioux Community, Minnesota
Upper Skagit Indian Tribe of Washington
Ute Indian Tribe of the Uintah & Ouray Reservation, Utah
Ute Mountain Tribe of the Ute Mountain Reservation, Colorado, New Mexico & Utah
Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California
Walker River Paiute Tribe of the Walker River Reservation, Nevada
Wampanoag Tribe of Gay Head (Aquinnah) of Massachusetts
Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches)
White Mountain Apache Tribe of the Fort Apache Reservation, Arizona
Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma
Winnebago Tribe of Nebraska
Winnemucca Indian Colony of Nevada
Wiyot Tribe, California (formerly the Table Bluff Reservation—Wiyot Tribe)
Wyandotte Nation, Oklahoma
Yankton Sioux Tribe of South Dakota
Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona
Yavapai-Prescott Tribe of the Yavapai Reservation, Arizona
Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada
Yomba Shoshone Tribe of the Yomba Reservation, Nevada
Ysleta Del Sur Pueblo of Texas
Yurok Tribe of the Yurok Reservation, California
Zuni Tribe of the Zuni Reservation, New Mexico

**Native Entities Within the State of Alaska Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

Native Village of Afognak (formerly the Village of Afognak)
Agdaagux Tribe of King Cove
Native Village of Akhiok
Akiachak Native Community
Akiak Native Community
Native Village of Akutan
Village of Alakanuk
Alatna Village
Native Village of Aleknagik
Algaaciq Native Village (St. Mary's)
Allakaket Village
Native Village of Ambler
Village of Anaktuvuk Pass
Yupiit of Andreafski
Angoon Community Association
Village of Aniak
Anvik Village
Arctic Village (See Native Village of Venetie Tribal Government)
Asa'carsarmiut Tribe
Native Village of Atka
Village of Atmautluak
Atqasuk Village (Atkasook)
Native Village of Barrow Inupiat Traditional Government
Beaver Village
Native Village of Belkofski
Village of Bill Moore's Slough
Birch Creek Tribe
Native Village of Brevig Mission
Native Village of Buckland
Native Village of Cantwell
Native Village of Chenega (aka Chanega)
Chalkyitsik Village
Cheesh-Na Tribe (formerly the Native Village of Chistochina)
Village of Chefornak
Chevak Native Village
Chickaloon Native Village
Chignik Bay Tribal Council (formerly the Native Village of Chignik)
Native Village of Chignik Lagoon
Chignik Lake Village
Chilkat Indian Village (Klukwan)
Chilkoot Indian Association (Haines)
Chinik Eskimo Community (Golovin)
Native Village of Chitina
Native Village of Chuathbaluk (Russian Mission, Kuskokwim)
Chuloonawick Native Village
Circle Native Community
Village of Clarks Point
Native Village of Council
Craig Community Association
Village of Crooked Creek
Curyung Tribal Council

Native Village of Deering
Native Village of Diomede (aka Inalik)
Village of Dot Lake
Douglas Indian Association
Native Village of Eagle
Native Village of Eek
Egegik Village
Eklutna Native Village
Native Village of Ekuk
Ekwok Village
Native Village of Elim
Emmonak Village
Evansville Village (aka Bettles Field)
Native Village of Eyak (Cordova)
Native Village of False Pass
Native Village of Fort Yukon
Native Village of Gakona
Galena Village (aka Louden Village)
Native Village of Gambell
Native Village of Georgetown
Native Village of Goodnews Bay
Organized Village of Grayling (aka
    Holikachuk)
Gulkana Village
Native Village of Hamilton
Healy Lake Village
Holy Cross Village
Hoonah Indian Association
Native Village of Hooper Bay
Hughes Village
Huslia Village
Hydaburg Cooperative Association
Igiugig Village
Village of Iliamna
Inupiat Community of the Arctic Slope
Iqurmuit Traditional Council (formerly
    the Native Village of Russian
    Mission)
Ivanoff Bay Village
Kaguyak Village
Organized Village of Kake
Kaktovik Village (aka Barter Island)
Village of Kalskag
Village of Kaltag
Native Village of Kanatak
Native Village of Karluk
Organized Village of Kasaan
Kasigluk Traditional Elders Council
    (formerly the Native Village of
    Kasigluk)
Kenaitze Indian Tribe
Ketchikan Indian Corporation
Native Village of Kiana
King Island Native Community
King Salmon Tribe
Native Village of Kipnuk
Native Village of Kivalina
Klawock Cooperative Association
Native Village of Kluti Kaah (aka Copper
    Center)
Knik Tribe
Native Village of Kobuk
Kokhanok Village
Native Village of Kongiganak
Village of Kotlik
Native Village of Kotzebue
Native Village of Koyuk
Koyukuk Native Village
Organized Village of Kwethluk

Native Village of Kwigillingok
Native Village of Kwinhagak (aka
    Quinhagak)
Native Village of Larsen Bay
Levelock Village
Lesnoi Village (aka Woody Island)
Lime Village
Village of Lower Kalskag
Manley Hot Springs Village
Manokotak Village
Native Village of Marshall (aka Fortuna
    Ledge)
Native Village of Mary's Igloo
McGrath Native Village
Native Village of Mekoryuk
Mentasta Traditional Council
Metlakatla Indian Community, Annette
    Island Reserve
Native Village of Minto
Naknek Native Village
Native Village of Nanwalek (aka English
    Bay)
Native Village of Napaimute
Native Village of Napakiak
Native Village of Napaskiak
Native Village of Nelson Lagoon
Nenana Native Association
New Koliganek Village Council
New Stuyahok Village
Newhalen Village
Newtok Village
Native Village of Nightmute
Nikolai Village
Native Village of Nikolski
Ninilchik Village
Native Village of Noatak
Nome Eskimo Community
Nondalton Village
Noorvik Native Community
Northway Village
Native Village of Nuiqsut (aka Nooiksut)
Nulato Village
Nunakauyarmiut Tribe (formerly the
    Native Village of Toksook Bay)
Native Village of Nunam Iqua (formerly
    the Native Village of Sheldon's
    Point)
Native Village of Nunapitchuk
Village of Ohogamiut
Village of Old Harbor
Orutsararmiut Native Village (aka
    Bethel)
Oscarville Traditional Village
Native Village of Ouzinkie
Native Village of Paimiut
Pauloff Harbor Village
Pedro Bay Village
Native Village of Perryville
Petersburg Indian Association
Native Village of Pilot Point
Pilot Station Traditional Village
Native Village of Pitka's Point
Platinum Traditional Village
Native Village of Point Hope
Native Village of Point Lay
Native Village of Port Graham
Native Village of Port Heiden
Native Village of Port Lions
Portage Creek Village (aka Ohgsenakale)

Pribilof Islands Aleut Communities of
    St. Paul & St. George Islands
Qagan Tayagungin Tribe of Sand Point
    Village
Qawalangin Tribe of Unalaska
Rampart Village
Village of Red Devil
Native Village of Ruby
Saint George Island (See Pribilof Islands
    Aleut Communities of St. Paul & St.
    George Islands)
Native Village of Saint Michael
Saint Paul Island (See Pribilof Islands
    Aleut Communities of St. Paul & St.
    George Islands)
Village of Salamatoff
Native Village of Savoonga
Organized Village of Saxman
Native Village of Scammon Bay
Native Village of Selawik
Seldovia Village Tribe
Shageluk Native Village
Native Village of Shaktoolik
Native Village of Shishmaref
Native Village of Shungnak
Sitka Tribe of Alaska
Skagway Village
Village of Sleetmute
Village of Solomon
South Naknek Village
Stebbins Community Association
Native Village of Stevens
Village of Stony River
Sun'aq Tribe of Kodiak (formerly the
    Shoonaq' Tribe of Kodiak)
Takotna Village
Native Village of Tanacross
Native Village of Tanana
Native Village of Tatitlek
Native Village of Tazlina
Telida Village
Native Village of Teller
Native Village of Tetlin
Central Council of the Tlingit & Haida
    Indian Tribes
Traditional Village of Togiak
Tuluksak Native Community
Native Village of Tuntutuliak
Native Village of Tununak
Twin Hills Village
Native Village of Tyonek
Ugashik Village
Umkumiute Native Village
Native Village of Unalakleet
Native Village of Unga
Village of Venetie (See Native Village of
    Venetie Tribal Government)
Native Village of Venetie Tribal
    Government (Arctic Village and
    Village of Venetie)
Village of Wainwright
Native Village of Wales
Native Village of White Mountain
Wrangell Cooperative Association
Yakutat Tlingit Tribe

[FR Doc. E8–6968 Filed 4–3–08; 8:45 am]
**BILLING CODE 4310-4J-P**

# EXHIBIT C

Case 1:08-cv-00519-HHK    Document 7-7    Filed 05/13/2008    Page 2 of 6

Public Law 85-671

### AN ACT

To provide for the distribution of the land and assets of certain Indian rancherias and reservations in California, and for other purposes.

August 18, 1958
[H. R. 2824]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the lands, including minerals, water rights, and improvements located on the lands, and other assets of the following rancherias and reservations in the State of California shall be distributed in accordance with the provisions of this Act: Alexander Valley, Auburn, Big Sandy, Big Valley, Blue Lake, Buena Vista, Cache Creek, Chicken Ranch, Chico, Cloverdale, Cold Springs, Elk Valley, Guidiville, Graton, Greenville, Hopland, Indian Ranch, Lytton, Mark West, Middletown, Montgomery Creek, Mooretown, Nevada City, North Fork, Paskenta, Picayune, Pinoleville, Potter Valley, Quartz Valley, Redding, Redwood Valley, Robinson, Rohnerville, Ruffeys, Scotts Valley, Smith River, Strawberry Valley, Table Bluff, Table Mountain, Upper Lake, Wilton.

Indian rancherias.
Land distribution.

SEC. 2. (a) The Indians who hold formal or informal assignments on each reservation or rancheria, or the Indians of such reservation or rancheria, or the Secretary of the Interior after consultation with such Indians, shall prepare a plan for distributing to individual Indians the assets of the reservation or rancheria, including the assigned and the unassigned lands, or for selling such assets and distributing the proceeds of sale, or for conveying such assets to a corporation or other legal entity organized or designated by the group, or for conveying such assets to the group as tenants in common. The Secretary shall provide such assistance to the Indians as is necessary to organize a corporation or other legal entity for the purposes of this Act.

Distribution of assets.

(b) General notice shall be given of the contents of a plan prepared pursuant to subsection (a) of this section and approved by the Secretary, and any Indian who feels that he is unfairly treated in the proposed distribution of the property shall be given an opportunity to present his views and arguments for the consideration of the Secretary. After such consideration, the plan or a revision thereof shall be submitted for the approval of the adult Indians who will participate in the distribution of the property, and if the plan is approved by a majority of such Indians who vote in a referendum called for that purpose by the Secretary the plan shall be carried out. It is the intention of Congress that such plan shall be completed not more than three years after it is approved.

Referendum.

(c) Any grantee under the provisions of this section shall receive an unrestricted title to the property conveyed, and the conveyance shall be recorded in the appropriate county office.

Record of conveyance.

(d) No property distributed under the provisions of this Act shall at the time of distribution be subject to any Federal or State income tax. Following any distribution of property made under the provisions of this Act, such property and any income derived therefrom by the distributee shall be subject to the same taxes, State and Federal, as in the case of non-Indians: *Provided,* That for the purpose of capital gains or losses the base value of the property shall be the value of the property when distributed to the individual, corporation, or other legal entity.

Taxation.

SEC. 3. Before making the conveyances authorized by this Act on any rancheria or reservation, the Secretary of the Interior is directed:

(a) To cause surveys to be made of the exterior or interior boundaries of the lands to the extent that such surveys are necessary or

Surveys.

appropriate for the conveyance of marketable and recordable titles to the lands.

(b) To complete any construction or improvement required to bring Indian Bureau roads serving the rancherias or reservations up to adequate standards comparable to standards for similar roads of the State or subdivision thereof. The Secretary is authorized to contract with the State of California or political subdivisions thereof for the construction or improvement of such roads and to expend under such contracts moneys appropriated by Congress for the Indian road system. When such roads are transferred to the State or local government the Secretary is authorized to convey rights-of-way for such roads, including any improvements thereon.

(c) to install or rehabilitate such irrigation or domestic water systems as he and the Indians affected agree, within a reasonable time, should be completed by the United States.

(d) To cancel all reimbursable indebtedness owing to the United States on account of unpaid construction, operation, and maintenance charges for water facilities on the reservation or rancheria.

(e) To exchange any lands within the rancheria or reservation that are held by the United States for the use of Indians which the Secretary and the Indians affected agree should be exchanged before the termination of the Federal trust for non-Indian lands and improvements of approximately equal value.

SEC. 4. Nothing in this Act shall abrogate any water right that exists by virtue of the laws of the United States. To the extent that the laws of the State of California are not now applicable to any water right appurtenant to any lands involved herein they shall continue to be inapplicable while the water right is in Indian ownership for a period not to exceed fifteen years after the conveyance pursuant to this Act of an unrestricted title thereto, and thereafter the applicability of such laws shall be without prejudice to the priority of any such right not theretofore based upon State law. During the time such State law is not applicable the Attorney General shall represent the Indian owner in all legal proceedings, including proceedings before administrative bodies, involving such water right, and in any necessary affirmative action to prevent adverse appropriation of water which would encroach upon the Indian water right.

SEC. 5. (a) The Secretary of the Interior is authorized to convey without consideration to Indians who receive conveyances of land pursuant to this Act, or to a corporation or other legal entity organized by such Indians, or to a public or nonprofit body, any federally owned property on the reservations or rancherias subject to this Act that is not needed for the administration of Indian affairs in California.

(b) For the purposes of this Act, the assets of the Upper Lake Rancheria and the Robinson Rancheria shall include the one-hundred-and-sixty-acre tract set aside as a wood reserve for the Upper Lake Indians by secretarial order dated February 15, 1907.

(c) The Secretary of the Interior is authorized to sell the five hundred and sixty acres of land, more or less, which were withdrawn from entry, sale, or other disposition, and set aside for the Indians of Indian Ranch, Inyo County, California, by the Act of March 3, 1928 (45 Stat. 162), and to distribute the proceeds of sale among the heirs of George Hanson.

SEC. 6. The Secretary of the Interior shall disburse to the Indians of the rancherias and reservations that are subject to this Act all funds of such Indians that are in the custody of the United States.

SEC. 7. Nothing in this Act shall affect any claim filed before the Indian Claims Commission, or the right, if any, of the Indians sub-

ject to this Act to share in any judgment recovered against the United States on behalf of the Indians of California.

Sec. 8. Before conveying or distributing property pursuant to this Act, the Secretary of the Interior shall protect the rights of individual Indians who are minors, non compos mentis, or in the opinion of the Secretary in need of assistance in conducting their affairs, by causing the appointment of guardians for such Indians in courts of competent jurisdiction, or by such other means as he may deem adequate, without application from such Indians, including but not limited to the creation of a trust for such Indians' property with a trustee selected by the Secretary, or the purchase by the Secretary of annuities for such Indians.

*Appointment of guardians.*

Sec. 9. Prior to the termination of the Federal trust relationship in accordance with the provisions of this Act, the Secretary of the Interior is authorized to undertake, within the limits of available appropriations, a special program of education and training designed to help the Indians to earn a livelihood, to conduct their own affairs, and to assume their responsibilities as citizens without special services because of their status as Indians. Such program may include language training, orientation in non-Indian community customs and living standards, vocational training and related subjects, transportation to the place of training or instruction, and subsistence during the course of training or instruction. For the purposes of such program, the Secretary is authorized to enter into contracts or agreements with any Federal, State, or local governmental agency, corporation, association, or person. Nothing in this section shall preclude any Federal agency from undertaking any other program for the education and training of Indians with funds appropriated to it.

*Educational training.*

Sec. 10. (a) The plan for the distribution of the assets of a rancheria or reservation, when approved by the Secretary and by the Indians in a referendum vote as provided in subsection 2 (b) of this Act, shall be final, and the distribution of assets pursuant to such plan shall not be the basis for any claim against the United States by an Indian who receives or is denied a part of the assets distributed.

*Finality of plan.*

(b) After the assets of a rancheria or reservation have been distributed pursuant to this Act, the Indians who receive any part of such assets, and the dependent members of their immediate families, shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians, all statutes of the United States which affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner as they apply to other citizens or persons within their jurisdiction. Nothing in this Act, however, shall affect the status of such persons as citizens of the United States.

*Laws applicable.*

Sec. 11. The constitution and corporate charter adopted pursuant to the Act of June 18, 1934 (48 Stat. 984), as amended, by any rancheria or reservation subject to this Act shall be revoked by the Secretary of the Interior when a plan is approved by a majority of the adult Indians thereof pursuant to subsection 2 (b) of this Act.

*Revocation.*
25 USC 461-479.

Sec. 12. The Secretary of the Interior is authorized to issue such rules and regulations and to execute or approve such conveyancing instruments as he deems necessary to carry out the provisions of this Act.

*Rules and regulations.*

Sec. 13. There is authorized to be appropriated not to exceed $509,235 to carry out the provisions of this Act.

*Appropriation.*

Approved August 18, 1958.

Public Law 88-419

**AN ACT**

To amend the Act entitled "An Act to provide for the distribution of the land and assets of certain Indian rancherias and reservations in California, and for other purposes", approved August 18, 1958 (72 Stat. 619).

*August 11, 1964*
*[H. R. 7833]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That (a) the first section of the Act entitled "An Act to provide for the distribution of the land and assets of certain Indian rancherias and reservations in California, and for other purposes," approved August 18, 1958 (72 Stat. 619), is amended to read as follows: "the lands, including minerals, water rights, and improvements located on the lands, and other assets of the rancherias and reservations lying wholly within the State of California shall be distributed in accordance with the provisions of this Act when such distribution is requested by a majority vote of the adult Indians of a rancheria or reservation or of the adult Indians who hold formal or informal assignments on the rancheria or reservation, as determined by the Secretary of the Interior. The requirement for a majority vote shall not apply to the rancherias and reservations that were at any time named in this section."

*Indian rancherias.*
*Land distribution.*

(b) Section 2(a) of such Act is amended by deleting "The Indians who hold formal or informal assignments on each reservation or rancheria, or the Indians of such reservation or rancheria, or the Secretary of the Interior after consultation with such Indians," and by substituting "When the Indians of a rancheria or reservation request a distribution of assets in accordance with the provisions of this Act, they, or the Secretary of the Interior after consultation with them,".

*Distribution of assets.*

(c) Section 2(a) of such Act is further amended by changing the period at the end of the first sentence to a colon and adding: "*Provided*, That the provisions of this section with respect to a request for distribution of assets shall not apply to any case in which the requirement for such request is waived by section 1 of this Act, and in any such case the plan shall be prepared as though request therefor had been made."

(d) Section 2(b) of such Act is amended by changing the period at the end of the penultimate sentence to a colon and adding: "*Provided*, That the provisions of such plan may be modified with the approval of the Secretary and consent of the majority of the distributees."

(e) Section 3(c) of such Act is amended to read as follows:

*Sanitation and irrigation facilities.*

"(c) To construct, improve, install, extend, or otherwise provide, by contract or otherwise, sanitation facilities (including domestic and community water supplies and facilities, drainage facilities, and sewage- and waste-disposal facilities, together with necessary appurtenances and fixtures) and irrigation facilities for Indian homes, communities, and lands, as he and the Indians agree, within a reasonable time, should be completed by the United States: *Provided*, That with respect to sanitation facilities, as hereinbefore described, the functions specified in this paragraph, including agreements with Indians with respect to such facilities, shall be performed by the Secretary of Health, Education, and Welfare in accordance with the provisions of section 7 of the Act of August 4, 1954 (58 Stat. 674), as amended (42 U.S.C. 2004a)."

*68 Stat. 674;*
*73 Stat. 267.*

(f) Section 3(e) of such Act is amended by deleting the word "non-Indian".

(g) Section 5 of such Act is amended by adding a new subsection as follows:

"(d) Any rancheria or reservation lying wholly within the State of California that is held by the United States for the use of Indians of California and that was not occupied on January 1, 1964, by Indians under a formal or informal assignment shall be sold by the Secretary of the Interior and the proceeds of the sale shall be deposited in the Treasury of the United States to the credit of the Indians of California. Any rancheria or reservation lying wholly within the State of California that is held by the United States for a named tribe, band, or group that was not occupied on January 1, 1964, may be sold by the Secretary of the Interior and the proceeds shall be deposited to the credit of the tribe, band, or group." <span style="float:right">Unoccupied lands. Sale.</span>

(h) Section 10(b) of such Act is amended (1) by inserting after the words "their immediate families" the words "who are not members of any other tribe or band of Indians", (2) by inserting after "because of their status as Indians", the words "all restrictions and tax exemptions applicable to trust or restricted land or interests therein owned by them are terminated,", and (3) by adding at the end of section 10(b) the following sentence: "The provisions of this subsection, as amended, shall apply in the case of a distribution of assets made either before or after the amendment of the subsection."

(i) Section 11 of such Act is amended by inserting immediately after the words "as amended," the words "or any other authority,".

(j) Section 13 of such Act is amended by deleting "not to exceed $500,235" and by substituting "such sums as may be necessary".

Approved August 11, 1964.

---

Public Law 88-420

## AN ACT

To permit the vessel United States ship Alabama to pass through the Panama Canal without payment of tolls. <span style="float:right">August 11, 1964 [H. R. 11622]</span>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, notwithstanding any other provision of law, in order to facilitate the movement of the vessel United States ship Alabama from the west coast of the United States to a site in the State of Alabama where it is to be established as a public shrine, the vessel United States ship Alabama shall be permitted to pass through the Panama Canal from west to east without payment of tolls of any kind. <span style="float:right">U.S.S. Alabama.</span>

For the purposes of such transit through the Panama Canal the said vessel shall be regarded as a vessel operated by the United States within the meaning of section 412(c) of title 2 of Canal Zone Code (76A Stat. 27).

Approved August 11, 1964.

31-667 O—65—28

# EXHIBIT D

T. 9 S., R. 4 W.,
Secs. 6 and 7.
T. 10 S., R. 4 W.,
Sec. 21, W½;
Sec. 29, N½.
T. 2 S., R. 5 W.,
Secs. 13, 14, 23, 26, 27, 28, 33, 34, and 35.
T. 3 S., R. 5 W.,
Secs. 3, 4, 9, 10, 15, 16, 21, 28;
Secs. 33 to 36 inclusive.
T. 4 S., R. 5 W.,
Secs. 1 to 4 inclusive;
Secs. 9 to 12 inclusive.
T. 5 S., R. 5 W.,
Secs. 19 to 22 inclusive;
Secs. 26 to 35 inclusive.
T. 6 S., R. 5 W.,
Secs. All.
T. 7 S., R. 5 W.,
Secs. 3 to 10 inclusive;
Secs. 15 to 22 inclusive;
Secs. 27 to 34 inclusive.
T. 8 S., R. 5 W.,
Secs. 5 to 8 inclusive;
Secs. 17 to 22 inclusive;
Secs. 26 to 35 inclusive.
T. 9 S., R. 5 W.,
Secs. 1 to 12 inclusive;
Secs. 17 to 20 inclusive;
Secs. 29 to 32 inclusive.
T. 11 S., R. 5 W.,
Secs. 1, 12, 13, 24, 25, and 36.
T. 2 S., R. 6 W.,
Secs. 2 to 6 inclusive;
Secs. 8 to 11 inclusive;
Secs. 14 to 17 inclusive;
Secs. 20 to 23 inclusive;
Secs. 27 to 33 inclusive.
T. 3 S., R. 6 W.,
Secs. 4, 5, and 6.
T. 6 S., R. 6 W.,
Secs. 1 and 2;
Secs. 11 to 14 inclusive;
Secs. 21 to 28 inclusive;
Secs. 33 to 36 inclusive.
T. 7 S., R. 6 W.,
Secs. 1 to 4 inclusive;
Secs. 9 to 16 inclusive;
Secs. 21 to 28 inclusive;
Secs. 33 to 36 inclusive.
T. 8 S., R. 6 W.,
Secs. 1, 12, 13, 24, 25, and 36.
T. 9 S., R. 6 W.,
Secs. 1, 2, and 3;
Secs. 10 to 15 inclusive;
Secs. 22 to 27 inclusive;
Secs. 34 to 36 inclusive.
T. 1 S., R. 7 W.,
Secs. 19, 30, 31, and 32.
T. 2 S., R. 7 W.,
Secs. 4 to 9 inclusive;
Secs. 15 to 36 inclusive.
T. 3 S., R. 7 W.,
Secs. All.
T. 4 S., R. 7 W.,
Secs. 3 to 10 inclusive;
Secs. 16 to 21 inclusive;
Secs. 29 to 32 inclusive.
T. 8 S., R. 7 W.,
Secs. 22, 23, 26, 27, 34, and 35.
T. 1 S., R. 8 W.,
Secs. 24, 25, and 36.
T. 2 S., R. 8 W.,
Sec. 8 and 2;
Secs. 9 to 17 inclusive;
Secs. 19 to 36 inclusive.
T. 3 S., R. 8 W.,
Secs. All.
T. 4 S., R. 8 W.,
Secs. All.
T. 5 S., R. 8 W.,
Secs. 2 to 5 inclusive.
T. 2 S., R. 9 W.,
Secs. 25, 26, 35, and 36.

T. 3 S., R. 9 W.,
Secs. 1, and 2;
Secs. 11 to 14, inclusive;
Secs. 23 to 27, inclusive;
Secs. 34 to 36, inclusive.
T. 4 S., R. 9 W.,
Secs. 1, 2, and 3;
Secs. 10 to 15, inclusive;
Secs. 23 to 25, inclusive.

The public land in the areas described aggregate approximately 236,552 acres.

HAROLD TYSK,
*State Director.*
[F.R. Doc. 67–6102; Filed, June 1, 1967;
8:45 a.m.]

---

[Serial No. N–354]

## NEVADA

### Notice of Proposed Classification

MAY 25, 1967.

Notice is hereby given of a proposal to classify the lands described below through exchange under section 8 of the Taylor Grazing Act (43 U.S.C. 315g) for lands which lie mainly in the Humboldt National Forest. This proposal has been discussed with the District Advisory Board, local governmental officials, and other interested parties. Information derived from discussions and other sources indicate that these lands meet the criterion of 43 CFR 2410.1-3(c) (4), which authorizes classification of lands "for exchange under appropriate authority where they are found to be chiefly valuable for public purposes because they have special values, arising from the interest of exchange proponents, for exchange for other lands which are needed for the support of a Federal Program." Information concerning the lands, including the record of public discussions, is available for inspection and study at the Bureau of Land Management, Federal Building, 300 Booth Street, Reno, Nev. For a period of 60 days from the date of this publication, interested parties may submit comments to the District Manager of the Elko District.

The lands affected by this proposal are located in Elko County and are described as follows:

MOUNT DIABLO MERIDIAN, NEVADA

T. 45 N., R. 50 E.,
Sec. 1, lots 1, 2, 3, 4, S½N½;
Sec. 2, lots 3, 4, S½N½;
Sec. 3, lots 1, 2, 3, 4, S½N½;
Sec. 4, lots 1, 2, 3, 4, S½N½;
Sec. 5, lots 1, 2, 3, S½N½, S½;
Sec. 6, lots 3, 4, 5, 6, 7, SE¼NE¼, SE¼
NW¼, E½SW¼, W½SE¼;
Sec. 7, lots 2, 3, 4, NW½NE¼, S½NE¼,
E½NW¼, E½SW¼, SE¼;
Sec. 8.
Sec. 17, NW¼NW¼;
Sec. 18, lot 1, N½NE¼, NE¼NW¼.
T. 45 N., R. 51 E.,
Sec. 1, lots 3, 4, S½N½;
Sec. 2, lots 1, 2, 3, 4, S½N½;
Sec. 3, lots 1, 2, 3, 4, S½N½;
Sec. 4, lots 1, 2, 3, 4, S½N½;
Sec. 5, lots 1, 2, 3, 4, S½N½;
Sec. 6, lots 1, 2, 3, 4, 5, S½NE¼, SE¼NW¼.
T. 45 N., R. 52 E.,
Sec. 5, 6, 7, 8, 17, 18, 19, 20, 29, 30, 31, 32.

T. 44 N., R. 52 E.,
Sec. 6, lots 1, 2;
Sec. 19, NE¼NE¼, S½NE¼, SE¼SW¼,
SE¼;
Sec. 20, N½, SW¼, S½SE¼;
Sec. 30, lots 5 through 12, inclusive, N½
NE¼;
Sec. 31, lots 5, 6, 7, 10, 11;

Containing 14,603.93 acres.

For the State Director.

DANIEL P. BAKER,
*Manager, Nevada Land Office.*
[F.R. Doc. 67–6103; Filed, June 1, 1967;
8:45 a.m.]

---

[New Mexico 1239]

## NEW MEXICO

### Notice of Classification of Lands for Multiple Use Management; Correction

MAY 24, 1967.

F.R. Doc. No. 67–5512 which appeared in the FEDERAL REGISTER issue of May 18, 1967, at pages 7401–3 is hereby corrected to include "T. 7 S., R. 3 W., Secs. 13 and 14."

MORRIS A. TROGSTAD,
*Acting State Director.*
[F.R. Doc. 67–6110; Filed, June 1, 1967;
8:45 a.m.]

---

### Office of the Secretary

## CHICO RANCHERIA IN CALIFORNIA

### Notice of Termination of Federal Supervision Over Property and Individual Members Thereof

Notice is hereby given that the Indians named below and the dependent members of their immediate families named below who are not members of any other tribe or band of Indians are no longer entitled to any of the services performed by the United States for Indians because of their status as Indians; that all statutes of the United States which affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner as they apply to other citizens within their jurisdiction. Title to the land on the Chico Rancheria has passed from the U.S. Government under distribution plan dated December 11, 1960, for the above-named rancheria.

CHICO RANCHERIA

Comprised of two parcels, totaling 26 acres, more or less, located in Butte County, Calif., and more particularly described as follows:

*Parcel No. 1.* Being a portion of the Rancho Arroyo Chico, beginning at an iron post on the northerly side of Sacramento Avenue at its junction with the westerly side of a street, formerly known as Chestnut (being the easterly line of the present Indian village, formerly known as Me-choop-da Indian Village), the same being the southeasterly corner of Block F, of Chico Vecino; thence

HeinOnline -- 32 Fed. Reg. 7981 1967

northerly along the westerly line of Chestnut Street, 442 feet to the southerly line of First Street; thence westerly along the southerly line of First Street, 1,342.85 feet to the right-of-way line of the California and Oregon (now Southern Pacific) Railroad; thence southerly along said railroad right-of-way, 473 feet to the northerly line of Sacramento Avenue; thence easterly along said northerly line of Sacramento Avenue, 1,174 feet to place of beginning.

*Parcel No. 2.* Beginning at a point on the southerly line of Sacramento Avenue at its intersection with the easterly right-of-way line of California and Oregon (now Southern Pacific) Railroad; thence southerly along the easterly line of said railroad right-of-way to a point marked by the intersection with said line of the northerly line of Lincoln Avenue produced; thence easterly along said northerly line of the extension of Lincoln Avenue to the extension of the easterly line of Parcel 1 hereinabove described, being the extension of the easterly boundary of the Indian village formerly known as Me-choop-da Indian Village; thence along said extension of the easterly boundary of said Indian village to the southerly line of Sacramento Avenue; thence westerly along the southerly line of Sacramento Avenue to the place of beginning.

| Name | Birthdate | Address |
|---|---|---|
| Barbara Jean Beasley. | 1-28-1928 | Post Office Box 219, Central Valley, Calif. |
| Linda Frakes. | 2-05-1948 | Do. |
| Koreen Beasley. | 11-02-1950 | Do. |
| Wayne Beasley. | 4-18-1955 | Do. |
| Darvin Nuckolls. | 6-18-1928 | Post Office Box 418, Central Valley, Calif. |
| Lillian Stubblefield. | 11-17-1924 | Route 4, John Word Road, Marietta, Ga. |
| Kurlin E. Stubblefield. | 4-12-1946 | Do. |
| LeRoy C. Stubblefield. | 1-02-1951 | Do. |
| Kathy Stubblefield | 3-03-1953 | Do. |
| Luther Clements. | 4-09-1893 | Post Office Box 25, Tehama, Calif. |
| Esther Clements. | 10-16-1907 | Do. |
| Homer Sylvers, Jr. | 3-14-1928 | 2455–B–Curry Circle South, Holloman Air Force Base, N. Mex. |
| Patti J. Sylvers. | 5-23-1956 | Do. |
| Craig S. Sylvers. | 5-23-1959 | Do. |
| Alfred Nuckolls. | 5-02-1930 | Post Office Box 2, Bella Vista, Calif. |
| Rosie A. Nuckolls. | 9-22-1957 | Do. |
| LeRoy C. Nuckolls. | 12-28-1898 | Post Office Box 418, Central Valley, Calif. |
| Donald Sylvers. | 4-17-1930 | 2101 West 12th, Santa Ana, Calif. |
| DeAnn Sylvers. | 4-01-1952 | Do. |
| Dawn Sylvers. | 11-04-1953 | Do. |
| Denise Sylvers. | 10-22-1954 | Do. |
| Donna Sylvers. | 2-07-1956 | Do. |
| Devin Sylvers. | 8-14-1958 | Do. |
| Raymond Sylvers. | 5-18-1933 | 21411 Longworth Avenue, Artesia, Calif. |
| Dolores McHenry. | 2-08-1937 | 1621 Sheridan Avenue, Chico, Calif. |
| John W. McHenry. | 2-11-1955 | Do. |
| Vance L. McHenry. | 7-10-1956 | Do. |
| Robert M. McHenry. | 7-24-1957 | Do. |
| Patricia L. McHenry. | 9-03-1958 | Do. |
| Robyn D. McHenry. | 9-07-1960 | Do. |
| Carl Delgado. | 4-10-1912 | Box 195, Clearlake Park, Calif. |
| Shirley Delgado. | 7-02-1921 | Do. |
| Carlene Delgado. | 10-12-1944 | Do. |
| Frederick Delgado. | 5-06-1948 | Do. |
| Stella Conway. | 9-01-1897 | 328 "I" Street, Rio Linda, Calif. |
| Jodie Lee Conway. | 9-21-1939 | 1035 Mechoopda, Chico, Calif. |
| Chester Conway. | 10-15-1940 | 735 West 1st Avenue, Chico, Calif. |

| Name | Birthdate | Address |
|---|---|---|
| Vernon Conway. | 2-03-1924 | 6516 Skyland Drive, Citrus Heights, Calif. |
| Thelma Conway. | | Do. |
| Raymond Conway | 1-07-1958 | Do. |
| Loretta Lynn. | 1-13-1960 | Do. |
| Homer Sylvers, Sr. | 2-13-1918 | 1621 Sheridan Avenue, Chico, Calif. |
| Elmer N. Aranda. | 5-06-1934 | 1121 Magnolia Avenue, Chico, Calif. |
| George L. Aranda. | 11-11-1932 | 839–B North 21st Street, Milwaukee, Wis. |
| Virgil Nuckolls. | 9-12-1916 | Box 664, Scotia, Calif. |
| Ivan Conway. | 9-23-1922 | 328 I Street, Rio Linda, Calif. |
| Julie Conway. | 2-16-1934 | Do. |
| Ronald Conway. | 7-17-1947 | Do. |
| Luther Laverne Clements. | 6-28-1925 | Post Office Box 12, Gerber, Calif. |
| Beatrice Clements. | 7-05-1949 | Do. |
| Luther V. Clements. | 3-31-1951 | Do. |
| George L. Clements. | 5-07-1954 | Do. |
| Roberta J. Clements. | 9-19-1960 | Do. |
| Ruth Payne. | 1-06-1923 | 23128 76th Avenue West, Edmonds, Wash. |
| Robert C. Payne. | 2-05-1947 | Do. |
| Ryan A. Payne. | 11-03-1950 | Do. |
| Corina L. Payne. | 5-07-1951 | Do. |
| Earl Clements. | 11-03-1933 | Box 256, Chualar, Calif. |
| Joshua D. Clements. | 6-06-1958 | Do. |
| Rodney J. Clements. | 2-01-1960 | Do. |
| Donna Mae Rickard. | 6-24-1913 | 607 Tulip, Couleo Dam, Wash. |
| Joyce Drenon. | 6-27-1930 | General Delivery, Richfield, Calif. |
| Rebecca C. Drenon | 8-19-1951 | Do. |
| Roxanna Drenon. | 8-26-1952 | Do. |
| Ted E. Drenon. | 8-11-1953 | Do. |
| Ronald C. Drenon. | 7-24-1959 | Do. |
| Bernice Rogers. | 8-18-1925 | Route 1, Nine Mile Falls, Wash. |
| Connie D. Rogers. | 9-28-1945 | Do. |
| Douglas E. Rogers. | 10-09-1947 | Do. |
| Edward N. Wilson. | 9-05-1927 | Post Office Box 501, Ukiah, Calif. |
| Jerry Ann Wilson, Jr. | 8-26-1936 | Do. |
| Margaret Nuckolls. | 9-05-1923 | Post Office Box 418, Central Valley, Calif. |
| Patricia Nuckolls. | 11-25-1924 | Do. |
| Douglas E. Nuckolls. | 4-15-1946 | Do. |
| Marvin Wilson. | 4-18-1937 | Travis Air Force Base, Calif. |
| Amanda B. Wilson. | 3-12-1959 | Do. |
| Frances G. Potter. | 8-04-1939 | Post Office Box 291, Ukiah, Calif. |
| Marlene F. Potter. | 5-13-1951 | Do. |
| William G. Potter. | 8-21-1957 | Do. |
| Harold L. Potter. | 6-02-1959 | Do. |
| Norma Ramirez. | 5-29-1932 | Hamilton City, Calif. |
| Edward F. Ramirez. | 6-15-1951 | Do. |
| Jessie J. Ramirez. | 8-31-1952 | Do. |
| Tony M. Ramirez. | 6-15-1954 | Do. |
| Peter R. Ramirez. | 2-21-1956 | Do. |
| David G. Ramirez. | 3-14-1957 | Do. |
| Dennis Ramirez. | 4-18-1960 | Do. |
| Jimmie Durant. | 2-23-1927 | 1233 Martin Street, Chico, Calif. |
| Jimmie S. Durant. | 7-06-1959 | Do. |
| Harriet Ramirez. | 5-14-1932 | 953 Wisconsin Street, Chico, Calif. |
| Frank C. Ramirez. | 1-13-1962 | Do. |
| Grover S. Ramirez. | 4-18-1953 | Do. |
| Lenora R. Ramirez. | 10-14-1955 | Do. |
| John G. Ramirez. | 1-03-1957 | Do. |
| Thelma Wilson. | 6-26-1930 | 620 West Sacramento Avenue, Chico, Calif. |
| Lenora Wilson. | 2-19-1898 | Do. |
| Robert E. Wilson. | 4-15-1945 | Do. |
| Henry Arbill. | 9-22-1899 | 1252–B Mason Street, San Francisco, Calif. |
| Genevieve Aranda. | 2-04-1915 | 137 Julian No. 5, San Francisco, Calif. |
| John N. Aranda, Jr. | 6-11-1943 | Do. |
| Barbara J. Aranda Rose. | 6-07-1944 | Do. |
| Kenneth P. Aranda. | 8-14-1945 | Do. |
| Juanita M. Aranda. | 10-18-1946 | 4052 19th Street, San Francisco, Calif. |
| Donna P. Aranda Davis. | 4-16-1948 | 40 Dearborn, San Francisco, Calif. |
| Lewis Wilson. | 6-15-1934 | Post Office Box 501, Ukiah, Calif. |
| Eileen Gladys Wilson. | 5-28-1960 | Do. |

| Name | Birthdate | Address |
|---|---|---|
| Harold Wilson. | 3-21-1930 | Post Office Box 198, Ukiah, Calif. |
| Elsie Wilson. | 2-24-1930 | Do. |
| Eva Pierce. | 2-27-1898 | 1607 High Street, Oakland, Calif. |
| Kenneth J. Arbill. | 2-15-1928 | 1252 H Mason Street, San Francisco, Calif. |
| John Arbill. | 10-14-1966 | 339 College SE., Grand Rapids, Mich. |
| Mary Jane Pomeroy. | 9-06-1932 | Post Office Box 187, Auburn, Calif. |
| Lloyd E. Pomeroy. | 1-30-1950 | Do. |
| Juanita Simpson. | 8-18-1913 | Post Office Box 3264, Chico, Calif. |
| William R. Simpson. | 11-05-1952 | Do. |

This notice is issued pursuant to the Act of August 18, 1958 (72 Stat. 619), amended August 11, 1964 (78 Stat. 390), including the provisions in the 1964 Act that this notice affects only Indians who received any part of the assets of the rancheria and the dependent members of their immediate families who are not members of any other tribe or band of Indians; and that all restrictions and tax exemptions applicable to trust or restricted lands or interests therein owned by the Indians who are affected by this notice are terminated.

This notice becomes effective on the date of publication in the FEDERAL REGISTER.

HARRY R. ANDERSON,
*Assistant Secretary of the Interior.*

MAY 25, 1967.

[F.R. Doc. 67–6065; Filed, June 1, 1967; 8:45 a.m.]

# DEPARTMENT OF COMMERCE

## Business and Defense Services Administration

### SOUTHERN RESEARCH INSTITUTE AND VANDERBILT UNIVERSITY MEDICAL SCHOOL

#### Notice of Applications for Duty-Free Entry of Scientific Articles

The following are notices of the receipt of applications for duty-free entry of scientific articles pursuant to section 6(c) of the Educational, Scientific and Cultural Materials Importation Act of 1966 (Public Law 89–651; 80 Stat. 897). Interested persons may present their views with respect to the question of whether an instrument or apparatus of equivalent scientific value for the purposes for which the article is intended to be used is being manufactured in the United States. Such comments must be filed in triplicate with the Director, Office of Scientific and Technical Equipment, Business and Defense Services Administration, Washington, D.C. 20230, within 20 calendar days after date on which this notice of application is published in the FEDERAL REGISTER.

Regulations issued under cited Act, published in the February 4, 1967 issue of the FEDERAL REGISTER, prescribe the requirements applicable to comments.

A copy of each application is on file, and may be examined during ordinary

HeinOnline -- 32 Fed. Reg. 7982 1967

# EXHIBIT E

```
 1   STEPHEN V. QUESENBERRY
     LESTER J. MARSTON
 2   MICHAEL S. PFEFFER
     CALIFORNIA INDIAN LEGAL SERVICES
 3   510 - 16th Street, Suite 301
     Oakland, CA 94612
 4   (415) 835-0284
     Attorneys for Plaintiffs
 5
     WILLIAM T. MCGIVERN, JR.
 6   United States Attorney
     FRANCIS B. BOONE
 7   Assistant United States Attorney
     450 Golden Gate Avenue
 8   San Francisco, California  94102
     Telephone: (415) 556-3215
 9
     GLEN R. GOODSELL
10   Trial Attorney
     United States Department of Justice
11   Environment and Natural Resources Division
     Benjamin Franklin Station, Room 857
12   P.O. Box 663
     Washington, D.C. 20044-0663
13   Telephone: (202) 272-8144
     Attorneys for Federal Defendants
14
     ROBERT G. BOEHM
15   City Attorney
     City of Chico
16   P.O. Box 3420
     Chico, CA  95927-3420
17   Telephone: (916) 895-4826
     Attorney for City of Chico
18
19              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
20
     Scotts Valley Band of Pomo Indians of    )
21   the Sugar Bowl Rancheria, et al.,        )
                                              )   No. C-86-3660-VRW
22         Plaintiffs,                        )
        v.                                    )   STIPULATION FOR
23                                            )   ENTRY OF JUDGMENT
     United States of America, et al.         )
24                                            )   (CHICO RANCHERIA)
           Defendants.                        )
25  _____)
                                              )
26   Gerald R. Stewart, et al.; County of     )
     Sonoma; and City of Chico,               )
27                                            )
           Defendants-Intervenors.            )
28  _____)
```

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)

1   The Mechoopda Indian plaintiffs,[1] the Federal defendants

2   and the City of Chico (hereinafter "the parties"), enter into

3   the following stipulation for the purpose of reaching a

4   compromise and final settlement of the claims alleged by said

5   plaintiffs against the Federal defendants in the Third Amended

6   Class Action Complaint For Declaratory And Injunctive Relief And

7   Damages, filed herein on April 29, 1991.  The settling parties

8   understand that this stipulation shall provide the basis for

9   entry of a judgment by the Court which will serve to implement,

10  in an orderly and timely fashion, the substantive and procedural

11  matters agreed to herein.  Accordingly, the parties stipulate

12  and agree as follows:

13      1.  Federal defendants agree that the Chico Rancheria was

14  not terminated, and the Rancheria assets were not distributed,

15  in accordance with the provisions of the Act of August 18, 1958,

16  P.L. 85-671, 72 Stat. 619, as amended by the Act of August 11,

17  1964, P.L. 88-419, 78 Stat. 390 ("the Rancheria Act").  Federal

18  defendants further agree that the Indian status of the persons

19  named as distributees in the distribution plan of the Chico

20  Rancheria was not terminated in accordance with the Rancheria

21  Act.

22      2.  Federal defendants agree that the distributees and the

23  dependent members of the Chico Rancheria, and their lineal

24  descendants, will have the individual and collective status and

25

26      [1]  The named plaintiffs, representing the interests of the
27  Mechoopda Indians, are Robyn D. McHenry, Loretta Lynn, Roberta J.
    Clements, Dennis E. Ramirez, Clara Wilson and Eileen Gladys
28  Wilson.

STIPULATION FOR ENTRY OF JUDGMENT                                    1
(CHICO RANCHERIA)

rights, including the rights to organize for their common welfare and to govern their affairs, which they had prior to termination. Federal defendants further agree to deal with these Indians on the same basis on which they deal with other Indians of a similar status.

3. Federal defendants agree that, within 30 days of the Court's approval of the entry of judgment pursuant to this stipulation, the Assistant Secretary will transmit to the Federal Register for publication a proclamation stating:

    a. that the Chico Rancheria was not lawfully terminated and its assets were not distributed in accordance with the provisions of the Rancheria Act, Act of August 18, 1958, P.L. 85-671, 72 Stat. 619, as amended by the Act of August 11, 1964, P.L. 88-419, 78 Stat. 390;

    b. that the distributees of the Chico Rancheria are eligible for all rights and benefits extended to Indians under the Constitution and laws of the United States; and

    c. that the Mechoopda Indian Tribe of the Chico Rancheria and its members shall be eligible for all rights and benefits extended to other federally recognized Indian tribes and their members, including Indian tribes defined and organized under the provisions of the Indian Reorganization Act (IRA), 25 U.S.C. § 461 et seq.

4. Effective as of the date of entry of this stipulation by the Court, the Mechoopda Tribe shall, consistent with Federal

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)

2

1  law, have the right to determine its own membership and

2  otherwise to govern its internal and external affairs as a

3  tribal entity consistent with its status prior to termination.

4  When and if the members of the Mechoopda Tribe reorganize

5  pursuant to federal statute, the federal defendants agree to add

6  them to the list of federally recognized tribal entities then

7  being used and will include them on any list of tribal entities

8  published in the Federal Register.  The name of the tribal

9  entity entered on the list(s) shall be the name chosen by the

10 Mechoopda Tribe in its governing document.  The Federal

11 defendants further agree to advise the Commissioner of the

12 Internal Revenue Service promptly that the Mechoopda Tribe has

13 organized to exercise governmental functions and has been added

14 to the list of tribal entities.

15    5.    Lands Within the Former Boundaries of the Chico
            Rancheria and Currently in Indian Ownership

16

17    Federal defendants agree to accept in trust status that

18 particular parcel of land within the boundaries of the former

19 Chico Rancheria which is identified as Butte County Assessor's

20 Parcel No. 43-18-0-036-0-0, and which is currently used as a

21 cemetery for the Mechoopda Tribe.  This parcel is currently in

22 Indian ownership and was deeded or passed as tribal community

23 property as a direct consequence of termination.  Title is

24 currently held in the name of Henry Azbill, et al., Trustees c/o

25 Mechoopda Indian Tribe.  The Mechoopda Indian plaintiffs agree

26 that the use of this parcel shall be restricted solely to its

27 current use as a cemetery.

28    The only other parcel of land within the boundaries of the

STIPULATION FOR ENTRY OF JUDGMENT                            3
(CHICO RANCHERIA)

1  former Chico Rancheria remaining in Indian ownership is that
2  particular parcel of land identified as Butte County Assessor's
3  Parcel No. 43-18-0-039-0-0.  Title to this parcel is currently
4  held in joint tenancy by Donna Mae Rickard, and her daughter, E.
5  Jean Berney, who desire that the parcel remain in fee status.
6  (See Affidavits of Donna Mae Rickard, and E. Jean Berney,
7  attached hereto as Exhibits A and B.)  The Mechoopda Indian
8  plaintiffs, Ms. Rickard and Ms. Berney agree that this parcel
9  shall remain in fee status.

      6.    Interests in Allotted Lands Outside the Boundaries of
10 the Former Chico Rancheria.

11

12 Since persons listed in the plan for distribution of assets
13 of the Chico Rancheria may have acquired interests in trust
14 lands outside the Rancheria, which interests may no longer be
15 held in trust because of the purported termination of the Indian
16 status of the listed persons, Federal defendants agree to accept
17 in trust any fee interests in trust or former trust allotments
18 issued to such persons, if such interests are currently held in
19 the name of the Mechoopda Indian distributee, or of his/her
20 dependent or Indian heir, or successor in interest, provided the
21 successor is an Indian of the rancheria or reservation where the
22 allotment is located.  The parties acknowledge that there is
23 only one public domain allotment in Butte County and that it
24 would not be affected by this provision or paragraph 9 because
25 the interests therein are not held by any Mechoopda Indian
26 distributee of the Chico Rancheria, or by his/her dependent or
27 Indian heir, or Indian successor in interest.

28

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)

4

7.    Improvements to the Indian Cemetery Within the Former Boundaries of the Chico Rancheria

Federal defendants agree to contribute up to $5,000.00 toward the cost of constructing a fence around the cemetery parcel identified in Paragraph 5.

Plaintiffs agree to construct a fence around the cemetery within one year of the date this stipulation, fully executed by the parties' counsel, is filed with court.  At least those portions of the fence that face West Sacramento Avenue and Rancheria Road will be constructed of wrought iron, unless the funds available prove to be inadequate for this purpose. In that event, plaintiffs and the City of Chico will either secure the necessary additional funds, or will consider a less expensive form of fencing that is agreeable to the plaintiffs and the City, and which can be constructed within the funds available.

8.    Future Land Acquisitions Within the Boundaries of the Former Chico Rancheria

With respect to any future acquisition of land within the exterior boundaries of the former Chico Rancheria by the Mechoopda Tribe, the Mechoopda Indian plaintiffs agree that acceptance of any such land in trust status shall be subject to the condition that its use be and remain consistent with the land use element of the General Plan of the City of Chico or the County of Butte, whichever may apply.

9.    Process for Restoring Trust Status -- Mechoopda Indian Cemetery and Interests in Allotments

Federal defendants agree that restoration of lands to trust status under the provisions of Paragraphs 5 and 6 above shall be

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)

accomplished as follows:

a. <u>Notice - Publication</u>:  Federal defendants shall publish a copy of the judgment entered herein in a newspaper of general circulation within the county in which the trust lands are located. Additionally, a copy of the judgment shall be mailed to:

(1)  each individual Indian person listed in the Termination Proclamation for the Chico Rancheria, and

(2)  such other persons, based on all available information in the possession of the Federal defendants and any other information supplied by the Mechoopda Indian plaintiffs, who may be related to or descended from any such individual, for whom the Bureau of Indian Affairs has a current or last known address.

b. <u>Election to Convey</u>:  Each Indian of the Mechoopda Tribe who has retained any interest in or to allotted lands, fee patent to which was issued upon or, in the judgment of the Secretary, as a direct result of the purported termination of the Chico Rancheria, may elect to convey his or her interest to the United States, to be held in trust for the benefit of a person who is related by blood or, at the time of this decree, is the individual's spouse and is otherwise eligible to

1   have land held in trust as an Indian by the

2   United states for his or her benefit.  With

3   respect to the Mechoopda cemetery parcel, the

4   trustees for the Mechoopda Tribe listed on the

5   fee patent shall be entitled to convey the

6   interests therein to be held in trust by the

7   United States for the benefit of the Indians of

8   the Mechoopda Tribe, or such other recognized

9   Mechoopda tribal entity as specified in the

10  instrument of conveyance.

11      c.  Form of Conveyance Instrument; Conditions and

12          Restrictions:  Conveyance of title to the United

13          States made pursuant to paragraphs 5 or 6 may, at

14          the election of the grantor, provide that the

15          United States will hold title in trust for an

16          Indian or Indians, as provided above, or a tribal

17          entity of the Mechoopda Tribe, and be subject to

18          such conditions or restrictions as set forth in

19          the instrument of conveyance; provided such

20          conditions and restrictions are acceptable to the

21          United States; and, provided further, that the

22          United States shall not unreasonably withhold its

23          acceptance.

24      d.  Recording Conveyance:  Upon acceptance of any

25          instrument or instruments conveying to the United

26          States title to the Mechoopda cemetery on the

27          former Chico Rancheria, or to interests in

28          allotted lands pursuant to this stipulation and

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)                                              7

1    the judgment entered thereon, the Secretary of

2    the Interior or his designee shall promptly

3    record said instruments with the County Recorder

4    of the county in which said lands are located.

5    10.  Nothing in this stipulation shall be construed to

6    require the Secretary to accept in trust any land which has on

7    it hazardous substances or contaminants.  Before the Secretary

8    accepts any land in trust pursuant to this stipulation, a

9    hazardous substance determination shall be made in accordance

10   with 602 DM 2 and the instructions for implementing that chapter

11   of the Department Manual described in 54 BIAM Bulletin 1, dated

12   March 9, 1990, and any duly adopted revisions of the manual or

13   instructions.  (Copies of 602 DM 2 and 54 BIAM Bulletin 1 are

14   attached hereto as Exhibits C and D, respectively.)

15   11.  Should lands be acquired in the future on behalf of

16   the Mechoopda Tribe, if organized under the IRA, the Secretary

17   shall, within 180 days of acquisition, consider and respond to a

18   request to issue a proclamation in accordance with 25 U.S.C. §

19   467 that such newly acquired lands constitute an Indian

20   reservation.

21   12.  The Federal defendants will, following the execution

22   of this stipulation by their counsel, prepare a comprehensive

23   needs assessment for the Mechoopda Tribe, including the

24   projected needs of the Tribe for Federal programs and services

25   through Fiscal Year 1994.

26   The Federal defendants will provide workshops prior to

27   March 1992 to be conducted by a technical team comprised of

28   representatives from the Bureau of Indian Affairs, the Indian

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)                                                     8

1 Health Service, the Department of Housing and Urban Development,

2 and such other consultants as may be necessary, for the purpose

3 of providing needed technical assistance to the Mechoopda Tribe.

4 The scheduling and content of the workshops will be developed by

5 the Federal defendants in consultation with representatives from

6 the Mechoopda Tribe and will be designed to provide, at a

7 minimum, specific information regarding Federal programs

8 available to Indian tribes, including the tribal contracting

9 requirements of Public Law 93-638, and an overview of those

10 Indian programs available to meet the developmental needs of

11 individual Indians, such as health care, education and

12 vocational training.  The Federal defendants shall cover the

13 costs of attendance at the workshops of at least one

14 representative from the Mechoopda Tribe.

15     13.  The Mechoopda Indian plaintiffs will provide the

16 federal defendants with the names, current or last known

17 residential address of each potential class member to whom it

18 has given notice of this proposed settlement and the names and

19 ages of all minors who are dependents of potential class

20 members.  The Mechoopda Indian plaintiffs will give written

21 notice of the terms of the settlement to all members of the

22 plaintiff class, as such class is defined in Paragraph 10 of the

23 Third Amended Class Action Complaint, filed herein on April 29,

24 1991.  The costs of giving such notice shall be borne solely by

25 the Federal defendants.  The form of notice, the deadline for

26 responding to the notice, and other procedures for class members

27 to opt in or out of the settlement, shall be set forth in a

28 separate stipulation to be filed with the Court.

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)

14.   The Mechoopda Indian plaintiffs, in consideration of the above agreements by the Federal defendants, will (a) release and forever discharge Federal defendants from and against any and all liability, including attorneys' fees and costs, arising out of this litigation and settlement, provided, this release and discharge shall not apply to claims relating to hazardous substances or contaminants which may be identified in any survey conducted in order to make the determination required by paragraph 9 of this agreement; and (b) will dismiss with prejudice all money damages claims alleged herein against the Federal defendants, including any individual and tribal claims.

15.   It is agreed that the Mechoopda Indian plaintiffs will not seek, and Federal defendants will not agree, to reestablish the former boundaries of the Chico Rancheria, and that no action taken in connection with this settlement shall be construed as reestablishing the former Rancheria boundaries.

16.   It is understood that none of the terms of this agreement shall deprive a Federal official of his authority to revise, amend or promulgate regulations, nor shall this agreement be construed to commit a Federal official to expend funds not appropriated by Congress.  Furthermore, the sole remedy of the Mechoopda Indian plaintiffs for the  failure of the Federal defendants to comply with its terms shall be to initiate such proceedings in this action as may be available, or file a new action in the United States district court, to enforce the provisions of this stipulation and the judgment entered thereon.

Dated: ~~December~~ January 3, 1992.

STEPHEN V. QUESENBERRY
CALIFORNIA INDIAN LEGAL SERVICES
510 - 16th Street, Suite 301
Oakland, CA 94612
Telephone: (415) 835-0284

Attorney for Plaintiffs


Dated: December 19, 1991.

ROBERT G. BOEHM
City Attorney
City of Chico
P.O. Box 95927-3420
Telephone: (916) 895-4826

Attorney for City of Chico


Dated: December 31, 1991.

GLEN R. GOODSELL
Trial Attorney
United States Department of Justice
Environment and Natural
Resources Division
Benjamin Franklin Station, Room 857
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 272-8144

Attorney for Federal Defendants

c:wp51\jeb\121191.STI

STIPULATION FOR ENTRY OF JUDGMENT
(CHICO RANCHERIA)

11

FILED

APR 17 5 31 PM '9_

1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10   Scotts Valley Band of Pomo          )   NO.: C-86-3660-VRW
     Indians of the Sugar Bowl           )
11   Rancheria, et al.,                  )   ORDER FOR ENTRY OF
                                         )   JUDGMENT AND JUDGMENT
12        Plaintiffs,                    )
                                         )
13   v.                                  )
                                         )
14   United States of America, et        )   ENTERED IN CIVIL DOCKET APR 20 1992
     al.,                                )
15                                       )
          Defendants.                    )
16   _____        )
                                         )
17   Gerald R. Stewart, et al.;          )
     County of Sonoma; City of           )
18   Chico,                              )
                                         )
19        Defendants-Intervenors.        )
                                         )
20

21        On April 17, 1992, this matter came on for hearing on

22   approval of the proposed settlement of the claims of the

23   Mechoopda Indians of the Chico Rancheria pursuant to the order

24   prescribing notice of settlement and hearing on approval of

25   settlements issued by the Court on January 17, 1992.  This

26   action has not been certified as a class action; however, the

27   Court previously determined that it was proper to proceed under

28   the procedures of Fed.R.Civ.P. 23(e) to ensure that the

ORDER FOR ENTRY OF JUDGMENT AND JUDGMENT        COPIES MAILED TO -1-
                                                PARTIES OF RECORD

1  settlement and dismissal of plaintiffs claims would not

2  prejudice the interests of the putative class.  See Diaz v.

3  Trust Territory of the Pacific Islands, 876 F.2d 1401, 1408 (9th

4  Cir. 1989).

5      Having reviewed the Stipulation For Entry Of Judgment

6  (Chico Rancheria), filed January 6, 1992, the Certificate Of

7  Counsel, filed April 10, 1992, setting forth the plaintiffs' and

8  Federal defendants' reasons for supporting the settlement, the

9  Report Of Plaintiffs' Counsel Re: Objections To Proposed

10  Settlement And Undelivered Notices Of Settlement, filed April

11  10, 1992, and the other pleadings and papers on file; and having

12  fully considered the arguments of counsel and noting that no

13  objection has been made to the proposed settlement, the Court

14  finds that:

15      1.    Notice was duly given to putative class members as

16            ordered by the Court.

17      2.    The Stipulation For Entry Of Judgment compromising and

18            settling the claims of the Mechoopda Indian plaintiffs

19            will result in a judgment that is fair, just and

20            reasonable, is not collusive, and will not prejudice

21            the interests of the putative class.

22      3.    There is no just reason to delay entry of a final

23            judgment in accordance with Fed.R.Civ.P. 58 disposing

24            of the claims of the Mechoopda Indian plaintiffs in

25            accordance with the terms of the Stipulation For Entry

26            Of Judgment.

27      Accordingly, IT IS ORDERED THAT final judgment be, and

28  hereby is, entered according to the terms of the Stipulation For

ORDER FOR ENTRY OF JUDGMENT AND JUDGMENT                    -2-

1  Entry Of Judgment (Chico Rancheria), filed January 6, 1992.

2  Dated: April 17, 1992

3

   _____

4  VAUGHN R. WALKER
   United States District Judge

5  s:\svq\scotts92\041692.oej

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER FOR ENTRY OF JUDGMENT AND JUDGMENT                        -3-

# EXHIBIT F

The purpose of this analysis is to facilitate public comment on the proposed order. The analysis is not intended to constitute an official interpretation of the agreement and proposed order or to modify its terms in any way.

The proposed order was entered into for settlement purposes only and does not constitute an admission by the proposed respondent that the law has been violated as alleged in the complaint.

Donald S. Clark,

*Secretary.*

[FR Doc. 92–10323 Filed 5–1–92; 8:45 am]

BILLING CODE 6750-01-M

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Disease Control

### National Committee on Vital and Health Statistics; Meeting

Pursuant to Public Law 92–463, the National Center for Health Statistics (NCHS), Centers for Disease Control, announces the following committee meeting.

*Name:* National Committee on Vital and Health Statistics (NCVHS).

*Times and Dates:*

1 p.m.–5 p.m., June 2, 1992.

9 p.m.–5 p.m., June 3, 1992.

9 p.m.–1 p.m., June 4, 1992.

*Place:* Room 703A–729A, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201.

*Status:* Open.

*Purpose:* The purpose of this meeting is for the Committee to consider reports from each NCVHS subcommittee; to receive reports from NCHS, the Health Care Financing Administration, and the Agency for Health Care Policy and Research; and to address new business as appropriate.

*Contact Person for More Information:* Substantive program information as well as summaries of the meeting and a roster of committee members may be obtained from Gail F. Fisher, Ph.D., Executive Secretary, NCVHS, NCHS, Room 1100, Presidential Building, 6525 Belcrest Road, Hyattsville, Maryland 20782, telephone 301/436–7050 or FTS 436–7050.

Dated: April 28, 1992.

Elvin Hilyer,

*Associate Director for Policy Coordination, Centers for Disease Control.*

[FR Doc. 92–10298 Filed 5–1–92; 8:45 am]

BILLING CODE 4160-18-M

# Food and Drug Administration

[Docket No. 92F-0162]

## Asahi Denka Kogyo K. K.; Filing of Food Additive Petition

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing that Asahi Denka Kogyo K. K. has filed a petition proposing that the food additive regulations be amended to expand the safe use of sodium 2,2′-methylenebis(4,6-di-*tert*-butylphenyl)phosphate (CAS Reg. No. 85209-91-2) as a clarifying agent in polypropylene articles intended for contact with food.

**FOR FURTHER INFORMATION CONTACT:** Helen R. Thorsheim, Center for Food Safety and Applied Nutrition (HFF-335), Food and Drug Administration, 200 C St. SW., Washington, DC 20204, 202-254-9511.

**SUPPLEMENTARY INFORMATION:** Under the Federal Food, Drug, and Cosmetic Act (sec. 409(b)(5) (21 U.S.C. 348(b)(5))), notice is given that a petition (FAP 2B4300) has been filed by Asahi Denka Kogyo K. K., c/o 1002 Pennsylvania Ave. SE., Washington, DC 20003. The petition proposes to amend the food additive regulations in § 178.3295 **Clarifying agents for polymers** (21 CFR 178.3295) to expand the safe use of sodium 2,2′-methylenebis(4,6-di-*tert*-butylphenyl)phosphate (CAS Reg. No. 85209-91-2) as a clarifying agent in polypropylene articles intended for contact with food.

The potential environmental impact of this action is being reviewed. If the agency finds that an environmental impact statement is not required and this petition results in a regulation, the notice of availability of the agency's finding of no significant impact and the evidence supporting that finding will be published with the regulation in the **Federal Register** in accordance with 21 CFR 25.40(c).

Dated: April 23, 1992.

Fred R. Shank,

*Director, Center for Food Safety and Applied Nutrition.*

[FR Doc. 92–10305 Filed 5–1–92; 8:45 a.m.]

BILLING CODE 4160-01-F

# DEPARTMENT OF THE INTERIOR

## Bureau of Indian Affairs

### Notice of Reinstatement to Former Status for the Mechoopda Indian Tribe of the Chico Rancheria of Chico, CA

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice advises the public that the Federal government has settled litigation reinstating the status and rights of Indians of the Mechoopda Indian Tribe of the Chico Rancheria with which the Federal government had terminated its relationship. Effective April 17, 1992, the Indians of the Mechoopda Indian Tribe of the Chico Rancheria, of Chico, California, were reinstated to the status they had before termination. The tribe and its members are eligible for all rights and benefits to other federally recognized Indian tribes and their members.

**DATES:** Effective April 17, 1992.

**ADDRESSES:** The tribe is under the operational jurisdiction of the Superintendent, Central California Agency, Bureau of Indian Affairs, 1824 Tribute Road, suite J, Sacramento, CA 95815–4308, telephone (916) 978–4337; and the Director, Sacramento Area Office, Bureau of Indian Affairs, 2800 Cottage Way, Sacramento, CA 95825–1884, telephone (916) 978–4691.

**FOR FURTHER INFORMATION CONTACT:** Harold M. Brafford, Superintendent, Central California Agency, or Ronald Jaeger, Director, Sacramento Area Office, at the addresses listed above; or William Wirtz, Esq., Office of the Regional Solicitor, Pacific Southwest Region, 2800 Cottage Way, room E–2753, Sacramento, CA 95825–1890, telephone (916) 978–4824; or Scott Keep, Assistant Solicitor, Branch of Tribal Government & Alaska, Division of Indian Affairs, Office of the Solicitor, Mail Stop 6456, U.S. Department of the Interior, 1849 C Street, NW., Washington, DC 20240, telephone (202) 208–5134.

**SUPPLEMENTAL INFORMATION:** Pursuant to the authority in the Act of August 18, 1958, Public Law 85–671, 72 Stat. 619, as amended by the Act of August 11, 1964, Public Law 88–419, 78 Stat. 390 ("the Rancheria Act"), the Federal government terminated its relationship with many California Indian rancherias, including the Mechoopda Indian Tribe of the Chico Rancheria, and distributed the assets of the rancherias pursuant to plans adopted by the Indians. The Indians of the Mechoopda Indian Tribe of the Chico Rancheria and three other

rancherias, brought suit against the United States alleging that the termination was unlawfully done because the United States had not taken all actions required by the Rancheria Act prior to the purported termination. They sought reinstatement of the status they had individually and collectively enjoyed prior to the termination and certain other relief. A settlement of the litigation was negotiated which recognizes that the distributees of the rancheria assets are eligible for all rights and benefits extended to Indians under Federal law and that the tribes or communities of the rancherias and their members are eligible for all rights and benefits extended to other federally recognized Indian tribes and their members. See Order for Entry of Judgment and Judgment, April 17, 1992, in *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, et al.* v. *United States,* No. C–86–3660 WWS, N. D. California.

Dated: April 27, 1992.

**Eddie F. Brown,**

*Assistant Secretary—Indian Affairs.*

[FR Doc. 92–10360 Filed 5–1–1992; 8:45 am]

**BILLING CODE 4310-02-M**

## Bureau of Land Management

[OR–030–02–4333–14; G2–208]

## Temporary Closure of Certain Public Lands in Baker County, OR

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of temporary closure of public land in the vicinity of the National Historic Oregon Trail Interpretive Center at Flagstaff Hill.

**SUMMARY:** Notice is hereby given that under the authority of 43 CFR 8364.1, certain public lands are closed to public use and access from 0001 hours, May 22, 1992, until 2400 hours, May 25, 1992. The public land closed are all public lands lying within WM, T. 8 S., R. 41 E., sections 28, 29, 32, 33, 34; T. 9 S., R. 41 E., sections 2, 3, 4, 5, 6, 7, 8, 10, 11, 12 , 13, 15, 16, 17, 18, 19, 20, 21, 24, 25, 26, 27, 28, 29, 34, 35, 36; T. 9 S., R. 42 E., sections 30, 31; T. 10 S., R. 41 E., sections 1, 2, 3, 11, 12, 13, 14, 15; T. 10 S., R. 42 E., sections 7, 8, 18. A map of the closure area may be viewed at the Baker Resource Area Office, 1550 Dewey, Baker City, Oregon.

The purpose of this closure is to provide safety and security for the public, dignitaries, even, and facilities at the National Historic Oregon Trail Interpretive Center at Flagstaff Hill and along the Oregon Trail route during the Grand Opening of the Interpretive Center.

The public lands listed above are closed to any entry and use including camping, hiking, shooting, and vehicular use. No person may use, drive, move, transport, let stand, park or have charge or control over any type of motorized or mechanical vehicle within the closure area. All major access routes into the area will be posted.

Exemptions to this order are granded to the following: Persons participating in or attending authorizing Grand Opening activities.

Law enforcement and other emergency service personnel performing official duties.

Employees of the Bureau of Land Management performing official duties.

Holders of valid permits, leases, claims, right-of-way, and other authorizations and their employees in the course of duties associated with the authorization.

Owners of private land within the closure area crossing public land to reach their land.

Violations of this order are punishable by fine not to exceed $1,000 and/or imprisonment not to access 12 months.

**FOR FURTHER INFORMATION CONTACT:**
Jack Albright, BLM Baker Resource Area, P.O. Pox 987, Baker City, Oregon 97814, 503–523–6391.

Jack D. Albright,

*Area Manager.*

[FR Doc. 92–10268 Filed 5–1–92; 8:45 am]

**BILLING CODE 4310-33-M**

[CO–030–02–4410–13–1784]

## Montrose District Advisory Council; Meeting

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of meeting.

**SUMMARY:** Notice is hereby given in accordance with 43 CFR subpart 1784 that a meeting of the Montrose District Advisory Council will be held on Wednesday, May 20, 1992, in Gunnison, Colorado.

**DATES:** The meeting is scheduled for May 20, 1992.

**ADDRESSES:** For further information, contact Roger Alexander, Bureau of Land Management (BLM), Montrose District Office, 2465 South Townsend Avenue, Montrose, Colorado 81401; Telephone (303) 249–7791.

**SUPPLEMENTARY INFORMATION:** The meeting is scheduled to begin at 9 a.m., Wednesday, May 20, 1992, at the Gunnison County Electric Association

Office, 37250 West Highway 50, Gunnison, Colorado. Agenda items will include the following:

(1) Election of Officers.
(2) District Manager's Remarks.
(3) Resource Area Status Reports.
(4) Livestock Grazing/Riparian Area Management.
(5) Field Tour.

The District Advisory Council Meeting is open to the public. Interested persons may make oral statements to the Council, or written statements may be submitted for the Council's consideration. Any person wishing to make an oral statement must notify the District Manager, 2465 South Townsend Avenue, Montrose, Colorado 81401, by close of business May 18, 1992. Depending on the number of persons wishing to make oral statements, a per-person time limit may be established by the District Manager.

Summary minutes for the Council meeting will be maintained in the Montrose District Office and will be available for public inspection and reproduction during regular business hours within thirty (30) days following the meeting.

Dated: April 24, 1992.

**Alan L. Kesterke,**

*District Manager.*

[FR Doc. 92–10304 Filed 5–1–92; 8:45 am]

**BILLING CODE 4310-JB-M**

[AK–050–02–4331–12]

## Modifications of Alaska Off-Road Vehicle Designations; Tangle Lakes National Register Archaeological District, AK

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice on off-road vehicle decision.

**SUMMARY:** This notice is provided in reference to the use of off-road vehicles on public lands within the Glennallen District, Alaska, in accordance with authority and requirements of Executive Order's (EO) 11644 and 11989 and the regulations contained in 43 CFR part 8340. The following described lands under the administration of the Bureau of Land Management are designated open, limited use, or closed to off-road motorized vehicle (ORV) use. This modifies an earlier notice, published July 6, 1984. This order will be effective upon publication and remain in effect until rescinded and/or modified by the District Manager, Glennallen District.

A 466,000-acre area is affected by the designations, known as the Tangle

# EXHIBIT G



DEC 3 2001

Mr. Darren R. Pete
Monteau, Peebles & Crowell, LLP
1001 Second Street
Sacramento, CA 65814-3201

RE:  Request for Approval of Mechoopda Band of Chico Rancheria Tribal Gaming Ordinance

Dear Mr. Pete:

This letter responds to your request to the National Indian Gaming Commission (NIGC) for the review and approval of the Tribal Gaming Ordinance (Ordinance) of the Mechoopda Band of Chico Rancheria (Tribe).  The Ordinance was adopted by the Tribal Council pursuant to Resolution No. 01-53 on October 10, 2001, and was received by the NIGC on October 12, 2001. Under the Indian Gaming Regulatory Act (IGRA) and the regulations promulgated by the NIGC, the Chairman has 90 days to review a new ordinance and either approve or disapprove the ordinance. 25 C.F.R. § 522.4. The Tribe's ordinance is hereby approved.

We note that, on July 31, 2001, the Chairman disapproved a predecessor to this ordinance, an ordinance adopted by Resolution No. 01-21.  The disapproval was based on several deficiencies, all of which have been corrected. Because we undertook a comprehensive review of the prior ordinance submission, our review of the current ordinance was limited only to those items identified in our letter of July 31, 2001.

We further note that one reason for the prior disapproval was the failure to specifically identify a law enforcement agency that will take fingerprints used in obtaining a criminal history check of key employees and management officials of the gaming operation.  The revised and approved ordinance provides that the "Tribal Gaming Commission shall enter into an agreement with the Butte County Sheriff's Office. . .  to take the Applicant's fingerprints." Section 5.5.1. Please inform the NIGC immediately if the Tribal Gaming Commission is unable to enter into such an agreement with Butte County Sheriff's Office.

Thank you for submitting the Tribe's ordinance for review and approval. The NIGC staff and I look forward to working with you and the Tribe on future gaming issues.

Sincerely yours,

Montie R. Deer
Chairman

# TRIBAL GAMING ORDINANCE

## OF THE

OCT 1 2 2001

## MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA

# TITLE I

## REGULATION OF CLASS II AND CLASS III GAMING

*A law to authorize, license and regulate the conduct of Class II and Class III Gaming within the jurisdiction of the MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA.*

### SECTION 1  FINDINGS, INTENT AND POLICY

**1.1**  **Findings**  The MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA ("Tribe" or "Tribal") Tribal Council on behalf of the General Membership finds that:

1.1.1  Tribal regulation and control of Gaming within the jurisdiction of the Tribe is essential for the protection of public health and welfare of the Tribe and visitors to the Tribal community.

1.1.2  The Tribe has the legal authority to license and regulate any Gaming Activity within the jurisdiction of the Tribe.

1.1.3  Properly licensed and regulated Gaming are in conformance with announced Federal policy promoting Indian self-government and Indian Tribal economic self-sufficiency.

1.1.4  It is essential that the Tribal Council regulate Gaming in a manner commensurate with applicable Federal, State of California ("State") and Tribal law and policy.

1.1.5  The present needs of the Tribe are not adequately addressed by State and Federal programs including the need for increased employment, training, housing, health care, nutrition, educational opportunities, preservation of culture, social services and community and economic development.

1.1.6  Tribal operation and licensing of Gaming is a legitimate means of generating revenue to address the aforementioned needs and pursuing the Tribe's goal of self-sufficiency and self-determination.

1

1.1.7  The State, in recognition of the Tribe's sovereign right and need for Gaming, has entered into a Tribal/State Compact ("Compact") pursuant to the terms and conditions of the Indian Gaming Regulatory Act.

1.1.8  As a result of the foregoing, the adoption of a new and expanded Gaming Ordinance is in the best interest of the Tribe and State.

**1.2    Intent**  The Tribal Council, on behalf of the Tribe, declares that the intent of this Code is to:

1.2.1  Regulate, control, and oversee Gaming within the jurisdiction of the Tribe.

1.2.2  State, declare and otherwise clarify that a License related to Gaming is a revocable privilege, not a right.

1.2.3  Ensure that the operation of Tribally regulated Gaming can continue as a means of generating Tribal revenue.

1.2.4  Ensure that Gaming is conducted fairly and honestly by both Licensees and players, and that it remain free from corrupt, incompetent, unconscionable and dishonest practices.

1.2.5  Encourage Tribal economic development and employment opportunities.

1.2.6  Ensure that all Gaming revenue is used for the benefit of the Tribe and its community.

1.2.7  Ensure that the Tribe provides a fair and impartial forum for the resolution of Gaming disputes.

1.2.8  Ensure that Tribal Gaming laws are strictly and fairly enforced upon Persons involved in Gaming Activity within the jurisdiction of the Tribe.

**1.3    Policy**

1.3.1  <u>Tribal Policy of Self-Government</u>  The Tribe is firmly committed to the principle of Tribal self-government.  Consistent with Federal policy, Gaming revenues shall be utilized and expended by the Tribal Council by resolution and only for the following purposes:

(1)    To fund Tribal government operations or programs.

(2)    To provide for the general welfare of the Tribe and its members.

(3)    To promote Tribal economic development.

2

    (4)    To donate to charitable organizations.

    (5)    To preserve and protect cultural and historic resources.

    (6)    To help to fund operations of local government agencies, general governmental services, the maintenance of peace and good order, the establishment of educational systems and programs, and the promotion and regulation of economic activities within the sovereign jurisdiction of the Tribe.

1.3.2   <u>Tribal Gaming Policy</u>  The establishment, promotion and operation of Gaming is necessary, provided that such Gaming is regulated and controlled by the Tribe pursuant to the Tribal/State Compact authorized by the Indian Gaming Regulatory Act, and that the revenues of such Gaming are used exclusively for the benefit of the Tribe.

1.3.3   <u>Tribal Ownership of Gaming Facility</u>  The Tribe shall have sole proprietary interest in and responsibility for the conduct of Gaming Facilities and/or Enterprises authorized by this Code.

1.3.4   <u>Tribal Class II Gaming Authorized</u>  Class II Gaming is authorized as defined in the IGRA, P.L. 100-447, 25 U.S.C. Section 2703(7)(A) and by regulations promulgated by the NIGC.

1.3.5   <u>Tribal Class III Gaming Authorized</u>  Class III Gaming is authorized and permitted only to the games identified pursuant to Section 4.1 of the Tribal/State Compact as approved by the Secretary of the Interior, and played in accordance within the definitions and scope of the IGRA, P.L. 100-447, 25 U.S.C. Section 2703(8) and by regulations promulgated by the NIGC.

1.3.6   <u>Location of Gaming</u>  Authorized Gaming shall be allowed on the lands identified in the legal description of Appendix A, and pursuant to the legal analysis regarding the status of those lands in Appendix B.

## SECTION 2 DEFINITIONS

In this Code, except where otherwise specifically provided or the context otherwise requires, the following terms and expressions shall have the following meanings:

2.1   **"Adjusted Gross Revenues"** means gross revenues less all cash prizes or the aggregate price of merchandise prizes, except in the case of the games of draw poker and stud poker. Regarding games of draw poker and stud poker, "adjusted gross revenues" means the time buy-ins or tournament fees collected by the Licensee.

2.2    **"Applicant"** means any Person or entity who has applied for a License under the provisions of this Code.

2.3    **"Application"** means a request for the issuance of a License for employment by a Gaming Facility, or for approval of any act or transaction for which approval is required or permitted under the provisions of this Code.

2.4    **"Association"** means representatives from California tribes, the California State Division of Gaming Control and the California Gambling Control Commission as established pursuant to Section 2.2 of the Compact.

2.5    **"Bingo"** means the game of chance commonly known as bingo (whether or not electronic, computer or other technologic aids are used in connection therewith) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations, in which the holder of each card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and in which the game is won by the first Person covering a previously designated arrangement of numbers or designations on such cards, including (if played in the same location) pull-tabs, lotto, punch boards, tip-jars, instant bingo and other games similar to bingo.

2.6    **"Breakage"** means the remainder by which the amount payable on each dollar wagered exceeds a multiple of ten cents, and in a minus pool, five cents.

2.7    **"Capital Cost"** means any disbursement for Personal property, the useful life of which is expected to extend beyond one year.

2.8    **"Cash"** means any currency commonly accepted as legal tender, including but not limited to currency, traveler's checks, credit cards, and electronic debit cards.

2.9    **"Casino"** means an establishment in which several Gaming activities or enterprises are operated.

2.10    **"Charitable Gaming Ticket"** means any game piece used in the play of a paper pull tab game, or jar ticket game, or raffle.

2.11    **"Cheating"** means a Person's operating or playing in any game in a manner in violation of the written or commonly understood rules of the game, with the intent to create for himself or someone in privity with him an advantage over and above the chance of the game.

2.12    **"Class II Gaming"** means those Gaming activities as defined as Class II Gaming in the IGRA of 1988, P.L. 100-447, 25 U.S.C. Section 2703(7).

2.13    **"Class III Gaming"** means those Gaming activities as defined as Class III Gaming in the IGRA of 1988, P.L. 100-447, 25 U.S.C. Section 2703(8).

4

**2.14** **"Code"** means this Tribal Gaming Ordinance of the Mechoopda Indian Tribe of Chico Rancheria, as amended.

**2.15** **"Compact"** means the Gaming compact between the Tribe and the State, as authorized by the Indian Gaming Regulatory Act.

**2.16** **"Compensation"** means all wages salaries, perks, bonuses and all other forms of enumeration for services rendered.

**2.17** **"Contract"** means any legally binding agreement made between an Licensee and another Person for the purpose of conducting any form of lawful Gaming Activity, or providing goods or services to any lawful Gaming Activity or operation.

**2.18** **"Council" or "Tribal Council"** means the governing body of the Tribe.

**2.19** **"Determination of Suitability"** means a formal finding by the Tribal Gaming Commission or State Gaming Agency that the Applicant or Licensee is suitable to obtain and/or maintain the License.

**2.20** **"Employee"** means any person who (a) operates, maintains, repairs, assists in any Gaming Activity, works in, or is in any way responsible for supervising such Gaming Activities or persons who conduct, operate, account for, or supervise any such Gaming Activity, (b) is in a category under federal or Tribal gaming law requiring licensing, (c) is an employee of the Tribal Gaming Commission with access to confidential information, or (d) is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public.

**2.21** **"Enrolled Tribal Member"** means a Person who is enrolled with the Tribe, and whose name appears on the tribal membership roll.

**2.22** **"Enterprise"** means the economic entity that is licensed by the Tribal Gaming Commission, operates the games, receives the revenues, issues the prizes, and pays the expenses. A Gaming Enterprise may be operated by the Tribe or a Management Contractor.

**2.23** **"Equipment for Games of Chance"** (see "Gaming Device").

**2.24** **"Exclusive License"** means a license, which precludes the Tribal Gaming Commission from issuing to another a license for the same specific form of Gaming during the life of the exclusive license. An Applicant must demonstrate and the Tribal Gaming Commission must find that the issuance of an Exclusive License is in the economic interest and welfare of the Tribe.

2.25   **"Financial Source"** as that term is used in § 6.4.6 of the Compact, and in this Code, means every Person, with whom the Tribe enters into an agreement or contract for the purpose of extending financing to the Tribe, the proceeds of which are used either directly or indirectly to finance the Gaming Facility or Enterprise. For the purposes of this section and § 5.1.3, the term "Contract" means an agreement between the Tribe, or any Tribal subdivision, arm, or entity, and another Person. Financial Sources must be licensed.

2.26   **"Games of Chance"** means any game or activity, which falls within the broad definition of Gaming or Gaming Activity.

2.27   **"Gaming"** or **"Gaming Activity"** means any activity, operation or game of chance in which any valuable consideration may be wagered upon the outcome determined by chance, skill, speed, strength or endurance, and in which any valuable prize is awarded to the player so wagering.

2.28   **"Gaming Device"** means a slot machine, including an electronic, electromechanical, electrical, or video device that, for consideration permits: individual play with or against that device or the participation in any electronic, electromechanical, electrical, or video system to which that device is connected; the playing of games thereon or therewith, including, but not limited to, the playing of facsimiles of games of chance or skill; the possible delivery of, or entitlement by the player to, a prize or something of value as a result of the application of an element of chance; and a method for viewing the outcome, prize won, and other information regarding the playing of games thereon or therewith.

2.29   **"Gaming Facility"** means any building in which Class III Gaming Activities or Gaming operations occur, or in which the business records, receipts, or other funds of the Gaming operation are maintained (but excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, buildings, and areas, including hotels, ancillary businesses, parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming operation, provided that nothing herein prevents the conduct of Class II Gaming (as defined under IGRA) therein.

2.30   **"Gaming Program"** means any Tribal program, which oversees one or more parts of the operation of Gaming. The Gaming Program must be licensed by the Tribal Gaming Commission.

2.31   **"Gaming Vendor"** means the same as a "Gaming Resource Supplier" as defined by the Compact or any Person or entity who, directly or indirectly, manufactures, distributes, supplies, vends, leases or otherwise purveys Class II Gaming or Class III Gaming resources to the Gaming Facility, provided that the Tribal Gaming Commission may interpret this definition to exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection of Gaming. Gaming Vendors must be Licensed

**2.32**  **"General Manager"** means the Person or entity, which has management responsibilities for the Gaming Activity, and which shall have access to all areas of the Gaming Facility, provided that such access to the surveillance room and count room shall be by prior notice to the Tribal Gaming Commission.

**2.33**  **"Gross Revenues"** means all gaming and non-gaming revenues collected or received from the lawful Gaming Enterprise.

**2.34**  **"Immediate Family"** means, with respect to the Person under consideration, a husband, wife, father, mother, son, daughter, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother or half sister.

**2.35**  **"Indian Gaming Regulatory Act"** or **"IGRA"** means Public Law 100-497, 102 Stat. 2426, 25 U.S.C. §§2701, *et seq.* (1988), as amended.

**2.36**  **"Indian Lands"** means:

    2.36.1  Lands within the limits of the Tribe's exterior boundaries, whereby it exercises sovereign jurisdiction over such lands, notwithstanding the issuance of any patent and including rights-of-way running through such lands; and

    2.36.2  Land title to which is either held in trust by the United States for the benefit of the Tribe or individual Indian or held by the Tribe subject to restriction by the United States against alienation and over which the Tribe exercises governmental powers; and

    2.36.3  Lands that may be acquired by the Tribe that meet the requirements of 25 U.S.C. Section 2719 et. seq.

**2.37**  **"In privity with"** means a relationship involving one who acts jointly with another or as an accessory before the fact to an act committed by the other or as a co-conspirator with the other.

**2.38**  **"IRS"** means the United States Internal Revenue Service.

**2.39**  **"Key Employee"** means:

    2.39.1  A Person who performs one or more of the following functions:

        (1)  Bingo caller;

        (2)  Counting room supervisor and Personnel;

7

(3)     Chief of security, or any Person who supervises or directs other employees engaged in providing security or surveillance services;

(4)     Custodian of Gaming supplies or cash;

(5)     Floor manager; manager or General Manager;

(6)     Pit boss;

(7)     Dealer;

(8)     Croupier;

(9)     Approver of credit or whose recommendation in this regard are ordinarily sought or followed; or

(10)    Custodian of gambling devices including Persons with access to cash and accounting records within such devices;

2.39.2  If not otherwise included, any other Person whose total cash compensation is in excess of $50,000 per year; or

2.39.3  If not otherwise included, any other Person who supervises or directs other employees engaged in the control of Gaming assets and revenues and record keeping, including the recording of cash and evidences in indebtedness, and the maintenance, review, or control of the records, accounts, and reports of transactions; or

2.39.4  If not otherwise included, the four most highly compensated Persons in the Gaming Facility; or

2.39.5  Any Applicant or Person the Tribal Gaming Commission finds is important or necessary to the operation of the Gaming Facility.

**2.40**   **"License"** means the official, legal and revocable permission granted by the Tribal Gaming Commission to an Applicant to conduct "Licensed" Gaming Activities of the Tribe.

**2.41**   **"Licensee"** means the Employee, Key Employee, Primary Management Official, Vendor, Enterprise or Facility that has legitimately obtained a valid License.

**2.42**   **"Lotto"** means a form of Gaming in which the revenues derived from the sale of tickets or chances are pooled and those revenues or parts thereof allotted by chance to one or more chance takers or ticket purchasers. The amount of cash

8

prizes or winnings is determined by the Licensee conducting the "lottery," and a progressive pool is permitted.

2.43    **"Management Contract"** means any Contract for the management of Class II or Class III Gaming within the meaning of IGRA and any Contract entered between the Tribe and a Vendor, which authorizes the Vendor to manage any Gaming or Gaming Facility, including any Contract defined as a Management Contract under IGRA by the NIGC.

2.44    **"Management Contractor"** means any Person or entity who has entered into a Class II or Class III Gaming Management Contract or is a Vendor who is authorized to manage Gaming or Gaming Facility, including any Person who is regarded as a Management Contractor within the meaning of IGRA or the NIGC.

2.45    **"National Indian Gaming Commission" or "NIGC"** means the National Indian Gaming Commission established by the IGRA.

2.46    **"Net Revenues"** means Gross Revenues less amounts paid out as prizes and less total Gaming related operating expenses, excluding Management Contractor fees.

2.47    **"Net Win"** means the "net win" as defined by the American Institute of Certified Public Accountants.

2.48    **"Participate"** in any Gaming means operating, directing, financing or in any way assisting in the establishment of or operation of any class of Gaming or any site at which such Gaming is being conducted, directly or indirectly, whether at the site in Person or off the Reservation.

2.49    **"Person"** means any individual, partnership, joint venture, corporation, joint stock company, company, firm, association, trust, estate, club, business trust, municipal corporation, society, receiver, assignee, trustee in bankruptcy, political entity and any owner, director, officer or employee of any such entity or any group of individuals acting as a unit, whether mutual, cooperative, fraternal, nonprofit, or otherwise, the government of the Tribe, any governmental entity of the Tribe or any of the above listed forms of business entities that are wholly owned or operated by the Tribe; provided, however, that the term does not include the Federal Government and any agency thereof. The plural of "Person" is "people."

2.50    **"Player"** means a Person participating in a game with the hope of winning money or other benefit, but does not include an Licensee or any assistant of an Licensee.

9

**2.51** **"Primary Management Official"** means:

 2.51.1 The Person having management responsibility for the overall operation of the Enterprise or Facility, or a management contract; or

 2.51.2 Any Person who has authority to:

  (1) Hire and fire employees; or

  (2) Set up working policy for the Gaming Operation; or

 2.51.3 The Chief Financial Officer or other Person who has financial management responsibility.

**2.52** **"Progressive Gaming"** means any game in which a cash prize which, not being won by any player during any game, is retained and further monetarily enhanced by the Licensee or eligible organization, and offered as a prize to players in the next game.

**2.53** **"Pull-tabs, Punchboards and Tip Jars"** means a form of Gaming in which preprinted cards utilizing symbols or numbers in random order which are uncovered by random choice in expectation of cash prizes if prescribed combinations of symbols and numbers are revealed.

**2.54** **"Raffle"** means a form of Gaming in which each player buys a ticket for a chance to win a prize with the winner determined by a random method. "Raffle" does not include a slot machine.

**2.55** **"Reservation"** means lands defined as "Indian Lands" herein.

**2.56** **"State"** means the State of California.

**2.57** **"State Gaming Agency"** means the entity of the State pursuant to the Gambling Control Act, pursuant to Division 8 of the Business and Professions Code, Chapter 5, Sec. 19800 et. seq.

**2.58** **"State Gaming Facility Compliance Agent"** means the Person appointed pursuant to Section 6.4.2(d) of the Compact.

**2.59** **"Tribal Court"** means the Court created, if and when created by the Tribe's Constitution, or in the alternative, the Tribal Council until such Tribal Court is created.

**2.60** **"Tribe"** means the Mechoopda Indian Tribe of Chico Rancheria.

**2.61** **"Wager"** means the initial bet made in any game.

10

## SECTION 3  GENERAL PROVISIONS

**3.1**  **Authority**  This Code is enacted pursuant to the inherent sovereign powers of the Tribe pursuant to Article IV of the Tribal Constitution, and pursuant to the powers of the Tribal Council pursuant to Article VIII, Section 3(a) of the Tribal Constitution.

**3.2**  **Title, Repeal of Prior Laws, and Effect of Repeal**  This Code may be cited as the Mechoopda Indian Tribe of Chico Rancheria Gaming Code or "Code".

    3.2.1  All titles, chapters and sections of the Tribal Code which pertain to Gaming and are in effect as of the date that this Code becomes operative, are hereby repealed, and all other laws, or parts thereof, inconsistent with the provisions of this Code are hereby repealed.

    3.2.2  Repeal of this Code, or any portion thereof, shall not have the effect of reviving any prior Law, Ordinance, or Resolution theretofore repealed or suspended.

**3.3**  **Construction**  In construing the provisions of this Code, unless the context otherwise requires, the following shall apply:

    3.3.1  This Code shall be liberally construed to effect its purpose and to promote substantial justice.

    3.3.2  Words in the present tense include the future and past tenses.

    3.3.3  Words in the singular number include the plural, and words in the plural number include the singular.

    3.3.4  Words of the masculine gender or neuter include masculine and feminine genders and the neuter.

**3.4**  **Severability**  If any section of this Code is invalidated by a court of competent jurisdiction, the remaining sections shall not be affected thereby.

**3.5**  **Effective Date**  The Code shall become effective upon the date of its approval by the Chairman of the NIGC pursuant to the IGRA.

## SECTION 4  TRIBAL GAMING COMMISSION

**4.1**  **Establishment**  The Tribal Council hereby charters, creates and establishes the Mechoopda Indian Tribe of Chico Rancheria Tribal Gaming Commission as a governmental subdivision of the Tribe.

**4.2**    **Location and Place of Business**

4.2.1    <u>Gaming Facility</u>  The Tribal Gaming Commission shall maintain its headquarters, principal place of business and office within the Gaming Facility.

4.2.2    <u>Other Locations</u>  The Tribal Gaming Commission may, however, with a majority vote from the Tribal Council, establish other places of business in such other locations as the Tribal Gaming Commission may from time to time determine to be in the best interest of the Tribe.

**4.3**    **Duration**  The Tribal Gaming Commission shall have perpetual existence and succession in its own name, unless dissolved by the Tribal Council pursuant to Tribal law.

**4.4**    **Attributes**  As a governmental subdivision of the Tribe, the Tribal Gaming Commission is under the directive and control of the Tribal Council, but it is the purpose and intent of the Tribal Council that the operations of the Tribal Gaming Commission be conducted on behalf of the Tribe for the sole benefit and interests of the Tribe, its members and the residents of the Reservation.

4.4.1    <u>Arm of Tribe</u>  In carrying out its purposes under this Code, the Tribal Gaming Commission shall function as an arm of the Tribe.

4.4.2    <u>Tribe Actions</u>  Notwithstanding any authority delegated to the Tribal Gaming Commission under this Code, the Tribe reserves to itself the right to bring suit against any Person or entity in its own right, on behalf of the Tribe or on behalf of the Tribal Gaming Commission, whenever the Tribe deems it necessary to protect the sovereignty, rights and interests of the Tribe or the Tribal Gaming Commission.

**4.5**    **Recognition as a Political Subdivision of the Tribe**  The Tribe, on behalf of the Tribal Gaming Commission, shall take all necessary steps to acquire recognition of the Tribal Gaming Commission as a political subdivision of the Tribe, recognized by all branches of the United States Government as having been delegated the right to exercise one or more substantial governmental functions as specifically authorized under the terms and conditions of this Code.

**4.6**    **Sovereign Immunity of the Tribal Gaming Commission**

4.6.1    <u>Authority</u>  The Tribal Gaming Commission is clothed by Federal and Tribal law with all the privileges and immunities of the Tribe, except as specifically limited by this Code, including sovereign immunity from suit in the State, Federal or Tribal Court.

4.6.2    <u>No Waiver</u>  Nothing in this Code shall be deemed or construed to be a

waiver of sovereign immunity of the Tribal Gaming Commission from suit, which shall only be waived pursuant to subsection 4.7 below.

4.6.3   <u>No Consent to Jurisdiction</u>   Nothing in this Code shall be deemed or construed to be a consent of the Tribal Gaming Commission to the jurisdiction of the United States or of any state or of any other tribe with regard to the business or affairs of the Tribal Gaming Commission.

**4.7   Waiver of Sovereign Immunity of the Tribal Gaming Commission**   The sovereign immunity of the Tribal Gaming Commission may be waived only by express resolutions of both the Tribal Gaming Commission and the Tribal Council after consultation with its attorneys.

4.7.1   <u>Resolution Effecting Waiver</u>   All waivers of sovereign immunity must be preserved with the resolutions of the Tribal Gaming Commission and the Tribal Council of continuing force and effect.

4.7.2   <u>Policy on Waiver</u>   Waivers of sovereign immunity are disfavored and shall be granted only when necessary to secure a substantial advantage or benefit to the Tribal Gaming Commission.

4.7.3   <u>Limited Nature to Waiver</u>   Waivers of sovereign immunity shall not be general but shall be specific and limited as to duration, grantee, transaction, property or funds, if any, of the Tribal Gaming Commission subject thereto, court having jurisdiction pursuant thereto and law applicable thereto.

4.7.4   <u>Limited Effect of Waiver</u>   Neither the power to sue and be sued provided in subsection 4.7 herein, nor any express waiver of sovereign immunity by resolution of the Tribal Gaming Commission, shall be deemed a consent to the levy of any judgment, lien or attachment upon property of the Tribal Gaming Commission other than property specifically pledged or assigned, or a consent to suit in respect of any land within the exterior boundaries of the Reservation or a consent to the alienation, attachment or encumbrance of any such land.

**4.8   Sovereign Immunity of the Tribe**   All inherent sovereign rights of the Tribe as a Federally-recognized Indian Tribe, with respect to the existence and activities of the Tribal Council, are hereby expressly reserved, including sovereign immunity from suit in any state, Federal or Tribal court.

**4.9   Assets of the Tribal Gaming Commission**   The Tribal Gaming Commission shall have only those assets specifically assigned to it by the Tribal Council or acquired in its name by the Tribe or by it on its own behalf. No activity of the Tribal Gaming Commission nor any indebtedness incurred by it shall implicate or in any way involve any assets of Tribal Membership or the Tribe not assigned in

writing to the Tribal Gaming Commission.

**4.10    Membership**

4.10.1   <u>Number of Commissioners</u>   The Tribal Gaming Commission shall be comprised of three (3) Tribal Gaming Commissioners.

4.10.2   <u>Organization</u>   The Commission will consist of a Chairman and two (2) Commissioners.

(1) The Chairman shall direct Tribal Gaming Commission meetings, be responsible for day-to-day operations of the Tribal Gaming Commission and supervise Tribal Gaming Commission employees, provided that the Chairman shall not supervise the Commissioners.

(2) The Chairman shall be the agent for service of process.

(3) The Tribal Gaming Commission shall keep minutes of meetings and provide a copy to the Tribal Council.

4.10.3   <u>Qualifications for Tribal Gaming Commission Positions</u>

(1)    Preference shall be given first to Enrolled Tribal Members, and second to Indians that are recognized as a member within an Indian Community.

(2)    Must pass the scrutiny of a background check pursuant to 4.10.5 below.

(3)    Tribal Gaming Commissioners shall have expertise, experience, education or a combination thereof in the following areas: finance, management, legal, business, governmental regulation, and Tribal policy and law.

(4)    Tribal Gaming Commissioners shall be at least twenty-five (25) years of age.

(5)    Must not be an Immediate Family Member of an existing Commissioner.

4.10.4   <u>Date of Appointment</u>   As soon as necessity dictates, the Tribal Council shall appoint temporary Tribal Gaming Commissioners at a duly called Tribal Council meeting. Thereafter, the Tribal Council shall appoint the **first** Tribal Gaming Commissioners at the General Membership Meeting in the first July following the appointment of the temporary commissioners. The Tribal Council shall then appoint Tribal Gaming

Commissioners at the General Membership Meeting in July. The Tribal Council shall create job descriptions, terms and conditions of employment for each Tribal Gaming Commissioner.

4.10.5 Background Check  Prior to the time that any Tribal Gaming Commission member takes office on the Tribal Gaming Commission, the Tribe shall perform or arrange to have performed a comprehensive background check on each prospective member. No Person shall serve as a Commissioner if:

(1)  His/Her prior activities, criminal record, if any, or reputation, habits or associations:

(i)  Pose a threat to the public interest; or

(ii)  Threaten the effective regulation and control of Gaming; or

(iii)  Enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of Gaming; or

(2)  He/She has been convicted of or entered a plea of *nolo contendere* to a felony of any jurisdiction or to a misdemeanor involving dishonesty or moral turpitude in any jurisdiction; or

(3)  He/She has a direct  monetary or financial interest in the conduct of any Gaming Enterprise or is in privity with a Management Contractor; or

(4)  He/She is presently a member of the Tribal Council.

**4.11**  **Term of Office**  The **first** Tribal Gaming Commission shall be appointed as follows: the Chairman shall be appointed for three (3) years; a Commissioner appointed for two (2) years; and a Commissioner appointed for one (1) year. Upon the expiration of the first terms, each Commissioner **thereafter** shall be appointed for three (3) year staggered terms.

**4.12**  **Ex-Officio Members**  At the sole direction of the Tribal Council, any member of the Tribal Council, Tribal or Bureau of Indian Affairs employee, or any other Person may be designated to Participate, without vote, in Tribal Gaming Commission meetings.

**4.13**  **Meetings**

4.13.1 Regular Meetings  The Tribal Gaming Commission shall set a day of the week to conduct formal business at least once per week. Nothing in this

15

Code shall prohibit the Commission from authorizing telephone and off-site meetings.

4.13.2 <u>Special Meetings</u>  Special meetings may be called at the request of the Tribal Council, the Chairman of the Tribal Gaming Commission or by a majority vote of the Gaming Commissioners.

4.13.3 <u>Quorum</u>  A quorum for all meetings shall consist of two (2) members.

4.13.4 <u>Voting</u>  All questions arising in connection with the action of the Tribal Gaming Commission shall be decided by majority vote.

**4.14  Compensation of Commissioners**  The compensation of Tribal Gaming Commissioners shall be established by the Tribal Council.

**4.15  Removal of Members or Vacancies**

4.15.1 <u>Removal</u>  A Commissioner may be removed by the Council for the following reasons: serious inefficiency, neglect of duty, malfeasance, misfeasance, nonfeasance, misconduct in office, or for any conduct which threatens the honesty and integrity of the Tribal Gaming Commission or otherwise violates the letter or intent of this Code.

4.15.2 <u>Due Process</u>  Except as provided below, no Commissioner may be removed without notice and an opportunity for a hearing before the Council, and then only after the Commissioner has been given written notice of the specific charges at least ten (10) days prior to such hearing. At any such hearing, the Commissioner shall have the opportunity to be heard in Person, or at their own expense by legal counsel, and to present witnesses on his behalf.

4.15.3 <u>Temporary Suspension</u>  If the Council determines that immediate suspension of a Commissioner is necessary to protect the interests of the Tribe, the Council may hold a hearing with the Commissioner to suspend the Commissioner temporarily, and the question of permanent removal shall be determined thereafter pursuant to Tribal Gaming Commission hearing procedures pursuant to 4.15.2 herein.

4.15.4 <u>Written Record</u>  A written record of all removal proceedings together with the charges and findings thereon shall be kept by the Tribal Secretary.

4.15.5 <u>Removal Final</u>  The decision of the Tribal Council upon the removal of a Commissioner shall be final.

4.15.6 <u>Vacancies</u>  If any Commissioner shall die, resign, be removed or for any reason be unable to serve as a Commissioner, the Council shall declare

16

his/her position vacant and shall appoint another Person to fill the position within thirty (30) days of the vacancy. The terms of office of each Person appointed to replace an initial Commissioner shall be for the balance of any un-expired term for such position provided, however, that any prospective appointee must meet the qualifications established by this Code.

**4.16    Conflict of Interest** No Person shall serve as a Commissioner if he/she or any member of his/her Immediate Family has an ownership, partnership or other direct financial interest, other than a regular salary interest, in any Gaming Enterprise, or if he/she has any other Personal or legal relationship which places him/her in a conflict of interest.

**4.17    Powers of the Tribal Gaming Commission** In furtherance, but not in limitation, of the Tribal Gaming Commission's purposes and responsibilities, and subject to any restrictions contained in this Code or other applicable law, the Tribal Gaming Commission shall have, and is authorized to exercise by majority vote, the following powers in addition to all powers already conferred by this Code:

4.17.1  To reasonably inspect and regulate all Gaming within the jurisdiction of the Tribe, provided that the Commission does not make Management decisions as to the day-to-day operations of the Gaming Enterprise.

4.17.2  To investigate any reported violations of this Code, the Compact, or any other applicable law regarding Gaming within the jurisdiction of the Tribe.

4.17.3  To act as liaison with the NIGC and the California Division of Gaming Control and the California Gambling Control Commission.

4.17.4  To publish and distribute copies of this Code and Tribal Gaming Commission rules and any Tribal Council, Tribal Gaming Commission or Tribal Court decisions regarding Gaming matters.

4.17.5  To prepare and submit for Tribal Council approval proposals, including budget and monetary proposals related to the operation of the Tribal Gaming Commission, which could enable the Tribe to better carry forth the policies and intent of this Code.

4.17.6  To work directly, and only with the Tribal Council with regard to any Gaming issues.

4.17.7  To make or cause to be made reasonable inspections or investigations as it deems necessary to ensure compliance with this Code. In undertaking such investigations, the Tribal Gaming Commission may request the assistance of Tribal Gaming staff, Federal and local law enforcement officials, legal counsel and other third parties.

4.17.8 To request the assistance of the Gaming Review Board when established, in conducting Gaming hearings.

4.17.9 To arrange for training of Tribal Gaming Commission members and employees in areas relating to the regulation or operation of Gaming.

4.17.10 Upon prior explicit resolution and approval of the Tribal Council, to employ such advisors as it may deem necessary. Advisors may include, but are not limited to, lawyers, accountants, law enforcement specialists and Gaming professionals.

4.17.11 To promulgate rules and regulations to implement and further the provisions of this Code, including the development of a personnel and procedures policy with regard to its own employees; provided such rules or regulations are approved by Tribal Council resolution or ordinance.

4.17.12 To accept, review, approve or disapprove any Application for a License.

4.17.13 To consult with and make recommendations to the Tribal Council regarding changes in Tribal Gaming laws and policies.

4.17.14 To examine under oath, either orally or in writing, in hearings or otherwise any Person or agent, officer or employee of any Person, or any other witness with respect to any matters related to this Code, including enforcement of tribal Gaming laws, regulations, and policies, and to compel by subpoena the attendance of witnesses and the production of any books, records, and papers with respect thereto.

4.17.15 To make, or cause to be made by its agents or employees, an examination or investigation of the place of business, equipment, facilities, tangible Personal property and the books, records, papers, vouchers, accounts, documents and financial statements of any Gaming operating, or suspected to be operating, within the jurisdiction of the Tribe.

4.17.16 To delegate to an individual member of the Tribal Gaming Commission, or to an individual member of the Tribal Council, or Tribal staff, such of its functions as may be necessary to administer these ordinances efficiently; provided, that the Tribal Gaming Commission may not re-delegate its power to exercise any of the substantial governmental functions of the Tribe or its power to promulgate rules and regulations; and provided further that the Tribal Gaming Commission may not delegate to any Person the power to permanently revoke a License.

4.17.17 To issue fines and sanctions to the Gaming Facility if it is operating in violation of this Code, and report significant violations of the Compact to the Tribal Council and the State Gaming Agency.

4.17.18 To sue or be sued in courts of competent jurisdiction within the United States and Canada, subject to Sections 4.6 and 4.7 herein; provided, that no suit shall be brought by the Tribal Gaming Commission without the prior explicit written approval of the Tribal Council.

4.17.19 To use the seal of the Tribal Gaming Commission, or the seal of the Tribe with the approval of the Tribal Council.

4.17.20 To arbitrate, compromise, negotiate or settle any dispute to which it is a party relating to the Tribal Gaming Commission's authorized activities.

4.17.21 To exercise the Tribal power to tax, authorized by the Tribal Constitution in accordance with a Tribal Council resolution delegating such power to the Tribal Gaming Commission solely for the purpose of allowing it to charge administrative and License Application fees to Gaming License Applicants which are reasonably related to the costs of operating the Commission.

4.17.22 To purchase insurance from any stock or mutual company for any property or against any risk or hazard.

4.17.23 With prior approval of the Tribal Council, to make application and accept grants and other awards from private and governmental sources in carrying out or furthering the purposes of the Tribal Gaming Commission or the Tribe.

4.17.24 To establish and maintain such bank accounts as may be necessary or convenient.

4.17.25 To require the filing of any records, forms, and reports and all other information desired by the Tribal Council or required by this Code.

4.17.26 To provide for an internal system of record keeping with adequate safeguards for preserving confidentiality as deemed necessary by the Tribal Gaming Commission for retaining records, forms and reports at least three (3) years.

4.17.27 To adopt a schedule of fees to be charged for Licenses.

4.17.28 To adopt a schedule of fees for services rendered relating to transcripts and the furnishing or certifying of copies of proceedings, files, and records.

19

4.17.29 To conduct or arrange for background investigations of all Applicants.

4.17.30 To discipline any Licensee or Person participating in Gaming by ordering immediate compliance with this Code, and to issue an order of temporary suspension of any License issued under this Code pursuant to the hearings and due process required by Section 4.22 and 4.23 herein.

4.17.31 To issue an order of temporary closure of a Gaming Facility in the event the Tribal Gaming Commission determines that immediate closure is necessary to protect assets or interests of the Tribe pursuant to the due process and hearings required by Section 4.22 and 4.23 herein.

4.17.32 To become self-regulating whenever the Tribe becomes eligible for a certificate of self-regulation under the IGRA.

4.17.33 To file with the State Gaming Agency a request to be heard on any denial of a Determination of Suitability as defined by the Tribal/State Compact.

4.17.34 To ask for the assistance of the State Gaming Agency to carry out the Class III provisions of this Code and to reimburse the State Gaming Agency for any costs that it occurs in the provision of this service.

4.17.35 To assist Management in taking all steps necessary and appropriate to insure the physical safety of all Tribal Gaming Enterprises, their Licensees, patrons and employees.

4.17.36 Notwithstanding any authority granted herein, the Tribal Gaming Commission shall endear to follow rules, regulations, standards, specification and procedures which are consistent with the State Gaming Agency's rules, regulations, standards, specifications and procedures adopted pursuant to Sections 6.0- 8.0 of the Compact.

4.17.37 To enact and adhere to its own internal controls including a Conflict of Interest Policy governing Commissioners and Tribal Gaming Commission staff.

4.17.38 To file a quarterly report to the Tribal Council summarizing reports received from the Tribe's Management Contractor or General Manager pursuant to Section 9.1.3, and further to make such comments as it deems necessary to keep the Tribal Council fully informed as to the status of the Tribal Gaming Commission's activities in response to those reports.

**4.18    Annual Budget**    The Tribal Gaming Commission shall prepare an annual operating budget for all Tribal Gaming Commission activities and present it to the Council by October 15 of each year.

**4.19    Tribal Gaming Commission Regulations**

    4.19.1 Tribal Gaming Commission regulations necessary to carry out the orderly performance of its duties and powers shall include, but shall not be limited to, the following:

        (1)    The Minimum Internal Control Standards ("MICS") as issued by the NIGC;

        (2)    Interpretation and application of this Code, as may be necessary to enforce the Tribal Gaming Commission's duties and exercise its powers;

        (3)    A regulatory system for overseeing Gaming, including accounting, contracting, management and supervision;

        (4)    The findings of any reports or other information required by or necessary to implement this Code; and

        (5)    The conduct of inspections, investigations, hearings, enforcement actions and other powers of the Tribal Gaming Commission authorized by this Code.

    4.19.2 No regulation of the Tribal Gaming Commission shall be of any force or effect unless it is adopted by the Tribal Gaming Commission by written resolution and subsequently approved by a resolution of the Tribal Council and both resolutions filed for the record in the office of the Tribal Secretary.

**4.20    Right of Entrance; Bi-Monthly Inspection.**    The Tribal Gaming Commission and duly authorized officers and employees of the Tribal Gaming Commission, during regular business hours, may reasonably enter upon any premises of any Licensee or Gaming Facility for the purpose of making inspections and examining the accounts, books, papers and documents of any such Gaming Facility.

    4.20.1 <u>Aid to Entry</u>  The Gaming Facility staff shall facilitate such inspection or examinations by giving every reasonable aid to the Tribal Gaming Commission and to any properly authorized officer or employee.

    4.20.2 <u>Frequency of Inspection</u>  A Commissioner or a member of the Tribal Gaming Commission's staff shall visit each Gaming Facility at least once

every two weeks during normal business hours for the purpose of monitoring its operation.  Such visits shall be unannounced.

4.21 **Investigation**  The Tribal Gaming Commission, upon complaint or upon its own initiative or whenever it may deem it necessary in the performance of its duties or the exercise of its powers, may investigate and examine the operation and premises of any Person or Licensee within its jurisdiction.  In conducting such investigation, the Tribal Gaming Commission shall make no order or final decisions without affording any affected party notice and a hearing pursuant to Section 4.22.

4.22 **Due Process; Notice; Hearings; Examiner**  The Tribal Gaming Commission shall provide due process and provide notice and a hearing if it is to utilize any of its enforcement capabilities in the administration of its powers and duties hereunder.

4.22.1 <u>No Hearing, Voluntary Resolution</u>  Whenever it shall appear to the satisfaction of the Tribal Gaming Commission that all of the interested parties involved in any proposed hearing have agreed concerning the matter at hand, the Tribal Gaming Commission may dismiss the issue without a hearing.

4.22.2 <u>Notice of Hearing</u>  The Tribal Gaming Commission shall, within 5 days after the event giving rise to the concern, provide a written notice setting forth, with specificity, the issues to be resolved.

4.22.3 <u>Hearing</u>  The Tribal Gaming Commission shall, within 5 days after the notice of hearing pursuant to 4.22.2, provide the affected parties the right to present oral or written testimony to all people interested therein as determined by the Tribal Gaming Commission.

4.22.4 <u>Examiner</u>  The Tribal Gaming Commission shall act as examiner for the purpose of holding any  hearing, or the Tribal Gaming Commission may appoint a Person qualified in the law or possessing knowledge or expertise in the subject matter of the hearing to act as examiner for the purpose of holding any hearing.  Any such appointment shall constitute a delegation to such examiner of the powers of the Tribal Gaming Commission under this Code with respect to any such hearing.

4.22.5 <u>Decision</u>  The Examiner shall render a written opinion within 48 hours of the hearing.

4.22.6 <u>Appeals</u>  Affected parties may appeal a Tribal Gaming Commission determination by filing a written appeal to the Gaming Dispute Court within thirty (30) days of the Tribal Gaming Commission's or Examiner's final decision.

22

**4.23  Appeals to Gaming Review Board**

4.23.1  <u>Creation of the Gaming Review Board</u>   The Tribal Council hereby establishes the Gaming Review Board, which shall be composed of a Trial Branch and an Appellate Branch.  The Gaming Review Board shall have jurisdiction over all disputes arising out of or in connection with actions of the Tribal Gaming Commission or any actions that arise between Tribal Management and customers pursuant to Section 10.

4.23.2  <u>Procedures</u>   Within Ninety (90) days of the appointment of Judges under Section 4.23.6 below, the Gaming Review Board shall enact reasonable rules of procedure, which such rules shall be enacted by the Tribal Council ("Rules of the Gaming Review Board").  At a minimum, these procedures must provide any claimant in the Gaming Review Board with a right to a hearing at both the trial and appellate levels, and the rules must provide each claimant with due process of law under the Tribe's Constitution.  In addition, the rules must incorporate and make binding upon the Judges of the Gaming Review Board a Code of Judicial Ethics, as that document is from time to time amended.

4.23.3  <u>Governing Law</u>   To the extent Tribal law does not otherwise govern a dispute the Gaming Review Board shall apply relevant provisions of California or Federal law.

4.23.4  <u>Remedies</u>   The Gaming Review Board shall have full jurisdiction and authority to compel arbitration to enforce any arbitration order or other dispute resolution mechanism provision.

4.23.5  <u>Findings</u>   All findings and orders of the Gaming Review Board shall be in writing within Ninety (90) days after the dispute is submitted for the court's consideration.

4.23.6  <u>Appointment of Judges</u>   The Tribal Council shall appoint the Judges for the Gaming Review Board.  The Tribal Council shall, when necessity dictates, appoint four (4) Judges for the Gaming Review Board.  Any time the number of judges falls below four, the Tribal Council shall, within thirty (30) days appoint such additional judges as necessary to restore the number of judges to four.  If the Tribal Council fails to restore the number of judges to four within thirty (30) days of a vacancy, the remaining Judges may appoint the judges necessary to restore the number of Judges to four.  All Judges shall be selected with the following qualifications:

(1)     has never been convicted of a felony or any gaming offense;

(2)     is not a member of the Tribal Council;

(3) is of sound mind, trustworthy, and of good moral character;

(4) is able to determine in what cases he or she will be disqualified and is willing to disqualify himself or herself;

(5) is capable of carrying out the duties of the office, including staff administration and supervision;

(6) is willing to commit, upon public oath or affirmation, to uphold this Code, the Tribal Constitution and to fairly and impartially adjudicate all matter before the Gaming Review Board;

(7) shall be subject to the same background and Licensing standards as Commissioners pursuant to Title I, Section 4.10.5 herein;

(8) shall not engage in any Gaming Activity with the Gaming Enterprise; and

(9) is not employed by the Gaming Enterprise, nor have any immediate relatives who are employed by the Gaming Enterprise.

4.23.7 <u>Appeals</u> Trial Branch decisions shall only be appealed to the Appellate Branch. Appeals from any decision of the Trial Branch shall be heard by the three judges that did not hear the case in the Trial Branch. Decisions of the Appellate Branch may be appealed to the Tribal Court. There shall be no right to appeal Appellate Branch decisions to any State or Federal Court.

4.23.8 <u>Compensation</u> Judges of the Gaming Review Board shall be compensated by the Tribal Council in amounts appropriate to the duties and responsibilities of the office, which compensation shall not be diminished during a judge's continuation in office. The Gaming Review Board shall have the power to take appropriate action to enforce this subsection.

4.23.9 <u>Recall and Discipline</u> After appointment, Judges of the Gaming Review Board shall be subject to discipline and removal for cause pursuant to the Rules of the Gaming Review Board.

## SECTION 5  GAMING LICENSES

### 5.1  Applicability

5.1.1 Every Employee, Key Employee, Primary Management Official, Gaming Enterprise, and Gaming Facility that aids, participates or is related to Gaming is required to have a current and valid License as issued by the Tribal Gaming Commission.

24

5.1.2   Every Gaming Vendor that provides or receives, or is likely to provide or receive at least Twenty-five Thousand Dollars in any twelve (12) month period from the Enterprise is required to have a current and valid License as issued by the Tribal Gaming Commission.

5.1.3   Every Person extending financing, directly or indirectly, to the Facility or Enterprise is required to have a current and valid License as issued by the Tribal Gaming Commission, provided that any Person extending the financing shall be Licensed within Ninety (90) days of execution of such financing.

**5.2   Application Procedure**

5.2.1   Submission to Tribal Gaming Commission   An   Applicant   seeking   a License shall submit an Application to the Tribal Gaming Commission on such form as the Tribal Gaming Commission may require.

5.2.2.   Privacy Act and False Statement   The application form shall include the following notices:

5.2.2.1.   Privacy Act

In compliance with the Privacy Act of 1974, the solicitation of information on this form is authorized by 25 U.S.C. 2701 et seq. The purpose of the requested information is to determine the eligibility of individuals to be employed in a gaming operation.   The information will be used by National Indian Gaming Commission members and staff who have need for the information in the performance of their official duties. The information may be disclosed to appropriate Federal, Tribal, State, local, or foreign law enforcement and regulatory agencies when relevant to civil, criminal or regulatory investigations or prosecutions or when pursuant to a requirement by a tribe or the National Indian Gaming Commission in connection with the hiring or firing of an employee, the issuance or revocation of a gaming license, or investigation of activities while associated with a tribe or a gaming operation. Failure to consent to the disclosures indicated in this notice will result in a tribe's being unable to hire you in a primary management official or key employee position.   The disclosure of your Social Security Number (SSN) is voluntary. However, failure to supply a SSN my result in errors in processing your application.

25

5.2.2.2.False Statement

A false statement on any part of your application may be grounds for not hiring you, or for firing you after you begin work. Also, you may be punished by fine or imprisonment (U.S. Code, title 18, section 1001).

5.2.3  <u>Submission to State Gaming Agency</u>  The Tribal Gaming Commission shall forward the Applicant's Application for a Determination of Suitability along with required releases to the State Gaming Agency.

5.2.4  <u>Application Contents</u>  At a minimum, and whether the information is relevant for the type of License applied for, the Application shall contain the following information:

(1)  The full name (and other names ever used), address, telephone number, age, birth date and place, citizenship, gender, and social security number or business identification number of the Applicant.

(2)  If the Applicant has resided at his current address for less than five (5) years, his previous address, and if the Applicant has been issued more than one (1) driver's license number within the last five years, each driver's license number.

(3)  The name, address and telephone number of the Licensee for whom he will work and the specific location at which he will be employed. A description of the job, task, or service the Applicant will provide.

(4)  The names and addresses of the Applicant's Immediate Family.

(5)  The Applicant's criminal and civil record, if any, and an explanation of any crimes for which he has been convicted or civil suits he has lost, or to which he has entered a plea of *nolo contendere*.

(6)  A disclosure of any judgment rendered against the Applicant.

(7)  The names, addresses and telephone numbers of three (3) references who are not related to the Applicant; including one (1) personal reference acquainted with the Applicant for the last five (5) years.

(8)  A list of the Applicant's previous jobs over the preceding five (5) years and his present business affiliations.

26

(9)     The identity of any ownership interest in any past business ventures.

(10)    The disclosure of whether there is a previous contractual relationship with an Indian tribe.

(11)    A sworn statement whether the Applicant or any member of his/her Immediate Family has a past or current financial interest in any Gaming-related enterprise anywhere.

(12)    A list of all Gaming-related licenses the Applicant has ever applied for, whether or not they were granted such license.

(13)    A list of all professional, occupational or business licenses the Applicant has ever applied for, whether or not they were granted such license.

(14)    A statement of all languages written or spoken.

(15)    Written permission giving the Tribal Gaming Commission, State Gaming Agency and NIGC or its designees the right to the Applicant's background, including his criminal record.

(16)    A complete disclosure of any pending or anticipated civil or criminal action against the Applicant.

(17)    A sworn statement that if the License applied for is issued, the Applicant will submit to the jurisdiction of the Tribe and the Tribal Court.

(18)    A sworn statement that the Applicant will abide by all applicable Tribal and Federal laws, regulations and policies.

(19)    A photograph of the Applicant taken within the past year.

(20)    A written statement that the information contained in the Application is true and correct to the best of Applicant's knowledge.

5.2.5   Business Entities In addition to the relevant information requested in 5.2.4, business entities shall also submit the following:

(1)     Each of its officers and directors;

27

(2)   Each of its principle management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager;

(3)   Each of its owners or partners, if an unincorporated business;

(4)   Each of its shareholders who own more than 10 percent of the shares of the corporation; and

(5)   Each person or entity that, alone or in combination with others, has provided financing in connection with Gaming authorized under this Compact.

**5.3    Review of License Application.**   The Tribal Gaming Commission shall thoroughly review and conduct a background investigation for each Tribal Gaming License Application sufficient to make a determination of eligibility as required under this Code.   The Tribal Gaming Commission's review and background investigation shall include, but is not limited to the following:

5.3.1   The Tribal Gaming Commission shall enter into an agreement with the Butte County Sheriff's Office, State of California, to take the Applicant's fingerprints.   Each applicant shall submit the completed fingerprint card along with his/her application to the Tribal Gaming Commission.

5.3.2   The Tribal Gaming Commission shall review diligently, the information provided in the Tribal Gaming License Application, including, but not limited to, contacting and investigating all resources identified in the Tribal Gaming License Application.   An authorized Tribal official, identified by the Tribal Gaming Commission, shall review an Applicant's prior activities, criminal record (if any), reputation, habits, and associations in order to make an eligibility determination for key employees and primary management officials.

5.3.3   The Tribal Gaming Commission shall provide a written report as to findings and conclusions of the foregoing background investigation, including, but not limited to:

5.3.3.1 Steps taken in conducting diligence.

5.3.3.2 Results of the conducted diligence.

5.3.3.3 Conclusions from review of conducted diligence.

5.3.3.4 The basis for those conclusions.

28

5.3.4   The Tribal Gaming Commission shall transmit the Applicant's Application, file, and eligibility determination report to the NIGC and the State Gaming Agency.

5.3.5   The Tribal Gaming Commission shall maintain the Applicant's file, including applications, background investigation reports, and eligibility determination reports, for inspection by the NIGC for no less than three (3) years from the date of termination of employment.

5.3.6   The Tribal Gaming Commission, when it does not license an Applicant, shall notify the NIGC and forward copies of the Tribal Gaming Commission's eligibility determination report and the investigative report (if any).

**5.4   License Application Submission to NIGC.**  The Tribal Gaming Commission shall enter into an agreement with the Butte County Sheriff's Office, with approval from the Tribal Council, to receive and process fingerprint cards for background investigation purposes, so long as such background investigation shall, at a minimum, include a State and local check of criminal history records as well as records maintained by the Federal Bureau of Investigation.  The Tribal Gaming Commission, if it chooses not to contract with any other entity, may designate the NIGC as its authorized entity for receiving and processing fingerprint cards for background investigation purposes, so long as such background investigation shall, at a minimum, include a check of criminal history records information maintained by the Federal Bureau of Investigation.

**5.5   Notification and MOU with NIGC.**  If the Tribal Gaming Commission chooses to utilize the NIGC pursuant to Section 5.4 above, The Tribal Gaming Commission, with consent of the Tribal Council, shall notify the NIGC of the forwarding of Tribal Gaming License applications to NIGC.  Before obtaining and processing fingerprint cards for background investigation purposes, the Tribal Gaming Commission shall enter into a Memorandum Of Understanding (MOU) with the NIGC providing, that any and all result obtained from the fingerprint cards for background investigation purposes shall be viewed by Tribal government officials only.

**5.6   Scope and Types of License**

5.6.1   <u>Gaming Employee License</u>   Employee Gaming Licenses are for those Employees that deal in an area of Gaming or Cash Handling within the Gaming Facility or Enterprise.  A License issued pursuant to this section shall be effective for only the location, job and employer contained in the Application; provided, however, nothing herein shall prohibit a Primary Management Official or Key Employee from simultaneously performing the duties and responsibilities of more than one position; provided further, that the Primary Management Official or Key Employee is performing a

29

position that is directly in lineal descent below them in the organizational structure of the Enterprise and that they are qualified and trained to perform the duties of the positions so performed. Dealers may also be permitted to deal various card games so long as they are qualified and trained to perform the duties of the positions so performed and are specifically licensed for those positions.

5.6.2   <u>Non-Gaming Employee License</u>  A Non-Gaming Employee License is for employees that are not permitted in areas of Gaming, for example, cooks, kitchen staff, food servers, or hostess. A License issued pursuant to this section shall be effective for only the location, job and employer contained in the Application. These Licenses will not require the same level of background scrutiny required for Gaming Licenses.

5.6.3   <u>Part-Time or Full-Time Licenses</u>    The Employee's License shall state clearly whether the Employee is a part-time or full-time Employee.

5.6.4   <u>Transferring Licenses</u>  A Licensee shall apply to have his/her license transferred to a new location by requesting that transfer in writing to the Tribal Gaming Commission in a manner, which details the new job and location.

**5.7**   **Temporary Licensing**  Notwithstanding anything herein to the contrary, if the Applicant has completed a License Application, the Tribal Gaming Commission may immediately issue a temporary License if:

5.7.1   The Tribal Gaming Commission has conducted a preliminary, local, background investigation; and

5.7.2   Based on the preliminary investigation, the information does not indicate that the Applicant has a criminal history.

5.7.3   Temporary licenses may last no longer than 90 days.

**5.8**   **License Issuance, Term and Substance**

5.8.1   <u>Issuance</u>  Upon completion of the necessary background investigation, and after the Tribe has complied with the 30-day NIGC review requirements found in 25 C.F.R. §558.3 and §558.4, the Tribal Gaming Commission may issue a License on a conditional or unconditional basis. If the NIGC objects to an Applicant, the Tribe shall reconsider the Application, taking into account the reasons for the objections noted by NIGC. However, the Tribe shall have the final word on whether to license an Applicant. Nothing herein creates a property right in the License.

5.8.2   <u>Term</u>  Any License issued pursuant to this section shall be effective for a period of two (2) years from the date of issuance.

5.8.3   <u>License Substance</u>  The License shall state on its face the name of the Applicant, the Tribal Logo, the Licensee who employs him, and the license number.  It shall also include a photograph of Licensee.

**5.9**   **License Denial**  Any Application for a License shall be denied if the Tribal Gaming Commission, after an adequate review, determines the Application is incomplete or deficient, or that the employment of the Applicant poses a threat to the public interest or the effective regulation of gaming, or creates or enhances the danger of unsuitable, unfair or illegal practices and methods and activities in the conduct of gaming,.  If the foregoing determinations about the Applicant are made, no management contractor or Tribal gaming operation shall employ the Applicant.

**5.10**   **Renewals**  A Licensee shall petition to have the License renewed by applying to the Tribal Gaming Commission for a renewal before the License expires. Applicants may be required to provide updated material as requested.

**5.11**   **Requirement to Produce License Upon Request**   Licensees must carry the License and visibly display the License during working hours and must produce the License upon the request of any Person.

**5.12**   **License Suspension or Revocation of License**

5.12.1  <u>Temporary Suspension or Revocation</u>  The Tribal Gaming Commission may suspend or revoke a License, after notice and an opportunity for a hearing pursuant to Section 4.22 herein, for any of the following reasons:

(1)   The Licensee withheld pertinent information on the Application;

(2)   The Licensee made false statements on the Application;

(3)   The Licensee participated in Gaming that was not authorized by any Gaming License or regulatory approvals, and therefore deemed illegal;

(4)   The Licensee attempted to bribe a Tribal Council member, Commissioner or other Person, in an attempt to avoid or circumvent Tribal law;

(5)   The Licensee offered something of value to a Tribal Gaming Commission member;

31

(6)    The Licensee knowingly promoted, played or participated in any Gaming operated in violation of Tribal or Federal law;

(7)    The Licensee is knowingly involved in the falsification of books or records which relate to a transaction connected with the operation of Gaming;

(8)    The Licensee violated this Code or the rules and regulations of the Tribal Gaming Commission;

(9)    The Licensee has been convicted or has entered a plea of *nolo contendere* to any crime involving Gaming, fraud, theft, or embezzlement.

(10)    The Licensee has refused to comply with any lawful order, inquiry or directive of the Tribal Gaming Commission, the Tribal Council, the Federal Government or any court of competent jurisdiction;

(11)    The Licensee has been convicted of, or entered a plea of *nolo contendere* to, a crime involving the sale of illegal narcotics or controlled substances;

5.12.2  Procedure for Suspension

(1) Upon reasonable cause that a violation of the Code has occurred, the Tribal Gaming Commission or its designee may either undertake an investigation of the Licensee, or serve upon such Licensee an order to show cause why the Licensee's License should not be revoked, or why the Licensee should not be enjoined from conducting Gaming.

(2) Additionally, if the NIGC notifies the Tribe that it has received reliable information indicating that a key employee or primary management official is not eligible for employment under 25 C.F.R. §558.2, the Tribal Gaming Commission or its designee shall suspend such license and notify the licensee in writing that his/her license has been suspended and may be revoked.

(3) Such notice shall state the reason for the suspension and/or order, and the time and place for the hearing before the Tribal Gaming Commission pursuant to Section 4.22 herein.

(4) The Licensee shall have an opportunity to present testimony and cross-examine opposing witnesses, and to present any other evidence as to why a revocation order or injunction should not be issued.

32

(5) The hearing shall be set for not less than two (2) days or more than five (5) days from the date of the notice. The hearing shall be governed in all respects in accordance with Tribal law and Tribal Gaming Commission regulations. Any suspension decision of the Tribal Gaming Commission after hearing shall be reviewable in the Gaming Review Board pursuant to the requirements of Section 4.22 and 4.23. The Tribe shall notify NIGC of its decision.

**5.13    Enterprise License**  The Gaming Enterprise authorized by the Compact and this Code shall be licensed by the Tribal Gaming Commission. The Tribal Gaming Commission shall automatically issue a License if the following threshold criteria are met:

5.13.1 The Gaming is located on lands taken into trust after October 17, 1988, as a settlement of a claim.

5.13.2 The Gaming is authorized pursuant to this Code, the Compact and the IGRA.

5.13.3 The Gaming is authorized by a Tribal Council resolution.

5.13.4 The Tribe has the sole proprietary interest and the Management Contract is consistent with Tribal and Federal law and is properly approved by the Chairman of the NIGC.

**5.14    Facility License**  The Gaming Facility authorized by the Compact and this Code shall be licensed by the Tribal Gaming Commission.

5.14.1 A Facility License shall be issued if the following criteria are met:

(1) The Tribal Gaming Commission has determined, based on the reports of qualified inspectors and a review by the Tribal Gaming Commission of all relevant contracts and operational policies and procedures, including safety manuals and intergovernmental agreements relating to environmental protection, health, safety and emergency services, that the Gaming Facility has been constructed and shall be maintained and operated in a manner that adequately protects the environment and the public health and safety.

(2) The construction, expansion or modification of the Facility shall meet the Building and Safety Code pursuant to Title VIII of this Code.

(3) The construction, expansion or modification of the Facility shall meet the standards of the federal American with Disabilities Act pursuant to Title IV of this Code.

33

(4) Upon the inspection of the health and safety of the building, and upon the inspection that all Gaming controls that are necessary to insure the integrity of the Gaming are in place, the Tribal Gaming Commission shall issue to the Facility a Certificate of Occupancy, which shall be reissued upon similar inspections every two years.

5.14.2 Upon the issuance of a Facility License, the Tribal Gaming Commission shall forward the License to the State Gaming Agency within ten (10) days of issuance.

5.14.3 The Facility License shall be posted in a conspicuous and public place in the Facility at all times.

**5.15    State Gaming Agency Licensing**

5.15.1 Except as provided in Sections 5.15.2 and 5.15.3 below, the Tribe will not employ or affiliate with any Person whose application to the State Gaming Agency for a determination of suitability has been denied.

5.15.2 Notwithstanding Section 5.15.1, the Tribe may employ a Person who has been denied for a determination of suitability by the State Gaming Agency if:

(1) The Person holds a valid and current Tribal License;

(2) The denial by the State Gaming Agency is based on reasons that antedate the filing of the Person's initial application to the State Gaming Agency;

(3) The Person is not an Employee of another Gaming Enterprise;

(4) The Person has been in continuous employ for at least three years by the Tribe prior to the effective date of the Compact.

5.15.3 Notwithstanding Section 5.15.1, the Tribe may employ a Person who has been denied for a determination of suitability by the State Gaming Agency if:

(1) The Person is an Enrolled Member of the Tribe;

(2) The Person holds a valid and current Tribal License;

(3) The denial by the State Gaming Agency is based on reasons that antedate the filing of the Person's initial application to the State Gaming Agency;

34

(4) The Person is not an Employee of another Gaming Enterprise;

**5.16    Miscellaneous Licensing Provisions**

5.16.1 No License shall be sold, lent, assigned or otherwise transferred.

5.16.2 Each Licensee shall have a copy of the Code and regulations readily available for inspection by any Person at each authorized Gaming site.

5.16.3 The Tribe shall monthly provide the State Gaming Agency with the name, badge identification number, and job descriptions of all non-key Gaming Employees.

## SECTION 6   BANK ACCOUNTS AND RECORDKEEPING

**6.1    Bank Account**  The Tribe shall open a separate bank account for the Enterprise and all receipts of each Gaming Activity shall be deposited in the account.

**6.2    Record Keeping**  Accounting records of the Gaming, Enterprise, and Facility shall be kept on a double entry system of accounting, maintaining detailed supporting and subsidiary records.  The Tribe shall maintain the following records for not less than three (3) years:

6.2.1    Revenues, expenses, assets, liabilities and equity for each location at which Class II and Class III Gaming is conducted.

6.2.2    Daily cash transactions for Gaming, including but not limited to transactions relating to each Gaming table, game drop box and game room bank.

6.2.3    All markers, IOU's, returned checks, hold checks or other similar credit instruments.

6.2.4    Individual and statistical game records to reflect statistical drop and statistical win for electronic, computer, or other technologically assisted games.

6.2.5    Contracts, correspondence and other transaction documents relating to all Gaming Vendors.

6.2.6    Records of all customer complaints and Tribal Gaming enforcement activities.

6.2.7    All gaming related audits prepared by or on behalf of the Tribe or one of its subdivisions.

**6.3    Audit Requirements**

6.3.1    The Enterprise shall provide a copy of an annual independent audit to the Tribal Gaming Commission, the Tribal Council, the State Gaming Agency, and the National Indian Gaming Commission.

6.3.2    Each contract between the Tribe and another Person for supplies, services (other than legal and accounting services) or concessions for a contract amount in excess of $25,000 annually shall be subject to an independent audit. Such audit shall be solely limited to a monthly printout from the accounts payable of the Gaming Operations of the checks rendered .    A copy of such audit will be provided to the Tribal Gaming Commission, the Tribal Council, State Gaming Agency and the National Indian Gaming Commission.

**6.4    Notices to the Public**

6.4.1    The Gaming Facility shall have a copy of this Code readily available for inspection by any Person at each Gaming Facility.

6.4.2    The Gaming Facility shall post in a conspicuous location near each game an explanation of the rules of play of every game operated or shall otherwise provide the public with such an explanation.

**SECTION 7    GAMING ENTERPRISE RESTRICTIONS AND COMPLIANCE**

**7.1    Number of Facilities**

7.1.1    The Tribe may establish and operate not more than two Gaming Facilities, and only on those lands on which Gaming may lawfully be conducted under IGRA.

7.1.2    The Tribe may combine and operate in each Gaming Facility any forms and kinds of Gaming permitted under the Compact, IGRA and this Code.

**7.2    Gaming Device Restrictions**

7.2.1    <u>Number of Devices</u>    The Tribe may offer no more than Two Thousand Gaming Devices combined for all Facilities.

7.2.1    <u>Transferability of Devices</u>    The Gaming Enterprise, or any Licensee, is prohibited from selling, renting or lending Gaming Devices to any Person without prior written approval of the Tribal Gaming Commission.

7.2.2    <u>Transportation of Devices</u>    Transportation of a Gaming Device to or from the Gaming Facility within California is permissible only if:

(1)    The Tribal Gaming Commission has issued a permit to transport the Device; and

(2)    The Tribal Gaming Commission has provided at least ten (10) days notice to the local County Sheriff; and

(3)    The final destination of the Device is a gaming facility of any tribe in California with a Tribal/State Compact; or

(4)    The final destination is in a state or country whereby the Device is otherwise legal; or

(5)    The final destination is located in California for the purpose of testing, repair or storage by a Person that is licensed by the State Gaming Agency.

**7.3    Gaming Device Technical Standards**    The technical standards for Gaming Devices shall adhere to the Gaming Laboratories International, Incorporated standards.

**7.4    Age Restrictions**

7.4.1    No Person under the age of Eighteen (18) shall be employed by the Gaming Facility, Management Contractor or the Tribal Gaming Commission.

7.4.2    No Person under Twenty-one (21) years of age shall be employed in the service of alcoholic beverages at the Gaming Facility.

7.4.3    No Person under the age of Twenty-one (21) shall be permitted in any area where Gaming is occurring and alcoholic beverages are being consumed.

7.4.4    No Person under the age of Eighteen (18) shall be permitted to place any wager, directly or indirectly, in any Gaming Activity.

7.4.5    No Person under the age of Eighteen (18) shall be permitted in any room in which Gaming is being conducted unless the person is en-route to a non-gaming area of the Gaming Facility.

**7.5    Methods of Payment**

7.5.1    Gaming chips and other tokens of value may be sold and redeemed by the Enterprise and only for full value.

7.5.2   Consideration to participate in Gaming shall be cash only.  No other form of consideration shall be allowed unless the Tribal Gaming Commission gives prior written approval.

**7.6   Compliance requirements**

7.6.1   Evidence of win or loss incurred by a Player must, upon request, be provided in such form as will be acceptable to the Internal Revenue Service.

7.6.2   The Enterprise shall pay all fees and file all reports required by law within the time prescribed.

7.6.3   The Enterprise shall respond immediately to all inquiries, subpoenas, or orders of the Tribal Gaming Commission, the State Gaming Agency, the Tribal Council, or the NIGC.

7.6.4   The Enterprise shall make its premises and books and records available for inspection during normal business hours by the Tribal Gaming Commission, the State Gaming Agency, the National Indian Gaming Commission and members of the Tribal Council or their designee.

**7.7   Miscellaneous**

7.7.1   The Enterprise shall provide adequate security to protect the public before, during, and after Gaming.

7.7.2   The Enterprise may not discriminate on the basis of sex, race, color, or creed in its employment practices related to Gaming, notwithstanding Indian Preference laws.

## SECTION 8  ENFORCEMENT

**8.1   Jurisdiction**  Except as provided in this Code or the Compact, the Tribal Gaming Commission and Tribal Court shall have jurisdiction over all violations of this Code.

**8.2   Prohibited Acts**  In addition to other civil and criminal offenses provided for in this Code, the following acts are prohibited by any Person and subject any violator to the civil or criminal penalties specified herein:

8.2.1   Participating in any Gaming, which is not authorized by this Code.

8.2.2   Knowingly making a false statement in connection with any Contract to participate in any Gaming Activity.

38

8.2.3   Attempting to bribe any Person participating in any Gaming Activity.

8.2.4   Offering or accepting a loan, financing or other thing of value between a Tribal Gaming Commission member or employee and any Person participating in any Gaming Activity.

8.2.5   Promoting or participating in any illegal Gaming Activity.

8.2.6   Failing to keep sufficient books and records to substantiate receipts, disbursements and expenses incurred or paid from any Gaming Activity authorized pursuant to this Code.

8.2.7   Falsifying any books or records that relate to any transaction connected with any Gaming Activity pursuant to this Code.

8.2.8   Conducting or participating in any Gaming Activity, which results in Cheating.

8.2.9   Allowing participation in Gaming Activity by or with an intoxicated or disorderly Player.

8.2.10  Allowing or participating in the sale of liquor when such sale is prohibited by Tribal law.

8.2.11  Accepting consideration other than money, tokens or chips for participation in any Gaming Activity.

8.2.12  Using bogus or counterfeit chips or charitable Gaming tickets, or to substitute or use any cards, charitable Gaming tickets or Gaming equipment that has been marked or tampered with.

8.2.13  Employing or possessing any cheating device or to facilitate cheating in any Gaming Activity.

8.2.14  Willfully using any fraudulent scheme or technique to change the odds of any game of chance.

8.2.15  Soliciting, directly or indirectly, or using inside information on the nature or status of any Gaming Activity for the benefit of an individual.

8.2.16  Tampering with a Gaming Device, attempting to conspire to manipulate the outcome or the payoff of a Gaming Device, or otherwise unlawfully tampering with or interfering with the proper functioning of the machine.

8.2.17  Alter or counterfeiting a Gaming license.

8.2.18 Aiding, abetting, or conspiring with another Person knowingly or knowingly to cause any Person to violate any provision of this Code or any rules and regulations adopted hereunder.

8.2.19 Operating, using or making available to the public any illegal Gaming Device, apparatus, material or equipment.

8.2.20 Selling, holding out for sale or transporting into or out of the jurisdiction of the Tribe any illegal Gaming Device, apparatus, material or equipment.

8.2.21 Assisting or allowing a Person who is under the age of Eighteen (18) to participate in a Gaming activity.

8.2.22 Possessing any illegal narcotics or controlled substances on any licensed Gaming site.

8.2.23 Stealing or attempting to steal funds or other items of value from any Gaming Facility or from the Tribal Gaming Commission.

8.2.24 Employing any Person at a licensed Gaming Facility whom the Licensee knows has been convicted of a Gaming crime or a crime of fraud.

**8.3    Criminal Violation**   Any Indian who violates or fails to comply with any provision of this Code, or who fails or neglects to comply with any order, decision of the Tribal Gaming Commission, shall be charged and given due process pursuant to Section 4.22 herein.  If such Indian is found to be guilty of a crime, he may be required to pay a fine not to exceed Five Thousand Dollars ($5,000) or be incarcerated for not to exceed two (2) years.  Each day during which any such violation or failure to comply continues shall constitute a separate violation of this Code.

**8.4    Civil Violation**   Any non-Indian who violates or fails to comply with any provision of this Code, or who fails or neglects to comply with any final order of the Tribal Gaming Commission, shall be charged and given due process pursuant to Section 4.22 herein.  If the non-Indian is found liable, he may pay a civil fine not to exceed Five Thousand Dollars ($5,000) for each violation thereof.  Each day during which any such violation or failure to comply continues shall constitute a separate violation of this Code.  The amount of any such civil fine may be recovered in a civil action in the Tribal Court.

**8.5    Cumulative Fines**  All civil fines accruing under this Code shall be cumulative and a suit for the recovery of one fine shall not bar or affect the recovery of any other fine, or judgment, penalty, forfeiture or damages, nor bar the power of the Tribal Court to punish for contempt, nor bar any criminal prosecution against any officer, director, agent, or employee of any Licensee, or any other Person.

**8.6    Purpose of Civil Penalties**  The civil fines imposed under this Code are intended to be remedial and not punitive and are designed to compensate the Tribe for the damage done to the peace, security, economy and general welfare of the Tribe and the Reservation, and to compensate the Tribe for costs incurred by the Tribe in enforcing this Code.  The civil fines under this Code are also intended to coerce all people into complying with this Code and Tribal Gaming Commission regulations and not to punish such people for violation of such laws and regulations.

**8.7    Civil Action for Penalties**  In enforcing the civil infraction provisions of this Code, the Tribal Gaming Commission shall proceed, in the name of the Tribe, against a Person for violation of such provision by civil complaint in the Gaming Review Board pursuant to the provisions of this Code.  The Tribal Gaming Commission in such action shall have the burden of showing, by the preponderance of the evidence, that such Person violated the applicable provision of this Code.

**8.8    Seizure and Forfeiture of Property**  Property utilized in violation of this Code shall be subject to seizure and forfeiture by order of the Tribal Gaming Commission pursuant to such procedures and rules as the Tribal Gaming Commission shall promulgate.

**8.9    Reporting of Offenders**  The Tribal Gaming Commission, upon final conviction of any Person under this subsection, shall report the name of the Person convicted to the Tribal Council, State Gaming Board and NIGC.

## SECTION 9   GAMING MANAGEMENT

**9.1    Management by a Gaming Contractor**

9.1.1    The Gaming Contractor, or if no Gaming Contractor the Tribe, shall identify in writing a Person(s) who shall serve as General Manager of the Gaming Enterprise.  The General Manager appointed shall undergo a background check by the Tribal Gaming Commission and shall obtain a License before commencing work.

9.1.2    The General Manager shall have access to any area within the Gaming Facility in accordance with the limitations defined in Section 2.30.

9.1.3    The General Manager shall present a written monthly report to the Tribal Gaming Commission which estimates the number of patrons served, the amount of income generated, the numbers of employees working at the establishment, a detailed description of any patron complaints and other problems experienced at the establishment, a written statement of any changes in Primary Management Officials and all bills which are thirty (30) days or more past due.

**9.2    Rules and Regulations for Management**    The Tribal Gaming Commission shall, with the input and suggestions of Primary Management Officials, promulgate rules and regulations or specifications governing the following subjects:

9.2.1    The enforcement of all relevant laws and rules with respect to the Gaming Operation and the Facility;

9.2.2    Ensuring the physical safety of Enterprise patrons and Employees;

9.2.3    The physical safeguarding of assets transported to, within, and from the Gaming Facility;

9.2.4    The prevention of illegal activity from occurring within the Gaming Facility including employee procedures and surveillance;

9.2.5    The recording of occurrences that deviate from normal operating policies including the following procedure for reporting incidents:

   (1)    Specify that security personnel record all incidents, regardless of immateriality;

   (2)    Require the assignment of a sequential number to each report;

   (3)    Provide for permanent reporting in indelible ink in a bound notebook;

   (4)    Require that each report include the following:

      (i)      The record number.
      (ii)     The date.
      (iii)    The time.
      (iv)     The location of the incident.
      (v)      A detailed description of the incident.
      (vi)     The persons involved in the incident.
      (vii)    The security personnel assigned to the incident.

9.2.6    The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like;

9.2.7    Maintenance of a list of persons barred from the Gaming Facility;

9.2.8    In accordance with section 8.4.1 of the Compact, except as provided in subdivision 8.4.1(d) of the Compact, no State Gaming Agency regulation shall be effective with respect to the Tribe's Gaming Operation unless it

has first been approved by the Association, and further, the Tribe has had an opportunity to review and comment on the proposed regulations.

**9.3    Insurance Requirements**  Pursuant to the Tribal/State Compact, the Gaming Contractor shall ensure that the Enterprise shall carry a minimum of Five Million Dollars ($5,000,000.00) liability insurance to protect the public in the event of an accident.

**9.4    IRS Requirements**  The General Manager shall be responsible for seeing that Gaming Activity is managed in accordance with Tribal and Federal law and that such Gaming Activity complies with all IRS reporting requirements.

**9.5    Audit Requirements**

9.5.1    <u>Annual Enterprise Audit</u>  The Tribal Gaming Commission and the General Manager of the Enterprise shall obtain an annual independent audit of such Enterprise by a certified public accountant using the accounting standards for audits of casinos of the American Institute of Certified Public Accountants.

9.5.2    <u>Contract Audits</u>  Each contract between the Management Contractor and another Person for supplies, services (other than legal and accounting services) or concessions for a contract amount in excess of Twenty-five Thousand Dollars ($25,000) annually shall be subject to an independent audit.  For the purposes of the previous sentence, the term "services" does not include contracts the purpose of which is to extend financing to the Management Contractor, the Tribe, or the Enterprise.

9.5.3    <u>Copies</u>  A copy of all such audits shall be provided to the Tribal Gaming Commission, the Tribal Council, State Gaming Agency and the NIGC.

**9.6    Annual Reports from Management Contractor.**  Management Contractors must file an annual report with the Tribal Gaming Commission and the Tribal Council between the 15th and the last day of the 12th month duration of each such License period.  The report include, at a minimum, the following information:

9.6.1    The name, address and telephone number of the Licensee;

9.6.2    The names, addresses and titles of all of its current managers of the Licensee;

9.6.3    A description of the Gaming operated and Gross Revenue;

9.6.4    The name and address of the Person who will be designated as Primary Management Official, or new Key Employees over the next License Term;

9.6.5   Written proof that the Licensee has paid to the National Indian Gaming Commission such fees as Federal and Tribal law may require it to pay;

9.6.6   A sworn statement that the Licensee has complied with the IRS including written notice of customer winning;

9.6.7   The number of full-time equivalent people, on an annualized basis, employed by the operation during the past twelve (12) months, together with a projection of the number of full-time equivalent people who are expected to be employed during the next license period;

9.6.8   A sworn statement that the Licensee will continue to comply with all Tribal and Federal laws applicable to Gaming;

9.6.9   The name, address and signature of the agent who will accept service of process on behalf of the Licensee, who must reside on the Reservation; and

9.6.10  If the Licensee is a corporation, a copy of any amendment to its articles of incorporation, properly certified by the incorporating government, unless a current copy has already been filed with the Tribal Gaming Commission.

**9.7    Management Contracts**

9.7.1   Each Management Contract is subject to the prior approval of the National Indian Gaming Commission.

9.7.2   Each Management Contract shall be approved by the Tribal Council.  In making its selection, the Tribal Council shall review the following:

(1)   Background information on the proposed Management Contractor including: its name, its address, the names and addresses of each Person or entity having a direct financial interest or management responsibility for the proposed management contractor, and in the case of a corporation the names and addresses of each member of its board of directors and all stockholders who hold directly or indirectly ten percent (10%) or more of its issued or outstanding stock.

(2)   A description of any previous experience that each Person listed in subsection above has had with other Gaming contracts with Indian Tribes or with the Gaming industry generally, including the name and address of any tribal government or licensing agency with which such Person has had a contract relating to Gaming.

44

(3)     A complete financial statement of each Person listed in subsection 9.7.2(1).

(4)     The Tribal Council shall undertake any additional steps it can to determine the character and reputation of each proposed management contractor.

(5)     If the Tribal Council, after reviewing the above described information, still desires to enter into a management contract with the proposed management contractor, such management contract shall be placed in writing and submitted to legal counsel for review before the Council approves it.

9.7.3   Any Management Contract approved by the Council must contain at a minimum the following with respect to the Gaming Enterprise to which the contract is applicable:

(1)     A provision requiring a monthly financial accounting of the Gaming Enterprise's income and expenses. Such reports shall be prepared by an independent auditor who is mutually acceptable to the Tribe and the Management Contractor.

(2)     A provision guaranteeing the Tribe a minimum guaranteed payment that shall always take precedence over the Management Contractor's right to recoup development and construction costs.

(3)     An agreed upon ceiling for the Management Contractor's development and construction costs.

(4)     A provision that the contract shall not exceed seven (7) years or 40% of Net Revenues.

(5)     A provision for termination of the contract and the grounds for termination.

9.7.4   If the Council is satisfied with the information it receives it shall submit its proposed contract along with all of the above-described information to the Tribal Gaming Commission, State Gaming Agency and to the Chairman of the National Indian Gaming Commission for Licensure approval.

## SECTION 10 PROCEDURES FOR RESOLVING DISPUTES BETWEEN THE GAMING PUBLIC AND GAMING MANAGEMENT

**10.1    General Principles.** The Tribe values its customers and intends, at all times, to see that questions, concerns, issues, and/or disputes raised by the gaming public are addressed in a fair and orderly manner. However, nothing in these procedures

45

shall be construed as a waiver of the Tribe's sovereign immunity, or any of the rights and privileges attendant thereto.

**10.2    Initial Dispute Resolution Procedure.**

10.2.1   Members of the Gaming public who, in the course of their otherwise lawful and proper use of the Tribe's Gaming Facilities, have questions or concerns about the condition or operation of any part of the Gaming Facilities, or who otherwise believe themselves to be aggrieved by some aspect of the condition or operation of any part of the Gaming Facilities, shall direct their questions, concerns, or disputes (hereinafter collectively "disputes") in the first instance to gaming management at the Gaming Facility, either orally or in writing.

10.2.2   Concerns or disputes shall be raised as soon as reasonably possible after the events giving rise to the dispute occur; however, no dispute may be raised more than 10 calendar days after said events take place.

10.2.3   Upon learning about a dispute, Gaming Management shall expediently and informally gather sufficient facts to make an initial determination about the dispute (i.e. whether the dispute has any merit, whether further investigation is required, whether to take any corrective action, etc.). Gaming Management shall inform the complainant, either orally or in writing, about its initial determination as soon as is reasonably practicable. At that time, if the complainant indicates that he or she has additional concerns or is not satisfied, gaming management shall inform the complainant about how to initiate the formal dispute resolution procedure.

**10.3   Formal Dispute Resolution Procedure.**

10.3.1   Complainants who have followed the initial dispute resolution procedure, and who are unsatisfied with gaming management's initial determination, may appeal that determination in writing to the Tribal Gaming Commission no later than 5 days after being informed about the initial determination.

10.3.2   The Tribal Gaming Commission may investigate the dispute in any manner it chooses.  The Tribal Gaming Commission shall offer the complainant a fair opportunity to be heard in person or through counsel about the dispute, either before or after it makes its own inquiries.  The complainant's opportunity to be heard shall take place within 30 days after the Tribal Gaming Commission receives the complainant's written appeal.

10.3.3   After investigating (if it chooses to do so), and within 30 days after affording the complainant an opportunity to be heard, the Tribal Gaming Commission shall issue a written opinion on the complainant's appeal, and shall mail a copy of the opinion to the complainant at his/her last known

46

address. The opinion shall inform the complainant that he or she may appeal the Tribal Gaming Commission's decision to the Gaming Review Board pursuant to Section 4.23.

# TITLE II

## REGULATION OF THE ENVIRONMENT
## FOR CLASS III GAMING

### SECTION 1  INTRODUCTION

**1.1**  **Title**  This Title shall be known as "THE MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA TRIBAL ENVIRONMENT OFF-RESERVATION IMPACT CODE."

**1.2**  **Authority**  This Title is enacted pursuant to the inherent sovereign powers of the Tribe pursuant to Article VIII, Section 3(a) of the Constitution.

**1.3**  **Purpose**  The basic purposes of this Code are to:

    1.3.1  <u>Inform</u>  Inform the Tribe and the public about the potential significant off-reservation environmental impacts of any (1) expansion or significant renovation or modification of an existing Tribal Gaming Facility and/or (2) significant excavation, construction, or development associated with a Tribal Gaming Facility or proposed Tribal Gaming Facility.

    1.3.2  <u>Identify</u>  Identify ways that environmental impacts of the aforementioned activities can be avoided or significantly reduced through the use of reasonable alternative or mitigation measures such as changes in the construction plans.

    1.3.3  <u>Disclose</u>  Disclose to the public the reasons why the Tribal Council approved a Gaming Facility construction plan if significant off-reservation environmental impacts are likely to occur.

**1.4**  **Scope or Coverage of This Ordinance.**  This ordinance shall apply solely to studies of and decisions related to the potential off-reservation impacts of any:

    1.4.1  Expansion or significant renovation or modification of an existing Tribal Gaming Facility; and

    1.4.2  Significant excavation, construction, or development associated with a Tribal Gaming Facility or proposed Tribal Gaming Facility.

**1.5**  **Repeal of Prior Laws, and Effect of Repeal**  All titles, chapters and sections of the Tribal Code which pertain to the environment and are in effect as of the date that this Code becomes operative, are hereby repealed as to Gaming Activities

48

only, and all other laws, or parts thereof, inconsistent with the provisions of this Code with regard to Gaming Activities are hereby repealed.

1.6    **Construction**    In construing the provisions of this Code, unless the context otherwise requires, the following shall apply:

    1.6.1    This Code shall be liberally construed to effect its purpose and to promote substantial justice.

    1.6.2    Words in the present tense include the future and past tenses.

    1.6.3    Words in the singular number include the plural, and words in the plural number include the singular.

    1.6.4    Words of the masculine gender or neuter include masculine and feminine genders and the neuter.

1.7    **Severability**    If any section of this Code is invalidated by a court of competent jurisdiction, the remaining sections shall not be affected thereby.

1.8    **Effective Date.**    This Code shall be effective on certification by the Tribal Council.

## SECTION 2    DEFINITIONS

2.1    **"Cumulative Impacts"**    means two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.

2.2    **"Environmental Assessment"**    means an initial study of the environmental impacts of a proposed Project.

2.3    **"Environmental Reports"**    means any environmental assessment, environmental report, or environmental statement, as the case may be.

2.4    **"Impact"**    means the direct or primary environmental effects which are caused by the Project and occur at the same time and place.

2.5    **"Mitigation"**    means avoiding an impact altogether by not taking a certain action or parts of an action; minimizing impacts by limiting the degree or magnitude of the action and its implementation; rectifying the impact by repairing, rehabilitating or restoring the impacted environment; reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; compensating for the impact by replacing or providing substitute resources or environments.

2.6 **"Project"** means any: (1) expansion or significant renovation or modification of an existing Tribal Gaming Facility and/or (2) significant excavation, construction, or development associated with a the Tribe's Gaming Facility or proposed Tribal Gaming Facility.

## SECTION 3  BASIC REQUIREMENTS

3.1 **Environment Assessment or Finding of No Significant Impact** Before commencing any expansion or significant renovation or modification of an existing Tribal Gaming Facility, or any significant excavation, construction, or development associated with a Tribal Gaming Facility or proposed Tribal Gaming Facility, the Tribe shall require the development of an Environmental Assessment which the Tribal Council shall use to determine if there is substantial evidence that the proposed Project will have a significant off-reservation environmental impact. If the Tribal Council finds that it will not, it shall follow the procedures detailed in this Code for the issuance of a Finding of No Significant Impact (FONSI).

3.2 **Off-Reservation Impact** If, however, the Tribal Council finds that there is substantial evidence that the proposed Project will have a significant off-reservation environmental impact, defined as a substantial adverse impact in the physical conditions of the off-reservation areas as they existed at the time of the study, the Tribal Council shall follow the procedures detailed in this Code for the preparation of an Environmental Report (ER).

3.3 **Response to Adverse Findings** When an Environmental Assessment shows that an expansion or significant renovation or modification of an exiting Tribal Gaming Facility or any significant excavation, construction, or development associated with a Tribal Gaming Facility or proposed Tribal Gaming Facility would cause substantial adverse changes in the off-reservation environment, the Tribal Council shall respond to the finding by one or more of the following methods:

3.3.1 Change the proposed Project.

3.3.2 Impose conditions on the approval of the Project.

3.3.3. Adopt plans or ordinances to control the adverse impact.

3.3.4. Choose an alternative way to meet the same need.

3.3.5. Disapprove the Project.

3.3.6. Find that changes in or alternatives to the Project are not feasible.

50

3.3.7. Find that the unavoidable, significant environmental damage is acceptable, because the Tribe's economic, legal, social, technological or other benefits of the proposed Project outweigh its unavoidable off-reservation environmental impacts.

## SECTION 4  POLICIES GOVERNING ENVIRONMENTAL ASSESSMENTS AND REPORTS

It shall be the policy of the Tribe that:

**4.1**     **Review of Off-Reservation Impacts**   These studies shall serve not only to protect the environment but also to demonstrate to the off-reservation community that it is being protected and that the Tribe has, in fact, analyzed and considered the off-reservation impacts of its actions.

**4.2**     **Notice to Public**   These studies shall inform the Tribal and local governments and the public of the anticipated off-reservation environmental impacts of the Project.

**4.3**     **Decision-Making**   These studies shall allow the Tribal government to make decisions regarding these proposed Projects with the off-reservation environmental consequences in mind.

**4.4**     **No Delay of Projects**   These studies shall be undertaken in a manner which is designed to allow the Tribe to make informed and balanced decisions, not to prevent, delay or preclude the advancement of Gaming.

**4.5**     **Off-Reservation Influence**   These studies shall be prepared early enough to allow off-reservation environmental concerns to influence the Project's design and construction, yet late enough to allow for a real and honest assessment of the Project's off-reservation environmental impact.

**4.6**     **Tribal/Federal Cooperation**   These studies shall be prepared in a manner which eliminates duplication of federal efforts by providing for joint Tribal/federal preparation of environmental documents.

**4.7**     **Simple Writing**   These studies shall be analytic, rather than lengthy, and shall be written in plain language.  They shall also mention, only briefly, issues other than significant off-reservation environmental impacts in the Environmental Report text.

**4.8**     **Weighing Negative Projects**   The Tribe shall give serious consideration to preventing off-reservation environmental damage and should not approve a Project as proposed if there are feasible alternatives or mitigation measures available that would substantially lessen any significant adverse off-reservation impacts that the Project would create.  In deciding whether to approve a Project

51

that has negative off-reservation economic impact, the Tribe shall consider the specific economic, environmental, legal social and technological factors involved.

4.9    **Public Comment**  The Tribe shall assure adequate opportunity and time for public review and comment on all Environmental Assessments, an Environmental Report, and a Finding of No Significant Impact, and it shall review, evaluate and respond to comments received on each of these environmental studies.

4.10   **Approving Projects**  The Tribe may approve a Project which would cause significant effect on the off-reservation environment if it finds that:

4.10.1 There is no feasible way to lesson or avoid the significant off-reservation environmental impact.

4.10.2 The specifically identified expected benefits of the Project outweigh the policy of reducing or avoid significant off-reservation environmental impacts of the Project.

4.11   **Assignment of Responsibilities**  Where a Project is under the requirements of the National Environmental Protection Act, the Tribal Council may delegate the responsibilities assigned to it under this Code in whole or in part to the United States government agency which is serving as the lead agency on the NEPA review.  Provided, however, that the Tribal Council asks that federal agency to study and render findings on the off-reservation impact of the Project and perform the local consultation required by this Code.

4.12   **Time**   The Tribe shall allow adequate time to review an Environmental Assessment or ENVIRONMENTAL REPORT for completeness.  Acceptance of an Environmental Assessment or ENVIRONMENTAL REPORT as complete shall not prohibit the Tribe from requiring additional information during its review of the findings.

4.13   **Consultation**  The Tribe shall make an effort to consult with the planning and design team on the potential off-reservation environmental impacts of any such Project during the planning and design stage.

## SECTION 5  INITIAL ENVIRONMENTAL ASSESSMENT REQUIRED

5.1    **Applicability**   When the Tribe commences any expansion or significant modification of an existing Tribal Gaming Facility or any significant excavation, construction or development associated with a new or proposed Tribal Gaming Facility, the Tribal Council shall require an initial Environmental Assessment to determine if the Project may have a significant effect on the environment.  This initial study may rely on expert opinion supported by facts, technical studies or other substantial evidence to documents its findings.

52

**5.2**    **Process for Significant Effects**    If, when reviewing this Environment Assessment, the Tribal Council determines that there is substantial evidence that any aspect of the Project, either individually or cumulatively, may cause a significant effect on the off-reservation environment, regardless of whether the overall effect of the Project is adverse or beneficial, it shall do one of the following:

5.2.1.  Require an expanded Environmental Assessment,

5.2.2.  Require the preparation of an Environmental Report, or

5.2.3.  Use a previously prepared Environmental Assessment or Environmental Report, which it determines would adequately analyze the Project at hand or require an expanded study of one or more aspects of the proposed Project.

**5.3**    **Purposes of EA's**

5.3.1  To assist the Tribe in determining when a Finding of No Significant Impact is appropriate.

5.3.2  To enable the Tribe to modify or amend the Project to minimize the off-reservation impact.

5.3.3  To focus attention on those off-reservation impacts that are significant and identify those off off-reservation environmental impacts that are not significant.

5.3.4  To explain the reasons for determining that potentially significant off-reservation environmental impacts would not be significant.

5.3.5  To eliminate the need for unnecessary Environmental Impact Studies.

**5.4**    **Substance of EA's**

5.4.1  A description of the Project, including its location.

5.4.2  An identification of the environmental setting surrounding the Project.

5.4.3  A listing or chart of environmental impacts covered by the study, along with a narrative report that discusses those impacts.

5.4.4  A discussion of the ways that negative off-reservation impacts can, or have been, addressed.

5.4.5  An examination of how the Project fits into local land use patterns.

5.4.6   The name of the person or persons who prepared the report.

## SECTION 6   TRIBAL COUNCIL REVIEW OF AN ENVIRONMENTAL ASSESSMENT

6.1   **Review**   Following the completion of an Environmental Assessment, the Tribal Council shall review its findings and determine whether the entire record, including that study, justifies the issuance of a proposed Finding of No Significant Impact or the development of an expanded Environmental Assessment or an Environmental Report. In so doing, the Tribal Council shall utilize the criteria set forth in Sections 7-9 below.

6.2   **Expanded EA's**   The Tribal Council shall call for the production of an expanded Environmental Assessment when it determines that the proposed Project will have an impact on the off-reservation environment, but such impact is limited enough that it can be addressed in a shorter more concise study.

6.3   **Limited EA's**   The Tribe may require an ER on only those aspects of the Project that present a significant adverse impact off-reservation.

6.4   **Urban and Rural Distinctions**   A determination of whether a Project may have a significant off-reservation impact on the environment calls for careful judgement on the part of the Tribal Council, based to the extent possible on scientific and factual data.   An impact that may not be significant in an urban area may be significant in a rural area.

6.5   **Mitigating Effects**   If the Tribe determines that a Project will have off-reservation impacts, but this impact is mitigated to the point that the impact is no longer significant and the whole record taken together shows no significant impact, a FONSI shall be issued.

6.6   **Evidentiary Requirements**   The existence of a public controversy over the off-reservation impact will not require an ER, if the evidence in the report does not show that significant impact.   Substantial evidence shall not be found from opinion or narrative but only from facts, reasonable assumptions predicted on facts and expert opinions supported by facts.

6.7   **Archeological or Historical Resource**   A Project which alters, in an advanced manner, those physical characteristics of an Archeological or Historical Resource (those listed in or eligible for listing in the California Register of Historical Resources or which are otherwise of historical significance) shall require mitigation.

6.8   **Biological Species**   A Project which endangers the overall health of a biological species shall require mitigation.

## SECTION 7   FINDINGS OF NO SIGNIFICANT IMPACT (FONSI)

The Tribal Council shall issue a proposed FONSI when:

**7.1**   It finds that in view of the entire records before it, including the Environmental Assessment, there is no substantial evidence that the Project will have a significant impact on the off-reservation environment.

**7.2**   The mitigation steps agreed to by the developer clearly mitigate the off-reservation impacts to the point that no significant impacts would occur.

**7.3**   The Project, as modified, would have no significant impacts on the off-reservation environment.

## SECTION 8   FONSI ELEMENTS

**8.1**   A brief description of the Project.

**8.2**   The Project's location, preferably shown on a map.

**8.3**   A proposed finding that the Project will not have a significant effect on the off-reservation equipment.

**8.4**   An attached copy of the Environmental Assessment.

**8.5**   A description of mitigation measures taken.

## SECTION 9   PROCEDURE FOR APPROVAL OF A FONSI

**9.1**   If the Tribal Council determines that it is prepared to approve a FONSI, it shall prepare a notice which includes each of the following items and forward that notice to the Clearinghouse of the State Office of Planning and Research, the Board of Supervisors and the County Clerk of the county in which the Project will be located.

**9.2**   This notice shall contain:

9.2.1   Identification of the Project and a brief description of it.

9.2.2   The date on which the Tribal Council approved the Project.

9.2.3   A determination by the Tribal Council that the Project will not have a significant effect on the off-reservation environment.

9.2.4   A statement that a FONSI has been prepared pursuant to this ordinance.

9.2.5   The address where a copy of the FONSI may be examined.

## SECTION 10 DECISION TO PREPARE AN ENVIRONMENTAL REPORT (ER)

**10.1**   **Decision to Prepare an ER**   An ER shall be prepared when the Tribal Council finds that there is substantial evidence that the proposed Project will have a substantial impact on the off-reservation environment.

## SECTION 11 DETERMINING THE SCOPE OF THE ER

**11.1**   Before determining when to commence an Environmental Report, the Tribal Council shall arrange for consultation with state and local agencies, including the Board of Supervisors of the county in which the Project will be located, that have an interest in the specific environmental concerns raised by the Project and seek to have input on the nature and scope of the ER.  Nothing herein shall require the Tribal Council to provide these agencies with more than 30 days to submit the Environmental Report concerns.

**11.2**   Prior to completing the Environmental Report, the Tribal Council may arrange for consultation with any person or organization believed to be concerned with the off-reservation environmental impact of the proposed Project.  Any person may submit information or comments to the Tribal Council to assist it in preparing and evaluating the Environmental Report.

## SECTION 12 PREPARATION OF ER

**12.1**   The Tribal Council may arrange for the Environmental Report to be prepared by its staff, enter a contract with a third party to prepare the study, accept an Environmental Report prepared by the federal government or an Environmental Report prepared by the state on the Project.  In determining the scope of an Environmental Report, the Tribal Council shall meet with and consider the views of the Board of Supervisors of the county in which the Project is to be located.  It may also use a previously prepared Environmental Report.

## SECTION 13 PREPARATION AND CERTIFICATION OF ER

**13.1**   The Tribal Council shall prepare or arrange to have prepared an Environmental Report, which shall be circulated for public comment before the Project is approved.

**13.2**   Contents of Environmental Report.  The Environmental Report shall contain:

13.2.1 The Environmental Report and all revisions made to it.

13.2.2 A summary of the comments and recommendations received on the proposed draft.

13.2.3 A list of persons and organizations wishing to commenting on the draft.

13.2.4 The response of the Tribal Council to those comments.

13.2.5 Any additional information the Council deems relevant.

**13.3    Notice of the Final ER**

13.3.1 The Tribal Council shall provide notice of completion of the Environmental Report of the public, the State Clearinghouse Office of Planning and Research, and the Board of Supervisors and County Clerk of the county in which the Project will be located. The notice to the County Clerk shall ask the clerk to post that notice in the county office within 24 hours of receipt and keep it posted for a minimum of 20 days.

13.3.2 This notice shall contain, at a minimum:

(1) A brief description of the Project.

(2) Starting and ending dates for the receipt of public comments and information on where and how those comments can be submitted.

(3) The date, time and place of any scheduled public meetings or hearings to be held by the Tribe on the proposed Project.

(4) The address or addresses where copies of the final Environmental Report can be viewed and/or obtained.

(5) All comment periods shall be for a minimum of 20 days.

**SECTION 14   TRIBAL COUNCIL FINDINGS FOLLOWING A FINAL ER**

**14.1    Issuance of Findings**   After reviewing the public comments received on a final Tribal Council certified ER, the Tribal Council shall issue one or more of the following findings:

14.1.1 That changes and alterations have been required in or incorporated into the Project which avoid or substantially lessen the significant environmental effect as identified in the ER.

14.1.2 Such changes or alterations are within the responsibility or jurisdiction of an entity other than the Tribe, and the Tribe recommends that they be made.

14.1.3 Specific economic, legal, social, technological or other considerations, including provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or Project alternatives identified in the final ER.

## SECTION 15  NOTICE OF DETERMINATION

**15.1    Notice Publication**  Upon final review and approval of the Project, the Tribal Council shall publish a notice in a newspaper of general circulation, with the State clearinghouse Office of Planning and Research, and with the Board of Supervisors and County Clerk of the county in which the Project will be located, a notice of approval or rejection of the Project.  That notice shall contain at a minimum:

15.1.1 The name and description of the Project and its locations.

15.1.2 The date upon which the Tribal Council approved the Project.

15.1.3 The determination of the Tribal Council that the Project will or will not have a significant effect on the off-reservation environment.  If it will have such an effect, this notice shall be accompanied by a statement of overriding considerations which shall state that the Projects economic, legal, social, technological or other benefits override the unavoidable environmental risks associated with the Project.

15.1.4 A statement that the Environmental Report was prepared.

15.1.5 A description of the mitigation measures required.

15.1.6 The address where a copy of the final Environmental Report can be examined.

# TITLE III

## ADOPTION OF FEDERAL OCCUPATIONAL SAFETY AND HEALTH STANDARDS FOR THE CLASS III GAMING FACILITY

The adoption of 29 C.F.R. part 1910 – Occupational Safety and Health Standards and part 1926 – Safety and Health Regulations for Construction, together will serve to regulate the safety and inspection of retail sale, wholesale/commercial and light industrial labor practices, along with the standard of tribal labor force protections from hazardous workforce environments and exposure to potential contaminants within each of these areas, establishment of contract work hours and other labor safety standards as deemed necessary by the tribal government, along with the enforcement of these codes including the setting of penalties.

### SECTION 1. ADOPTION BY REFERENCE.

1.1    **Findings.** The MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA ("Tribe" or "Tribal") Tribal Council on behalf of the Tribe finds that:

    1.1.1    A certain document, three copies of which are on file in the office of the Tribal Secretary, being marked and designated as 29 C.F.R. part 1910 – *Occupational Safety and Health Standards* and part 1926 – *Safety and Health Regulations for Construction,* published by the U.S. Department of Labor, Occupational Safety and Health Administration, is hereby adopted as the Tribal OSHA Standards, for regulating the safety and inspection of retail sale, wholesale/commercial and light industrial labor practices, along with the standard of tribal labor force protections from hazardous workforce environments and exposure to potential contaminants within each of these areas, establishment of contract work hours and other labor safety standards as deemed necessary by the tribal government, along with provisions for submission of labor contracts, building plans and hazardous activity permits for tribal government approval, collection of fees, and enforcement of these codes including the setting of penalties, where necessary.

1.2    **Inconsistent Codes Repealed.** All other codes or portions of codes in conflict herewith are hereby repealed in that respect only.

1.3    **Certification of Adoption and Publishing.** The Tribal Secretary shall certify the adoption of this Tribal Ordinance and cause the same to be published as required by law.

1.4    **Effective Date.** This Tribal Ordinance and the rules, regulations, provisions, requirements, orders, and matters established and adopted hereby shall take effect

and be in full force and effect from and after the date of its final passage and approval.

# TITLE IV

## ADOPTION OF AMERICANS WITH DISABILITIES ACT STANDARDS FOR CLASS III GAMING FACILITY

The adoption of 28 C.F.R. part 35, the Nondiscrimination on the Basis of Disability in State and Local Government Services, will serve to effectuate subtitle A of Title II of the Americans with Disabilities Act f 1990 (104 Stat. 327, Pub. L. 101-336, as amended), which prohibits discrimination on the basis of disability by public entities.

### SECTION 1. ADOPTION BY REFERENCE.

    **1.1**    **Findings.**  The MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA ("Tribe" or "Tribal") Tribal Council on behalf of the Tribe finds that:

        **1.1.1**    A certain document, three copies of which are on file in the office of the Tribal Secretary, being marked and designated as 28 C.F.R. part *35 – Nondiscrimination on the Basis of Disability in State and Local Government Services,* is hereby adopted as the Tribal ADA Standards, which prohibits discrimination on the basis of handicap in tribally assisted programs and activities.

    **1.2**    **Inconsistent Codes Repealed.**  All other codes or portions of codes in conflict herewith are hereby repealed in that respect only.

    **1.3**    **Certification of Adoption and Publishing.**  The Tribal Secretary shall certify the adoption of this Tribal Ordinance and cause the same to be published as required by law.

    **1.4**    **Effective Date.**  This Tribal Ordinance and the rules, regulations, provisions, requirements, orders, and matters established and adopted hereby shall take effect and be in full force and effect from and after the date of its final passage and approval.

# TITLE V

## ADOPTION OF THE FDA 1999 FOOD CODE FOR A CLASS III GAMING FACILITY

The adoption of the 1999 edition of the "Food Code" regulating the retail sale, commercial and institutional service, and vending of food; defining permit holder, person in charge, employee, food, potentially hazardous food, food establishment, safe material, sanitation, and other terms; and providing standards for employee food safety knowledge, health, and practices; food sources, preparation, holding temperatures, and protection; equipment design, construction, installation, cleaning, and sanitation; water, and liquid and solid wastes; facilities construction and maintenance, and storage and use of poisonous and toxic materials; requiring a permit to operate a food establishment; and providing for the restriction or exclusion of employees, the examination and condemnation of food, and the enforcement of this code including the setting of penalties.

### SECTION 1. ADOPTION BY REFERENCE.

**1.1** **Findings.** The MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA ("Tribe" or "Tribal") Tribal Council on behalf of the Tribe finds that:

1.1.1 A certain document, three copies of which are on file in the office of the Tribal Secretary, being marked and designated as the *Food Code, 1999 Recommendations of the United States Public Health Service/Food and Drug Administration* as published by the U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration be, and is hereby adopted as, the Food Code of the Tribe, located in the State of California; for regulating the design, construction, management and operation of food establishments, and providing for plans submission and approval and the issuance of permits and collection of fees therefore.

**1.2** **Insertions and Changes.** That the following provisions are hereby revised as follows:

Paragraph 8-811.10(B) Insert (as provided by California law) Paragraph 8-813.10(B) Insert (as provided by California law) Subparagraph 8-811.10(B)(2) Insert (as provided by California law)

**1.3** **Inconsistent Codes Repealed.** All other codes or portions of codes in conflict herewith are hereby repealed in that respect only.

**1.4** **Certification of Adoption and Publishing.** The Tribal Secretary shall certify the adoption of this Tribal Ordinance and cause the same to be published as required by law.

1.5    **Effective Date.**    This Tribal Ordinance and the rules, regulations, provisions, requirements, orders, and matters established and adopted hereby shall take effect and be in full force and effect for the period of 36 months from and after the date of its final passage and approval.

# TITLE VI

## ADOPTION OF FEDERAL SAFE DRINKING WATER STANDARDS

The adoption of 40 C.F.R. part 141 – National Primary Drinking Water Regulations and part 142 – National Primary Drinking Water Regulations Implementation, together will serve to regulate the safety and inspection of ground and surface water aquifers and public drinking water systems on tribal lands.

## SECTION 1. ADOPTION BY REFERENCE.

**1.1** **Findings.** The MECHOOPDA INDIAN TRIBE OF CHOCO RANCHERIA ("Tribe" or "Tribal") Tribal Council on behalf of the Tribe finds that:

1.1.1 A certain document, three copies of which are on file in the office of the Tribal Secretary, being marked and designated as 40 C.F.R. part 141 – *National Primary Drinking Water Regulations* and part 142 – *National Primary Drinking Water Regulations Implementation*, published by the U.S. Environmental Protection Agency, is hereby adopted as the Tribal Safe Drinking Water Standards, for regulating the safety and inspection of ground and surface water aquifers and public drinking water systems on tribal lands.

**1.2** **Inconsistent Codes Repealed.** All other codes or portions of codes in conflict herewith are hereby repealed in that respect only.

**1.3** **Certification of Adoption and Publishing.** The Tribal Secretary shall certify the adoption of this Tribal Ordinance and cause the same to be published as required by law.

**1.4** **Effective Date.** This Tribal Ordinance and the rules, regulations, provisions, requirements, orders, and matters established and adopted hereby shall take effect and be in full force and effect from and after the date of its final passage and approval.

# TITLE VII

**ADOPTION OF THE UNIFORM BUILDING CODE, UNIFORM MECHANICAL CODE, UNIFORM PLUMBING CODE, NATIONAL ELECTRICAL CODE AND OTHER RELEVANT FEDERAL BUILDING AND CONSTRUCTION STANDARDS**

The adoption of 24 C.F.R. part 200.925c -- Model Codes, including the Uniform Building Code, Uniform Mechanical Code, Uniform Plumbing Code, National Electrical Code and others, together will serve to regulate the operational safety and inspection of all relevant building and construction activities conducted on tribal lands.

## SECTION 1. ADOPTION BY REFERENCE.

    **1.1**    **Findings.** The MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA ("Tribe" or "Tribal") Tribal Council on behalf of the Tribe finds that:

        1.1.1    A certain document, three copies of which are on file in the office of the Tribal Secretary, being marked and designated as 5 U.S.C. 552(a) and 1 CFR part 51 is hereby adopted as the Tribal Uniform Building Code, Tribal Uniform Mechanical Code, Tribal Uniform Plumbing Code, Tribal Electrical Code and Tribal Building and Construction Standards, for regulating the construction of buildings on tribal lands. The aforementioned documents are:

        (A) Model Building Codes—

            (i)    The BOCA National Building Code, 1993 Edition, The BOCA National Plumbing Code, 1993 Edition, and the BOCA National Mechanical Code, 1993 Edition, excluding Chapter 1, Administration, for the Building, Plumbing and Mechanical Codes and the references to fire retardant treated wood and a distance of 4 feet (1219 mm) from the wall in exception number 1 of paragraph 705.6 and 707.5.2 number 2 (Chapter 7) of the Building Code, but including the Appendices of the Code. Available from Building Officials and Code Administrators International, Inc., 4051 West Flossmoor Road, Country Club Hills, Illinois 60478.

            (ii)    Standard Building Code, 1991 Edition, including 1992/1993 revisions. Standard Plumbing Code, 1991 Edition, Standard Mechanical Code, 1991 Edition, including 1992 revisions, and Standard Gas Code, 1991 Edition, including the 1992 revisions, but excluding Chapter 1--Administration from each standard code and

65

the phrase ``or fire retardant treated wood" in reference note (a) of table 600 (Chapter 6) of the Standard Building Code, but including Appendices A, C, E, J, K, M, and R. Available from the Southern Building Code Congress International, Inc., 900 Montclair Road, Birmingham, Alabama 35213.

(iii)    Uniform Building Code, 1991 Edition, including the 1993 Accumulative Supplement, but excluding Part I-- Administrative, and the reference to fire retardant treated plywood in section 2504(c)3 and to fire retardant treated wood in 1-HR type III and V construction referenced in paragraph 4203.2., but including the Appendix of the Code. Uniform Plumbing Code, 1991 Edition, including the 1992 Code Changes but excluding Part I--Administration, but including the Appendices of the Code. Uniform Mechanical Code, 1991 Edition, including the 1993 Accumulative Supplement but excluding Part I--Administrative, but including the Appendices of the Code. All available from the International Conference of Building Officials, 5360 South Workman Mill Road, Whittier, California 90601.

(B) National Electrical Code, NFPA 70, 1993 Edition, including appendices. Available from the National Fire Protection Association, Batterymarch Park, Quincy, Massachusetts 02269.

(C) National Standard Plumbing Code, 1993 Edition. Available from the National Association of Plumbing-Heating-Cooling Contractors, P.O. Box 6808, Falls Church, Virginia 22046.

1.1.2   <u>Model Code Compliance Requirements</u>.

(A) When a multifamily or care-type property is to comply with one of the model building codes set forth in paragraph 1.1.1 (A) of this section, the following requirements of those model codes shall not apply to those properties:

(i)  Those provisions of the model codes that do not pertain to residential or institutional buildings;

(ii) Those provisions of the model codes that establish energy requirements for multifamily or care-type structures; and

66

(iii)        Those provisions of the model codes that require or allow the issuance of permits of any sort.

1.1.3   Where the model codes set forth in paragraph 1.1.1 (A) of his section designate a building, fire, mechanical, plumbing or other official, the Secretary's designee in the HUD Field Office serving the jurisdiction in which the property is to be constructed shall act as such official.

1.1.4   Designation of Model Codes. When a multifamily or care-type property is to comply with a model code, it shall comply with one of the model codes designated in paragraphs 1.1.3 (A-C) of this section, and with any other code or codes identified in the same paragraph. However, seismic design is a mandatory requirement. In addition, the property shall comply with all of the standards that are incorporated into the code or codes by reference. By the time of application for insurance or other benefits, the developer or other interested party shall notify the Department of the code or group of codes to which the developer intends to comply.

(A)   The BOCA National Building Code, The BOCA National Plumbing and The BOCA National Mechanical Code, 1993 Editions.

(B)   Standard Building Code, Standard Plumbing Code, Standard Mechanical Code and Standard Gas Code, 1991 Editions, including the revisions specified in paragraph 1.1.1 (A)(ii) of this section, and the National Electrical Code, 1993 Edition.

(C)   Uniform Building Code, Uniform Plumbing Code and Uniform Mechanical Code, 1991 Editions, including the 1993 Accumulative Supplements to the Building and Mechanical Codes, and the 1992 Code Changes to the Uniform Plumbing Code, and the National Electrical Code, NFPA 70, 1993 Edition.

(D)   The National Electrical Code, NFPA 70, 1993 Edition.

**1.2   Inconsistent Codes Repealed.**   All articles, titles, chapters, or other codes or portions thereof, in conflict herewith are hereby repealed in that respect only.

**1.3   Certification of Adoption and Publishing.**   The Tribal Secretary shall certify the adoption of this Tribal Ordinance and cause the same to be published as required by law.



**1.4    Effective Date.**  This Tribal Ordinance and the rules, regulations, provisions, requirements, orders, and matters established and adopted hereby shall take effect and be in full force and effect from and after the date of its final passage and approval.

Letter to NIGC Re: Submission of Amended Mechoopda Tribal Gaming Ordinance
Page 2 of 2

## TABLE OF CHANGES

<table>
<tr><td><strong>Noted Issue:</strong></td><td><strong>How Amended:</strong></td></tr>
<tr>
<td>

1. Section 2.36.3 of the Mechoopda Tribal Gaming Ordinance received by the NIGC on August 14, 2001 defined certain lands owned and/or controlled by the Mechoopda Indian Tribe as "Indian Lands." Section 2.36.3 read as follows:

**2.36 "Indian Lands"** means:

   2.36.3   Real property consisting of:

      Parcel I:  Lot 3, as shown on that certain Map entitled, "ME-CHOOP-DA INDIAN RANCHERIA SUBDIVISION", which Map was filed in the office of the Recorder of the County of Butte, State of California, April 25, 1961 in Book 25 of Maps, at Pages 40 and 41; and,

      Lot 4, as shown on the plat of the Me-Choop-Da Indian Rancheria Subdivision recorded in the Official Records of Butte County, California, April 25, 1961 in Map Book 25 at Pages 40 and 41; and,

      Parcel 27, as shown on the Plat of the ME-CHOOP-DA RANCHERIA SUBDIVISION, filed in the Official Records of Butte County, California, April 25, 1961, in Map Book 25 at Pages 40 and 41; and,

</td>
<td>

1. Previous Section 2.36.3 was deleted, and the current definition of "Indian Lands," in the Mechoopda Tribal Gaming Ordinance is as follows:

**2.36 "Indian Lands"** means:

   2.36.1   Lands within the limits of the Tribe's exterior boundaries, whereby it exercises sovereign jurisdiction over such lands, notwithstanding the issuance of any patent and including rights-of-way running through such lands; and

   2.36.2   Land title to which is either held in trust by the United States for the benefit of the Tribe or individual Indian or held by the Tribe subject to restriction by the United States against alienation and over which the Tribe exercises governmental powers; and

   2.36.3   Lands that may be acquired by the Tribe that meet the requirements of 25 U.S.C. Section 2719 et. seq.

</td>
</tr>
</table>

# EXHIBIT A

# RESOLUTION
## NO. 01-53

**A Resolution to Adopt the Revised Mechoopda Indian Tribe of Chico Rancheria Class II and III Gaming Ordinance and Submit the Ordinance to the NIGC**

**WHEREAS,** the Mechoopda Indian Tribe of Chico Rancheria is a sovereign federally recognized tribe as established pursuant to the Constitution of the Mechoopda Indian Tribe, approved by the Secretarial Election on February 1, 1998; and

**WHEREAS,** the Tribal Council of the Mechoopda Indian Tribe of Chico Rancheria is the governing body of the Tribe pursuant to Article IV of the Tribal Constitution; and

**WHEREAS,** the Tribal Council of the Mechoopda Indian Tribe of Chico Rancheria is authorized by the Tribal Constitution, Article VIII, Section 3(a), to promulgate and adopt ordinances for the Tribe; and

**WHEREAS,** we the duly elected Tribal Council of the Mechoopda Indian Tribe of Chico Rancheria are entrusted with the preservation of our cultural values, and promotion of the general welfare of the Mechoopda Indian Tribe; and

**WHEREAS,** the protection, safety and welfare of all persons, including, but not limited to, the preservation of education, economic and employment opportunities, and preservation of cultural and natural resources of the Mechoopda Indian Tribe, are primary goals and objectives of the Tribal Council; and

**WHEREAS,** the Mechoopda Indian Tribe of Chico Rancheria approved Resolution 01-40 on August 8, 2001 at a duly called Tribal Council Meeting, approving the amended Title I, Regulation of Class II and Class III Gaming, of the Mechoopda Indian Tribe of Chico Rancheria Gaming Ordinance of 2001 and adopted the amended Title I by Resolution 01-40; and

**WHEREAS,** the Tribal Council has determined that it is the best interest of the Tribe to revise Section 2.36 of Title I, Regulation of Class II and Class III Gaming, previously amended by Resolution No. 01-40; and

**WHEREAS,** the Tribal Council has revised Section 2.36 to read as follows:

**2.36** "Indian Lands" means:

    **2.36.1** Lands within the limits of the Tribe's exterior boundaries, whereby it exercises sovereign jurisdiction over such lands, notwithstanding the issuance of any patent and including rights-of-way running through such lands; and

    **2.36.2** Land title to which is either held in trust by the United States for the benefit of the Tribe or individual Indian or held by the Tribe subject to restriction by the United States against alienation and over which the Tribe exercises governmental powers; and

    **2.36.3** Lands that may be acquired by the Tribe that meet the requirements of 25 U.S.C. Section 2719 et. seq.; and

**WHEREAS,** the Tribal Council has determined that it is in the best interest of the Tribe to remove the previously definition of "Indian Lands", in Section 2.36 from the Mechoopda Indian Tribal Gaming Ordinance Five, Tribal Gaming Ordinance and to adopt the above referenced definition of "Indian Lands" in each instance referenced in Tribal Ordinance Five, including each Title as listed below:

| | |
|---|---|
| Title I | Regulation of Class II and Class III Gaming |
| Title II | Tribal Environmental Code for Class III Gaming |
| Title III | Adoption of Federal Occupational Safety and Health Standards for the Class III Gaming Facility |
| Title IV | Adoption of the Americans with Disabilities Act Relative to Class III Gaming Facilities |
| Title V | Adoption of the FDA 1999 Food Code for the Class III Gaming Facility |
| Title VI | Adoption of Federal Safe Drinking Water Standards for the Class III Gaming Facility |
| Title VII | Adoption of the Uniform Building Code, Uniform Mechanical Code, Uniform Plumbing Code, Uniform Electrical Code and other Relevant Building and Construction Standards for Development of a Class III Gaming Facility |

**NOW THEREFORE, BE IT RESOLVED,** that the Mechoopda Indian Tribe of Chico Rancheria Tribal Council hereby adopts the revised definition of "Indian Lands" in Tribal Ordinance Five, Section 2.36, as described above and that the Tribal Chairperson is authorized to execute all documents necessary to implement this Resolution; and

**BE IT FURTHER RESOLVED,** that the language in the Mechoopda Indina Tribal Gaming Ordinance Five, including all Titles, shall in no way be construed as a waiver of the Mechoopda Indian Tribe's sovereign immunity.

**BE IT FURTHER RESOLVED**, that the Tribe's attorneys, Monteau, Peebles & Crowell, LLP, are directed to submit the revised Tribal Gaming Ordinance to the National Indian Gaming Commission for approval.

### C*E*R*T*I*F*I*C*A*T*I*O*N

This will certify that the foregoing resolution was considered at a meeting of the Tribal Council of the Mechoopda Indian Tribe of Chico Rancheria, duly called on the _10_ day of October, 2001, and was adopted by a vote of _5_ for, _0_ against, and _0_ abstentions. A quorum of _6_ was present.

Dated this _10_ day of October, 2001

_____
Steve Santos, Chairman
Mechoopda Indian Tribe of Chico Rancheria

ATTEST:

_____
Sandra M. Knight, Tribal Council Secretary
Mechoopda Indian Tribe of Chico Rancheria

# EXHIBIT B

**2.31** **"Gaming Vendor"** means the same as a "Gaming Resource Supplier" as defined by the Compact or any Person or entity who, directly or indirectly, manufactures, distributes, supplies, vends, leases or otherwise purveys Class II Gaming or Class III Gaming resources to the Gaming Facility, provided that the Tribal Gaming Commission may interpret this definition to exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection of Gaming. Gaming Vendors must be Licensed

**2.32** **"General Manager"** means the Person or entity, which has management responsibilities for the Gaming Activity, and which shall have access to all areas of the Gaming Facility, provided that such access to the surveillance room and count room shall be by prior notice to the Tribal Gaming Commission.

**2.33** **"Gross Revenues"** means all gaming and non-gaming revenues collected or received from the lawful Gaming Enterprise.

**2.34** **"Immediate Family"** means, with respect to the Person under consideration, a husband, wife, father, mother, son, daughter, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother or half sister.

**2.35** **"Indian Gaming Regulatory Act" or "IGRA"** means Public Law 100-497, 102 Stat. 2426, 25 U.S.C. §§2701, *et seq.* (1988), as amended.

**2.36** **"Indian Lands"** means:

2.36.1 Lands within the limits of the Tribe's exterior boundaries, whereby it exercises sovereign jurisdiction over such lands, notwithstanding the issuance of any patent and including rights-of-way running through such lands; and

2.36.2 Land title to which is either held in trust by the United States for the benefit of the Tribe or individual Indian or held by the Tribe subject to restriction by the United States against alienation and over which the Tribe exercises governmental powers; and

~~2.36.3 Real property consisting of:~~

~~Parcel I: Lot 3, as shown on that certain Map entitled, "ME-CHOOP-DA INDIAN RANCHERIA SUBDIVISION", which Map was filed in the office of the Recorder of the County of Butte, State of California, April 25, 1961 in Book 25 of Maps, at Pages 40 and 41; and;~~

~~Lot 4, as shown on the plat of the Me-Choop-Da Indian Rancheria Subdivision recorded in the Official Records of Butte County, California, April 25, 1961 in Map Book 25 at Pages 40 and 41; and;~~

~~Parcel 27, as shown on the Plat of the ME-CHOOP-DA RANCHERIA SUBDIVISION, filed in the Official Records of Butte County, California, April 25, 1961, in Map Book 25 at Pages 40 and 41; and;~~

~~2.36.4~~2.36.3  Lands that may be acquired by the Tribe that meet the requirements of 25 U.S.C. Section 2719 et. seq.

2.37  **"In privity with"** means a relationship involving one who acts jointly with another or as an accessory before the fact to an act committed by the other or as a co-conspirator with the other.

2.38  **"IRS"** means the United States Internal Revenue Service.

2.39  **"Key Employee"** means:

2.39.1  A Person who performs one or more of the following functions:

(1)    Bingo caller;

(2)    Counting room supervisor and Personnel;

(3)    Chief of security, or any Person who supervises or directs other employees engaged in providing security or surveillance services;

(4)    Custodian of Gaming supplies or cash;

(5)    Floor manager; manager or General Manager;

(6)    Pit boss;

(7)    Dealer;

(8)    Croupier;

(9)    Approver of credit or whose recommendation in this regard are ordinarily sought or followed; or

(10)   Custodian of gambling devices including Persons with access to cash and accounting records within such devices;

2.39.2  If not otherwise included, any other Person whose total cash compensation is in excess of $50,000 per year; or

2.39.3  If not otherwise included, any other Person who supervises or directs other employees engaged in the control of Gaming assets and revenues and record keeping, including the recording of cash and evidences in

8

# EXHIBIT H

MEMORANDUM OF AGREEMENT
BETWEEN
THE NATIONAL INDIAN GAMING COMMISSION
AND
THE DEPARTMENT OF THE INTERIOR

WHEREAS, both parties agree that they are in need, from time to time, for legal advice on whether lands may be Indian lands on which a tribe may conduct gaming and that such advice must be provided in a timely fashion;

NOW, THEREFORE, the NIGC and the DOI agree to the terms of this MEMORANDUM OF AGREEMENT as follows:

1. The NIGC agrees that whether a tribe meets one of the exceptions in 25 U.S.C. §2719 (i.e. settlement of a land claim, restored lands for a restored tribe, or an initial reservation of a tribe acknowledged through the Part 83 process) is a decision made by the Secretary when he or she decides to take land into trust for gaming.

2. The Department of Interior ("DOI") agrees that deciding whether gaming is being conducted on Indian lands is a basic and essential jurisdictional requirement for the NIGC under IGRA.

3. To the extent the Secretary or the Chairman seek legal advice for certain actions requiring action under IGRA dependant upon the determination of Indian lands, the NIGC Office of General Counsel ("OGC") and the DOI Office of the Solicitor ("Solicitor") agree on the following division of responsibilities:

   - If the Secretary is considering a fee-to-trust acquisition, then the DOI's Division of Indian Affairs ("DIA") will draft the legal opinion to the Bureau of Indian Affairs ("BIA") whether it must complete a two-part determination as part of the fee-to-trust acquisition;

   - If a tribe and a state submit a Class III Tribal-State Compact for gaming on existing Indian lands, then the DIA will draft the legal opinion whether the tribe has Indian lands;

   - If a tribe requests that the NIGC approve a management contract or ordinance for gaming on existing trust lands, then the OGC will draft the legal opinion to the Chairman on whether the tribe has Indian lands; and

   - The OGC will draft the legal opinion to the Chairman whether existing or proposed tribal gaming operations will be on Indian land when the land is already held in trust by the United States.

1

Memorandum of Agreement
NIGC - DOI

4. Regardless of whether the DIA or the OGC are drafting the legal opinion, prior to a draft opinion being released to entities other than the DOI and the NIGC, and before any legal opinion is issued, the parties will make every attempt to reach concurrence on all written opinions that provide legal advice that interprets the definition of Indian lands, the exceptions in 25 U.S.C. §2719, a tribe's jurisdiction over proposed Indian lands or the boundaries of a tribe's reservation.

5. A request for concurrence of an Indian lands opinion will include a draft of the opinion and copies of all supporting documents. Within 30 working days of receiving the request, the receiving party will notify the requesting party of his or her intent to either concur or not concur.

6. Notwithstanding the 30 working day requirement in paragraph 5, either party may inform the other of exigent circumstances that require an expedited process. Upon agreement of the parties of the need for expedition, either the Solicitor or the OGC will notify the other party within 5 working days of its intent to concur or not concur.

7. If notified of the intent to not concur, then the parties will meet within 15 working days to discuss ways to resolve the issues of non-concurrence. The notice of the intent not to concur shall include in writing all factual and legal reasons for the non-concurrence.

8. If a legal opinion is re-submitted that addresses the issues of non-concurrence, either the Solicitor or the OGC will notify the parties of its intent to concur or not concur within 10 working days.

9. If the parties are still not able to resolve the issues of non-concurrence, the parties will meet to discuss the next step. The next step may include, with the mutual agreement of both parties, submission of the draft opinion and a summary of the issues of non-concurrence to the Office of Legal Counsel, Department of Justice for resolution.

10. Each party to the MOA will advise the other party within 15 working days of receiving a request to provide Indian lands determinations. The party receiving the request will inform the other party of the individual specifically assigned to work on the legal opinion. In addition, the parties shall periodically coordinate and update pending opinion requests and the OGC shall record and track all Indian lands opinions and decisions in the NIGC Indian lands database and provide periodic updated reports to DIA.

11. If either party has a need for additional information or assistance from the other party in order to render a legal opinion, then the party requiring the information will request such information or assistance in writing to the other party. To the extent either party is able to comply with such a request, it will fully and promptly cooperate with the request. If unable to comply with such request, notice shall be promptly given to the requesting party.

ı

Memorandum of Agreement
NIGC - DOI

12. The party responsible for the initial draft of the legal opinion shall provide the other party with reasonable time to review the draft and make written comments. The party making the comments will designate the individual responsible and notify the other party. All comments will be provided to the requesting party within 30 working days.

13. The DIA and the OGC will work cooperatively and with collegiality and make every attempt to reach agreement on all Indian lands opinions before submitting a draft legal opinion for concurrence.

14. The Solicitor may request in writing that the OGC draft an Indian lands opinion on pending trust acquisitions that address whether a tribe is a restored tribe and whether the lands are restored lands under IGRA. The OGC, at its discretion, will provide the Solicitor with a draft opinion or decline in writing.

15. It is the position of the Secretary not to approve compacts for gaming on lands that have not been acquired into trust.

16. It is the position of the Chairman not to approve tribal ordinances or management contracts that are site specific when they call for gaming on Indian lands that have not been acquired into trust. The Chairman may continue to approve or disapprove ordinances and management contracts that are otherwise site specific.

17. To meet the demands caused by the need for Indian lands opinions, the NIGC will fund an attorney position (one FTE) within the DIA for 2 years with additional years, if any, in the sole discretion of the NIGC. This attorney position and funding will remain in effect and unaltered by the termination provisions of paragraph 19.

18. This MEMORANDUM OF AGREEMENT supersedes the MEMORANDUM OF UNDERSTANDING previously entered into between the OGC and the Associate Solicitor of the DOI regarding Indian lands opinions.

19. This MEMORANDUM OF AGREEMENT shall be effective upon signatures by both parties and will terminate six (6) months after the date of execution, unless extended by mutual agreement.

Dated this 24 day of May, 2006

For the National Indian Gaming
Commission:
Chairman

Penny J. Coleman
Acting General Counsel

Dated this 31 day of May, 2006

For the United States Department
of the Interior:
Deputy Associate Secretary

David Bernhardt
Deputy Solicitor

1

# EXHIBIT I



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Pacific Regional Office
2800 Cottage Way
Sacramento, California 95825

IN REPLY REFER TO:

DEC 1 3 2006

Memorandum

To:         Assistant Secretary – Indian Affairs

From:       Regional Director, Pacific Regional Office
through:    Director, Office of Indian Gaming Management

Subject:    Request Approval of the Finding Of No Significant Impact for the
            Proposed Fee-To-Trust Land Acquisition for Gaming Purposes on behalf
            of the Mechoopda Tribe of the Chico Rancheria

Through this memorandum the Pacific Regional Office (PRO) is hereby transmitting to
the Assistant Secretary - Indian Affairs the NEPA Decision Package for the proposed
transfer of a 630-acre site in Butte County, California into Federal trust status for the
Mechoopda Tribe of the Chico Rancheria and the subsequent development of a gaming
facility on a portion of the site.

The National Environmental Policy Act of 1969 ("NEPA") requires that a public
environmental review process be accomplished prior to an agency's approval of any
federal action. Prior to making a decision, the Bureau of Indian Affairs (BIA) as the lead
agency under NEPA and the National Indian Gaming Commission (NIGC) as a
Cooperating Agency, must ensure that it has analyzed and addressed the environmental
effects of taking lands into trust.

The environmental review of this project under NEPA has been extensive. The process
started on December 24, 2003, when the BIA released an Environmental Assessment
("EA") for a public comment period extending until January 27, 2004. While the
comment period was never formally extended, comments were received and accepted
through April 19, 2004. Approximately forty copies of the EA were distributed during
the public review. Comments on the EA were received from nine (9) parties.

Due to changes in the project alternatives and the availability of new information, a
Revised Environmental Assessment (REA) for the proposed action was provided for
public review and comment from June 26, 2006 to July 26, 2006. Extensions to the
comment period were granted to those that asked until August 11, 2006. Copies of the
REA were sent to Federal, State, local and Tribal agencies, as well as the State
clearinghouse. A Notice of Availability (NOA) for the REA was published in two local

1

newspapers serving the area; the Chico Enterprise –Record and the Oroville Mercury-Register on June 26, 2006.

The attached NEPA Decision Package contains documentation related to the REA's circulation, comment letters on the REA, responses to the comments, the Finding Of No Significant Impact (FONSI), and other related materials.

The Pacific Region concludes that after review and independent evaluation, that the proposed federal action, to approve the Mechoopda Indian Tribe of the Chico Rancheria's request to take the 630-acre site into trust for the purpose of operating a gaming facility, does not constitute a major federal action that would significantly affect the quality of the human environment. This conclusion is based on the analysis contained in the REA, public comments made on the REA, the response to those comments, and the mitigation imposed. Therefore, An Environmental Impact Statement is not required and the Pacific Region recommends the approval of the FONSI.

If there is a need for additional information or questions, please contact John Rydzik, Chief, DECRMS at (916) 978-6042.

Attachments

Clayton Gregory

2

# EXHIBIT J

THE MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA, CALIFORNIA

RESOLUTION 06-62

Subject:    **A Resolution to Amend Title II of the Mechoopda Indian Tribe
of Chico Rancheria Gaming Ordinance of 2001, and to Submit Same
to the National Indian Gaming Commission for Review and Approval**

**WHEREAS,** the Mechoopda Indian Tribe of Chico Rancheria is a sovereign federally recognized Tribe as
established pursuant to the Constitution of the Mechoopda Indian Tribe, approved by the
Secretarial Election on February 1, 1988; and

**WHEREAS,** the Tribal Council of the Mechoopda Indian Tribe of Chico Rancheria is the governing body
of the Tribe pursuant to Article IV of the Tribal Constitution; and

**WHEREAS,** the Tribal Council of the Mechoopda Indian Tribe of Chico Rancheria is authorized by Article
VIII, Section 3(a) of the Tribal Constitution to promulgate and adopt ordinances for the Tribe;
and

**WHEREAS,** We, the duly elected Tribal Council of the Mechoopda Indian Tribe of Chico Rancheria, are
entrusted with preserving the cultural values and promoting the general welfare of the
Mechoopda Indian Tribe; and

**WHEREAS,** the protection, safety, and welfare of all persons, which includes, but is not limited to,
promoting educational, economic and employment opportunities and preserving the cultural
and natural resources of the Mechoopda Indian Tribe, are primary goals and objectives of the
Tribal Council; and

**WHEREAS,** in furtherance of its primary goals and objectives, the Tribal Council has determined to amend
Title II of the Mechoopda Indian Tribe of Chico Rancheria Gaming Ordinance of 2001,
entitled "Regulation of the Environment for Class III Gaming," to ensure that mitigation
measures as may be set forth in an approved FONSI are implemented in compliance with
applicable authority;

**NOW THEREFORE, BE IT RESOLVED,** that Section 2, "Definitions," of Title II of the Mechoopda
Indian Tribe of Chico Rancheria Gaming Ordinance of 2001 is amended to add:

> *"2.1  "Applicable Mitigations" means those mitigation measures described in an
> Applicable FONSI or EA.*
>
> *2.2  "Applicable FONSI or EA" means a FONSI or EA prepared by the Tribe and
> submitted to and approved by the Secretary of the Department of Interior.
> Secretary of the Department of Interior. In the event the National Indian Gaming
> Commission ("NIGC") determines that an Environmental Impact Statement*

*("EIS") is warranted and a Record of Decision ("ROD") is therefore prepared rather than a FONSI, each reference to FONSI in this Ordinance shall be read to include ROD.";* and

**BE IT FURTHER RESOLVED**, that all other sub-sections in Section 2, "Definitions," of Title II of the Mechoopda Indian Tribe of Chico Rancheria Gaming Ordinance of 2001 are re-numbered accordingly; and

**BE IT FURTHER RESOLVED**, that Title II of the Mechoopda Indian Tribe of Chico Rancheria Gaming Ordinance of 2001 is further amended to insert the following section after current Section 15, "Notice of Determination":

*"SECTION 16.     ENFORCEMENT AND COMPLIANCE*

16.1    *The Tribal Council shall insure compliance with the mitigation measures and conditions set forth in the Finding of No Significant Impact and the Revised Environmental Assessment related to the Trust Acquisition on behalf of the Tribe of two parcels in Butte County, California totaling 630-acres (the "Proposed Parcel") as well as the Finding of No Significant Impact related to the approval of a management contract by the National Indian Gaming Commission.*

16.1.1  *This Section sets forth a process to ensure compliance with environmental conditions and approvals. The Tribe acknowledges the NIGC enforcement power regarding compliance with the Finding of No Significant Impact related to the approval of a management contract. The NIGC approves tribal gaming ordinances, including this title and has the ability to enforce provisions set forth in this title pursuant to 25 C.F.R. 572.5 and 573.1 (Part 573) as well as has the authority to monitor any mitigation measures for compliance with the Finding of No Significant Impact under 40 C.F.R. 1505.3.*

16.1.2  *If the National Indian Gaming Commission notifies the Tribal Council that it believes a condition or mitigation measure as set forth in the Environmental Assessment related to the Trust Acquisition of the Proposed Parcel as well as the Finding of No Significant Impact related to the approval of a management contract by the National Indian Gaming Commission is not in compliance, then the Tribal Council shall investigate the matter and provide a response within 45 days and clearly state how the violation will be remedied and the timeframe in which it must be remedied.*

16.1.3  *If any local, state, or federal government authority other than the National Indian Gaming Commission believes a condition or mitigation measure as set forth in the Environmental Assessment related to the Trust Acquisition of the Proposed Parcel as well as the Finding of No Significant Impact related to the approval of a management contract by the National Indian Gaming Commission is not in compliance, such authority may file a petition for review with the Tribal Council.*

16.1.4 *The Tribal Council shall investigate the matter and provide a response to the petitioner within 45 days. A copy of the response shall be provided to the National Indian Gaming Commission.*

16.1.5 *The response shall set forth the determination as to whether a condition or mitigation measures is in violation of the Finding of No Significant Impact and the Environmental Assessment related to the Trust Acquisition of the Proposed Parcel or the Finding of No Significant Impact related to the approval of a management contract by the National Indian Gaming Commission. If a violation exists the Tribal Council shall clearly state how the violation will be remedied and the timeframe in which it must be remedied.*

16.1.6 *If the petitioner is not satisfied with the Tribe's response, it may seek redress through the NIGC. If the NIGC concurs with petitioner's claim that a violation has occurred, the Tribal Council will provide to the NIGC a report detailing how the violation will be remedied and the timeframe in which it must be remedied within 15 days of receiving notice from the NIGC.*

16.2. *Annual Mitigation Report. No later than January 31st of each calendar year the Tribe shall prepare a report on the status and implementation of all required mitigation measures as set forth in an Applicable FONSI or EA as of the close of the preceding calendar year (the "Reporting Period").*

16.2.1 *The Annual Mitigation Report shall set forth the following information:*

(a) *a list of Applicable Mitigations fully implemented in the Reporting Period;*

(b) *a list of Applicable Mitigations partially but not fully implemented during the Reporting Period;*

(c) *a list of Applicable Mitigations that remain to be implemented, including a description and timetable for their implementation.*

16.2.2 *A copy of the Annual Mitigation Report shall be filed with the office of the NEPA compliance officer of the NIGC by January 31st of each year.*"; and

**BE IT FURTHER RESOLVED**, that the Tribal Chairperson is hereby authorized to execute all documents necessary to implement this Resolution; and

**BE IT FURTHER RESOLVED**, that the language in the Mechoopda Indian Tribe of Chico Rancheria Tribal Gaming Ordinance, including all Titles, shall in no way be construed as a waiver of the Mechoopda Indian Tribe's sovereign immunity; and

**BE IT FURTHER RESOLVED**, that the Tribe's attorneys, Monteau & Peebles, LLP, are directed to submit the amended Tribal Gaming Ordinance to the National Indian Gaming Commission for approval.

# C E R T I F I C A T I O N

**This will certify that the foregoing resolution was considered at a meeting of the Tribal Council of the** Mechoopda Indian Tribe of Chico Rancheria, duly called on the 20th day of December, 2006, and was adopted by a vote of 4 for, 0 against, and 0 abstentions. A quorum of 5 was present.

Dated this 20th day of December, 2006

Dennis E. Ramirez, Chairman
Mechoopda Indian Tribe of Chico Rancheria

ATTEST:

Robyn Forrestel, Tribal Council Secretary
Mechoopda Indian Tribe of Chico Rancheria

# EXHIBIT K

**Finding of No Significant Impact and Notice**

**Proposed Mechoopda Casino Project, Butte County, California**

AGENCY  National Indian Gaming Commission

ACTION  Finding of No Significant Impact

SUMMARY

The Mechoopda Indian Tribe of the Chico Rancheria (Tribe) submitted a request to the National Indian Gaming Commission (NIGC) to approve a management contract between the Tribe and Stations Casinos, Inc. The management contract is associated with the proposed management of a proposed gaming facility that would be constructed on 630 acres of land that the Tribe has asked the Bureau of Indian Affairs (BIA) to take into trust. The land proposed for development and trust acquisition is located within portions of Sections 5 and 6, Township 20N, Range 3E, and a portion of NE ¼ of Section 1, Township 20N, Range 2E, Mount Diablo Base and Meridian of the "Shippee, California" U.S. Geological Survey 7.5 minute topographic quadrangle. The land is located approximately ten miles southeast of the City of Chico, immediately adjacent to and east of State Route 149, near its intersection with Highway 99, in unincorporated Butte County, California.

Based upon the analysis documented in the Environmental Assessment (EA), Revised Environmental Assessment (REA), consideration of comments received during the public review period, and implementation of additional mitigation requirements detailed below, the NIGC has reached a Finding Of No Significant Impact (FONSI). This finding constitutes a determination that the Proposed Action (as defined below) is a federal action that will not significantly affect the quality of the human environment. Therefore, an Environmental Impact Statement (EIS) is not required.

FOR FURTHER INFORMATION CONTACT

National Indian Gaming Commission
NEPA Compliance Officer
1441 L Street NW, Suite 9100
Washington, DC 20005
(202) 632-7003

DESCRIPTION OF THE PROPOSED PROJECT

The NIGC's Proposed Action is the approval of a management contract between the Tribe and Stations Casinos, Inc. A concurrent proposed action is the BIA's proposed transfer of the site into federal trust status for the benefit of the Tribe. The proposed fee-to-trust conveyance is for two parcels totaling approximately 630 acres. A reasonably foreseeable consequence of these actions is the subsequent proposed development of a portion of the site into a gaming facility (Proposed Project). The gaming facility is proposed to include a mixture of uses including food and beverage facilities, casino support areas, administration facilities, a lounge, retail space, and a main gaming hall. Other intended uses of the site include a casino parking area, a new groundwater well and water storage tank, and a wastewater treatment plant.

The REA considered several alternatives to the Proposed Action, which are described in the REA and summarized below. The Alternative On-Site Location Alternative and the No Action Alternative were evaluated in full detail in the REA. Three alternative sites (the Skyway Property, the Live Oak Property,

1

and the Sacramento Property) and a non-gaming alternative (agricultural project) were considered but ultimately eliminated from further consideration.

1) Alternative On-Site Location Alternative: The Alternative On-Site Location consists of the conveyance of the site from private ownership into federal trust status for the benefit of the Tribe, and the subsequent construction of a gaming facility on the site. The conceptual design of the gaming facility under this alternative would be similar to the design under the Proposed Action, but the gaming facility would be constructed north and west of Clear Creek. Primary access to the gaming facility would also be from the terminus of Openshaw Road. Under this alternative, Caltrans would extend Openshaw Road west as part of its current Highway 149 improvement project and construct a bridge over Clear Creek.

2) No Action Alternative: Under the No Action Alternative, the proposed management contract would not be approved, the two parcels (630 acres) would not be placed into federal trust for the benefit of the Tribe, and the site would not be developed as a gaming facility. The current uses of the site (grazing and open space) are assumed to continue.

3) Skyway Property Alternative: The Skyway Property Alternative consists of the conveyance of the Skyway Property from private ownership into federal trust status for the benefit of the Tribe, and the subsequent construction of a gaming facility on the site. The Skyway Property is a 151-acre site located along Skyway Avenue between Paradise and Chico in unincorporated Butte County. This alternative site was eliminated from further consideration due to the preponderance of environmental impacts (including potential impacts to wetlands, visual resources, topography, and cultural resources) and lack of available electrical utilities.

4) Live Oak Property Alternative: The Live Oak Property Alternative consists of the conveyance of the Live Oak Property from private ownership into federal trust status for the benefit of the Tribe, and the subsequent construction of a gaming facility on the site. The Live Oak Property is located at the intersection of Sankey Road and SR-99/70 (in the northeast quadrant) in unincorporated Sutter County. This alternative site was eliminated from further consideration due to the difficulties extending an option on the properties, a preponderance of environmental impacts (including potential impacts to farmland of statewide importance, and state and federal special status species), lack of available utilities, and the site's relatively distant location from the Tribe's historical reservation.

5) Sacramento Property Alternative: The Sacramento Property Alternative consists of the conveyance of the Sacramento Property from private ownership into federal trust status for the benefit of the Tribe, and the subsequent construction of a gaming facility on the site. The Sacramento Property is a 240-acre site located at the intersection of Sankey Road and SR-99/70 (in the southeast quadrant) in unincorporated Sutter County. This alternative site was eliminated from further consideration due to a preponderance of environmental impacts (including potential impacts to farmland of statewide importance, and state and federal special status species), lack of available utilities, and the site's relatively distant location from the Tribe's historical reservation.

6) Agricultural Project Alternative: For eleven years the Tribe has operated a 40-acre almond orchard on a site northwest of Chico in unincorporated Butte County. A professional agricultural management firm operates the orchard under a contract with the Tribe to ensure maximum production and revenue generation. Unfortunately, net revenue generated by the orchard has been minimal and the Tribe has not been able to attract investors needed to fund the purchase of sufficient acreage for Tribal revenue-generation needs. The Agricultural Project Alternative consists of continuing agricultural operations as a means for a sustained revenue stream to support Tribal needs. This alternative was eliminated from further consideration because it does not satisfy the purpose and need for the Proposed Action.

PUBLIC REVIEW AND COMMENT

The EA documenting and analyzing the potential impacts of the Proposed Action and Alternatives was completed in December 2003. The EA was distributed for public review from December 27, 2003 to January 27, 2004. The BIA received eleven comment letters regarding the EA completed in December 2003. The REA was completed in June 2006 and updated the analysis and reanalyzed issues based on comments received on the EA dated December 2003. The REA was distributed for public review and comment for the period beginning June 26, 2006, and ending July 26, 2006. Extensions of the comment period were granted to those that asked until August 11, 2006. 22 comment letters were received on the REA.

This FONSI will be distributed to all persons and agencies known to be interested in the Proposed Action as indicated by their comments on the REA. Additionally, all persons and agencies on the EA and REA mailing lists will receive a copy.

SUMMARY OF IMPACTS AND MITIGATION ISSUES

As part of the REA, potential impacts to land resources, water resources, air quality, biological resources, cultural resources, socioeconomic conditions, resource use patterns, public services, and other values were evaluated, with the following conclusions:

A.  Having considered land resources impacts during project design/planning, Best Management Practices (BMPs) incorporated into the Proposed Project and mitigation measures will ensure impacts to land resources will be less than significant. See REA Sections 2.0, 4.1.1, and 5.1.

B.  Having considered water resources impacts during project design/planning, BMPs incorporated into the Proposed Project and mitigation measures will ensure that impacts to water resources are not significant. See REA Sections 2.0, 4.1.2, and 5.2.

C.  Impacts to air quality will be less than significant. BMPs incorporated into the Proposed Project and mitigation measures will further reduce impacts to air quality. See REA Sections 2.0, 4.1.3, and 5.3.

D.  Having considered biological resources impacts during project design/planning, BMPs incorporated into the Proposed Project and mitigation measures will ensure that impacts to biological resources are not significant. See REA Sections 2.0, 4.1.4, and 5.4.

E.  There will be no significant impacts to known cultural resources. Mitigation measures will ensure impacts to unknown cultural resources are less than significant. See REA Sections 4.1.5 and 5.5.

F.  Having considered socioeconomic impacts during project design/planning, mitigation measures will ensure that socioeconomic impacts are less than significant. See REA Sections 2.0, 4.1.6, and 5.6.

G.  Having considered transportation networks impacts during project design/planning, BMPs incorporated into the Proposed Project and mitigation measures will ensure that impacts to transportation networks are not significant. See REA Sections 2.0, 4.1.7, and 5.7.1.

H.  There will be no significant land use impacts. See REA Section 4.1.7.

I.  There will be no significant impacts to agricultural resources. See REA Section 4.1.7.

J.  Having considered public services impacts during project design/planning, BMPs incorporated into the Proposed Project and mitigation measures will ensure that impacts to public services are not significant. See REA Sections 2.0, 4.1.7, and 5.7.2.

K.  There will be no significant impacts to visual resources. Having considered visual resources impacts during project design/planning, BMPs incorporated into the Proposed

3

Project and mitigation measures will further reduce impacts to visual resources. See REA Sections 2.0, 4.1.7, and 5.7.3.

L.   Having considered noise impacts (including noise levels during construction) during project design/planning, mitigation measures will ensure that noise impacts are not significant. See REA Sections 2.0, 4.1.8, and 5.8.1.

M.   Having considered hazardous materials impacts during project design/planning, BMPs incorporated into the Proposed Project and mitigation measures will ensure that hazardous materials impacts are not significant. See REA Sections 2.0, 4.1.8, and 5.8.2.

N.   Cumulative impacts to land resources, water resources, air quality, biological resources, cultural resources, socioeconomic conditions, environmental justice, land use, agriculture, public services, visual resources, and noise or hazardous materials changes would be less than significant. Having considered transportation networks impacts during project design/planning, BMPs incorporated into the Proposed Project, and mitigation measures will ensure that cumulative impacts to transportation networks are not significant. See REA Sections 2.0, 4.4, and 5.7.1.

O.   There will be no significant growth-inducing or other indirect effects. See REA Section 4.5.1.

P.   Mitigation measures will ensure that indirect effects from off-site traffic mitigation would be less than significant. See REA Sections 4.5.2 and 5.2.7.

The BMPs and mitigation measures described in the REA are included either to reduce significant impacts to a less than significant level, to further reduce already less than significant impacts, or both. To ensure that the mitigation measures required to reduce significant impacts to a less than significant level are enforceable as applicable, the mitigation measures will be included as an integral part of the project description as required by Federal law and made enforceable either pursuant to the provisions of a Memorandum of Understanding (MOU) or by the NIGC pursuant to the provisions of section 2 of Title II of the Mechoopda Indian Tribe of Chico Rancheria Gaming Ordinance of 2001, as amended by Res. No. 06-62.

The NIGC hereby accepts the proposed mitigation measures described in Section 5 of the REA for areas where impacts occur. The following is a summary of BMPs and mitigation measures contained in the REA (see the REA for a detailed description of all BMPs and mitigation measures):

Land Resources
• Prior to site development a qualified professional will prepare detailed recommendations regarding foundation design and maximum slopes to minimize erosion. All structures will be designed in accordance with the seismic design criteria of the most recent edition of the Uniform Building Code.
• All site clearing, removal of all unsuitable soil, moisture conditioning, review of imported fill material, fill placement, observation of foundation excavations and other site grading shall be verified by a registered civil engineer during construction.

Water Availability
• A new well will be installed on the site and tested for water quality and quantity.
• The Tribe shall implement an aggressive water conservation program, including the installation and use of low-flow fixtures in the gaming facility.
• To reduce water loss through evaporation, the Tribe shall water lawns and landscaped areas in the early morning hours when temperatures and winds are low.
• The Tribe shall position sprinklers to ensure that only landscaped areas are watered and sidewalks, streets, and parking areas are avoided.

4

- The Tribe shall use California native plants in landscaping wherever feasible to reduce the frequency of watering necessary to maintain landscaping vegetation.
- The Tribe shall delineate the location and types of external landscaping to better predict water use.
- The Tribe shall install a groundwater level monitoring network as part of an adaptive management program to protect groundwater supplies.
- The Tribe shall ensure that the project does not disturb or alter creek channels, which are prime recharge areas.

Water Quality

- Prior to construction, a Storm Water Pollution Prevention Plan shall be prepared as required by the U.S. Environmental Protection Agency (EPA) to prevent erosion and prevent pollutants from entering surface and groundwater. Permanent water quality maintenance features shall be incorporated into the design and operation of the gaming facility. Water quality control measures identified in the Storm Water Pollution Prevention Plan shall include, but not be limited to, the following:
  - o Vegetation existing on the site shall be retained where possible. Grading activities shall be limited to the immediate development area.
  - o Temporary erosion control measures, such as silt fences, staked straw bales, and temporary revegetation, shall be employed for disturbed areas.
  - o No disturbed surfaces shall be left without erosion control measures in place during the winter and spring months.
  - o Sediment shall be retained on-site by a system of sediment basins, traps, or other appropriate measures.
  - o A spill prevention and countermeasure plan shall be developed, if necessary, which identifies proper storage, collection, and disposal measures for potential pollutants (such as fuel storage tanks) used on-site.
  - o Storm drains shall be equipped with silt and oil traps to remove oils, debris, and other pollutants. Also, storm drain inlets shall be labeled "No Dumping – Drains to Streams and Rivers."
  - o Stormwater runoff will be directed to the stormwater detention basin where flows will be attenuated before being released at rates lower than pre-development peak release rates.
  - o The parking lot shall be designed to allow storm water runoff to be directed toward vegetative filter strips to help control sediment.
  - o Permanent energy dissipaters shall be included in drainage outlets.
  - o The detention basin shall be designed to provide effective water quality control measures. Design and operational features of the drainage basins shall meet the following criteria:
    - The drainage basins shall be designed to provide the maximum detention time for settling of fine particles.
    - The distance between basin inlets and outlets shall be maximized to reduce velocities.
    - Maintenance schedules shall be established for periodic removal of sedimentation, excessive vegetation, and debris that may clog basin inlets and outlets.
- All areas within 200 feet of Clear Creek shall be designated building exclusion areas during all construction activities. Temporary fencing shall be installed to provide a 200-foot wide buffer prior to construction. The fence shall remain in place until all construction activities on the site have been completed.
- Treated effluent from the wastewater treatment plant (WWTP) shall be applied on the sprayfield at such a rate that it does not run off the field. The sprayfield shall be monitored on a daily basis by qualified personnel to ensure that the treated effluent is applied at the proper rate.
- Treated effluent from the WWTP or sprayfield shall not migrate beyond the boundaries of the WWTP.

- All tailwater and stormwater shall be collected and returned to the storage pond at all times when treated effluent is being applied to the sprayfield.
- Treated effluent shall not be applied on the sprayfield 24 hours before forecasted precipitation, during periods of precipitation, or for 24 hours after treated effluent application has ceased.
- A tailwater recapture system shall be operated to capture treated effluent runoff, as well as any stormwater runoff that occurs within 24 hours of the last application of treated effluent.
- Sprayfield irrigation shall cease when winds exceed 30 miles per hour. During wet conditions, or when soils are saturated, treated effluent shall be pumped into the storage reservoir to avoid runoff impacts.
- A plan shall be prepared that provides safety measures in the event that human error or equipment malfunction results in improper discharge.
- A WWTP utilizing membrane bioreactor technology shall be used to provide tertiary level treatment of project wastewater.
- All effluent produced by the WWTP will be treated to Title 22 standards for the use of recycled water.
- Within six months of the commencement of construction, the Tribe will develop a contingency plan that outlines procedures that would be implemented immediately if the WWTP were to fail to preclude any environmental contamination from occurring.
- The Tribe will implement the recommendations contained in the Site Grading, Stormwater Drainage and Erosion Control Plan, which is contained in Appendix J of the REA.

Hydrology and Flooding

- The Tribe will work with appropriate Federal, State, and local agencies to comply with the National Flood Insurance Program.
- To avoid potentially significant impacts to the floodplain, and to reduce potential flood hazards, the measures contained in the Butte County Flood Hazard Prevention Ordinance (Ordinance No. 3598) contained in Article IV of the Butte County Code shall be substantially incorporated. Mitigation measures shall include, but not be limited to, the following:
    o Development shall not increase the water surface elevation on neighboring properties and shall not increase the water surface elevation of the base flood elevations (as established for the 91+ acre study area referred to in the REA) more than one foot at any point. Prior to construction, a registered professional engineer shall certify that the project design and methods of construction comply with these standards.
    o All electrical, heating, ventilation, plumbing, and air conditioning equipment and other service facilities shall be designed and/or located to prevent water from entering or accumulating within those components during flood conditions.
    o The lowest floor elevation of new structures and attendant utility and sanitary facilities shall be elevated a minimum of one foot above the regulatory flood elevation or be flood-proofed so that below the regulatory flood elevation the structure is watertight with walls impermeable to the passage of water, and shall have structural components capable of resisting hydrostatic and hydrodynamic loads and effects of buoyancy. Upon completion of structures, the elevation of the lowest floor, or proper flood-proofing, shall be certified by a registered engineer or surveyor.
    o New water and sewer systems shall be constructed to eliminate or minimize infiltration of floodwaters into systems, and discharge from systems into floodwaters. Moreover, on-site waste disposal systems shall be designed and located to avoid impairment to them or contamination from them during flooding.
    o Construction materials and utility equipment that are resistant to flood damage will be used for the gaming facility.

6

- o Construction methods and practices that minimize flood damage will be incorporated into the gaming facility.
- o All structures will be designed or anchored to prevent flotation, collapse, or lateral movement of the structure or portions of the structure due to flooding.

Air Quality

- To minimize the emission of pollutants and impacts to air quality during construction phases of the gaming facility, the construction contractor shall be required to implement the following mitigation measures (as recommended by the Butte County Air Quality Control Management District (BCAQMD)) for the duration of the construction operations:
  - o Water shall be applied by means of truck(s), hoses, and/or sprinklers as needed prior to any land clearing or earth movement to minimize dust emission.
  - o Haul vehicles transporting soil into or out of the property shall be covered.
  - o A water truck shall be on site at all times. Water shall be applied to disturbed areas a minimum of 2 times per day or more as necessary.
  - o On-site vehicles shall be limited to a speed of 15 mph on unpaved roads.
  - o A publicly visible sign shall be posted with the telephone number and person to contact regarding dust complaints. This person shall respond and take corrective action within 24 hours.
  - o All visibly dry disturbed soil surface areas of operation shall be watered to minimize dust emission.
  - o Existing roads and streets adjacent to the project will be cleaned at least once per day unless conditions warrant a greater frequency.
  - o All visibly dry disturbed unpaved roads and surface areas of operation shall be watered to minimize dust emission.
  - o Unpaved roads may be graveled to reduce dust emissions.
  - o Haul roads shall be sprayed down at the end of the work shift to form a thin crust. This application of water shall be in addition to the minimum rate of application.
  - o Vehicles entering or exiting construction areas shall travel at a speed which minimizes dust emissions.
  - o Construction workers shall park in designated parking areas(s) to help reduce dust emissions.
  - o Soil pile surfaces shall be moistened if dust is being emitted from the pile(s). Adequately secured tarps, plastic or other material may be required to further reduce dust emissions.
- Public transportation service to the gaming facility shall be provided at frequent intervals. The Tribe has authorized a one-time expenditure of $50,000 to assist in establishing public transportation to the gaming operation. An annual expenditure of $5,000 has also been authorized to maintain the public transportation service.
- The Tribe shall provide at least two transit shelters with benches and at least one bus turnout.
- The Tribe shall ensure that buses will comply with the California Air Resource Board's Airborne Toxic Control Measure to Limit Diesel-Fueled Commercial Motor Vehicle Idling (California Code of Regulations, Title 13, Division 3, Article 1, Chapter 10, Section 2485) which requires that the driver of any diesel bus not idle for more than 5 minutes at any location, except for periods of 10 minutes prior to passenger boarding, or when passengers are on board.
- The Tribe will use energy-efficient lighting and process systems such as water heaters, furnaces, and boiler units.
- The Tribe will use fleet vehicles that use clean-burning fuel as may be practicable.
- The Tribe shall incorporate shade trees, adequate in number and proportional to the project size, throughout the project site to reduce building heating and cooling requirements.

7

- The Tribe shall establish a development pattern that encourages pedestrian and bicycle use by providing paths and building access which are physically separated from street and parking lot traffic, and that eliminates physical barriers such as walls, berms, landscaping, and slopes that impede the use of pedestrian or bicycle facilities, or public transportation vehicles.

Biological Resources
- A bridge shall be installed which spans the vernal pool located near the entrance of the property, thereby eliminating direct impacts to wetlands, vernal pools, and endangered fairy shrimp. All features associated with the construction of the bridge shall be located outside the boundaries of the identified wetland areas. BMPs shall be employed to avoid impacts to the area from construction-related activities.
- Should installation of a bridge not be possible due to failure to obtain construction approvals (despite the applicant's good faith effort to obtain such approvals) or some other barrier to construction that is beyond the Tribe's control, the Tribe shall seek to obtain mitigation for the loss of vernal pool habitat conducive to the species (*Branchinecta lynchi and Lepidurus packardii*) at a USFWS and Army Corps of Engineers-approved mitigation bank. The 0.035 acres of impacts to vernal pool habitat shall be mitigated according to a revised biological opinion issued by the USFWS.
- Indirect impacts to vernal pools or seasonal wetland features within 250 feet of construction areas will be subject to the provisions of the biological opinion issued by the USFWS (REA Appendix R). All conservation measures identified by the USFWS must be implemented prior to ground disturbance activities. These measures include: compensatory mitigation for habitat loss (2:1 ratio) of 10.25 acres of vernal pool habitat, or preservation of vernal pool habitat (3:1) ratio at an off-site location approved by the USFWS; seasonal restrictions on construction, protective fencing and signs, worker education programs, biological monitoring and reporting for activities within 250 feet of vernal pool crustacean habitat, and implementation of BMPs to prevent the accidental release of disturbed soils, fuel, oil, or other materials associated with construction activities into sensitive habitats.
- The Sacramento USFWS and BIA shall be notified within three working days of the finding of any dead federally-listed species or any unanticipated harm to the species addressed in the biological opinion as well as any other federally-listed species not authorized in the biological opinion.
- If construction activities are to occur during the nesting season (approximately March through September), pre-construction surveys for nesting Cooper's hawk, white-tailed kite, and other raptor species shall be conducted by a qualified biologist within 500 feet of the proposed construction areas. If active nests are identified in these areas, the USFWS shall be consulted to develop measures to avoid "take" of active nests prior to the initiation of any construction activities. Avoidance measures may include the establishment of buffers and biological monitoring.
- A pre-construction survey for burrowing owls shall be conducted by a qualified biologist within the 30 days immediately prior to construction activities to establish the status of this species on the project site. If ground-disturbing activities are delayed or suspended for more than 30 days after the pre-construction survey, the site shall be resurveyed. If burrowing owls are detected within approximately 500 feet of the proposed project site, the USFWS shall be consulted to develop measures to avoid "take" of this species prior to the initiation of any construction activities. Avoidance measures may include seasonal restrictions on construction, the establishment of buffers, compensatory mitigation for impacts to active burrow sites, and biological monitoring.
- A 200-foot "no disturbance" buffer shall be maintained along Clear Creek (giant garter snake aquatic habitat) during project construction. Temporary fencing shall be installed outside the 200-foot buffer prior to any construction, and remain in place until all construction activities on the site have been completed. An on-site biological monitor shall be present during all initial ground disturbance activities associated with the proposed project within the 200-foot buffer. If implementation of this measure is not feasible, the USFWS shall be consulted to develop measures to avoid or permit the "take" of the giant garter snake. All conservation measures identified by the USFWS shall be

8

implemented. Measures may include compensatory mitigation for habitat loss, seasonal restrictions on construction, protective fencing and signs, worker education programs, biological monitoring and reporting, and implementation of BMPs to prevent the accidental release of disturbed soils, fuel, oil, or other materials associated with construction activities into sensitive habitats.

- To minimize the potential effects of lighting on listed species, reflectors directing lighting shall be installed on all exterior lighting, low intensity halogen bulbs shall be used, and all lighting shall be less than or equal to full moon intensity 100 feet outside of the project site.

- A Department of the Army permit shall be obtained from the U.S. Army Corps of Engineers, and any required wetland mitigation credits shall be purchased from an approved wetlands mitigation bank prior to the discharge of any dredged or fill material within jurisdictional waters of the U.S.

- Indirect impacts to wetlands and vernal pool crustacean habitat shall be mitigated as prescribed by the biological opinion issued by the USFWS.

- Construction activities occurring within wetland areas shall be conducted during the dry season to minimize the potential for erosion.

- Temporary fencing shall be installed around areas of wetland habitat to remain undisturbed. Fencing shall be located as far as feasible from the edge of wetland habitats and installed prior to any construction. Fencing shall remain in place until all construction activities on the site have been completed.

- Staging areas shall be located at least 250 feet away from wetland habitats that are to be preserved. Temporary stockpiling of excavated or imported material shall occur only in approved construction staging areas. Excess excavated soil shall be used on site or disposed of at a regional landfill or other appropriate facility. Stockpiles that are to remain on the site through the wet season shall be protected to prevent erosion (e.g. with silt fences or straw bales).

- Standard precautions shall be employed by the construction contractor to prevent the accidental release of disturbed soils, fuel, oil, lubricant, or other potentially hazardous materials associated with construction activities into wetland habitats. All workers shall be informed of the importance of preventing spills and appropriate measures to take, should a spill occur. A contaminant containment program shall be developed and implemented in the event of release of hazardous materials. Any spills of hazardous materials shall be cleaned up immediately. Such spills shall be reported in the post-construction compliance reports.

Cultural Resources

- Prior to the start of construction, a set of engineering drawings shall be provided to a senior archaeologist designated by the Tribe. The senior archaeologist, in consultation with the Tribal monitor, will then determine if areas exist where construction work will require monitoring. This information will then be provided to the job superintendent or foreperson, who will then be responsible for notifying the monitors 24 hours in advance of work being performed in areas requiring monitoring.

- In the event of discovery of significant archaeological resources, the BIA will follow the regulation concerning unanticipated discoveries on tribal lands as set forth under 36 CFR § 800.13(d), before land disturbing activities in the area of discovery will be allowed to resume.

- The Tribe shall include the following requirement in construction contract specifications for construction activities on the site:

  o In the event that any prehistoric, historic, or paleontological resources are discovered during construction-related earth-moving activities, all work within 50 feet of the resources shall be halted and the Tribe shall consult with a qualified archaeologist or paleontologist and the BIA Regional Archaeologist to assess the significance of the find. If any find is determined to be significant by the qualified archaeologist and BIA Regional Archaeologist, then representatives from the Tribe, the qualified archaeologist

9

and/or paleontologist, and BIA Regional Archaeologist will meet to determine the appropriate course for action.

- If human remains are discovered or suspected, work shall halt in that area and procedures set forth in the Native American Graves Protection and Repatriation Act (25 USC 3001 *et seq.*) shall be followed.

Socioeconomic Conditions

- The Tribe has agreed to make a $25,000 annual contribution to a fund addressing problem and pathological gambling.
- Brochures, pamphlets, videos and other materials promoting responsible gambling, including a help line at the proposed casino, will be developed and made available to patrons.
- Exclusion, self-exclusion, and self-limitation policies will be instituted.
- All employees will be trained on the issue of problem gambling, including education on the nature of problem gambling, how to recognize such behavior and resources available to help problem gamblers.
- Underage gambling will be strictly prohibited, by requesting identification of gambling customers, displaying/advertising legal age to gamble, heightening awareness of customer responsibility when bringing children to the proposed casino, and working with educational institutions and other local organizations to raise awareness of problem gambling.
- The Tribe shall enact an ordinance creating a standard policy encouraging responsible drinking and designated-driver programs. As part of this policy, the gaming and entertainment facility employees serving alcohol shall undergo Responsible Beverage Service Training (RBST), also known as "server training." RBST educates mangers, servers and sellers at alcohol establishments about strategies to avoid illegally selling alcohol to underage youth or intoxicated patrons. The goal of RBST is to decrease the number of illegal alcohol sales to underage youth and intoxicated patrons through education programs. Information provided in server training must at a minimum include:
  - o The importance of checking age identification of customers who appear to be under age 30.
  - o How to identify fake IDs and what to do once a fake ID is confiscated.
  - o How to recognize situations in which adults are buying alcohol for underage youth.
  - o How to refuse sales to individuals who may supply alcohol to underage youth.
  - o How to identify intoxicated customers.
  - o How to refuse service to underage youth and intoxicated customers.
- The Tribe has agreed to contribute $25,000 annually to alcohol awareness programs.
- While the final amount agreed upon may differ, the Tribe has authorized an annual expenditure of $351,000 and a one-time expenditure of $50,000 for law enforcement services.
- While the final amount agreed-upon may differ, the Tribe has authorized an annual expenditure of $168,000 and a one-time expenditure of $100,000 for fire protection and emergency response services.

Transportation Networks

- The access driveway will include two inbound lanes and one outbound lane to minimize traffic on Openshaw Road.
- The following intersections shall be temporarily signalized until the completion of the Caltrans SR-149 improvements (unless Caltrans does not recommend signalization due to conflicts with their construction plans): SR-149/Shippee Road, SR-149/SR-99, and SR-149/SR-70.
- All improvements, temporary and otherwise, shall be coordinated to the maximum extent possible with the Caltrans SR-149 improvement project.

10

- A permanent, new signal shall be at the location of the realigned Shippee Road and SR-149 intersection, with associated geometric improvements on the Openshaw approach of the intersection to accommodate casino traffic. The east leg of Shippee Road connecting to Openshaw Road will be stop-controlled with one lane in the eastbound direction and with a left-shared-through and right-turn lane in the westbound direction.
- If project timelines for the Caltrans SR-149 and/or SR-99 improvements are coincidental with the proposed project, the Tribe will be responsible for obtaining environmental approvals, permits, and the added cost for the signal improvements. If the timelines do not coincide, Caltrans will process the signal project through the standard encroachment process as a separate project.
- The Tribe shall continue to work with Caltrans to develop a MOU that will address mitigation implementation.
- The Tribe has authorized a one-time expenditure of $750,000 for signal and general road improvements. It has also agreed to an annual expenditure of $25,000 for County road maintenance.
- Casino-related improvements along SR-149 shall be closely coordinated with the Caltrans SR-149 improvement project, as required by Caltrans. Casino-related improvements may require amendment of the traffic management plan or construction phasing for the SR-149 improvement project, which, if required, will be the financial responsibility of the Tribe.
- The Tribe shall work with Butte Regional Transit to allow a transit stop and associated amenities at the casino. Serving the project site would require a small route deviation and should not impact the transit agency's ability to manage their current service area in a timely fashion. If Butte Regional Transit does not wish to provide bus service, the Tribe shall sponsor shuttles or charter buses from population centers to reduce automobile traffic to the casino. Preferential carpool or vanpool spaces shall be provided at the project site to encourage ridesharing by patrons and employees.
- It is recommended that an additional lane be added to the southbound approach on Shippee Road.
- The casino shall provide for the expected fair share of the costs of the widening improvements necessary as noted below based on the *Caltrans' Guide for the Preparation of Traffic Impact Studies*.
    - o *Widen SR-70 south of SR-149.* The casino should contribute two percent of the cost of the widening in each direction.
    - o *Widen SR-70 north of SR-149.* The casino should contribute two percent of the cost of the widening in the westbound direction and three percent for widening in the eastbound direction.
    - o *Widen SR-99 north of SR-149.* The casino should contribute two percent of the cost of the widening in each direction.
    - o *Widen SR-99 south of SR-149.* The casino should contribute six percent of the cost of the widening in each direction.
- The Tribe shall provide for a fair share to the following traffic improvements on SR-99:
    - o Extending the deceleration length of the SR-99 northbound Durham Pentz Road off-ramp to 215 feet.
    - o Extending the acceleration length of the SR-99 northbound Durham Pentz Road on-ramp to 420 feet.
    - o Extending the acceleration length of the SR-99 southbound Durham Pentz Road on-ramp to 400 feet.
- The barrier rails on the Openshaw Road Dry Creek Bridge shall be improved and guardrails installed (and safety rails upgraded where present along Openshaw Road between the project site and the SR-149/Shippee Road intersection), according to current applicable standards, to maximize traffic safety during operation.
- Signage should be placed to alert northbound and southbound Openshaw Road drivers that the bridge over Dry Creek is a narrow bridge.

- To avoid the SR-149/SR-70 intersection, trucks traveling to the borrow pit from the project site shall turn right from the SR-149/Shippee Road intersection onto SR-149; they shall then turn right at the SR-149/SR-99 intersection, and continue north to Durham Pentz Road; they shall then turn right onto Durham Pentz road and continue along Durham Pentz Road to Pentz Road; they shall then turn right at Pentz Road and then right at SR-70; finally they shall turn right onto Wheelock Road.
- Construction of an access to the site from a temporary right-in/out driveway off of SR-149 shall take place during construction, if possible. This would require a temporary access easement and an encroachment permit from Caltrans as well as design of the access. Construction traffic shall adhere to the terms of the Caltrans encroachment permit in using this access. The access should only be used for overweight/oversize vehicles that cannot use the Dry Creek Bridge. All other construction vehicles should use the Shippee Road access.
- The pavement on Openshaw Road from the project site to the SR-149/Shippee Road intersection should be overlaid during project construction but prior to the public opening of the proposed casino, if the road has not already been overlaid by Caltrans at that time.
- A construction traffic management plan should be prepared in consultation with Butte College and Butte County to ensure construction traffic is managed efficiently with as little impact on area traffic and roadways as possible, without disturbing the timely construction of the proposed project. The construction traffic management plan should be implemented for the duration of the proposed project's construction. The plan should include provisions for training construction delivery vehicle drivers. Construction material importation should be scheduled outside of the area-wide commute peak hours. Debris along the truck route caused by trucks should be monitored daily and the roadways cleaned as necessary.
- The Tribe shall provide flagging and associated traffic controls when necessary in consultation with the California Highway Patrol (CHP), Caltrans, and the Butte County Sheriff's Department.

Public Services
- The Tribe shall provide compensation for the incremental cost of providing police, fire, transportation, and other services to the gaming facility. The Tribe shall enter into a negotiation with each service provider on an individual basis to determine levels and conditions for compensatory mitigation.
- The gaming facility's air conditioning and refrigeration systems shall utilize refrigerants approved for use in California. The facility shall use high-efficiency chillers.
- The air handling systems shall utilize outside air economizer cycles to take advantage of efficient cooling when the outside air temperature is below 55°F.
- The gaming facility building shall be equipped with a direct digital energy management and control system to perform energy conservation measures such as optimum start/stop, duty cycling, and demand limiting. This management system will insure that the gaming facility minimizes energy usage.
- The gaming facility shall comply with the intent of energy building standards within the California Code of Regulations, Title 24, Part 6e.
- The final design of the gaming facility shall consider solar orientation for energy efficiency to the extent practicable.
- Security personnel shall be sworn officers of the Tribal Government, and be trained as peace officers with specialized training in gaming facility security.
- All surveillance officers shall be fully trained in observation and report writing.
- Security officers shall be trained in basic first aid, cardiopulmonary resuscitation, and customer service.
- The Tribe shall also make arrangements with the Butte County Sheriff's Department and/or other local jurisdictional agencies to coordinate the handling of criminal investigations and the handing over of criminal suspects.

12

- Trained security staff shall be provided to address security issues within the gaming facility during operating hours. All security guards shall carry two-way radios to respond to back-up and emergency-related calls.
- All parking areas shall be well lit and monitored by parked and/or roving security guards at all times during operation.
- Areas surrounding the gaming facility shall be well lit and patrolled regularly by security guards.
- The Tribe shall provide traffic control with appropriate signage and the presence of peak-hour traffic control staff.
- An appropriately sized water storage tank equipped for emergency fire flows shall be constructed and maintained by the Tribe.
- All Uniform Fire Code requirements shall be incorporated into the design and operation of the gaming facility.
- Construction equipment and power tools shall be equipped with spark arrestors, as applicable, and maintained in good working order.
- Staging areas, welding areas, or areas slated for development using spark-producing equipment shall be cleared of dried vegetation or other materials that could serve as fire fuel. To the extent feasible, the contractor shall keep these areas clear of combustible materials in order to maintain a firebreak.
- Casino security personnel and other employees will receive first aid training, to include CPR and use of an automatic external defibrillator (AED). An AED will be kept in the gaming facility.
- Construction waste shall be recycled to the extent practicable by diverting green waste and recyclable building materials from the solid waste stream.
- Environmentally preferable materials shall be acquired to the extent practicable for construction of facilities.
- The Tribe shall adopt public health standards for the handling of food and beverages. The Tribe shall permit inspection of the food and beverage facilities by the Indian Health Service, State, or County inspectors.
- The Tribe shall submit water samples for routing testing and permit inspection of the water treatment facility by Federal, State or County inspectors.
- The Tribe will adopt a solid waste management plan that addresses recycling and solid waste reduction at the site.

Visual Resources
- Signage will be designed to reflect and accentuate the natural elements of the project.
- The gaming facility shall be designed in a manner that compliments the natural landscape. The design of the gaming facility and all on-site parking shall be generally consistent with design standards set forth in the Butte County Zoning Ordinance.
- Signage for the proposed project shall not conflict with applicable County, State or Federal requirements in place at the time for signs along a State highway.
- Downcast lighting fixtures and low-pressure sodium bulbs shall be utilized so that nighttime lighting for the parking areas shines only on the parking areas, and not surrounding areas.

Noise
- The construction contractor shall be required to muffle and shield intakes and exhaust on construction equipment in accordance with the manufacturer's specifications, and shroud and shield impact tools.

Hazardous Materials
- If contaminated soil, groundwater, or other suspected contamination is encountered during project construction, work shall be halted in the affected area and the type and extent of the contamination shall be determined. A qualified professional, in consultation with appropriate regulatory agencies,

13

shall then develop an appropriate method to remediate the contamination. If necessary, the Tribe shall implement a remediation plan in conjunction with continued project construction.

- The Tribe shall develop, implement, and review annually a hazardous materials and hazardous waste minimization program to determine if additional opportunities for hazardous materials and hazardous waste minimization are feasible, for both construction and operation of the gaming facility.
- Personnel shall follow written standard operating procedures (SOPs) for filling and servicing construction equipment and vehicles. The SOPs, which are designed to reduce the potential for incidents involving hazardous materials, shall include the following:
  - o Refueling shall be conducted only with approved pumps, hoses, and nozzles.
  - o Catch-pans shall be placed under equipment to catch potential spills during servicing.
  - o All disconnected hoses shall be placed in containers to collect residual fuel from the hose.
  - o Vehicle engines shall be shut down during refueling.
  - o No smoking, open flames, or welding shall be allowed in refueling or service areas.
  - o Refueling shall be performed away from bodies of water to prevent contamination of water in the event of a leak or spill.
  - o Service trucks shall be provided with fire extinguishers and spill containment equipment, such as absorbents.
  - o Should a spill contaminate soil, the soil shall be put into containers and disposed of in accordance with local, State, and Federal regulations.
  - o All containers used to store hazardous materials shall be inspected at least once per week for signs of leaking or failure. All maintenance and refueling areas shall be inspected monthly. Results of inspections shall be recorded in a logbook that shall be maintained on site.
- The amount of hazardous materials used in construction and operation of the gaming facility shall be consistently kept at the lowest volumes needed.
- The least toxic material capable of achieving the intended result shall consistently be used to the extent practicable.
- The contractor shall be requested to avoid and minimize the use of hazardous materials during construction to the fullest extent practicable.
- The use of pesticides and toxic chemicals shall be minimized to the greatest extent feasible in landscaping, or less-toxic alternatives shall be utilized.
- All personnel who handle herbicides or pesticides will be trained in safe handling and disposal of hazardous materials.

In addition to the BMPs and mitigation measures detailed in the REA, the following BMPs and mitigation measures have been added in responses to comments on the REA:

- As construction plans are finalized, the Tribe will coordinate with Pacific Gas & Electric (PG&E) to determine the exact modifications to utilities that will be necessary to serve the project.
- The Tribe will coordinate with PG&E and the California Department of Health Services to ensure information on the possible or perceived risks of electromagnetic field exposure are readily available to employees and patrons.
- Final design calculations and construction drawings and drainage plans will be provided to Caltrans for review prior to construction.
- As necessary and consistent with the federal Safe Drinking Water Act, appropriate treatment methods shall be employed to treat the water to State potable water quality standards.
- The WWTP will be staffed with operators who are qualified to operate the plant safely, effectively, and in compliance with all permit requirements and regulations. The operators shall have qualifications similar to those required by the State Water Resources Control Board Operator Certification Program for municipal wastewater treatment plants. This program specifies that for

14

tertiary level wastewater treatment plants with design capacities of 1.0 MGD or less, the chief plant operator must be a Grade III operator. Supervisors and Shift Supervisors must be Grade II operators. An Operations and Maintenance Program will be followed by the plant operators. Emergency preparedness will include all appropriate measures, including a high level of redundancy in the major systems. Monitoring of discharge shall be in accordance with the National Pollutant Discharge Elimination System (NPDES) permit issued by the EPA. This monitoring will include both continuous and grab monitoring of various parameters.

- A new local well location is proposed that provides further separation between water supply and wastewater treatment facilities (see Decision Package Attachment B).
- The following additional air quality BMPs will be implemented during project construction (see Attachment D): use aqueous diesel fuel, use cooled exhaust gas recirculation, and use a shuttle to transport workers to retail establishments at lunch.
- All parking lots will be landscaped.
- The Tribe will prepare a list of hazardous materials used at the site and a Spill Prevention Control and Countermeasure (SPCC) Plan for submission to the Butte County Environmental Health Division.
- The USFWS and NIGC NEPA Compliance Officer for this project will be contacted within three working days of the finding of any dead federally-listed species or any unanticipated harm to the species addressed in the biological opinion as well as any other federally-listed species not authorized in the biological opinion.
- The BIA and NIGC NEPA Compliance Officers will be notified which areas are determined to require archaeological monitoring during construction.
- The NIGC NEPA Compliance Officer will be contacted in the event of any spill or should contamination be encountered during project construction.
  - To ensure that native plants are indeed used wherever feasible, the landscaping for the Proposed Project shall be planned in consultation with the California Native Plant Society. To prevent the introduction of invasive species, which would impact the surrounding environment, the California Invasive Plant Council shall also be consulted on the specific list of plants proposed for use in the landscaping.

## FINDINGS

The NIGC makes the following findings which support this FONSI:

1. Federal and state agencies and the public were involved in identifying environmental issues related to the Proposed Action. The REA contains a list of agencies, tribal governments and individuals that were contacted (see REA Section 6.0, "Consultation and Coordination").

2. Alternative courses of action were developed in response to environmental concerns and issues related to the proposed action (see REA Sections 2.0, "Alternatives" and 5.0, "Mitigation Measures"). The REA discloses the environmental consequences of the Proposed Action, the Alternative On-site Location Alternative, and the No-Action Alternative (see REA Section 4.0, "Environmental Consequences"). The REA assesses compliance of the alternatives with applicable environmental mandates, and includes information that supports a finding of no significant impact.

3. The REA describes mitigation measures that will be implemented to protect the human environment (see REA Section 5.0, "Mitigation Measures"). The measures are summarized above. The REA describes permitting processes and other enforceable mechanisms that are in place to ensure that the Tribe completes mitigation measures to protect key resources (see REA Sections 4.0, "Environmental Consequences" and 5.0, "Mitigation Measures").

15

The NIGC has independently evaluated the information and analysis in the EA.

## DETERMINATIONS

The REA provides a sound basis for evaluating the environmental impacts of the Tribe's development, construction, and operation of a gaming facility on the proposed site.

## RECOMMENDATIONS/APPROVALS

After careful and thorough consideration of the facts contained herein, the undersigned finds that the proposed federal action is consistent with existing national environmental policies and objectives as set forth in Section 101 of the NEPA and other applicable environmental requirements and will not significantly affect the quality of the human environment or otherwise include any condition requiring consultation pursuant to Section 102(2)(c) of NEPA.

*Environmental Assessment and FONSI reviewed and recommended by:*

Bradley A. Mehaffy
NIGC NEPA Compliance Officer

10/25/07
Date

*Approved by:*

Philip N. Hogen
NIGC Chairman

10/25/07
Date

16

# EXHIBIT L



# United States Department of the Interior

**Bureau of Indian Affairs**
Pacific Regional Office
2800 Cottage Way, Rm. W-2820
Sacramento, CA 95825
Phone: (916) 978-6002
Fax: (916) 978-6019

# FAX TRANSMITTAL

| TO | FROM |
|---|---|
| Christina Katze | Terisa Draper<br>(916) 978-6064 |
| | |
| DATE: January 10, 2008 | |
| SUBJECT: Mechoopda Fonsi | |

Number of sheets transmitted: 21
Will mail transmitted documents: ____Yes __X__No



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON. D.C. 20240



**FINDING CF NO SIGNIFICANT IMPACT FOR THE PROPOSED MECHOOPDA INDIAN TRIBE CHICO CASINO FEE-TO-TRUST ACQUISITION**

**AGENCY:**    Bureau of Indian Affairs

**ACTION:**    Finding of No Significant Impact

**SUMMARY:**

The Mechoopda Indian Tribe of the Chico Rancheria (Tribe) submitted a request to the Bureau of Indian Affairs (BIA) to approve the acquisition in trust of 630 acres of fee land and develop a gaming facility on the property. The land proposed for development and trust acquisition is located within portions of Sections 5 and 6, Township 20N, Range 3E, and a portion of NE ¼ of Section 1, Township 20N, Range 2E, Mount Diablo Base and Meridian of the "Shippee, California" U.S. Geological Survey 7.5 minute topographic quadrangle. The land is located approximately ten miles southeast of the City of Chico, immediately adjacent to and east of State Route 149, near its intersection with Highway 99, in unincorporated Butte County, California.

Based upon the analysis documented in the Environmental Assessment (EA), Revised Environmental Assessment (REA), consideration of comments received during the public review period, and implementation of additional mitigation requirements detailed below, the BIA has reached a Finding Of No Significant Impact (FONSI). This finding constitutes a determination that the Proposed Action is not a federal action significantly affecting the quality of the human environment. Therefore, an Environmental Impact Statement (EIS) is not required.

**BACKGROUND, REGULATORY AND STATUTORY CONSTRAINTS:**

- The Tribe is a federally recognized Indian tribe that has historically used and occupied lands in present day Butte, Yuba, Sutter and Sacramento Counties. In 1992, the Tribe and the United States entered into a Stipulation for Entry of Judgment that reinstated the Tribe and its members status prior to termination and authorized their organization under the provisions of the Indian Reorganization Act, 25 U.S.C. § 461. The BIA approved the tribe's Constitution on February 13, 1998. The Stipulated Judgment provided that the Secretary of the Interior was authorized to take lands in trust on behalf of the Tribe outside of the rancheria's former boundaries and declare these newly acquired lands a reservation. On March 14, 2003, the National Indian

1

Gaming Commission issued an opinion (concurred by the Department of Interior) that
the proposed site will qualify as restored lands pursuant to the Indian Gaming
Regulatory Act (25 U.S.C. § 2719 (b)(1)(B)(iii)).

## DESCRIPTION OF THE PROPOSED ACTION:

The BIA's Proposed Action is limited to the transfer of the site into federal trust status for
the benefit of the Tribe. The proposed fee-to-trust conveyance is for two parcels totaling
approximately 630 acres. A concurrent proposed action is the approval of a management
contract by the NIGC. A reasonably foreseeable consequence of these actions is the
subsequent proposed development of a portion of the site into a gaming facility
(Proposed Project). The gaming facility is proposed to include a mixture of uses
including food and beverage facilities, casino support areas, administration facilities, a
lounge, retail space, and the main gaming hall. Other intended uses of the site include a
casino parking area, a new groundwater well and water storage tank, and a wastewater
treatment plant.

## ALTERNATIVES CONSIDERED:

The BIA considered several alternatives to the Proposed Action which are described in
the REA and summarized below. The Alternative On-Site Location Alternative and the
No Action Alternative were evaluated in full detail in the REA. Three alternative sites
(the Skyway Property, the Live Oak Property, and the Sacramento Property) and a non-
gaming alternative (agricultural project) were considered but ultimately eliminated from
further consideration.

1) Alternative On-Site Location Alternative: The Alternative Or -Site Location, like
   the Proposed Action, consists of the conveyance of the site from private
   ownership into federal trust status for the benefit of the Tribe, and the subsequent
   construction of a gaming facility on the site. The conceptual design of the gaming
   facility under this alternative would be similar to the design under the Proposed
   Action, but the gaming facility would be constructed north and west of Clear
   Creek. Primary access to the gaming facility would also be from the terminus of
   Openshaw Road. Under this alternative, Caltrans would extend Openshaw Road
   west as part of its current Highway 149 improvement project and construct a
   bridge over Clear Creek.
2) No Action Alternative: Under the No Action Alternative, the two parcels (630
   acres) would not be placed into federal trust for the benefit of the Tribe and would
   not be developed as a gaming facility. Land use jurisdiction would remain with
   Butte County, and the Tribe would continue to pay property taxes on the parcels.
   The current uses of the site (grazing and open space) are assumed to continue.
3) Skyway Property Alternative: The Skyway Property Alternative consists of the
   conveyance of the Skyway Property from private ownership into federal trust
   status for the benefit of the Tribe and the subsequent construction of a gaming
   facility on the site. The Skyway Property is a 151-acre site located along Skyway
   Avenue between Paradise and Chico in unincorporated Butte County. This

2

alternative site was eliminated from further consideration due to the preponderance of environmental impacts (including potential impacts to wetlands, visual resources, topography, and cultural resources) and lack of available electrical utilities.

4) Live Oak Property Alternative: The Live Oak Property Alternative consists of the conveyance of the Live Oak Property from private ownership into federal trust status for the benefit of the Tribe, and the subsequent construction of a gaming facility on the site. The Live Oak Property is located at the intersection of Sankey Road and SR-99/70 (in the northeast quadrant) in unincorporated Sutter County. This alternative site was eliminated from further consideration due to the difficulties extending an option on the properties, a preponderance of environmental impacts (including potential impacts to farmland of statewide importance, and state and federal special status species), lack of available utilities, and the site's relatively distant location from the Tribe's historical reservation.

5) Sacramento Property Alternative: The Sacramento Property Alternative consists of the conveyance of the Sacramento Property from private ownership into federal trust status for the benefit of the Tribe and the subsequent construction of a gaming facility on the site. The Sacramento Property is a 240-acre site located at the intersection of Sankey Road and SR-99/70 (in the southeast quadrant) in unincorporated Sutter County. This alternative site was eliminated from further consideration due to a preponderance of environmental impacts (including potential impacts to farmland of statewide importance, and state and federal special status species), lack of available utilities, and the site's relatively distant location from the Tribe's historical reservation.

6) Agricultural Project Alternative: For eleven years the Tribe has operated a 40-acre almond orchard on a site northwest of Chico in unincorporated Butte County. A professional agricultural management firm operates the orchard under a contract with the Tribe to ensure maximum production and revenue generation. Unfortunately, net revenue generated by the orchard has been minimal and the Tribe has not been able to attract investors needed to fund the purchase of sufficient acreage for Tribal revenue-generation needs. The Agricultural Project Alternative consists of continuing agricultural operations as a means for a sustained revenue stream to support Tribal needs. This alternative was eliminated from further consideration because it does not satisfy the purpose and need for the Proposed Action.

## ENVIRONMENTAL IMPACTS:

An EA documenting and analyzing the potential impacts of the Proposed Action and Alternatives was completed in December 2003. The EA was distributed for public review from December 27, 2003, to January 27, 2004. The BIA received 11 comment letters regarding the EA completed in December 2003. A Revised EA (REA) completed in June 2006 updated the analysis and reanalyzed issues based on comments received on the EA dated December 2003. The REA was distributed for public review and comment for the period beginning June 26, 2006, and ending July 26, 2006. Extensions of the comment period were granted to those that asked until August 11, 2006. As part of the

3

REA, potentia' impacts to land resources, water resources, air quality, biological resources, cultural resources, socioeconomic conditions, resource use patterns, public services, and other values were evaluated, with the following conclusions:

A.  Having considered land resources impacts during project design/planning, Best Management Practices (BMPs) incorporated into the Proposed Project and mitigation measures will ensure impacts to land resources will be less than significant. See REA Sections 2.0, 4.1.1, and 5.1.

B.  Having considered water resources impacts during project design/planning, BMPs incorporated into the Proposed Project, and mitigation measures will ensure that impacts to water resources are not significant. See REA Sections 2.0, 4.1.2, and 5.2.

C.  Impacts to air quality will be less than significant. BMPs incorporated into the Proposed Project and mitigation measures will further reduce impacts to air quality. See REA Sections 2.0, 4.1.3, and 5.3.

D.  Having considered biological resources impacts during project design/planning, BMPs incorporated into the Proposed Project and mitigation measures will ensure that impacts to biological resources are not significant. See REA Sections 2.0, 4.1.4, and 5.4.

E.  There will be no significant impacts to known cultural resources. Mitigation measures will ensure impacts to unknown cultural resources are less than significant. See REA Sections 4.1.5 and 5.5.

F.  Having considered socioeconomic impacts during pro ect design/planning and mitigation measures will ensure that socioeconomic impacts are less than significant. See REA Sections 2.0, 4.1.6, and 5.6.

G.  Having considered transportation networks impacts during project design/planning, BMPs incorporated into the Proposed Project, and mitigation measures will ensure that impacts to transportation networks are not significant. See REA Sections 2.0, 4.1.7, and 5.7.1.

H.  There will be no significant land use impacts. See REA Section 4.1.7.

I.  There will be no significant impacts to agricultural resources. See REA Section 4.1.7.

J.  Having considered public services impacts during project design/planning, BMPs incorporated into the Proposed Project, and mitigation measures will ensure that impacts to public services are not significant. See REA Sections 2.0, 4.1.7, and 5.7.2.

K.  There will be no significant impacts to visual resources. Having considered visual resources impacts during project design/planning, BMPs incorporated into the Proposed Project, and mitigation measures will further reduce impacts to visual resources. See REA Sections 2.0, 4.1.7, and 5.7.3.

L.  Having considered noise impacts (including noise levels during construction) during project design/planning and mitigation measures will ensure that noise impacts are not significant. See REA Sections 2.0, 4.1.8, and 5.8.1.

4

M.     Having considered hazardous materials impacts during project
       design/planning, BMPs incorporated into the Proposed Project, and
       mitigation measures will ensure that hazardous materials impacts are not
       significant. See REA Sections 2.0, 4.1.8, and 5.8.2.

N.     Cumulative impacts to land resources, water resources, air quality,
       biological resources, cultural resources, socioeconomic conditions,
       environmental justice, land use, agriculture, public services, visual
       resources, noise and hazardous materials would be less than significant.
       Having considered transportation networks impacts during project
       design/planning, BMPs incorporated into the Proposed Project, and
       mitigation measures will ensure that cumulative impacts to transportation
       networks are not significant. See REA Sections 2.0, 4.4, and 5.7.1.

O.     There will be no significant growth-inducing or other ndirect effects. See
       REA Section 4.5.1.

P.     Mitigation measures will ensure that indirect effects from off-site traffic
       mitigation would be less than significant. See REA Sections 4.5.2 and
       5.2.7.

## RESPONSE TO REA COMMENTS:

Twenty-two comment letters were received on the REA (see Decision Package Section
2). Responses to comments are contained in Section 3 of this Decision Package.

## SUMMARY OF REA BMPS AND MITIGATION MEASURES:

The BMPs and mitigation measures described in the REA are included either to reduce
significant impacts to a less than significant level, to further reduce already less than
significant impacts, or both. To ensure that the mitigation measures required to reduce
significant impacts to a less than significant level are enforceable as applicable, the
mitigation measures will be included as an integral part of the project description,
required by Federal law and made enforceable either pursuant to the provisions of a
Memorandum of Understanding (MOU) or by the NIGC pursuant to the provisions of an
approved Tribal Gaming Ordinance.

The following is a summary of BMPs and mitigation measures contained in the REA (see
the REA for a detailed description of all BMPs and mitigation measures):

Land Resources

*   Prior to site development, a qualified professional will prepare detailed
    recommendations regarding foundation design and maximum slopes to minimize
    erosion. A l structures will be designed in accordance with the seismic design criteria
    of the most recent edition of the Uniform Building Code.

*   All site clearing, removal of all unsuitable soil, moisture conditioning, review of
    imported fill material, fill placement, observation of foundation excavations, and
    other site grading shall be verified by a registered civil engineer during construction.

Water Availab lity
- A new wel will be installed on the site and tested for water quality and quantity.
- The Tribe shall implement an aggressive water conservation program, including the installation and use of low-flow fixtures in the gaming facility.
- To reduce water loss through evaporation, the Tribe shall water lawns and landscaped areas in the early morning hours when temperatures and winds are low.
- The Tribe shall position sprinklers to ensure that only landscaped areas are watered and sidewalks, streets, and parking areas are avoided.
- The Tribe shall use California native plants in landscaping wherever feasible to reduce the frequency of watering necessary to maintain landscaping vegetation.
- The Tribe shall delineate the location and types of external landscaping to better predict water use.
- The Tribe shall install a groundwater level monitoring network as part of an adaptive management program to protect groundwater supplies.
- The Tribe shall ensure that the project does not disturb or alter creek channels, which are prime recharge areas.

Water Quality
- Prior to construction, a Storm Water Pollution Prevention Plan shall be prepared as required by the U.S. Environmental Protection Agency (EPA) to prevent erosion and prevent pollutants from entering surface and groundwater. Permanent water quality maintenance features shall be incorporated into the design and operation of the gaming fac lity. Water quality control measures identified in the Storm Water Pollution Prevention Plan shall include, but not be limited to, the following:
  - o Vegetation existing on the site shall be retained where possible. Grading activities shall be limited to the immediate development area.
  - o Temporary erosion control measures, such as silt fences, staked straw bales, and temporary revegetation, shall be employed for disturbed areas.
  - o No disturbed surfaces shall be left without erosion control measures in place during the winter and spring months.
  - o Sediment shall be retained on-site by a system of sediment basins, traps, or other appropriate measures.
  - o A spill prevention and countermeasure plan shall be developed, if necessary, which identifies proper storage, collection, and disposal measures for potential pollutants (such as fuel storage tanks) used on-site.
  - o Storm drains shall be equipped with silt and oil traps to remove oils, debris, and other pollutants. Also, storm drain inlets shall be labeled "No Dumping – Drains to Streams and Rivers."
  - o Stormwater runoff will be directed to the stormwater detention basin where flows will be attenuated before being released at rates lower than pre-development peak release rates.
  - o The parking lot shall be designed to allow storm water runoff to be directed toward vegetative filter strips to help control sediment.
  - o Permanent energy dissipaters shall be included in drainage outlets.

6

o The detention basin shall be designed to provide effective water quality control measures. Design and operational features of the drainage basins shall meet the following criteria:
- The drainage basins shall be designed to provide the maximum detention time for settling of fine particles.
- The distance between basin inlets and outlets shall be maximized to reduce velocities.
- Maintenance schedules shall be established for periodic removal of sedimentation, excessive vegetation, and debris that may clog basin inlets and outlets.

- All areas within 200 feet of Clear Creek shall be designated building exclusion areas during all construction activities. Temporary fencing shall be installed to provide a 200-foot wide buffer prior to construction. The fence shall remain in place until all construction activities on the site have been completed.
- Treated effluent from the wastewater treatment plant (WWTP) shall be applied on the sprayfield at such a rate that it does not run off the field. The sprayfield shall be monitored on a daily basis by qualified personnel to ensure that the treated effluent is applied at the proper rate.
- Treated effluent from the WWTP or sprayfield shall not migrate beyond the boundaries of the WWTP.
- All tailwater and stormwater shall be collected and returned to the storage pond at all times when treated effluent is being applied to the sprayfield.
- Treated effluent shall not be applied on the sprayfield 24 hours before forecasted precipitation, during periods of precipitation, or for 24 hours after treated effluent application has ceased.
- A tailwater recapture system shall be operated to capture treated effluent runoff, as well as any stormwater runoff that occurs within 24 hours of the last application of treated effluent.
- Sprayfield irrigation shall cease when winds exceed 30 miles per hour. During wet conditions, or when soils are saturated, treated effluent shall be pumped into the storage reservoir to avoid runoff impacts.
- A plan shall be prepared that provides safety measures in the event that human error or equipment malfunction results in improper discharge.
- A WWTP utilizing membrane bioreactor technology would provide tertiary level treatment of project wastewater.
- All effluent produced by the WWTP will be treated to Title 22 standards for the use of recycled water.
- Within six months of the commencement of construction, the Tribe will develop a contingency plan that outlines procedures that would be implemented immediately if the WWTP were to fail to preclude any environmental contamination from occurring.
- The Tribe will implement the recommendations contained in the Site Grading, Stormwater Drainage and Erosion Control Plan, which is contained in Appendix J of the REA.

7

Hydrology and Flooding

- The Tribe will work with appropriate Federal, State, and local agencies to comply with the National Flood Insurance Program.
- To avoid potentially significant impacts to the floodplain and to reduce potential flood hazards the measures contained in the Butte County Flood Hazard Prevention Ordinance (Ordinance No. 3598) contained in Article IV of the Butte County Code shall be substantially incorporated. Mitigation measures shall include, but not be limited to, the following:
  - o Base flood elevations shall be established in the 91± acre study area. Development shall not increase the water surface elevation on neighboring properties and shall not increase the water surface elevation of the base flood more than one foot at any point. Prior to construction, a registered professional engineer shall certify that the project design and methods of construction comply with these standards.
  - o All electrical, heating, ventilation, plumbing, and air conditioning equipment and other service facilities shall be designed and/or located to prevent water from entering or accumulating within those components during flood conditions.
  - o The lowest floor elevation of new structures and attendant utility and sanitary facilities shall be elevated a minimum of one foot above the regulatory flood elevation or be flood-proofed so that below the regulatory flood elevation the structure is watertight with walls impermeable to the passage of water, and shall have structural components capable of resisting hydrostatic and hydrodynamic loads and effects of buoyancy. Upon completion of structures, the elevation of the lowest floor, or proper flood-proofing, shall be certified by a registered engineer or surveyor.
  - o New water and sewer systems shall be constructed to eliminate or minimize infiltration of floodwaters into systems and discharge from systems into floodwaters. Moreover, on-site waste disposal systems shall be designed and located to avoid impairment to them or contamination from them during flooding.
  - o Construction materials and utility equipment that are resistant to flood damage will be used for the gaming facility.
  - o Construction methods and practices that minimize flood damage will be incorporated into the gaming facility.
  - o All structures will be designed or anchored to prevent floatation, collapse, or lateral movement of the structure or portions of the structure due to flooding.

Air Quality

- To minimize the emission of pollutants and impacts to air quality during construction phases of the gaming facility, the construction contractor shall be required to implement the following mitigation measures (as recommended by the Butte County Air Quality Control Management District (BCAQMD)) for the duration of the construction operations:

8

- o Water shall be applied by means of truck(s), hoses, and/or sprinklers as needed prior to any land clearing or earth movement to minimize dust emission.
- o Haul vehicles transporting soil into or out of the property shall be covered.
- o A water truck shall be on site at all times. Water shall be applied to disturbed areas a minimum of 2 times per day or more as necessary.
- o On-site vehicles shall be limited to a speed of 15 mph on unpaved roads.
- o A publicly visible sign shall be posted with the telephone number and person to contact regarding dust complaints. This person shall respond and take corrective action within 24 hours.
- o All visibly dry disturbed soil surface areas of operation shall be watered to minimize dust emission.
- o Existing roads and streets adjacent to the project will be cleaned at least once per day unless conditions warrant a greater frequency.
- o All visibly dry, disturbed, unpaved roads, and surface areas of operation shall be watered to minimize dust emission.
- o Unpaved roads may be graveled to reduce dust emissions.
- o Haul roads shall be sprayed down at the end of the work shift to form a thin crust. This application of water shall be in addition to the minimum rate of application.
- o Vehicles entering or exiting construction areas shall travel at a speed which minimizes dust emissions.
- o Construction workers shall park in designated parking areas(s) to help reduce dust emissions.
- o Soil pile surfaces shall be moistened if dust is being emitted from the pile(s). Adequately secured tarps, plastic, or other material may be required to further reduce dust emissions.

- Public transportation service to the gaming facility shall be provided at frequent intervals. The Tribe has authorized a one-time expenditure of $50,000 to assist in establishing public transportation to the gaming operation. An annual expenditure of $5,000 has also been authorized to maintain the public transportation service.
- The Tribe shall provide at least two transit shelters with benches and at least one bus turnout.
- The Tribe shall ensure that buses will comply with the California Air Resource Board's Airborne Toxic Control Measure to Limit Diesel-Fueled Commercial Motor Vehicle Idling (California Code of Regulations, Title 13, Division 3, Article 1, Chapter 10, Section 2485), which requires that the driver of any diesel bus not idle for more than 3 minutes at any location, except for periods of 10 minutes prior to passenger boarding, or when passengers are on board.
- The Tribe will use energy-efficient lighting and process systems, such as water heaters, furnaces, and boiler units.
- The Tribe will use fleet vehicles that use clean-burning fuel as may be practicable.
- The Tribe shall incorporate shade trees, adequate in number and proportion to the project size, throughout the project site to reduce building heating and cooling requirements.

9

- The Tribe shall establish a development pattern that encourages pedestrian and bicycle use by providing paths and building access which are physically separated from street and parking lot traffic and that eliminates physical barriers such as walls, berms, landscaping, and slopes that impede the use of pedestrian or bicycle facilities, or public transportation vehicles.

Biological Resources

- A bridge shall be installed which spans the vernal pool located near the entrance of the property, thereby eliminating direct impacts to wetlands, vernal pools, and endangered fairy shrimp. All features associated with the construction of the bridge shall be located outside the boundaries of the identified wetland areas. BMPs shall be employed to avoid impacts to the area from construction-related activities.
- Should installation of a bridge not be possible due to failure to obtain construction approvals (despite the applicant's good faith effort to obtain such approvals) or some other barrier to construction that is beyond the Tribe's control, mitigation for the loss of vernal pool habitat conducive to the species (*Branchinecta lynchi and Lepidurus packardii*) would be obtained at a USFWS and Army Corps of Engineers-approved mitigation bank. The 0.035 acres of impacts to vernal pool habitat would need to be mitigated according to a revised biological opinion issued by the USFWS.
- Indirect impacts to vernal pools or seasonal wetland features within 250 feet of construction areas will be subject to the provisions of the biological opinion issued by the USFWS (REA Appendix R). All conservation measures identified by the USFWS must be implemented prior to ground disturbance activities. These measures include: compensatory mitigation for habitat loss (2:1 ratio) of 10.25 acres of vernal pool habitat, or preservation of vernal pool habitat (3:1) ratio at an off-site location approved by the USFWS; seasonal restrictions on construction, protective fencing and signs, worker education programs, biological monitoring and reporting for activities within 250 feet of vernal pool crustacean habitat, and implementation of BMPs to prevent the accidental release of disturbed soils, fuel, oil, or other materials associated with construction activities into sensitive habitats.
- The Sacramento USFWS and BIA shall be notified within three working days of the finding of any dead federally listed species or any unanticipated harm to the species addressed in the biological opinion as well as any other federally listed species not authorized in the biological opinion.
- If construction activities are to occur during the nesting season (approximately March through September), pre-construction surveys for nesting Cooper's hawk, white-tailed kite, and other raptor species shall be conducted by a qualified biologist within 500 feet of the proposed construction areas. If active nests are identified in these areas, the USFWS shall be consulted to develop measures to avoid the *take* of active nests prior to the initiation of any construction activities. Avoidance measures may include the establishment of buffers and biological monitoring.
- A pre-construction survey for burrowing owls shall be conducted by a qualified biologist within the 30 days immediately prior to construction activities to establish the status of this species on the project site. If ground disturbing activities are delayed or suspended for more than 30 days after the pre-construction survey, the site shall be resurveyed. If burrowing owls are detected within approximately 500 feet of

10

the proposed project site, the USFWS shall be consulted to develop measures to avoid the *take* of this species prior to the initiation of any construction activities. Avoidance measures may include seasonal restrictions on construction, the establishment of buffers, compensatory mitigation for impacts to active burrow sites, and biological monitoring.

- A 200-foot *no disturbance* buffer shall be maintained along Clear Creek (giant garter snake aquatic habitat) during project construction. Temporary fencing shall be installed outside the 200-foot buffer prior to any construction and remain in place until all construction activities on the site have been completed. An on-site biological monitor shall be present during all initial ground disturbance activities associated with the proposed project within the 200-foot buffer. If implementation of this measure is not feasible, the USFWS shall be consulted to develop measures to avoid or permit the *take* of the giant garter snake. All conservation measures identified by the USFWS shall be implemented. Measures may include compensatory mitigation for habitat loss, seasonal restrictions on construction, protective fencing and signs, worker education programs, biological monitoring and reporting, and implementation of BMPs to prevent the accidental release of disturbed soils, fuel, oil, or other materials associated with construction activities into sensitive habitats.

- To minimize the potential effects of lighting on listed species, reflectors directing lighting shall be installed on all exterior lighting, low intensity halogen bulbs shall be used, and all lighting shall be less than or equal to full moon intensity 100 feet outside of the project site.

- A Department of the Army permit shall be obtained from the U.S. Army Corps of Engineers, and any required wetland mitigation credits shall be purchased from an approved wetlands mitigation bank prior to the discharge of any dredged or fill material within jurisdictional waters of the United States.

- Indirect impacts to wetlands and vernal pool crustacean habitat shall be mitigated as prescribed by the biological opinion issued by the USFWS.

- Construction activities occurring within wetland areas shall be conducted during the dry season to minimize the potential for erosion.

- Temporary fencing shall be installed around areas of wetland habitat to remain undisturbed. Fencing shall be located as far as feasible from the edge of wetland habitats and installed prior to any construction. Fencing shall remain in place until all construction activities on the site have been completed.

- Staging areas shall be located at least 250 feet away from wetland habitats that are to be preserved. Temporary stockpiling of excavated or imported material shall occur only in approved construction staging areas. Excess excavated soil shall be used on site or disposed of at a regional landfill or other appropriate facility. Stockpiles that are to remain on the site through the wet season shall be protected to prevent erosion (e.g., with silt fences or straw bales).

- Standard precautions shall be employed by the construction contractor to prevent the accidental release of disturbed soils, fuel, oil, lubricant, or other potentially hazardous materials associated with construction activities into wetland habitats. All workers shall be informed of the importance of preventing spills and appropriate measures to take, should a spill occur. A contaminant containment program shall be developed and implemented in the event of release of hazardous materials. Any spills of

11

hazardous materials shall be cleaned up immediately. Such spills shall be reported in the post-construction compliance reports.

Cultural Resources

- Prior to the start of construction, a set of engineering drawings shall be provided to a senior archaeologist designated by the Tribe. The senior archaeologist, in consultation with the Tribal monitor, will then determine if areas exist where construction work will require monitoring. This information will then be provided to the job superintendent or foreperson, who will then be responsible for notifying the monitors 24 hours in advance of work being performed in areas requiring monitoring.
- In the event of discovery of significant archaeological resources, the BIA will follow the regulation concerning unanticipated discoveries on tribal lands as set forth under 36 CFR § 800.13(d), before land disturbing activities in the area of discovery will be allowed to resume.
- The Tribe shall include the following requirement in construction contract specifications for construction activities on the site:
  - o In the event that any prehistoric, historic, or paleontological resources are discovered during construction-related earth-moving activities, all work within 50 feet of the resources shall be halted, and the Tribe shall consult with a qualified archaeologist or paleontologist and the BIA Regional Archaeologist to assess the significance of the find. If any find is determined to be significant by the qualified archaeologist and BIA Regional Archaeologist, then representatives from the Tribe, the qualified archaeologist and/or paleontologist, and BIA Regional Archaeologist would meet to determine the appropriate course for action.
- If human remains are discovered or suspected, work shall halt in that area and procedures set forth in the Native American Graves Protection and Repatriation Act (25 USC 3001 *et seq.*) shall be followed.

Socioeconomic Conditions

- The Tribe has agreed to make a $25,000 annual contribution to a fund addressing problem and pathological gambling.
- Brochures, pamphlets, videos, and other materials promoting responsible gambling, including a help line at the proposed casino, will be developed and made available to patrons.
- Exclusion, self-exclusion, and self-limitation policies will be instituted.
- All employees will be trained on the issue of problem gambling, including education on the nature of problem gambling, how to recognize such behavior, and resources available to help problem gamblers.
- Underage gambling will be strictly prohibited, by requesting identification of gambling customers, displaying/advertising legal age to gamble, heightening awareness of customer responsibility when bringing children to the proposed casino, and working with educational institutions and other local organizations to raise awareness of problem gambling.
- The Tribe shall enact an ordinance creating a standard policy encouraging responsible drinking and designated-driver programs. As part of this policy, the gaming and

12

entertainment facility employees serving alcohol shall undergo Responsible Beverage Service Training (RBST), also known as *server training*. RBST educates managers, servers, and sellers at alcohol establishments about strategies to avoid illegally selling alcohol to underage youth or intoxicated patrons. The goal of RBST is to decrease the number of illegal alcohol sales to underage youth and intoxicated patrons through education programs. Information provided in server training must at a minimum include:

- o The importance of checking age identification of customers who appear to be under age 30.
- o How to identify fake IDs and what to do once a fake ID is confiscated.
- o How to recognize situations in which adults are buying alcohol for underage youth.
- o How to refuse sales to individuals who may supply alcohol to underage youth.
- o How to identify intoxicated customers.
- o How to refuse service to underage youth and intoxicated customers.
- The Tribe has agreed to contribute $25,000 annually to alcohol awareness programs.
- While the final amount agreed upon may differ, the Tribe has authorized an annual expenditure of $351,000 and a one-time expenditure of $50,000 for law enforcement services.
- While the final amount agreed upon may differ, the Tribe has authorized an annual expenditure of $168,000 and a one-time expenditure of $100,000 for fire protection and emergency response services.

Transportation Networks
- The access driveway will include two inbound lanes and one outbound lane to minimize traffic on Openshaw Road.
- The following intersections shall be temporarily signalized until the completion of the Caltrans SR-149 improvements (unless Caltrans does not recommend signalization due to conflicts with their construction plans): SR-149/Shippee Road, SR-149/SR-99, and SR-149/SR-70.
- All improvements, temporary and otherwise, shall be coordinated to the maximum extent possible with the Caltrans SR-149 improvement project.
- A permanent, new signal shall be at the location of the realigned Shippee Road and SR-149 intersection, with associated geometric improvements on the Openshaw approach of the intersection to accommodate casino traffic. The east leg of Shippee Road connecting to Openshaw Road will be stop-controlled with one lane in the eastbound direction and with a left-shared-through and right-turn lane in the westbound direction.
- If project timelines for the Caltrans SR-149 and/or SR-99 improvements are coincident with the proposed project, the Tribe will be responsible for obtaining environmental approvals, permits, and the added cost for the signal improvements. If the timelines do not coincide, Caltrans will process the signal project through the standard encroachment process as a separate project.

13

- The Tribe shall continue to work with Caltrans to develop an MCU that will address mitigation implementation.
- The Tribe has authorized a one-time expenditure of $750,000 for signal and general road improvements. It has also agreed to an annual expenditure of $25,000 for County road maintenance.
- Close coordination with the Caltrans SR-149 improvement project for casino-related improvements along SR-149 shall occur and will be required by Caltrans. Casino-related improvements may require amendment of the traffic management plan or construction phasing for the SR-149 improvement project, which if required, will be the financial responsibility of the casino project.
- The Tribe shall work with Butte Regional Transit to allow a transit stop and associated amenities at the casino. Serving the project site would require a small route deviation and should not impact the transit agency's ability to manage their current service area in a timely fashion. If Butte Regional Transit does not wish to provide bus service, the Tribe shall sponsor shuttles or charter buses from population centers to reduce automobile traffic to the casino. Preferential carpool or vanpool spaces shall be provided at the project site to encourage ridesharing by patrons and employees.
- It is recommended that an additional lane be added to the southbound approach on Shippee Road.
- The casino shall provide for the expected fair share of the costs of the widening improvements necessary as noted below based on the *Caltrans' Guide for the Preparation of Traffic Impact Studies*.
  - *Widen SR-70 south of SR-149.* The casino should contribute two percent of the cost of the widening in each direction.
  - *Widen SR-70 north of SR-149.* The casino should contribute two percent of the cost of the widening in the westbound direction and three percent for widening in the eastbound direction.
  - *Widen SR-99 north of SR-149.* The casino should contribute two percent of the cost of the widening in each direction.
  - *Widen SR-99 south of SR-149.* The casino should contribute six percent of the cost of the widening in each direction.
- The Tribe shall provide for a fair share to the following traffic improvements on SR-99:
  - Extending the deceleration length of the SR-99 northbound Durham Pentz Road off-ramp to 215 feet.
  - Extending the acceleration length of the SR-99 northbound Durham Pentz Road on-ramp to 420 feet.
  - Extending the acceleration length of the SR-99 southbound Durham Pentz Road on-ramp to 400 feet.
- The barrier rails on the Openshaw Road Dry Creek Bridge shall be improved and guardrails installed (and safety rails upgraded where present along Openshaw Road between the project site and the SR-149/Shippee Road intersection), according to current applicable standards, to maximize traffic safety during operation.

14

- Signage should be placed to alert northbound and southbound Openshaw Road drivers that the bridge over Dry Creek is a narrow bridge.
- To avoid the SR-149/SR-70 intersection, trucks traveling to the borrow pit from the project site shall turn right from the SR-149/Shippee Road intersection onto SR-149; they shall then turn right at the SR-149/SR-99 intersection, and continue north to Durham Pentz Road; they shall then turn right onto Durham Pentz road and continue along Durham Pentz Road to Pentz Road; they shall then turn right at Pentz Road and then right at SR-70; finally they shall turn right onto Wheelock Road.
- Construction of an access to the site from a temporary right-in/out driveway off of SR-149 shall take place during construction, if possible. This would require a temporary access easement and an encroachment permit from Caltrans as well as design of the access. Construction traffic shall adhere to the terms of the Caltrans encroachment permit in using this access. The access should only be used for overweight/oversize vehicles that cannot use the Dry Creek Bridge. All other construction vehicles should use the Shippee Road access.
- The pavement on Openshaw Road from the project site to the SR-149/Shippee Road intersection should be overlaid during project construction but prior to the public opening of the proposed casino, if the road has not already been overlaid by Caltrans at that time.
- A construction traffic management plan should be prepared in consultation with Butte College and Butte County to ensure construction traffic is managed efficiently with as little impact on area traffic and roadways as possible, without disturbing the timely construction of the proposed project. The construction traffic management plan should be implemented for the duration of the proposed project's construction. The plan should include provisions for training construction delivery vehicle drivers. Construction material importation should be scheduled outside of the areawide commute peak hours. Debris along the truck route caused by trucks should be monitored daily and the roadways cleaned as necessary.
- The Tribe shall provide flagging and associated traffic controls when necessary in consultation with the California Highway Patrol (CHP), Caltrans, and the Butte County Sheriff's Department.

Public Services

- The Tribe shall provide compensation for the incremental cost of providing police, fire, transportation, and other services to the gaming facility. The Tribe shall enter into a negotiation with each service provider on an individual basis to determine levels and conditions for compensatory mitigation.
- The gaming facility's air conditioning and refrigeration systems shall utilize refrigerants approved for use in California. The facility shall use high-efficiency chillers.
- The air handling systems shall utilize outside air economizer cycles to take advantage of efficient cooling when the outside air temperature is below 55 °F.
- The gaming facility building shall be equipped with a direct digital energy management and control system to perform energy conservation measures such as optimum start/stop, duty cycling, and demand limiting. This management system will insure that the gaming facility minimizes energy usage.

15

- The gaming facility shall comply with the intent of energy building standards within the California Code of Regulations, Title 24, Part 6e.
- The final design of the gaming facility shall consider solar orientation for energy efficiency to the extent practicable.
- Security personnel shall be sworn officers of the Tribal Government and be trained as peace officers with specialized training in gaming facility security.
- All surveillance officers shall be fully trained in observation and report writing.
- Security officers shall be trained in basic first aid, cardiopulmonary resuscitation, and customer service.
- The Tribe shall also make arrangements with the Butte County Sheriff's Department and/or other local jurisdictional agencies to coordinate the handling of criminal investigations and the handing over of criminal suspects.
- Trained security staff shall be provided to address security issues within the gaming facility during operating hours. All security guards shall carry two-way radios to respond to backup and emergency-related calls.
- All parking areas shall be well-lit and monitored by parked and/or roving security guards at all times during operation.
- Areas surrounding the gaming facility shall be well-lit and patrolled regularly by security guards.
- The Tribe shall provide traffic control with appropriate signage and the presence of peak-hour traffic control staff.
- An appropriately sized water storage tank equipped for emergency fire flows shall be constructed and maintained by the Tribe.
- All Uniform Fire Code requirements shall be incorporated into the design and operation of the gaming facility.
- Construction equipment and power tools shall be equipped with spark arrestors, as applicable, and maintained in good working order.
- Staging areas, welding areas, or areas slated for development using spark-producing equipment shall be cleared of dried vegetation or other materials that could serve as fire fuel. To the extent feasible, the contractor shall keep these areas clear of combustible materials in order to maintain a firebreak.
- Casino security personnel and other employees will receive first aid training, to include CPR and use of an automatic external defibrillator (AED). An AED will be kept in the gaming facility.
- Construction waste shall be recycled to the extent practicable by diverting green waste and recyclable building materials from the solid waste stream.
- Environmentally preferable materials shall be acquired to the extent practicable for construction of facilities.
- The Tribe shall adopt public health standards for the handling of food and beverages. The Tribe shall permit inspection of the food and beverage facilities by the Indian Health Service, State, or County inspectors.
- The Tribe shall submit water samples for routing testing and permit inspection of the water treatment facility by Federal, State, or County inspectors.
- The Tribe will adopt a solid waste management plan that addresses recycling and solid waste reduction at the site.

16

Visual Resources

- Signage will be designed to reflect and accentuate the natural elements of the project.
- The gaming facility shall be designed in a manner that compliments the natural landscape  The design of the gaming facility and all on-site parking shall be generally consistent with design standards set forth in the Butte County Zoning Ordinance.
- Signage for the proposed project shall not conflict with applicable County, State, or Federal requirements in place at the time for signs along a State Highway.
- Downcast lighting fixtures and low-pressure sodium bulbs shall be utilized so that nighttime lighting for the parking areas shines only on the parking areas, and not on surrounding areas.

Noise

- The construction contractor shall be required to muffle and shield intakes and exhaust on construction equipment, in accordance with the manufacturer's specifications, and shroud and shield impact tools.

Hazardous Materials

- If contaminated soil, groundwater, or other suspected contamination is encountered during project construction, work shall be halted in the affected area and the type and extent of the contamination shall be determined. A qualified professional, in consultation with appropriate regulatory agencies, shall then develop an appropriate method to remediate the contamination. If necessary, the Tribe shall implement a remediation plan in conjunction with continued project construction.
- The Tribe shall develop, implement, and review annually a hazardous materials and hazardous waste minimization program to determine if additional opportunities for hazardous materials and hazardous waste minimization are feasible, for both construction and operation of the gaming facility.
- Personnel shall follow written standard operating procedures (SCPs) for filling and servicing construction equipment and vehicles. The SOPs, which are designed to reduce the potential for incidents involving hazardous materials, shall include the following
    - o Refueling shall be conducted only with approved pumps, hoses, and nozzles.
    - o Catch-pans shall be placed under equipment to catch potential spills during servicing.
    - o All disconnected hoses shall be placed in containers to collect residual fuel from the hose.
    - o Vehicle engines shall be shut down during refueling.
    - o No smoking, open flames, or welding shall be allowed in refueling or service areas.
    - o Refueling shall be performed away from bodies of water to prevent contamination of water in the event of a leak or spill.
    - o Service trucks shall be provided with fire extinguishers and spill containment equipment, such as absorbents.

17

- o  Should a spill contaminate soil, the soil shall be put into containers and disposed of in accordance with local, State, and Federal regulations.
  - o  All containers used to store hazardous materials shall be inspected at least once per week for signs of leaking or failure. All maintenance and refueling areas shall be inspected monthly. Results of inspections shall be recorded in a logbook that shall be maintained on site.
- The amour t of hazardous materials used in construction and operation of the gaming facility shall be consistently kept at the lowest volumes needed.
- The least toxic material capable of achieving the intended result shall consistently be used to the extent practicable.
- The contractor shall be requested to avoid and minimize the use of hazardous materials during construction to the fullest extent practicable.
- The use of pesticides and toxic chemicals shall be minimized to the greatest extent feasible in landscaping, or less toxic alternatives shall be utilized
- All personnel who handle herbicides or pesticides will be trained in safe handling and disposal of hazardous materials.

## SUMMARY OF ADDITIONAL BMPS AND MITIGATION MEASURES:

In addition to the BMPs and mitigation measures detailed in the REA, the following BMPs and mitigation measures have been added in responses to comments on the REA:

- As construction plans are finalized, the Tribe will coordinate with Pacific Gas & Electric (PG&E) to determine the exact modifications to utilities that will be necessary to serve the project.
- The Tribe will coordinate with PG&E and the California Department of Health Services to ensure information on the possible or perceived risks of electromagnetic field exposure are readily available to employees and patrons.
- Final design calculations and construction drawings and drainage plans will be provided to Caltrans for review prior to construction.
- As necessary and consistent with the Federal Safe Drinking Water Act, appropriate treatment methods would be employed to treat the water to State potable water quality standards.
- The WWTP will be staffed with operators who are qualified to operate the plant safely, effectively, and in compliance with all permit requirements and regulations. The operators would have qualifications similar to those required by the State Water Resources Control Board Operator Certification Program for municipal wastewater treatment plants. This program specifies that for tertiary level wastewater treatment plants with design capacities of 1.0 MGD or less, the chief plant operator must be a Grade III operator. Supervisors and Shift Supervisors must be Grade II operators. An Operations and Maintenance Program will be followed by the plant operators. Emergency preparedness will include all appropriate measures, including a high level of redundancy in the major systems. Monitoring of discharge would be in accordance with the National Pollutant Discharge Elimination System (NPDES) permit issued by the EPA. This monitoring would include both continuous and grab monitoring of various parameters.

18

- A new water well location is proposed that provides further separation between the water supply and wastewater treatment facilities (see Decision Package Attachment B).
- The follow ng additional air quality BMPs will be implemented during project constructio 1 (see Attachment D): use aqueous diesel fuel, use cooled exhaust gas recirculation, and use a shuttle to transport workers to retail estab ishments at lunch.
- All parking lots will be landscaped.
- The Tribe will prepare a list of hazardous materials used at the site and a Spill Prevention Control and Countermeasure (SPCC) Plan for submission to the Butte County Environmental Health Division.
- The USFWS and NIGC NEPA Compliance Officer for this project will be contacted within three working days of the finding of any dead federally listed species or any unanticipated harm to the species addressed in the biological opinion, as well as any other Federally listed species not authorized in the biological opinion.
- The BIA ar d NIGC NEPA Compliance Officers will be notified of which areas are determined to require archaeological monitoring during construct on.
- The NIGC NEPA Compliance Officer will be contacted in the event of any spill or should contamination be encountered during project construction.
- To ensure t 1at native plants are indeed used wherever feasible, the landscaping for the Proposed Project shall be planned in consultation with the California Native Plant Society. To prevent the introduction of invasive species, which would impact the surrounding environment, the California Invasive Plant Council shall also be consulted on the specific list of plants proposed for use in the landscaping.

## DETERMINATION:

After review and independent evaluation, the BIA has determined that the proposed Federal action, to approve the Mechoopda Indian Tribe of the Chico Rancheria's request to take the proposed 630-acre site into trust for the purpose of operating a gaming facility, does not consti ute a major Federal action that would significantly affect the quality of the human environment within the meaning of NEPA. This conclusion is based on the analysis contained in the REA, public comments made on the REA, the response to those comments, and the mitigation imposed. Therefore, an Environmental Impact Statement is not required and the BIA is issuing this mitigated FONSI.

Issued in Washington, D.C., this ___4ᵗʰ___ day of ___Jan___, 2007.

Assistant Secretary – Indian Affairs

19

**PUBLIC AVAILABILITY:**

This FONSI will be distributed to all persons and agencies known to be interested in the
Proposed Action as indicated by their comments on the REA. Additionally, all persons
and agencies on the initial EA and REA mailing lists will receive a copy.

# EXHIBIT M

restriction under Alternative A. Alternative B would modify existing management agreements and/or plans cooperatively with stakeholders to address non-guided public use; and Alternatives C through E (the Preferred Alternative) would implement a limited permit program.

Under all of the Alternatives, sportfishing guides would be required to have special use permits. Permits would be limited to 20 under Alternatives A and B, reduced to 18 under C and E (the Preferred Alternative), and reduced to 15 under Alternative D. Permits would be reduced through attrition and issued competitively. Each permit would allow 10 starts per week with no more than 4 starts per day—except under Alternative B, which would require additional restrictions on the timing and starts of boats beyond such levels.

State-licensed sportfishing guides not having Refuge special use permits may be issued Incidental Use Permits (IUPs) under all the alternatives except Alternative D, which would eliminate the IUP Program. Alternatives A, C, and E (the Preferred Alternative) would issue up to three IUPs per year subject to quotas and blackout dates; and Alternative B would limit the number of IUPs to one per year.

Dispersed camping would be allowed (except within one-quarter mile of the Sterling Highway) under all of the alternatives but would be limited to 14 days in any 30-day period under Alternative A; limited to 24 hours within any 14-day period within 100 yards of the river under Alternative B; not allowed within 100 yards of the river under Alternatives C and E (the Preferred Alternative); limited to 48 hours within any 14-day period within 100 yards of the river and within one mile of the Kenai River/Skilak Lake inlet/outlet under Alternative D.

For the Middle Kenai River (Skilak Lake downstream to the Refuge boundary), non-guided public use would be allowed without restriction under Alternatives A and B. Such use would be allowed without restriction under Alternatives C and E (the Preferred Alternative) until a Limits-of-Acceptable Change planning process is completed with stakeholders; and Alternative D would implement a limited permit program after a public rulemaking process is conducted.

Sportfishing guides would be required to have special use permits under all of the alternatives, though such permits would be issued without limit under Alternative A. Under Alternative B, the need to implement a permitting process would be evaluated after the conclusion of the ongoing Kenai River-wide guide process. Under Alternatives C and E (the Preferred Alternative), permits would be limited to the number of existing permittees, and existing permittees would be "grandfathered"; under Alternative D, permits would be limited to 20 through a competitive selection process, and management of the timing and starts of boats would be initiated.

Issue 5: Balance Motorized Access With Resource and Visitor-Experience Protection

Under all the alternatives, airplane access would not be allowed May 1 to September 30 on any lake where nesting trumpeter swans and/or their broods are present except on two lakes in designated Wilderness—where the closure would be May 1 to September 10 under Alternatives A through C and E (the Preferred Alternative)—and five lakes in designated Wilderness plus one lake outside of designated Wilderness under Alternative D. Airplane access would be allowed on 46 lakes in designated Wilderness under Alternative A and E (the Preferred Alternative); 45 lakes under Alternative B; 50 lakes under Alternative C; and 59 lakes under Alternative D.

Under all the alternatives, floatplane access to Chickaloon Flats would be allowed on 6.5 miles of the Chickaloon River. Under Alternative A, wheeled airplane access would be allowed year-round within designated areas of the Chickaloon Flats area including three upland landing zones, a designated beach zone, and the unmaintained Big Indian Creek airstrip. Under Alternatives B through E (the Preferred Alternative), wheeled airplane access would be allowed on 21 square miles of unvegetated portions of the Chickaloon Flats area. Access would also be allowed on the unmaintained Big Indian Creek airstrip under Alternatives B and E (the Preferred Alternative). Under Alternatives C and D, access would be allowed on the Big Indian Creek airstrip, which would be maintained by the Service; and under Alternative D, an additional 6.8 square miles of unvegetated portions of the Chickaloon Flats would be accessible September 1 to December 15 (or to coincide with future waterfowl hunting seasons).

Under Alternatives A through C and E (the Preferred Alternative), snowmachines would be allowed in designated areas December 1 to April 30 when the refuge manager determines there is adequate snow cover. Under Alternative C, certain zones within designated areas may be opened earlier (than December 1) or later (than April 30) depending on local snow conditions.

Under Alternative D, the December 1 to April 30 time restriction would be eliminated, and certain zones within designated areas may be opened depending on local snow conditions. Under Alternatives B through E (the Preferred Alternative), research studies would be conducted with stakeholders to evaluate the effects of snowmachine use on Refuge resources and visitor experiences, and the results of those studies would be used to support future management decisions.

*Public Availability of Comments:* Before including your name, address, phone number, e-mail address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so. We will make all comments from individual persons part of the official public record. We will handle requests for such comments in accordance with the Freedom of Information Act, NEPA, and Departmental policies and procedures.

Dated: May 2, 2008.

**Gary Edwards,**
*Acting Regional Director, U.S. Fish and Wildlife Service, Anchorage, Alaska.*
[FR Doc. E8–10236 Filed 5–7–08; 8:45 am]
**BILLING CODE 4310–55–P**

---

# DEPARTMENT OF THE INTERIOR

**Bureau of Indian Affairs**

**Land Acquisitions; Mechoopda Indian Tribe, California**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of Final Agency Determination to Take Land into Trust under 25 CFR Part 151.

---

**SUMMARY:** The Assistant Secretary—Indian Affairs made a final agency determination to acquire approximately 631.05 acres of land into trust for the Mechoopda Indian Tribe of California on March 14, 2008. This notice is published in the exercise of authority delegated by the Secretary of the Interior to the Assistant Secretary—Indian Affairs by 209 Departmental Manual 8.1.

**FOR FURTHER INFORMATION CONTACT:** George Skibine, Office of Indian Gaming, MS–3657 MIB, 1849 C Street, NW., Washington, DC 20240; Telephone (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** This notice is published to comply with the requirement of 25 CFR 151.12(b) that notice be given to the public of the Secretary's decision to acquire land in trust at least 30 days prior to signatory acceptance of the land into trust. The purpose of the 30-day waiting period in 25 CFR 151.12(b) is to afford interested parties the opportunity to seek judicial review of final administrative decisions to take land in trust for Indian tribes and individual Indians before transfer of title to the property occurs. On March 14, 2008, the Assistant Secretary—Indian Affairs decided to accept approximately 631.05 acres of land into trust for the Mechoopda Indian Tribe of California under the authority of the Indian Reorganization Act of 1934, 25 U.S.C. 465. The 631.05 acres are located in Butte County, California. The parcel will be used for the purpose of construction and operation of a class II and class III gaming facility.

The real property consists of approximately 631.05 acres situated in the State of California, County of Butte. The legal description of the property is as follows:

**Parcel I**

All that portion of the east half of the northeast quarter of Section 1, Township 20 North, Range 2 East, M.D.B. & M., lying easterly of U.S. Highway 99E. Excepting therefrom that portion thereof, heretofore conveyed to the State of California by deed recorded July 27, 1951, in Book 575, Page 326, Official Records, recorded October 9, 1974, in Book 1944, Page 64, Official Records and October 9, 1974, in Book 1944, Page 68, Official Records and Parcel 1 of the Grant Deed recorded January 15, 2004, under Butte County Recorder's Serial No. 2004–0002294. APN 041–190–048 (formerly 038–150–026).

**Parcel II**

The north half of the northwest quarter, the southwest quarter of the northwest quarter and the northwest quarter of the southwest quarter of Section 5, and all that portion of Section 6 lying northeasterly of the Oroville Chico Highway, all in Township 20 North, Range 3 East, M.D.B. & M.

Excepting therefrom said Section 6, that portion conveyed to the State of California by Deeds recorded February 8, 1951 in Book 555, Page 329, Official Records, and July 27, 1951, in Book 575, Page 326, Official Records. Also excepting therefrom that portion conveyed to the State of California by Deed recorded October 9, 1974, in Book 1944, Page 64, Official Records and

Parcel 1 of Grant Deed recorded January 15, 2004, under Butte County Recorder's Serial No. 2004–002294. APN 041–190–045 (formerly 041–190–020).

Dated: March 25, 2008.

**Carl J. Artman,**

*Assistant Secretary—Indian Affairs.*
[FR Doc. E8–10279 Filed 5–7–08; 8:45 am]
**BILLING CODE 4310–4N–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

**[F–21870–15, F–21870–16, F21870–19, and F–19154–05; AK–964–1410–KC–P]**

## Alaska Native Claims Selection

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of decision approving lands for conveyance.

**SUMMARY:** As required by 43 CFR 2650.7(d), notice is hereby given that an appealable decision approving the surface and subsurface estates in certain lands for conveyance pursuant to the Alaska Native Claims Settlement Act will be issued to NANA Regional Corporation Inc. The lands are in the vicinity of the Native villages of Ambler, Kobuk, and Shungnak, Alaska, and are located in:

**Kateel River Meridian, Alaska**

T. 19 N., R. 3 E.,
  Secs. 4 to 9, inclusive;
  Secs. 13 to 36, inclusive.
  Containing approximately 18,996 acres.
T. 19 N., R. 7 E.,
  Secs. 1 to 36, inclusive.
  Containing approximately 22,660 acres.
T. 18 N., R. 10 E.,
  Secs. 1 to 16, inclusive;
  Secs. 21 to 28, inclusive;
  Secs. 33 to 36, inclusive.
  Containing approximately 17,596 acres.
T. 17 N., R. 11 E.,
  Secs. 1 to 36, inclusive.
  Containing approximately 20,981 acres.
  Aggregating approximately 80,233 acres.

Notice of the decision will also be published four times in The Arctic Sounder.

**DATES:** The time limits for filing an appeal are:

1. Any party claiming a property interest which is adversely affected by the decision shall have until June 9, 2008 to file an appeal.

2. Parties receiving service of the decision by certified mail shall have 30 days from the date of receipt to file an appeal.

Parties who do not file an appeal in accordance with the requirements of 43

CFR part 4, subpart E, shall be deemed to have waived their rights.

**ADDRESSES:** A copy of the decision may be obtained from: Bureau of Land Management, Alaska State Office, 222 West Seventh Avenue, #13, Anchorage, Alaska 99513–7504.

**FOR FURTHER INFORMATION CONTACT:** The Bureau of Land Management by phone at 907–271–5960, or by e-mail at *ak.blm.conveyance@ak.blm.gov.* Persons who use a telecommunication device (TTD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8330, 24 hours a day, seven days a week, to contact the Bureau of Land Management.

**Jason Robinson,**

*Land Law Examiner, Land Transfer Adjudication I.*
[FR Doc. E8–10224 Filed 5–7–08; 8:45 am]
**BILLING CODE 4310–JA–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

**[WY–050–1430–FR; WYW 49773]**

## Notice of Realty Action; Recreation and Public Purposes Act Classification of Public Lands in Fremont County, WY

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** The Bureau of Land Management (BLM) has examined and found suitable for classification for conveyance under the provisions of the Recreation and Public Purposes (R&PP) Act, as amended, approximately 73.42 acres of public land in Fremont County, Wyoming. The Wyoming Department of State Parks and Cultural Resources (WDSPCR), proposes to use the land as part of the South Pass City State Historic Site.

**DATES:** Interested parties may submit comments regarding the proposed conveyance or classification of the lands until *June 23, 2008.*

**ADDRESSES:** Send written comments to the Field Manager, Lander Field Office, 1335 Main Street, Lander, Wyoming 82520.

**FOR FURTHER INFORMATION CONTACT:** Robert B. Ross, Jr., Field Manager, Bureau of Land Management, Lander Field Office, at (307) 332–8400.

**SUPPLEMENTARY INFORMATION:** In accordance with Section 7 of the Taylor Grazing Act, (43 U.S.C. 315f), and Executive Order No. 6910, the following described public land in Fremont

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUTTE COUNTY, CALIFORNIA, 25 County Center Drive, Oroville, CA 95965,<br><br>     Plaintiff,<br><br>v.<br><br>PHILIP N. HOGEN, in his official capacity as CHAIRMAN OF THE NATIONAL INDIAN GAMING COMMISSION, 1441 L Street, N.W., Suite 9100, Washington, D.C. 20005, and NORMAN H. DESROSIERS, in his official capacity as COMMISSIONER OF THE NATIONAL INDIAN GAMING COMMISSION, 1441 L Street, Suite 9100, Washington, D.C. 20005,<br><br>     Defendants.<br>——————————————————<br>MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA, CALIFORNIA, a federally recognized Indian Tribe, c/o Dennis E. Ramirez, Chairman, Tribal Offices, 125 Mission Ranch Boulevard, Chico, CA 95926,<br><br>     Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No.: 1:08-cv-00519-HHK<br>Judge: Henry H. Kennedy, Jr.<br>Deck Type: Administrative Agency<br>               Review<br>Date Filed: 03/26/08<br><br><br>**ANSWER OF PROPOSED INTERVENOR MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA, CALIFORNIA** |

Proposed Intervenor Mechoopda Indian Tribe of Chico Rancheria, California ("Tribe"), a federally-recognized Indian tribe, submits this Answer to Plaintiff Butte County's Complaint. The Tribe specifically denies each and every allegation of the Complaint not otherwise expressly admitted, qualified, or denied in this Answer.

## INTRODUCTION

1.      The Tribe admits that the National Indian Gaming Commission ("NIGC" and "Defendants") has approved an amendment to a gaming ordinance that the Tribe enacted for the development of a gaming facility at a site located in Butte County, California.  The Tribe denies that the NIGC's approval violated the law.  It further denies Plaintiff's remaining allegations, which constitute Plaintiff's description and characterization of the law to which no substantive response is required.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 1.

## PARTIES

2.      The allegation in paragraph 2 constitutes Plaintiff's description and characterization of itself to which no substantive response is required.

3.      The Tribe admits the allegation in paragraph 3.

4.      The Tribe admits the allegation in paragraph 4.

5.      The Tribe admits the allegation in paragraph 5.  The Tribe admits that the NIGC consists of a Chairman and two Commissioners, and that one of the two Commissioner positions (formerly occupied by Cloyce V. Choney) currently is vacant.

## JURISDICTION

6.     The Tribe admits that the Complaint appears to be an action for review pursuant to a federal statute, but denies that Plaintiff is entitled to the relief requested.

## VENUE

7.     The Tribe admits the allegation contained in paragraph 7.

## FACTUAL BACKGROUND

8.     The allegations contained in paragraph 8 constitute Plaintiff's own characterization of the Indian Gaming Regulatory Act ("IGRA").  To the extent Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and which is the best evidence of its legal effect.  To the extent any response is required, the Tribes denies any allegations in this paragraph inconsistent with IGRA.

9.     The allegations in this paragraph purport to recount the requirements of IGRA, which speaks for itself.  Because the allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribes denies any allegations in this paragraph inconsistent with IGRA.

10.     The allegations in paragraph 10 purport to recount the requirements of IGRA, which speaks for itself.  Because the allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribes denies any allegations in this paragraph inconsistent with IGRA.

11.     The allegations in paragraph 11 purport to recount the requirements of IGRA, which speaks for itself.  Because the allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribes denies any allegations in this paragraph inconsistent with IGRA.

12.     The Tribe denies the allegations in paragraph 12, and affirmatively asserts that it is federally recognized by the Secretary of the Interior pursuant to the Stipulation for Entry of Judgment (Chico Rancheria) entered on January 6, 1992, in *Scotts Valley v. United States*, No. C-86-3660-VRW (N.D. Cal.).

13.     The Tribe denies the allegations in paragraph 13.

14.     The Tribe denies the allegations in paragraph 14.

15.     The Tribe admits that it purchased a 630-acre parcel of land in Butte County, and that Defendants concluded the parcel qualifies as "restored lands" under IGRA if the land were taken into trust by the United States for the benefit of the Tribe.  The Tribe admits that it plans to develop a portion of the parcel for gaming purposes.  The Tribe denies the remaining allegations in paragraph 15.

16.     The Tribe denies the allegations in paragraph 16.

17.      The Tribe admits that it submitted an application to Defendants for the purpose of approving a management contract, and that the application included an environmental assessment of the 630-acre parcel, prepared under the supervision of the NIGC.  The Tribe denies the remaining allegations in paragraph 17.

18.     The Tribe admits that it submitted an application to the United States Department of the Interior for the purpose of accepting the 630-acre parcel into trust for the benefit of the Tribe, and that the trust application included an environmental assessment of the proposed gaming project, prepared under the supervision of the Department of the Interior.  The Tribe denies the remaining allegations in paragraph 18.

19.     The Tribe admits that a "Finding of No Significant Impact" was issued by the United States Department of the Interior with respect to the Tribe's application to take into trust the 630-acre parcel of land, and that the Finding of No Significant Impact included a description of this site.  The Tribe denies the remaining allegations in paragraph 19.

20.     The Tribe admits that the Acting General Counsel for the NIGC issued a determination dated March 14, 2003, that was concurred in by the Department of the Interior, Office of Solicitor, that concluded that the 630-acre parcel would qualify as "restored land" of a restored tribe pursuant to IGRA if taken into trust by the United States for the benefit of the Tribe, and that therefore gaming may be conducted by the Tribe on such land.  The Tribe denies the remaining allegations in paragraph 20.

21.     The allegation in paragraph 21 constitutes opinion, argument and legal conclusions, requiring no response.  Nonetheless, the Tribe denies this allegation.

22.     The Tribe admits that that it previously occupied lands known as the Chico Rancheria and that the federal government terminated the federal status of the Chico Rancheria purportedly pursuant to the California Rancheria Act of 1958.  The Tribe denies all remaining allegations in paragraph 22.

23.     The Tribe denies the allegations in paragraph 23.

24.     The Tribe denies the allegations in paragraph 24.

25.     The Tribe admits that tribal members lived and worked on the land owned and operated by the Bidwells.

26.     The Tribe denies the allegations in paragraph 26.

27.     The Tribe denies the allegation in paragraph 27.

28.     The Tribe denies the allegation in paragraph 28.

29.     The Tribe denies the allegations in paragraph 29.

30.     The Tribe denies the allegations in paragraph 30.

31.     The Tribe denies the allegations in paragraph 31.

32.     The Tribe denies the allegations in paragraph 32.

33.     The Tribe admits that its members drafted a Constitution in 1955, and that the Constitution was approved by the Commissioner of Indian Affairs on January 21, 1959.  The Tribe also admits that the federal government terminated the federal status of the Chico Rancheria purportedly pursuant to the California Rancheria Act of 1958.  The Tribe denies the remaining allegations in paragraph 33.

34.     The Tribe denies the allegation in paragraph 34.

35.     The Tribe denies the allegation in paragraph 35.

36.     The Tribe denies the allegation in paragraph 36.

37.     The Tribe denies the allegations in paragraph 37.

38.     The Tribe denies the allegation in paragraph 38.

39.     The Tribe denies the allegation in paragraph 39.

40.     The Tribe denies the allegation in paragraph 40.

41.     The Tribe denies the allegation in paragraph 41.  The Tribe affirmatively alleges that the proposed site is located approximately 10 miles from the former Chico Rancheria.

**CLAIMS FOR RELIEF**

42.     The Tribe avers that paragraph 42 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is required.

43.     The Tribe admits that on or about February 8, 2007, the Defendants approved a duly enacted amendment to the Tribe's gaming ordinance, and that such ordinance was enacted for the purpose of regulating the lawful operation of a gaming facility on lands owned by the Tribe.  The Tribe also admits that the Defendants had determined that the lands would constitute "restored lands" under the Indian Gaming Regulatory Act in the event those lands were taken into trust by the United States for the benefit of the Tribe.  The Tribe denies the remaining allegations in paragraph 43.

44.     The Tribe denies the allegation in paragraph 44.  The Tribe affirmatively alleges that the Defendants determined that the land in question would constitute "restored land," as defined by Section 20(b)(1)(B)(iii) of the Indian Gaming Regulatory Act, if taken into trust by the United States for the benefit of the Tribe.

45.     The Tribe denies the allegation in paragraph 45, and denies that Plaintiff is entitled to the relief requested.

46.     The Tribe avers that paragraph 46 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is required.

47.     The Tribe admits that on or about February 8, 2007, the Defendants approved a duly enacted amendment to the Tribe's gaming ordinance, but denies the remaining allegations in paragraph 47.

48.     The Tribe denies the allegations in paragraph 48.  To the extent that paragraph 48 contains a characterization of IGRA and Plaintiff has interpreted IGRA in such a manner as to serve its own purpose, the Tribe denies Plaintiff's interpretation.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its legal effect.  The Tribe denies that Plaintiff is entitled to the relief requested.

49.     The Tribe avers that paragraph 49 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is required.

50.     The allegations in paragraph 50 purport to recount the requirements of IGRA, which speaks for itself.  Because the allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with IGRA.

51.     The allegations contained in paragraph 51 constitute opinion, argument and legal conclusions to which no response is required.  To the extent that a response is required, the Tribe denies the allegations in paragraph 51.

- 8 -

52.     The Tribe denies the allegations in paragraph 52.

53.     The Tribe denies the allegation in paragraph 53, and denies that Plaintiff is entitled to the relief requested.

54.     The Tribe avers that paragraph 54 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is necessary.

55.     The allegation in paragraph 55 purports to recount the requirements of IGRA, which speaks for itself.  Because the allegation constitutes opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies the allegations in this paragraph to the extent it is inconsistent with IGRA.

56.     The allegations contained in paragraph 56 constitute opinion, argument and legal conclusions to which no response is required.  To the extent that a response is required, the Tribe denies the allegations in paragraph 56.

57.     The Tribe denies the allegations in paragraph 57.

58.     The Tribe denies the allegation in paragraph 58, and denies that Plaintiff is entitled to the relief requested.

59.     The Tribe avers that paragraph 59 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is required.

60.     The allegation in paragraph 60 purports to recount the requirements of IGRA, which speaks for itself.  Because the allegation constitutes opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies the allegation in this paragraph to the extent it is inconsistent with IGRA.

61.    The Tribe denies the allegations in paragraph 61.

62.    The allegations contained in paragraph 62 constitute opinion, argument and legal conclusions, to which no response is required.  To the extent that a response is required, the Tribe denies the allegations in paragraph 62.

63.    The Tribe denies the allegation in paragraph 63, and denies that Plaintiff is entitled to the relief requested.

64.    The Tribe avers that paragraph 64 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is necessary.

65.    The allegation in paragraph 65 purports to recount the requirements of IGRA, which speaks for itself.  Because the allegation constitutes opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies the allegation in this paragraph to the extent that it is inconsistent with IGRA.

66.    The allegations contained in paragraph 66 constitute opinion, argument and legal conclusions, to which no response is required.  To the extent that a response is required, the Tribe denies the allegations in paragraph 66.

67.    The Tribe denies the allegations in paragraph 67.

68.    The Tribe denies that Plaintiff is entitled to the relief requested.

## REQUESTED RELIEF

The remaining paragraphs are calls for relief.  The Tribe denies that Plaintiff is entitled to any of the relief, attorney's fees or costs requested.

## <u>INTERVENOR'S AFFIRMATIVE DEFENSES</u>

### <u>First Affirmative Defense</u>

The Complaint should be dismissed because the Plaintiff has failed to state a claim upon which relief may be granted.

### <u>Second Affirmative Defense</u>

The Complaint should be dismissed because the Plaintiff lacks standing to bring this action.

### <u>Third Affirmative Defense</u>

The Complaint should be dismissed because the Plaintiff's claims are not ripe.

### <u>Fourth Affirmative Defense</u>

The Tribe asserts all other affirmative defenses that may be revealed subsequent to this filing.

Wherefore, the Tribe respectfully requests judgment dismissing the Plaintiff's Complaint herein, together with all costs and reimbursement for defense of this action and for such other relief as the Court deems just and proper.

Respectfully submitted this 13 day of May 2008.


Mechoopda Indian Tribe of Chico Rancheria, California, Intervenor-Defendant,


By _____/s/ Nicholas C. Yost_____

| Michael J. Anderson, DC Bar 417887 | Nicholas C. Yost, USDC-DC Bar 968289[1] |
| Anderson Tuell LLP | Paula M. Yost, CA Bar 156843 |
| 300 Independence Avenue, SE | Katherine K. Moore, CA Bar 235958 |
| Suite 200 | Sonnenschein Nath & Rosenthal LLP |
| Washington, D.C. 20003 | 525 Market Street |
| Telephone: (202) 543-5000 | 26th Floor |
| Facsimile:  (202) 543-7716 | San Francisco, CA  94105-2708 |
| | Telephone: (415) 882-5000 |
| | Facsimile:  (415) 882-0300 |

Christina Kazhe, CA Bar 192158
Kazhe Law Group P.C.
8359 Elk Grove Florin Road
Suite 103287
Sacramento, CA 95829
Telephone: (916) 226-2590
Facsimile:  (916) 880-5691

---

[1] Mr. Yost is admitted to practice before this Court (USDC-DC Bar No. 968289).  Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar No. 35297).

# CERTIFICATE OF SERVICE

I certify that on May 13, 2008, I filed the above document via the Clerk of the

Court's Generic Email Box, which will send notice of electronic filing to the following:

Dennis Jeffrey Whittlesey
DICKINSON WRIGHT, P.L.L.C.
1901 L Street, NW
Suite 800
Washington, DC  20036
Tele:  (202) 659-6928
Fax:   (202) 659-1559
dwhittlesey@dicksinsonwright.com

Amy S. Tyron
U.S. DEPARTMENT OF JUSTICE
P.O. Box 44378
Washington, DC  20026-4378
Tele:  (202) 353-8596
amy.tryon@usdoj.gov

_____/s/ Kimberly J. Soto_____
Kimberly J. Soto

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BUTTE COUNTY, CALIFORNIA, 25 County Center Drive, Oroville, CA 95965, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No.:  1:08-cv-00519-HHK |
| PHILIP N. HOGEN, in his official capacity as CHAIRMAN OF THE NATIONAL INDIAN GAMING COMMISSION, 1441 L Street, N.W., Suite 9100, Washington, D.C. 20005, and NORMAN H. DESROSIERS, in his official capacity as COMMISSIONER OF THE NATIONAL INDIAN GAMING COMMISSION, 1441 L Street, Suite 9100, Washington, D.C. 20005, | ) ) ) ) ) ) ) ) ) ) ) | Judge:  Henry H. Kennedy, Jr. Deck Type:  Administrative Agency Review Date Filed:  03/26/08 |
| Defendants. | ) ) | **[PROPOSED] ORDER** |
| ——————————————— | ) ) ) | |
| MECHOOPDA INDIAN TRIBE OF CHICO RANCHERIA, CALIFORNIA, a federally recognized Indian Tribe, c/o Dennis E. Ramirez, Chairman, Tribal Offices, 125 Mission Ranch Boulevard, Chico, CA 95926, | ) ) ) ) ) ) | |
| Intervenor. | ) ) ) ) ) ) ) ) ) ) | |

Presently before the Court is the Motion to Permissively Intervene of Mechoopda Indian Tribe of Chico Rancheria, California, a federally-recognized Indian tribe, which seeks to pursue an economic development project that is directly challenged by this litigation.  After thoroughly reviewing all papers filed in support or opposition to this Motion, including any argument of legal counsel and other pleadings on file,  the Court finds that the Motion to Intervene is hereby GRANTED.

**IT IS SO ORDERED.**


_____                    _____
Dated                                                                                The Honorable Henry H. Kennedy, Jr.
                                                                                          United States District Court Judge